**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Mark J. Politan, Esq.
**POLITAN LAW, LLC**
88 East Main Street, #502
Mendham, New Jersey 07945
(973) 768-6072
mpolitan@politanlaw.com

-and

Robert J. Tolchin, Esq.
**THE BERKMAN LAW OFFICE, LLC**
111 Livingston Street, Suite 1928
Brooklyn, New York 11201
(718) 855-3627
rtolchin@berkmanlaw.com

*Attorneys for Diana Campuzano, Avi Elishis,*
*and Gregg Salzman*

|  |  |
|---|---|
| In Re:<br>AMERICAN CENTER FOR CIVIL JUSTICE, INC.<br><br>Debtor-in Possession. | Case No.:    18-15691 (CMG)<br>Chapter:      11<br>Judge:        Christine M. Gravelle<br><br>**Hearing Date and Time:**<br>**May 29, 2018 at 10:00 a.m.**<br><br>**ORAL ARGUMENT REQUESTED** |

**APPLICATION IN SUPPORT OF MOTION OF DIANA CAMPUZANO, AVI**
**ELISHIS AND GREGG SALZMAN TO APPOINT A CHAPTER 11 TRUSTEE**
**PURSUANT TO 11 U.S.C. § 1104(a) AND FED R. BANKR. P. 2007.1**

TO:    THE HONORABLE CHRISTINE M. GRAVELLE

      UNITED STATES BANKRUPTCY JUDGE

Diana Campuzano, Avi Elishis and Gregg Salzman (the "Movants"), by and through their undersigned counsel, hereby move for the appointment of a Chapter 11 trustee pursuant to 11 U.S.C. § 1104(a) (as amended, the "Bankruptcy Code"), and in support thereof, respectfully states as follows:

## PRELIMINARY STATEMENT

1. By way of background, the instant Creditors are the victims of a 1997 suicide bombing terror attack, *see Campuzano v Islamic Republic of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003) *("Campuzano"),* who entered into an association with the Debtor in 1998 under which arrangement the Debtor was supposed to assist Creditors in seeking compensation for their injuries. Though a judgment was obtained against Iran, the Debtor breached its fiduciary duties to the Creditors and gave preferential treatment to other terrorism victims who collected over $150 million, while Debtor took no action on behalf of Creditors. An action by Creditors for breach of fiduciary duty is pending in New York State Supreme Court, Nassau County against ACCJ and others, *Campuzano, et al. v. Sher, et al.,* Sup. Ct., Nassau County index no. 605379/16. A decision on a fully briefed summary judgment motion was scheduled to be handed down on March 28, 2018, and that action was scheduled for trial on April 9, 2018 (*See* Ex. A), but that trial was stayed pursuant to 11 U.S.C. § 362(a) by the ACCJ's filing of this Chapter 11 proceeding on March 23, 2018.

2. The Debtor's schedules and statement of financial affairs (collectively, the "Schedules") as originally filed failed to disclose that since 2014 the Debtor has been embroiled in a state court derivative action brought by one of Debtor's founding board members, Dr. Michael Engelberg ("Engelberg"), challenging the composition of the Debtor's board and contending that the Debtor essentially has been hijacked by rogue management which has engaged in self-dealing,

-2-

diversion of corporate assets and opportunities, waste of corporate assets, and mismanagement. That state court derivative action is styled *Michael Engelberg, derivatively on behalf of the American Center for Civil Justice, Inc. v. Eliezer Perr, Jedidiah Perr, Milton Pollack and American Center for Civil Justice, Religious Liberty and Tolerance, Inc., Defendants, American Center for Civil Justice, Nominal Defendant, and The New York Center for Civil Justice, Tolerance and Values, Inc., Additional Defendant on Counterclaims,* Supreme Court of the State of New York, Nassau County index number 606919/14. A copy of Engelberg's operative amended complaint in that derivative action is annexed as Ex. B; the operative answer and counterclaims served by the Debtor in that derivative action is annexed as Ex. C; the operative answer and counterclaims served by the individual defendants (Debtor's purported management) in that derivative action is annexed as Ex. D.[1] The state court presiding over the derivative action took the allegations very seriously, repeatedly denying motions to dismiss the various iterations of the complaint. (*See* Ex. F, Order entered April 23, 2015 denying motion to dismiss of defendants Eliezer Perr, Jedidiah Perr and Milton Pollack; Ex. G, Order entered June 22, 2016 denying

---

[1] The individual defendants included Eliezer Perr, his son Jedidiah "Jed" Perr, and Milton Pollack, and were all represented by the same counsel, Efrem Schwalb, Esq. of Koffsky Schwalb, LLC. Mr. Schwalb also represented the Debtor itself in the *Campuzano* matter. This demonstrates that there was a unity of interest between all these parties. Yet today the largest debt listed in the Petition and Schedules is an alleged $14.8 million debt to an organization called American Center for Civil Justice, Religious Liberty and Tolerance, Inc. ("ACCJ-RLT") (Schedule E/F, item 3.1) pursuant to an alleged 10 year agreement dated April 12, 2007 signed by Milton Pollack for the Debtor and Jedidiah Perr for the ACCJ-RLT. A copy of that agreement is annexed as Ex. E. Oddly, it was not originally listed on Debtor's Schedule G. The derivative action points to that very agreement as a major example of self-dealing, diversion of corporate assets and opportunities, and malfeasance. While years later, on April 6, 2017, new counsel appeared for Jedidiah Perr—the same counsel who represent ACCJ-RLT in the derivative action—it is telling that for the first three years of the case our present Debtor and its allegedly largest creditor functioned as one unit with the same counsel.

Engelberg's motion to dismiss counterclaims; Ex. H, Order entered May 18, 2017 granting Engelberg's motion to file an amended derivative complaint; Ex. I, Order entered November 30, 2017 denying motion to dismiss of defendants ACCJ-RLT and Jedidiah Perr).

3.      Justice Stephen Bucaria, the New York State Court judge who had been presiding over the derivative action and the *Campuzano* breach of fiduciary duty action until the filing of this bankruptcy proceeding, provided a useful summary of the litigation in an order entered January 2, 2018 (Ex. J). Tellingly, on January 4, 2018, two days after this order was issued, the Debtor purportedly convened a board meeting to authorize the filing of this Chapter 11 Proceeding. (Dkt. 8). Plainly, after reading Justice Bucaria's summary of the case, the Debtor was desperate to re-deal the deck and so filed this Chapter 11 proceeding hoping that maybe this Court would not have their number as clearly as Justice Bucaria.

4.      In an earlier order, Justice Bucaria described the 2007 agreement between the Debtor ACCJ and the ACCJ-RTL as "itself a violation of defendant Jedidiah Perr's fiduciary duty to [Debtor] ACCJ" and held that "[t]hus the entire agreement is infected by fraud." (Ex I, p. 6).

5.      This motion will show that given the pervasive issues of dubious corporate governance, mismanagement, blatant breach of fiduciary duty and legal malpractice, self-dealing and insider transactions, and managerial incompetence, it is inappropriate for the Debtor to remain in possession and a Chapter 11 Trustee should be appointed.

## ARGUMENT

### A.      Legal Standard Governing Appointment of Chapter 11 Trustee

6.      A debtor-in-possession "has the same fiduciary duties as a trustee appointed by a court" and "holds its powers in trust for the benefit of creditors." *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 524 (Bankr. E.D.N.Y. 1989). A debtor-in-possession owes creditors "the

highest duties of care and loyalty," and must "protect and conserve property in its possession for the benefit of creditors." *In re Nartron Corp.*, 330 B.R. 573, 593 (Bankr. W.D. Mich. 2005); *In re Marvel Entm't Group, Inc.*, 140 F.3d 463, 474 (3d Cir. 1998) (quotation marks omitted).

7.      Indeed, "[t]he willingness of Congress to leave a debtor-in-possession [in control of its assets and business] is premised on an expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee." *In re V. Savino Oil*, 99 B.R. at 526. If a debtor-in-possession defaults in this duty, courts do not hesitate to replace a debtor-in-possession with a disinterested trustee who will "preserve the integrity of the bankruptcy process and [] insure that the interests of creditors are served." *In re Celeritas Techs., LLC*, 446 B.R. 514, 518 (Bankr. D. Kan. 2011).

8.      Section 1104 of the Bankruptcy Code governs the appointment of a chapter 11 trustee. Pursuant to section 1104(a), a court must order the appointment of a chapter 11 trustee if "cause" exists, or where "such appointment is in the interests of creditors." 11 U.S.C. § 1104(a). Specifically, section 1104(a) states:

(a)      [a]t any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1)      for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2)      if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

*Id.*

9.      The standard for appointing a trustee pursuant to § 1104(a) is disjunctive. *See In*

*re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989). Subsection (a)(1) addresses management's pre- and post-petition misdeeds or mismanagement, while subsection (a)(2) provides the court with "particularly wide discretion" to direct the appointment of a trustee even in the absence of wrongdoing or mismanagement. *In re Bellevue Place Associates*, 171 B.R. 615, 623 (N.D. Ill. 1994).

### B.    Cause Exists to Appoint a Trustee

10.    A court must appoint a trustee if "cause" exists. *See Sharon Steel*, 871 F.2d at 1226 (recognizing that "[s]ection 1104(a) mandates appointment of a trustee when the bankruptcy court finds cause"); *In re Oklahoma Refining Co.*, 838 F.2d 1133, 1136 (10th Cir. 1988); *Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.)*, 285 B.R. 148, 158 (Bankr. D. Del. 2002) (where the court finds either that cause exists or that appointment is in the interest of the parties, an order for the appointment of a trustee is mandatory). The grounds for appointing a trustee pursuant to section 1104(a)(1) of the Bankruptcy Code are illustrative, not exhaustive, and the "court need not find any of the enumerated wrongs to find cause for appointing a trustee." *In re Oklahoma Refining Co.*, 838 F.2d at 1136*; In re Marvel Entertainment Group, Inc.*, 140 F.3d at 472; 7 Collier on Bankruptcy I 104.02[3][c] (15th ed. Rev. 2003) (noting "fraud, dishonesty, incompetence and gross mismanagement…are not the exclusive bases for finding cause for the appointment of a trustee").

11.    A court may consider management's pre- and post-petition misconduct when determining whether cause exists to appoint a trustee. See 11 U.S.C. § 1 104(a)(1*); In re V. Savino Oil & Heating Co., Inc.,* 99 B.R. at 526. Other considerations include (a) the severity of any misconduct, (b) the debtor-in-possession's evenhandedness (or lack thereof) in dealings with insiders and affiliates versus dealings with other creditors, (c) the existence of pre-petition

preferences or fraudulent conveyances, (d) whether conflicts of interest impair the debtors' ability to fulfill its fiduciary duties, (e) whether there has been self-dealing or a squandering of estate assets, and (f) the "inability to formulate a business plan and make operating projections which have a longevity of more than several months" coupled with operating losses (*i.e.,* incompetence). *In re Keeley & Grabanski Land P'ship*, 455 B.R. 153, 163 (B.A.P. 8th Cir. 2011); *In re Ionosphere Clubs, Inc.,* 113 B.R.164, 170 (Bankr. S.D.N.Y. 1990).

12.    Here, several factors establish cause to appoint a trustee. Among other things:

### i.    *Present Management is Inextricably Conflicted*

13.    This proceeding was commenced by the filing of a petition signed by Eliezer Perr (Dkt. 1) purportedly following authorization at a meeting of the Board of Directors of the Debtor (Dkt. 8).[2]

14.    The problem with this is that the constitution of the Board of Directors, and by extension the authority of Eliezer Perr to serve as president and act for the Debtor, is uncertain. The derivative action filed by Dr. Michael Engelberg, one of Debtor's founding board members, presents multiple causes of action seeking the removal of Eliezer Perr, his son Jedidiah Perr (alleged to be a *de facto* board member) and Milton Pollack as board members (Ex B, 4th, 5th, 6th and 9th causes of action) based on allegations of fraud and breach of fiduciary duties. Engelberg's complaint particularizes specific instances of fraud, such as the diversion of $2.1 million from the Debtor to the ACCJ-RLT (Ex. B, ¶¶ 266, *et seq.*), and provision of false information to the IRS (Ex. B, ¶¶ 281, *et seq.*). Justice Bucaria summarized Dr. Engelberg's claims as follows:

---

[2] Debtor does not provide any information as to who was present at that board meeting. All that has been provided is a certification from Eliezer Perr that there was a board meeting and that an unidentified quorum was present and passed a resolution. (Dkt. 8).

In September 2013, ACCJ adopted amended by laws, providing that ACCJ would have no members and would be managed by the board of directors. Engelberg was allegedly a director of ACCJ at all relevant times

On December 29, 2014, Engelberg commenced a derivative action against [Eliezer] Perr and other officers or directors of ACCJ for breach of fiduciary duty. Engelberg alleges that the defendants have diverted over $20 million of ACCJ funds to profit and not-for-profit companies which they own or control. Engelberg further alleges that defendants have donated over $837,000 of ACCJ funds to various Jewish and educational organizations unrelated to ACCJ's purpose of obtaining compensation for victims of terrorist activity.

Engelberg alleges that Eliezer and Jedidiah Perr diverted settlement proceeds to another not-for-profit, the American Center for Civil Justice, Religious Liberty, and Tolerance, Inc., which Jedidiah Perr established in New Jersey. Engelberg further alleges that Jedidiah Perr diverted terrorism litigation to the American Recovery Center ("ARC"), a for-profit limited liability company of which he is the sole member. Finally, Engelberg seeks an accounting as to the affairs of the ACCJ.

In their answer, defendants Eliezer Perr, Jedidiah Perr, and Milton Pollack assert counterclaims against Engelberg for breach of fiduciary duty, and a declaratory judgment that plaintiff Engelberg is not a director of ACCJ. Defendants allege that Plaintiff Engelberg has enriched himself by paying himself over $1.2 million between 2001-2003 from the ACCJ, as well as $340,000 in pension contributions. While Perr and Pollack purport to assert these counterclaims individually, the[y] are actually derivative claims on behalf of ACCJ. Additionally, defendants allege that Engelberg channeled funds to a charity which he controlled, the New York Center for Civil Justice, Tolerance & Values, Inc. The New York Center obtained its tax exempt status by representing to the Department of the Treasury that it met the 1/3 "public support test."

On March 14, 2016, Joseph Orlow and other individuals who claimed to be innocent board members of the New York Center for Civil Justice, Tolerance & Values brought a derivative action against Engelberg for breach of fiduciary duty and seeking to remove him as a board member. Orlow alleges that Engelberg enriched himself by diverting $4.3 million of ACCJ's charitable assets to the New York Center. Orlow asserts that the New York Center is not a bona fide charitable organization.

On June 21, 2016, in view of the reciprocal claims of breach of fiduciary duty on the part of the directors of the ACCJ, the court on its own motion restrained the parties from conducting any unauthorized activities, not authorized by the

-8-

certificate of incorporation, or paying out or transferring any property of ACCJ, except in the ordinary course of business or by permission of the court. The court directed the parties to submit an accounting of the affairs of ACCJ for the five years preceding the commencement of the action. The balance sheet of ACCJ, which was submitted in response to the order, showed net assets of $1,942,300.75, as of June 30, 2016. Since ACCJ's net assets were $5,915,477.09 on March 31, 2011, its net assets had decreased by $3,973,176.34 in a little over a five year period.

* * *

By orders dated September 29 and November 16, 2016, Campuzano's motion for an order of attachment was granted as against defendants Engelberg and ACCJ in the amount of $9,512,860, the pro rata portion of her judgment which she would have recovered had ACCJ filed a claim with the federal restitution fund on her behalf. * * *

On July 27, 2016, in view of Engelberg and Perr's reciprocal claims of breach of fiduciary duty, and Campuzano's order of attachment, this court restrained defendants Sher, Engelberg, Perr, and ACCJ from disbursing any funds of ACCJ, whether in the ordinary course of business or otherwise, pending further order of the court. (Cf. N-PCL § 1113).

(Ex. J, pp. 4-6).

15.    Given these serious allegations and cross-allegations of fraud and corporate governance failures, and given the fact that these serious allegations remain unresolved, it is impossible to allow the Debtor to remain in possession. In this case, "Debtor in possession" effectively means Eliezer Perr in control, signing the pleadings and making decisions. Among the decisions he would have to make are decisions about how the Debtor will handle the disposition of the Engelberg derivative action. Yet Eliezer Perr, and his son Jedidiah Perr, and board member Milton Pollack, are all personally named as defendants in that derivative action (Ex. B). Plainly Eliezer Perr and Milton Pollack are conflicted and cannot possibly be relied upon to "carry out the fiduciary responsibilities of a trustee." *In re V. Savino Oil*, 99 B.R. at 526.

16.    Indeed, this conflict manifested itself in a very significant way very recently. The parties to the derivative suit had spent two years engaging in intermittent settlement negotiations.

On November 30, 2017 the state court issued an order denying the motion to dismiss for lack of personal jurisdiction of the defendant ACCJ-RLT (referred to in the order as the "New Jersey Center"), and freezing the assets of that organization, which is controlled by Eliezer Perr's son, Jedidiah Perr (Ex. I). Thereafter, a settlement was negotiated, resulting in a settlement agreement signed by all interested parties resolving the corporate governance claims, and merging the ACCJ and the ACCJ-RTL, and providing for the retirement of Eliezer Perr and Milton Pollack. (Ex. K). All that was left to implement that settlement was for the parties to have the agreement reviewed by the Charities Bureau of the New York State Attorney General and to obtain approval of the settlement by the court presiding over the derivative action. However, rather than run the last lap on this long-negotiated settlement, Eliezer Perr filed a Chapter 11 petition, and did not even disclose the existence of the *Engelberg* derivative action (Dkt. 20, p. 22, listing pending litigation but omitting *Engelberg* derivative action and numerous other litigations; and p. 19, Schedule G, omitting to list the settlement agreement as an executory contract). So the question becomes: when was Eliezer Perr acting in the interests of the Debtor, and when was he was acting in his own interests—on December 7, 2017 when he signed the settlement agreement and committed to promptly seek Attorney General and court approval, and to retire, or on March 23, 2018 when he signed the bankruptcy petition?

17.     Plainly, the appointment of a neutral, disinterested Chapter 11 trustee, unburdened and unbridled by the antagonistic history between these parties, will enable this matter to proceed in a fair and equitable fashion. A trustee can be trusted much more to protect the interests of the creditors than these factions who have been at war over their own self-interests for years.

### ii.     *Debtor's Management is Too Personally Entangled With Adverse Parties to Remain in Possession*

18.     As noted above, a debtor-in-possession "has the same fiduciary duties as a trustee

appointed by a court" and "holds its powers in trust for the benefit of creditors." *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. at 524. In this case, it is impossible for present management to hew to this standard, as it is far too personally entangled with adverse parties with whom it needs to negotiate to remain impartial and faithful to its duties to arm's length creditors.

19.     The starkest example is the largest single creditor listed in the Petition and Schedules, a claimed debt of $14,818,844 to the "American Center for Civil Justice Religi[ous Liberty and Tolerance, Inc.]" listed as undisputed in the Petition and Schedules.[3] As the state court judge has already noted, this entity (referred to in the state court case with the shorthand "New Jersey Center") is an entity created by Eliezer Perr's son Jedidiah Perr. A copy of the 2012 IRS Form 990 filed by this ACCJ-RLT entity is attached as Ex. M. On the first page it lists Jedidiah Perr as the principal officer, and on page 8 it represents that Jedediah Perr spends 50 hours per week working for the entity, whereas the other people listed spend no more than two hours per week. *Id.* Plainly, the ACCJ-RTL must be regarded as a non-statutory insider of the Debtor. This presents a serious problem for the Debtor, given Engelberg's contention that Jedediah Perr acted during relevant times as a "*de facto* board member" of the Debtor ACCJ.

20.     Indeed, it is not only Engelberg's contention that Jedidiah Perr is involved in the operation of the Debtor. Eliezer Perr testified:

Q.      Who else assists you with running American Center for Civil Justice?

A.      When I'm over my head.

Q.      When you're over your head?

A.      Okay, and then the board can't help me I will call my son to help me.

---

[3] Petitioner originally filed a Petition without schedules (Dkt. 1). Then Petitioner filed the missing schedules (Dkt. 20), amended schedules (Dkt. 37), and a strange self-serving explanatory certification (Dkt. 38). Petitioner's filings are still very deficient as numerous items are omitted, as came to light at the 341 meeting (Ex. L, transcript of April 19, 2018 341 meeting).

* * *

Q.      When you're over your head, what does your son do to assist?

A.      I can't tell you, magic.

Q.      What you're doing is you're going to cause me to serve a 2004 exam on your son by answering "magic." Do you want to clarify? A 2004 exam is a deposition. If you don't know, you don't know.

A.      I don't know, I don't know.

Q.      Magic—

A.      I don't know, take out magic, I don't know.

Q.      Magic is red flags.

A.      I don't know.

(Ex. L, Tr. of 341 meeting, pp. 62-63).

Q.      Do you speak to your son about the business of the center?

A.      Yes.

Q.      How frequently do you do that?

A.      I can't answer that question.

Q.      Why not?

A.      Because I don't keep a time schedule, I'm not an attorney.

Q.      Do you speak to your son every day?

A.      Pretty much.

Q.      And when you speak to him you talk about business?

A.      Sometimes yes, sometimes no.

Q.      Do you know how many employees are employed by the New Jersey Center?

A.      No, I don't.

Q.      Is it your understanding that your son is the principal employee and CEO of that organization?

A.      I never discussed it, I don't know.

Q.      Do you know the name of any other person who is affiliated with that?

A.      I'm not involved, I don't know.

Q.      You don't know?

A.      No.

(Ex. L, Tr. of 341 meeting, pp. 131-32).

21.      According to Eliezer Perr's testimony at the 341 meeting, the purported uncontested debt to the ACCJ-RLT arises pursuant to a 2007 agreement between the Debtor ACCJ and his son's entity the ACCJ-RLT However, that 2007 agreement was not listed as an executory contract in Schedule G (Dkt. 20, 37). A copy of that 2007 agreement, which was for a 10 year term commencing in April 2017, is attached as Ex. E.

22.      Remarkably, however, at the 341 meeting Eliezer Perr claimed to be unable to explain this $14.8 million debt to his son's organization:

Q.      So the—what you're calling the New Jersey Center is listed as having a claim against the debtor on the petition; is that correct?

A.      Yes.

Q.      You listed it as $14,818,844?

A.      If that's what it says, that's what it says.

Q.      And you said that there's an agreement between the debtor and the New Jersey Center?

A.      So I understand it, yes.

Q.      Who signed that agreement?

A.      I don't remember.

Q.      Did you sign that agreement?

A.      I don't remember, no, I don't remember.

Q.      Did that agreement require—

A.      I certainly didn't sign it.

Q.      Did that agreement require the New Jersey Center to perform some services or do some work?

A.      You don't have to—

Q.      In order to be entitled to be paid $14 million.

A.      I did not negotiate it, I was not involved with it, I can't answer the question.

Q.      Did you ever read it?

A.      I don't think so.

Q.      Did you ever sign it?

A.      No, not to my knowledge.

Q.      You said the board reaffirmed it in 2013 or so?

A.      I was not—I didn't sign it.

Q.      Were you at the board meeting where it was reaffirmed?

A.      I stepped out.

Q.      You stepped out of the meeting, why did you do that?

A.      Because I didn't want to run conflict of interest.

Q.      Why would there be a conflict of interest?

A.      Figure it out yourself.

Q.      I'm asking you, sir.

A.      I don't know.

Q.      You don't know why there would be a conflict of interest?

A.      At this moment, no.

Q.      Would it be because your son was the control person in the New Jersey Center?

A.      Look, this will ride out in court this business. I can't answer the question, I'm not going to answer.

Q.      Why aren't you going to answer?

A.      Because I don't know.

Q.      Is that a false claim that you put on the petition?

A.      No, no, it's not.

Q.      What?

A.      It's not to my knowledge.

Q.      How did you come up with the number $14.8 million?

-14-

A.      Ask our attorney.

Q.      Where did that number come from?

A.      Ask Mr. Sher, the attorney.

Q.      Ask Mr. who?

A.      Mr. Sher.

Q.      Mr. Neal Sher made up that number?

A.      I don't know if he made that up, he's more knowledgeable than I.

Q.      Can you show me where Neal Sher's signature appears on the petition?

A.      He's not a board member.

Q.      He didn't sign this petition under penalty of perjury, did he?

A.      No, he didn't.

Q.      You did sir, correct?

A.      That's right.

Q.      So before you signed the petition under penalty of perjury, did you review the information contained on it and make sure that it was accurate?

A.      I did advise my—either the controller—

Q.      Answer the question, sir, did you review the information and make sure this was accurate?

A.      No, I did not, I assumed it to be so.

Q.      So you're saying you have no idea whether the information contained in the petition was accurate. Is that correct, sir?

A.      What's your question?

Q.      Do you have any idea whether the information contained in the petition is accurate?

JEDEDIAH PERR:     (Inaudible.)

Q.      Mr. Jed Perr, please stop talking to the witness.

MR. SPONDER:       We're not taking a break right now.

A.      No breaks. Can you repeat your question?

Q.      As of today, sir, do you have any idea whether the information contained in the petition is accurate?

-15-

A.      I assume all the papers here are accurate and that's why they're signed as such.

Q.      What did you do to verify the accuracy of the number $14,818,844 listed as the claim for the American Center for Civil Justice Religious. It's cut off, but the New Jersey Center.

A.      I trust the accountant or the controller or my lawyer.

Q.      Did you actually talk to an accountant or a lawyer or a controller about that number before you signed the petition?

A.      I consulted everything here and I was told it's accurate.

Q.      Who did you consult about that $14.8 million number?

A.      I don't recall that particular thing.

Q.      That's a little thing, $15 million, right? Win some, lose some.

A.      You know.

Q.      Did you speak to Mr. Sher about that number?

A.      I can't—I do not know.

Q.      You do not know? So as you sit here today, is it a fact that you cannot give us even the general contours of where that $14.8 million number comes from.

A.      I cannot.

(Ex. L, Tr. of 341 meeting, pp. 134-40).

23.     The reason for Eliezer Perr's obviously feigned ignorance of the basis for the alleged debt to the ACCJ-RLT lies undoubtedly in the allegations that were advanced by Engelberg in the derivative action about this very 2007 agreement. Engelberg's counsel explained the issue in a brief to the New York State Appellate Division, Second Department, as follows:

> **ACCJ Is Called to Account By The IRS.** From early in 2012, Jed Perr and Engelberg were working on IRS inquiries concerning ACCJ's Form 990 filings with JoAnn Luehring, an attorney retained by ACCJ. The IRS inquiries would ultimately require that ACCJ explain the *Franqui* and *Collett* litigations and its collections from them.
>
> In a November 14, 2012, e-mail to Jed, cc'd to Eli Perr and Engelberg, Ms. Luehring stated that Jed had not addressed her concerns and that she was "puzzled

that your father [Eli] is not responding to me and my concerns directly." Ms. Luehring added that "frankness is called for in this situation."

Shortly thereafter, Ms. Luehring was discharged and replaced by another tax attorney, Marcus Owens, of Caplin & Drysdale.

In January 2013, Engelberg hired his own counsel, Jonathan Bach of Cooley LLP. Engelberg, through Bach, called for a special meeting of the Board of ACCJ on the IRS inquiry and the $2,646,000 transferred to the New Jersey Center. This was rebuffed.

After further demands for information, ACCJ's counsel, Caplin & Drysdale, began in or about September 2013 to share information with Mr. Bach.

**The Backdated 2007 Agreement.** In September 2013, Caplin & Drysdale provided attorney Bach with the draft of a letter to the IRS and two documents. The documents consisted of a single page, styled "Minutes of Board of Directors" of ACCJ, dated April 1, 2007, signed by Pollack, and a two-page agreement between ACCJ and the New Jersey Center dated April 12, 2007, signed by Pollack for ACCJ and by Jed Perr for the New Jersey Center. The parties refer to this crucial document as the "2007 Agreement."

Upon receipt, Bach responded that Engelberg "was not aware of these documents or of their contents and has never seen them before."

Bach also pointed out "red flags": the minutes did not mention a quorum or recusal by Eli Perr, and are "anomalous in that it was *generally not the practice of the ACCJ to make or keep board minutes* (or to hold board meetings at all)." (Italics supplied.)

**The Terms of the 2007 Agreement.** The 2007 Agreement glibly recites that "ACCJ does not see itself able to effect collection and recovery from Iran and Libya" and provides that the New Jersey Center "shall be the *exclusively authorized entity* representing Recovery Efforts on behalf of ACCJ and ACCJ's Claimants." (emphasis added).

Under the 2007 Agreement, the New Jersey Center would be entitled to 50% of ACCJ's share of recoveries. The agreement also provided that ACCJ "is hereby assigning to the New Jersey Center, *all ACCJ's interests in Libya claims*, which won't be subject to the 50% sharing…."

Bach raised obvious questions: "What unique services did the New Jersey Center have to offer? What background or experience did Jed Perr provide? He lacks a college education and had no relevant experience at the time." Bach pointed to a

raft of documents that contradicted the supposed existence of the agreement and expressed concern that false information was being provided to the IRS.

**Defendants' Conduct, and the 2007 Agreement, Are Inconsistent.** Defendants' behavior from April 2007 through much of 2014 was inconsistent with the April 2007 Board minutes and the 2007 Agreement.

As noted, Pollack, for ACCJ, signed the collections retainer agreement with DLA Piper in November 2007. The retainer does not refer to the New Jersey Center. It is implausible that Pollack would sign such an agreement just months after signing the purported 2007 Agreement providing that the New Jersey Center will "*represent ACCJ in all matters related to Recovery Efforts.*"

Further, when ACCJ recovered approximately $10 million as a result of the Libya claims in 2009, it did not pay over the entire amount to the New Jersey Center, as the 2007 Agreement would require.  Instead, it retained the $7,360,000 it received in its 2009 fiscal year in the *Ambush* litigation. It diverted to the New Jersey Center the *Collett* monies from a separate Libyan matter and, on information and belief, an additional amount from Fischel, a claimant in the *Franqui* case.  All these funds represented ACCJ's "interests in Libya claims," supposedly assigned to the New Jersey Center.  ACCJ's retention of this $7,360,000 was inconsistent with the terms of the 2007 Agreement.

Jed Perr also behaved inconsistently with the 2007 Agreement, by holding himself out as a representative of, and carrying out core responsibilities for, ACCJ. He signed a revised agreement with DLA Piper in 2011 as "attorney in fact" for ACCJ.  That agreement made no mention of the New Jersey Center.

In the period 2011 to 2014, Jed sent memos on ACCJ letterhead to claimants and signed them on behalf of ACCJ. (Many of these were designed to  mislead  the claimants into revising their Claimant and Center Agreements so ACCJ could take more from their recoveries.)

**ACCJ's Draft Responses To The IRS.** The draft responses to the IRS also support the conclusion that the 2007 Agreement was fabricated and backdated to facilitate a cover-up.

The explanations of the supposed Board approval of the agreement changed from one draft to the other. The earlier draft disclosed that the "son of the Executive Director of ACCJ" is the Executive Director of the New Jersey Center. It also stated that the 2007 Agreement was approved at a Board meeting and that the "Executive Director [Eli Perr] recused himself from the discussion of, and vote to approve, the agreement"

The December 12, 2013 draft states, in a footnote, that one of the New Jersey Center's "Board members is a son of ACCJ's *present* Executive Director," but states that when the Board approved the 2007 Agreement, "ACCJ's current Executive Director was *neither an official nor a Board member* of the ACCJ and therefore did not vote on the approval of the Agreement." The representation that Eli Perr was not a Board member on April 1, 2007, is belied by Eli's own declaration under penalty of perjury, dated April 13, 2009, where he stated: "I have served on the Board of Directors of The American Center for Civil Justice . . . since its formation in 1996. I have at various times served as the President of the Center, and I currently serve on its Board."

Both draft letters to the IRS purport to justify and explain diversion of $2,010,000 (the *Collett* monies) to the New Jersey Center on the ground this was required under the 2007 Agreement, where ACCJ had allegedly assigned all its interests in Libya claims. This explanation was disingenuous, because the $7.3 million ACCJ retained for itself was also from Libya claims.

Both draft letters incorrectly state that *Franqui* claimants were awarded $59 million. The correct amount, including $3 million awarded to Fischel, was $62 million. This was not disclosed because it would have led to the discovery that $600,000 from Fischel had been routed to the New Jersey Center.

(Ex. N, Brief of Engelberg filed in *Engelberg v. Perr,* NY App. Div. 2d Dep't docket no. 2015-5938, June 8, 2017, pp. 11-16) (citations to appellate record omitted) (emphasis and modifications in original).

24.     Clearly, Eliezer Perr and his son Jedidiah Perr are inextricably personally entangled in the convoluted relationship between the ACCJ and the ACCJ-RTL. Not only is there a direct and obvious personal involvement with each other, there are credible claims of a long history of passing money between the organizations and the son acting on behalf of the father's organization, as articulated in Engelberg's brief. There is further a long history of the son acting on behalf of the father's organization, as illustrated with various letters sent by Jedidiah Perr on behalf of the Debtor ACCJ concerning collection of judgments, inexplicably sent long after the alleged 2007 agreement that supposedly transferred responsibility for collections to the ACCJ-

RLT (Ex. O). And there is the specter of personal criminal consequences for relating to the submission of false information to the IRS, outlined by Engelberg, which means that besides each being entangled with the other's organization, these individuals have their own personal legal status to worry about.

25.    It should be noted that the lawyer from Caplin & Drysdale mentioned by Engelberg, Marcus Owens, Esq., who was involved with the submissions to the IRS, now with the firm Loeb & Loeb, LLP, personally continued to represent the Debtor until the filing the Petition, and is listed on the Petition and Schedules as among the top 20 creditors. Given the history and the information about the Debtor and the Perrs that Mr. Owens undoubtedly has in his possession, this presents another entanglement preventing present management from acting impartially and for the benefit of the creditors rather than for self-preservation.

26.    Numerous other entanglements abound.

27.    The Creditors represented by the undersigned, Diana Campuzano, Avi Elishis, and Gregg Salzman, have brought an action for breach of fiduciary duty against not only the Debtor ACCJ and Dr. Engelberg, but also the ACCJ's General Counsel, Neal Sher, Esq., who it should be mentioned had no legal malpractice insurance. Thus, Mr. Sher is facing the possibility of a judgment for $19 million plus years of interest against himself, as well as the possibility that such judgment will be trebled under New York's Judiciary Law § 487 (allowing for treble damages in the case of fraud or collusion by an attorney). Obviously, Mr. Sher has a gigantic financial motivation to manage things for his own personal benefit, rather than the benefit of creditors of the ACCJ—of which Campuzano, Elishis and Salzman are among the largest. Given that the ACCJ

only has four employees,[4] and that Mr. Sher is the General Counsel, one cannot overstate the conflict.

28.    Similarly, Eliezer Perr and Jedidiah Perr, as well as the ACCJ and the ACCJ-RTL, and Neal Sher are all named as defendants in *Ambush v. Engelberg,* D.D.C. docket number 15-cv-1237, in which the plaintiff seeks $31.8 million for breach of contract and RICO damages. (*See* Joshua Ambush, Claim Register No. 2). Obviously Eliezer Perr and Neal Sher cannot be relied upon to act for the benefit of creditors in this case where not only are they personal defendants, but the claimant is a creditor. It should be noted as well that Eliezer Perr was evasive at the 341 meeting when asked even what the Ambush case is about:

Q.    Do you understand, sir, the general nature of what Mr. Ambush claims?

A.    He claims violation of a settlement agreement.

Q.    What settlement agreement was that?

A.    I don't recall, it's going back a lot of years.

Q.    A settlement agreement of a case?

A.    No.

Q.    What kind of a settlement was it?

A.    I don't recall

Q.    Do you have a copy of that settlement agreement?

A.    Not at hand.

---

[4] After pulling teeth to get him to answer these simple questions, Eliezer Perr testified at the 341 meeting that the four employees are Eliezer Perr, General Counsel Neal Sher, Esq., secretary and board member Simone Beckeled, and controller Harris Tanenbaum (Ex. L, Tr. of 341 meeting, pp. 93-97). At the 341 meeting Eliezer Perr testified that no family members were employed ("Q. [A]re any of your family members employees of the company? / A. No.") (Ex. L, Tr. of 341 meeting, p. 32). After the 341 meeting, Eliezer Perr filed a bizarre certification supplementing various aspects of his testimony in which he for the first time stated that Harris Tanenbaum is actually his son-in-law (Dkt. 38). This is a further entanglement with the ACCJ-RTL, since Jedidiah Perr and Harris Tanenbaum are apparently brothers-in-law.

Q.      Do you have it anywhere in the world?

A.      Yep.

Q.      Where would that be?

A.      It would be in the office.

Q.      Did you violate the settlement agreement?

A.      No, not to my knowledge.

Q.      Did the settlement agreement require you to pay money to Josh Ambush?

A.      No, it was a settlement.

Q.      Well, usually in a settlement one person gives up his claim and the other one pays some money.

A.      Joshua Ambush paid some money.

Q.      Josh Ambush paid you money?

A.      Mm-hmm, American Center, yeah.

Q.      Did he pay that money?

A.      Yes, he—the insurance paid or he paid, I don't recall.

(Ex. L, Tr. of 341 meeting, pp. 99-101).

29.      The claim of Koffsky Schwalb, LLC presents another similar entanglement. That law firm represented Eliezer Perr and Milton Pollack personally in the *Engelberg* derivative action, but represented the Debtor ACCJ in the state court litigation with Creditors Campuzano, Elishis and Salzman. When that firm moved to be relieved as counsel on the ground of non-payment of legal fees by the Debtor ACCJ in the Campuzano litigation, the state court denied that application, finding:

Motion by Koffsky Schwalb LLC for leave [to] withdraw as counsel for defendants Eliezer Perr and Milton Pollack in the above action is denied. Although counsel alleges that defendants have failed to pay $74,000 in legal fees, counsel has not established that defendants have deliberately disregarded an obligation to counsel as to the payment of fees or expenses. (See Rule 1.16[c][5] of the Professional Conduct Rules). The court notes that Koffsky Schwalb was granted a legal fee in

-22-

the amount of $149,300, to be paid by defendant American Center for Civil Justice, Inc. on March 20, 2017.

(Ex. P, Order in *Engelberg v. Perr,* Feb. 28, 2018) (emphasis omitted). The $149,300 payment referenced was made in the Campuzano case. Thus, the state court judge perceived the inter-relatedness of both cases and Koffsky Schwalb's dual representation of Eliezer Perr and Milton Pollack in one case, and the Debtor ACCJ itself in the other case (with still another lawyer representing the ACCJ as a nominal defendant in the derivative case). Plainly, present management cannot be expected to have solely the best interests of creditors at heart in trying to negotiate a resolution of Koffsky Schwalb's claim for legal fees against the Debtor ACCJ when at the same time Koffksy Schwalb has a claim for legal fees against Eliezer Perr and Milton Pollok personally.

30.     The settlement agreement resolving the state court derivative action also gives rise to personal entanglements that prevent the Debtor's present management from acting as faithful stewards of the Debtor's assets for the benefit of creditors. That settlement agreement had, *inter alia*, Eliezer Perr, Jedidiah Perr and Neal Sher as signatories. (Ex. K). Pursuant to that agreement, the ACCJ and the ACCJ-RTL were going to be merged. If those two entities merge, then that would eliminate the alleged $14.8 million claimed debt from the ACCJ to the ACCJ-RTL. Keeping the organizations separate and posturing as if ACCJ owes the ACCJ-RCL $14.8 million on an undisputed claim is contrary to the interests of all the other creditors of the ACCJ; merging the organizations as was agreed pre-Petition would leave that $14.8 million available to satisfy debts to creditors.

### iii.     *Debtor's Purported Management is Confused, Ill-Informed, Evasive, and Not Up to the Task of Managing the Affairs of the Debtor in a Chapter 11 Context*

31.     Beyond the conflicts and personal entanglements that prevent present management from being proper stewards of the Debtor's assets for the benefit of creditors, it is

also pellucid that present management is not competent to do so. Eliezer Perr's performance at the 341 meeting showed him to be confused, ill-informed, evasive, and not up to the task.

Illustrations abound.

There is no doubt that the *Engelberg* derivative action has been one of the defining, existential issues being confronted by the Debtor for years. Another critical issue has been the *Campuzano* litigation, since the Debtor is exposed in that case to a judgment of $19+ million plus years of interest. Indeed, over $650,000 of legal bills relating to these two cases are listed in the Debtor's Schedule E/F: the creditors Koffsky & Schwalb, LLP, Loeb & Loeb, LLP, and the Weinreb Law Firm, PLLC, all of whom represented the Debtor in that litigation. Hundreds of thousands more have already been paid. Moreover, because of the asset freeze orders entered by the state court in those cases the Debtor has been unable to do much of anything at all these past few years except litigate these two cases. Yet Eliezer Perr—incredibly—testified at the 341 meeting that he does not know what either case is about. Asked about the *Engelberg* derivative case, Eliezer Perr testified as follows:

Q.      Which litigation is that part of?

A.      There's litigation between Engelberg's and—the litigation of Engelberg against myself and against the—

Q.      That case is called Engelberg versus Perr?

A.      I don't know what it's called.

Q.      You don't know the name of the case?

A.      I don't know the name of the case.

Q.      Is that a case in Nassau County?

A.      In Nassau County.

Q.      In front of Judge Bucaria?

A.      Yes.

Q.      In that litigation you are personally a party?

A.      I don't recall.

Q.      You don't know if you're a party?

A.      I don't know, I don't know.

Q.      You just said that Engelberg started a litigation against yourself. Didn't you just say that?

A.      You take everything literally. Okay, the litigation is what speaks for itself, okay.

Q.      Which litigation speaks for itself?

A.      I'm not going to answer.

MR. SPONDER:      So you're refusing to answer, sir?

THE WITNESS:      I don't have an answer. I don't know what he's talking about.

MR. SPONDER:      So ask him to clarify.

A.      You want to repeat your question?

Q.      You said a moment ago that there's litigation involving Dr. Engelberg's claim that certain claimants should be regarded as clients of the debtor. Do you recall saying that?

A.      I am not a lawyer to speak in legalese terms. There's a litigation between Engelberg and myself going on for six years, I do not know the name of the case and I'm not a specialist on it. It's either taken care of the by attorneys or Sher takes care of it and that's it.

Q.      But you're a part of that case, Elie Ezer Perr is part of that case?

A.      I do not know, I don't read the papers and I don't take part in it.

(Ex. L, Tr. of 341 meeting, pp. 115-18).

      32.      Eliezer Perr's testimony was equally incredible regarding the Campuzano matter. It should be recalled that a summary judgment motion in that case was fully briefed and marked fully submitted on March 2, 2018. Trial was scheduled for April 9, 2018 (Ex. A). The state court had appointed a special master to conduct a mediation (Ex. A). The last session of the mediation— at which Eliezer Perr was personally present—was held on March 19, 2018, just four days before the Petition was filed. Yet Eliezer Perr claimed at the 341 meeting that he does not pay attention

to the case:

> Q.      You do not know? So as you sit here today, is it a fact that you cannot give us even the general contours of where that $14.8 million number comes from.
>
> A.      I cannot.
>
> Q.      Would the same apply to Diana Campuzano's claim?
>
> A.      I do not know where it's from.
>
> Q.      Do you have even the foggiest notion of what Diana Campuzano's claims you owe her money for?
>
> MR. NEUMANN:      We're not talking about that. Don't answer the question. It's pending litigation.
>
> Q.      Well, last month when we sat in a mediation session, trying to negotiate a settlement of Diana Campuzano's claim, did you know what the case was about?
>
> A.      I still don't know what it was about.

(Ex. L, Tr. of 341 meeting, pp. 139-40).

> Q.      Do you know whether the American Center for Civil Justice submitted opposition papers to a summary judgment motion in that case?
>
> A.      I don't know.
>
> Q.      Have you ever read any document in the case of Diana Campuzano, Avi Elishis and Greg Salzman versus the American Center for Civil Justice et al.?
>
> A.      Hardly, hardly. I'm not—I don't pay attention to it.

(Ex. L, Tr. of 341 meeting, pp. 122-23).

> Q.      Elishis. * * * 5.6 million, do you recall what that's for?
>
> A.      That's what they're suing us for, I don't know—I don't have the figures.
>
> Q.      What are they suing you for?
>
> That's my question.
>
> A.      They're suing because they feel we should—that the American Center was obligated to tell them about a certain property and we didn't tell them about a property, something like that. I'm not very clear about that lawsuit to begin with.
>
> Q.      And you dispute that they're owed any money?
>
> A.      Dispute what.

Q.      The debtor disputes?

A.      I dispute that I owe it, yeah.

(Ex. L, Tr. of 341 meeting, pp. 59-60).

33.      Eliezer Perr further asserts that he does not know what the $31.8 million claim

filed by Joshua Ambush is about:

Q.      Joshua Ambush $38.8 million, that's disputed?

A.      Yes

Q.      What claim is that, that's a claim he brought against the debtor?

A.      Yeah.

Q.      Do you recall what it was for?

A.      Absolutely not.

(Ex. L, Tr. of 341 meeting, p. 67).

Eliezer Perr could not explain the $11,818,844 listed on Schedule A/B as "accounts

receivable 90 days old or less." (Dkt. 20, p. 6). His response was nonsensical:

Q.      Does the debtor set forth on its schedules and accounts receivable of $11.8
million and that all $11.8 million is uncollectible. Can you explain that?

A.      That's money that's coming to us by—from different sources for work that
was extended and agreements that were made and that's about it.

Q.      Well, what this says is that you have accounts receivable 11.8 million and
that you're not going to be getting the 11.8 million?

A.      Because I have no way to collecting it.

Q.      Your answers were opposite. So take a breath.

A.      If it's not collectible, if it's not collectible, it's not collectible, that's it.

Q.      Well, you're the one that did it, so—

A.      Right, right.  It's not collectible, I don't recall exactly the break on things.

Q.      Okay, you don't remember where it is?

A.      No, I know there's—you'll continue the questions, there's other moneys
coming to us that probably is collectible.

* * *

MR. SPONDER:        I'm going to need with that 11.8 million (inaudible).

A.        I don't recall that.

Q.        Number 11 on Schedule AB. So I think Mr. Neumann is showing you Schedule 11AB, question 11 which sets forth accounts receivable, 90 days older or less.

MR. SPONDER:        So I guess it is 90 days old or less.

Q.        11.8 million.

A.        I don't recall, I don't have the paperwork in front of me right now.

Q.        Okay, what paperwork do you need?

A.        I don't know notes it was written from, I don't recall.

MR. SPONDER:        So those written notes, Mr. Neumann, I'm going to need.

(Ex. L, Tr. of 341 meeting, pp. 42-43).

34.        Debtor's schedules assert that the Debtor has a $19 million claim to assert against

the law firm DLA Piper. Yet Eliezer Perr could not explain what the claim was about:

Q.        All right, there's an unliquidated claim against DLA Piper for damages and indemnification. Amount requested $19 million. Can you explain that, Mr. Perr?

A.        Yeah, I didn't do much—well, I can't tell you the figure where it comes from. But whatever damages we feel that that's the party that should be sued here, he breached an agreement. As far as we're concerned he breached an agreement with the American Center and is liable for whatever other liabilities are.

Q.        So the debtor's intent is to file a lawsuit against DLA Piper?

A.        At this point, yes.

Q.        But you don't know where the $19 million amount number came in?

A.        I don't recall.

(Ex. L, Tr. of 341 meeting, pp. 51-52).

35.        Another substantial matter listed in the Petition and Schedules is Paul Gaston, a

lawyer who is identified as "holding in escrow $712,522.50, but he has claims against this money."

(Dkt. 20, p. 10). As substantial a sum of money as this is, Eliezer Perr has no idea what Mr.

Gaston's claims are; indeed, his testimony reads like a Laurel and Hardy bit:

Q.    Paul Gaston, 712,000?

A.    Yes, he represents victims, yes.

Q.    And it says here he has claims against the amount of 712,000. Do you know what his claims are?

A.    According to the agreement made with him representing the clients, so it's owed to him.

Q.    That didn't answer my question.

A.    Repeat the question.

Q.    That's fine.    What amount is possibly owed to him of the 712,000 that he's claiming to be—

A.    We're not contesting that.

Q.    All right, so you're contesting that so you don't—

A.    I'm not contesting it, I'm not contesting it.

Q.    So then what's the answer?

A.    What's the question?

Q.    That's fine. I can ask the question over and over again. $712,000 is owed to Mr. Gaston?

A.    Yeah.

Q.    You set forth on the schedules he has claims against the money.

A.    Yes

Q.    I'm asking you how much are his claims?

A.    Total amount.

Q.    The entire amount?

A.    Okay, yeah.

Q.    And that's pursuant to a contract?

A.    Yes

(Ex. L, Tr. of 341 meeting, pp. 48-49).

Q.      All right, Paul Gaston you list as a secured creditor 712,000 but disputed. Before you told me that you think he might be owed the entire amount, but it's disputed as to that. So you don't think he's owed the entire amount?

A.      It's abnormally complicated, it's between how many clients owe him and he owes them. I can't answer that right now. That has to be worked out.

Q.      When can you answer it?

A.      I can't even answer that.

Q.      How do you answer that?

A.      I'll have to call whatever—Gaston and discuss with him possibly.

Q.      Is there a contract that explains what he's owed?

A.      Somewhere yes.

(Ex. L, Tr. of 341 meeting, pp. 56-57).

Q.      What's the nature of the fee dispute with Mr. Gaston?

A.      I don't know.

Q.      Who would know that?

A.      I don't know the name, I would have to ask Mr. Gaston and Mr. Sher.

Q.      Do you have any dispute with Mr. Gaston?

A.      No.

Q.      So I can ask Mr. Gaston for his side of the story?

A.      You can ask him.

Q.      Who would know your side of the story?

A.      I don't know.  I'm not involved in the financial things in any case, I don't know.

(Ex. L, Tr. of 341 meeting, pp. 132-33).

36.     Eliezer Perr could not explain multiple other details. For example, he could not explain why the schedules list payroll payments generically, i.e. "payroll," instead of listing who was paid, or why the payroll listing (Dkt. 20, p. 27) strangely states that negative numbers were paid (Ex. L, Tr. of 341 meeting, pp. 77-78). He does not know the Debtor's accounting basis or

calendar year. (Ex. L, Tr. of 341 meeting, pp. 71-72). Basically, Eliezer Perr knows next to nothing about the multi-million dollar operation he has run into bankruptcy, and now seeks to run for the benefit of its creditors.

37.     One should not take solace that at least Eliezer Perr has a General Counsel to turn to. Though still licensed as an attorney in New York, Sher has been disbarred in Washington, D.C. for submitting false expenses for reimbursement to his then employer, the International Commission on Holocaust Era Insurance Claims. He also had received a one year bar suspension for this in New York in 2005, which ended May 19, 2006. *See In re Sher*, 15 A.D.3d 123 (2d Dep't 2005). Mr. Sher's background hardly casts him as a reliable fiduciary.

### iv.     *Debtor Has Mismanaged Claimants' Cases, Exposing Debtor to Millions of Dollars of Potential Liability*

38.     The claims of Creditors Campuzano, Elishis, and Salzman themselves are further proof that Debtor's present management is not fit to be managing millions of dollars of claims as fiduciaries for creditors. A copy of these creditors' summary judgment briefing from state court was previously submitted as Ex. A to the motion for relief from the automatic stay (Dkt. 29-3). One can see from the exposition there of the defendants' numerous failings and episodes of abysmally poor judgment do not recommend them as trustworthy fiduciaries.

### v.     *A Trustee Ought to Be Appointed*

39.     Simply put, current management is not up to the task of reorganizing this estate. They are also so personally involved that they cannot bring themselves to recognize that resolving the claims of all the creditors in a fair, equitable, and legal way, will require them to recognize that their organization may not be able to continue, and that the gravy train of transferring money from the Eliezer Perr's ACCJ to Jedidiah Perr's ACCJ-RTL may have to end. Present management's

stubborn intransigence, bad judgment, and apparent utter ignorance of the issues that confront them have gotten the Debtor where it is today. Present management its inability and/or unwillingness to make the hard, disciplined decisions required to save the Debtor's business and deliver value to creditors. Cause exists to appoint a Chapter 11 trustee.

### C.    A Trustee is in the Best Interests of Creditors

40.    As an alternative, section 1104(a)(2) of the Bankruptcy Code provides for the appointment of a trustee when such appointment is in the "practical realities and necessities" to determine if a trustee is in the best interest of the estate and its creditors. *Id.* at 168.

41.    Courts consider the following factors to determine whether a trustee is in the best interest of creditors: (a) the debtor's trustworthiness; (b) the debtor's past and present performance and prospects for rehabilitation; (c) the confidence (or lack thereof) of the business community and creditors in present management; and (d) the benefits to be derived from a trustee, balanced against the cost of the appointment. *See In re Cajun Electric Power Co-Op, Inc.*, 191 B.R. 659, 661-62 (M.D. La. 1995) aff'd 74 F.3d 599 (5th Cir. 1996), cert. denied, 117 S. Ct. 51 (1996). Each of these factors supports the appointment of a trustee in these cases:

42.    As demonstrated in Section B, *supra*, the Debtor is far from trustworthy. The Debtor's present management are inextricably entangled with significant creditors, the largest of which is controlled by the son of Debtor's president, Eliezer Perr, who himself has no knowledge or insight into the major existential issue presently confronting the organization. Moreover, Eliezer Perr's testimony at the 341 meeting was evasive and hostile, and did not bespeak a person who is genuinely interested in maximizing the return to creditors. Finally, the fact that the Debtor's general counsel is a disbarred lawyer who was disbarred for submitting false expense account claims to a fund for Holocaust victims does not bode well for their trustworthiness.

-32-

43.     The past performance of present management similarly gives little hope for an outcome favorable to creditors. As the state court judge noted (Ex. J), in the five year period immediately before the state court's imposition of an asset freeze order the Debtor dissipated about $4 million. Had the asset freeze not been put in place there would likely be nothing left. Indeed, present management has not disputed the alleged debt to the ACCJ-RTL, suggesting that if left to their own devices, the Debtor would allow the lion's share of the assets of the Debtor to go to this non-statutory insider, just as substantial sums of money have been shifted there in the past. It should also be recalled that present management's mismanagement and refusal to resolve claims is what got the Debtor to this point.

44.     As to the confidence of the business community in present management, since this is not a true business little can be said. It is doubtful, though, that any true business community would put much stock in an amnesiac and a disbarred lawyer to act as fiduciaries for creditors.

45.     On the other hand, appointing a trustee would provide a very substantial benefit and is well worth the associated costs. A properly qualified trustee would be able to ascertain the facts of each debt and credit of the estate, and bring claims to a calm, sober, and professionally deliberate resolution. Anyone who reads the transcript of the 341 meeting can readily see that present management will never be able, or perhaps will never desire, to do this.

46.     Based on the foregoing, the Court should appoint a trustee pursuant to 11 U.S.C. § 1104(a). A trustee is necessary to "preside in an objective and impartial manner to bring the case to a swift and successful conclusion." *Id.* at 663.

## NOTICE

47.     Notice of this Motion has been provided to (i) counsel for the Debtor, Broege, Neumann, Fischer & Shaver, L.L.C., attn.: Timothy P. Neumann, Esq.; (ii) the Office of the United

States Trustee, Region Three, attn: Jeffrey Sponder, Esq.; (iii) the 20 largest creditors; and (iv) all parties having formally requested notice via CM/ECF.

## **MEMORANDUM OF LAW**

48.    In accordance with D.N.J. LBR 9013-1, the Movants submit that no memorandum of law is necessary at this time, because the facts and applicable law are adequately set forth herein. However, they specifically reserve the right to file a separate memorandum of law in reply to any objections which may be interposed or issues raised with respect to the relief requested herein.

## **CONCLUSION**

**WHEREFORE**, for all of the foregoing reasons, the Movants respectfully request that this Court direct the appointment of a Chapter 11 Trustee pursuant to 11 U.S.C. § 1104(a) and Fed R. Bankr. P. 2007.1.

Dated: May 8, 2018

Respectfully submitted,

**POLITAN LAW, LLC**
Mark J. Politan, Esq.
502 East State Street, #502
Mendham, New Jersey 07945
Telephone:    (212) 407-7700
Email: mpolitan@politanlaw.com

-and-

**THE BERKMAN LAW OFFICE, LLC**

By:     /s/ Robert J. Tolchin

Robert J. Tolchin
111 Livingston Street, Suite 1928
Brooklyn, New York 11201
(718) 855-3627
rtolchin@berkmanlaw.com

*Counsel to Diana Campuzano, Avi Elishis
and Gregg Salzman*