# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

MICHAEL ENGELBERG, derivatively on behalf of
THE AMERICAN CENTER FOR CIVIL JUSTICE,
INC.,

                 Plaintiff,

                -against-

ELIEZER PERR, JEDIDIAH PERR, MILTON
POLLACK, and THE AMERICAN CENTER FOR
CIVIL JUSTICE, RELIGIOUS LIBERTY AND
TOLERANCE, INC.,

                Defendants,

THE AMERICAN CENTER FOR CIVIL JUSTICE,
INC.,

                Nominal Defendant.

THE NEW YORK CENTER FOR CIVIL JUSTICE,
INC.,

                Additional Defendant on the
                Counterclaims.

Index No.

**AMENDED VERIFIED
DERIVATIVE COMPLAINT**

The basis for venue is Plaintiff's
residence.

Nassau County is designated by
Plaintiff as the place of trial

Plaintiff Michael Engelberg (the "Plaintiff" or "Dr. Engelberg"), by and through the

undersigned attorneys, hereby submits this Amended Verified Derivative Complaint (the

"Complaint") for the benefit of nominal defendant, The American Center for Civil Justice, Inc.

f/k/a The Raoul Wallenberg Center for Civil Justice, Inc., (the "ACCJ" or the "Center") against

certain current members of its Board of Directors (the "Board") and executive officer(s), and a

related *alter ego* entity, and alleges upon personal knowledge as to his own acts, and as to all

other matters upon information and belief, as follows:

FILED: NASSAU COUNTY CLERK 03/31/2017 01:35 PM

NYSEC DOC. Case 18-15691-CMG    Doc 43-4    Filed 05/08/18    Entered 05/08/18 21:30:37    Desc
Exhibit B - Operative complaint in Engelberg Derivative Litigation    Page 3 of 75

INDEX NO. 606919/2014

RECEIVED NYSCEF: 03/31/2017

## NATURE OF THE CASE

This is a case about the effective privatization of a not-for-profit entity, the ACCJ, by a father and son duo, defendants Eliezer Perr ("Rabbi Perr" or "Elie Perr") and Jedidiah Perr ("Jed Perr") (collectively, the "Perrs"), who control its management and Board, and used their respective positions of authority as officers and directors to siphon off, both directly and indirectly, over $20 million dollars of charitable funds to other shell for-profit and not-for-profit entities, owned and controlled by them. Not only have the Perrs used ACCJ funds for private gain and caused ACCJ to violate the Internal Revenue Code's (the "IRC") ban on private inurement, but they essentially have treated the ACCJ as their own personal piggy bank, donating over $800,000 to various Jewish religious and educational organizations entirely unrelated to, and beyond the scope of the Center's charitable mission.

The ACCJ is a not-for-profit advocacy organization founded by the Plaintiff and Rabbi Perr, dedicated to representing the victims of some of the deadliest state sponsored terrorist attacks by Hamas and Hezbollah in recent history. Established in 1996, when the Foreign Sovereign Immunities Act ("FSIA'') was amended to permit civil suits against terrorist states by their U.S. victims and create a federal cause of action for private citizens, the Center's mission is to advocate for and assist victims in bringing lawsuits in the United States against countries that condone and sponsor terrorist acts around the world. For over a decade, Dr. Engelberg engaged counsel and personally funded ACCJ sponsored litigations against the Islamic Republic of Iran ("Iran") and Libya, representing the estates of victims and/or their family members based on powers of attorney that were given to him by individual claimants. In return, the claimants entered into agreements with the ACCJ in which they agreed to pay 20% of the share in any recovery, including legal fees, to the Center to support its mission. By the mid- 2000s, multi-

million dollar judgments and/or settlements were obtained and collection efforts were underway in these cases.

By the late 2000s, as the ACCJ's share of settlement proceeds from the cases against Libya was received and recoveries from the collection efforts in the litigations against Iran were imminent, the Perrs sought to divert funds to themselves through entities set up by Jed Perr, who was leading collection efforts by this time as the Plaintiff had been diagnosed with multiple myeloma and was undergoing treatment. Over $2.5 million dollars of settlement proceeds from the Libyan cases was transferred unlawfully to The American Center for Civil Justice, Religious Liberty and Tolerance, Inc. (the "New Jersey Center"), a not-for-profit founded by Jed Perr, its principal officer and director.  Jed Perr also set up the American Recovery Center, LLC f/k/a American Center for Recovery, LLC ("ARC"), a for-profit single member limited liability company personally owned by him and used his position as a representative of the ACCJ to usurp business opportunities for ARC. Based on misrepresentations by the Perrs that the ACCJ and ARC were somehow related to each other, agreements were entered into with third parties, in which ARC, rather than the ACCJ, was retained as the consultant to assist with collection efforts for service fees potentially worth a minimum of $18 million. Upon finding out that the Perrs had shamelessly used their positions of authority and control as de facto officers and directors of a charitable organization for private profit in flagrant violation of their fiduciary duties, for over two years the Plaintiff has, both individually and through counsel, sought to obtain more information, called for Board meetings and requested an accounting, all to no avail. The Perrs have stonewalled him at every turn and been overtly hostile; fabricated documents post hoc, including Board minutes, in an attempt to justify the transfer of funds to Jed Perr's New Jersey Center as a 'lawful' assignment, providing false and misleading information to the

Internal Revenue Service (the "IRS"); and effectively ousted the Plaintiff from the organization, falsely claiming that he was no longer a representative, Board member or the Executive Director of the Center.

At the same time, the Perrs have attempted to have individual claimants revoke the Plaintiff's powers of attorney with them and fraudulently induced and sought to coerce claimants into signing new agreements with the ACCJ that would provide for additional fees to private persons and/or entities, including Jed Perr's ARC, as "other professionals/personnel" retained by the ACCJ to assist with recovery efforts. Such a blatant abuse of control and authority by the Perrs as defacto officers and directors of a not-for-profit organization for private gain of more than $20 million must be accounted for, as it comes at the considerable expense of the ACCJ's reputation as a charitable organization entrusted by the claimants to advocate on their behalf and represent their interests as victims of terrorist attacks.

## THE PARTIES

### A.    Plaintiff

1.    Plaintiff, Dr. Engelberg is an individual residing at 75 Woodmere Blvd., South Woodmere, New York 11598. In 1996, the Plaintiff, a practicing pediatrician until then, decided to devote his life and work full-time to advocate for victims of terror and founded the ACCJ. Since then, he has been, and currently is, one of the two members of the ACCJ as well as a member of the Board. He was the Executive Director of the Center from 2009 through 2012.

### B.    Nominal Defendant

2.    Nominal Defendant, the ACCJ is a not-for-profit victims' rights advocacy organization, organized under the laws of the State of New York, with its principal place of

business at 1331 55th Street, Brooklyn, New York 11219. It is recognized by the IRS as a tax-exempt organization described in Section 50l(c)(3) of the IRC.

### C.    Defendants

3.      Defendant Rabbi Perr is an individual residing at 16 Cactus Drive, Lakewood, New Jersey 08701. Since the Center's inception in 1996, Rabbi Perr has been, and currently is, one of the two members of the ACCJ as well as a Board member.

4.      Defendant Jed Perr is an individual residing at 23 Fem Street, Lakewood, New Jersey 08701 and the son of Rabbi Perr. Jed Perr acts as the ACCJ's principal and is a de facto officer of the Center since the mid-2000s.

5.      Defendant Milton Pollack is an individual residing at 11220 72°d Drive, Apt C35, Forest Hills, New York 11375. Pollack currently serves on the Board of the ACCJ and has been a Board member 1999. He was formerly the President of the ACCJ.

6.      Defendants Rabbi Perr, Jed Perr and Milton Pollack (the original defendants in this action) are collectively referred to hereinafter as the "Defendants".

7.      The New Jersey Center (sometimes referred to herein as the "Joined Defendant") is a not-for-profit corporation incorporated in the State of New Jersey with its principal place of business at 422 Martin Luther King Drive, Lakewood, New Jersey 08701. Jed Perr is the Principal Officer and a director of the New Jersey Center.

7A.  As detailed below, the individual Defendants exercised complete dominion and control over the New Jersey Center and the ACCJ, and used such dominion and control to commit wrong, fraud, the breach of a legal duty, and/or a dishonest and unjust act, by depriving the ACCJ of assets, revenues and opportunities, in order to benefit the New Jersey Center, and

FILED: NASSAU COUNTY CLERK 03/31/2017 01:35 PM
NYSCEF DOC. NO. 1
INDEX NO. 606919/2014
RECEIVED NYSCEF: 03/31/2017

Case 18-15691-CMG    Doc 43-4    Filed 05/08/18    Entered 05/08/18 21:30:37    Desc
Exhibit B - Operative complaint in Engelberg Derivative Litigation    Page 7 of 75

thus defendant Jed Perr (whose salary is paid by the New Jersey Center), which resulted in injury to ACCJ.

**D.      Entity Not Named Defendant**

8.      ARC is a for-profit single member limited liability company incorporated in the State of New Jersey on April 19, 2012, for the business purpose of "consultation and research", with a registered office at 422 Martin Luther King Drive, Lakewood, New Jersey 08701. Jed Perr is the sole member of ARC.

<u>**JURISDICTION AND VENUE**</u>

9.      This Court has jurisdiction over this action pursuant to N-PCL §§720(a) and (b) which authorizes 5% or more of any class of member of a domestic corporation to bring an action to: (i) require the directors and officers of a New York not-for-profit to account for the neglect of, or failure to perform or other violation of their duties in the management and disposition of corporate assets committed to their charge; (ii) require the directors and officers of a New York not-for-profit to account for the management of corporate assets and for acquisition to themselves, transfer to others, loss or waste of corporate assets in violation of their fiduciary duties and to recover all resulting damages from such officers and directors; and (iii) set aside an unlawful conveyance, assignment or transfer of corporate assets, where the transferee(s) knew of its unlawfulness.

10.      Further, N-PCL §714(c) authorizes an action by 10% of the members to seek removal of an officer for cause, including violations of his/her fiduciary duties and N-PCL§ 706(d) authorizes an action by 10% of the members, to seek removal of a director for cause, including violations of his/her fiduciary duties.

FILED: NASSAU COUNTY CLERK 03/31/2017 01:35 PM
NYSCEF DOC. NO. 1

INDEX NO. 606919/2014

RECEIVED NYSCEF: 03/31/2017

Case 18-15691-CMG   Doc 43-4   Filed 05/08/18   Entered 05/08/18 21:30:37   Desc
Exhibit B - Operative complaint in Engelberg Derivative Litigation   Page 8 of 75

11.     This Court has personal jurisdiction over the Defendants and ACCJ pursuant to C.P.L.R. §301 and §302 because the ACCJ is located in New York and Defendants are directors and/or officers of the ACCJ, because the claims stated herein arise out of the Defendants' acts and omissions in the State of New York, and because the ACCJ and Defendants regularly conduct business in the State of New York and, therefore, are residents for jurisdictional purposes.

12.     Venue is proper pursuant to C.P.L.R. §502 based on the location of Plaintiff's residence.

### DEFENDANTS' DUTIES

13.     As officers and/or directors of a corporation, Defendants have the responsibility to promote the interests of the organization that they serve, generally understood to entail three fiduciary duties under New York law: the duty of care, the duty of loyalty and the duty of obedience.

14.     The duty of loyalty requires that Defendants must make decisions that they believe are in the best interest of the organization -- not decisions that further their own interests or the interests of a third party. The duty of loyalty also requires that as directors and officers, Defendants not use their positions in the organization, or knowledge acquired through their association with the organization, to advance a personal agenda or usurp a business opportunity at the organization's expense.

15.     The duty of care requires that as officers and/or directors, Defendants act with common sense and reasonably informed, good faith, rational judgment without the presence of a conflict of interest. Directors and officers must do what is necessary to become and stay informed on important organizational matters. In addition, directors are expected to attend and

participate in regularly scheduled board meetings, review materials and information given to them, evaluate appropriate courses of action, and exercise reasonable supervision over officers and employees. Further, fulfilling the duty of care requires that they make sure that procedures are in place so that Board decisions are made in a disinterested manner, that any personal financial interests of Board members are disclosed, and that individuals with personal financial interests cannot vote in favor of those interests.

16.    The duty of obedience requires that as directors and/or officers, Defendants be faithful to the mission of the organization. The organization's resources and activities must be used to further its own mission and not diverted to benefit private parties or to other charitable purposes.

17.    Section §717 N-PCL requires that as officers and/or directors of a not-for-profit corporation, Defendants discharge the duties of their respective positions in good faith and with the care an ordinarily prudent person would exercise under the circumstances.

18.    Defendants, because of their positions of control and authority as directors and/or officers of the ACCJ, were able to, and did, directly and indirectly, exercise control over the wrongful acts complained of herein and breached each of their fiduciary duties of care, loyalty and obedience.  As further detailed below, they also used the New Jersey Center as a part and instrumentality of their breaches of duty to the ACCJ.

## SUBSTANTIVE ALLEGATIONS

### HISTORY AND BACKGROUND

I.    **The Genesis of the ACCJ**

19.    Rabbi Perr and Dr. Engelberg have a long-standing relationship for over 45 years. Plaintiff met Rabbi Perr at the age of 21 when he was a student at the Rabbi's Yeshiva for two

years. The two grew close over time and the Plaintiff came to rely on Rabbi Perr for advice and

guidance. With time, the relationship took on a familial role and Rabbi Perr became Plaintiff's

mentor, spiritual advisor and surrogate father.

20.     Over the years, the two would discuss myriad things, including how to help the

Jewish community and various ways to achieve this goal.

21.     In or around early 1996, Rabbi Perr brought to Plaintiff's attention, proposed

legislation, The Anti-Terrorism Bill, Pub L. No. 104-132, that would amend the FSIA and create

the "State Sponsored Terrorism Exception" to permit civil suits against terrorist states by their

U.S. victims. The bill was signed into law on April 24, 1996.

22.     Dr. Engelberg, who had the resources, decided to start an organization to support

victims of terrorism, advocate on their behalf and initiate contact with victims of terrorist attacks

to assist in bringing lawsuits.

23.     The first successful such effort was assisting and supporting Stephen Flatow,

whose daughter had died from a terrorist attack on a civilian bus in Gaza on April 9, 1995. The

organization helped him engage counsel and actively advocated on his behalf for a further

amendment to the FSIA, which created a federal cause of action for private citizens. On

September 30, 1996, the bill, identified as the Flatow Amendment, became law. The State

Sponsored Terrorism Exception to the FSIA and the Flatow Amendment are hereinafter

collectively referred to as the "1996 FSIA Amendments".

24.     With this began Plaintiff's second career. A practicing pediatrician until then, Dr.

Engelberg decided to devote the rest of his life's work and effort to advocate on behalf of victims

of terror.

25.    On November 21, 1996, the organization was formally incorporated as a not-for-profit entity, The Raoul Wallenberg Center for Civil Justice Center, Inc., named after the heroic Swedish diplomat, Raoul Wallenberg, who rescued thousands of Jews in Nazi-occupied Hungary during the Holocaust and who has been the recipient of numerous humanitarian awards, including the honorary title of "Righteous Among the Nations" by Israel.

26.    The Center's mission was to advocate for the civil rights of United States citizens who were the victims of state-sponsored terrorism. The original members of the Center were Dr. Engelberg and Rabbi Perr. Under New York's Not-for-Profit law, as a membership organization, the ACCJ Board is not self-perpetuating. Only members can appoint and remove members of the Board.

27.    The initial directors of the Center were Rabbi Perr, Dr. Engelberg and Channah Ginsburg. In 1999, defendant Milton Pollack replaced Channah Ginsburg as a director and the Raoul Wallenberg Center for Civil Justice Center, Inc. formally changed its name to the American Center for Civil Justice, Inc.

**The ACCJ's Role**

28.    Following the enactment of the Flatow Amendment, interest by law firms in representing victims of terrorism rose substantially given the enormous potential for large awards and correspondingly, substantial legal fees. However, most law firms taking on such cases on a contingency basis required a large share of the recovery. In addition, law firms routinely required a large retainer that many of the individual victims could not advance.

29.    To accomplish its mission, and on the premise that lawsuits are an effective deterrent to international terrorists and their financial backers, the ACCJ entered into written agreements with victims of terrorism or the estate representatives of murdered victims (the

"Claimant and Center Agreements"), under the terms of which, the ACCJ would advance funds for litigation and retain law firms and individual lawyers to prosecute the claims on behalf of victims of terrorism.

30. In most instances, the ACCJ's authority to act on behalf of the claimants and retain and supervise the efforts of counsel was pursuant to a power of attorney granted by the individual plaintiffs to Dr. Engelberg, personally. The powers of attorney, a representative sample of which is attached hereto as **Exhibit 1**, give Dr. Engelberg ''full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about claims being asserted and litigation being commenced" against persons or entities responsible for injuries or death arising from the terrorist attack in particular, "including but not limited to the selection of counsel and settlement authority."

31. The Claimant and Center Agreements provide that the Center will "undertake to secure counsel and cause such litigation to be commenced on behalf of claimant[s]" against the government and related entities that conspired with the perpetrators of terrorist acts and that the Center undertakes to be responsible for "funds necessary for the investigation, expenses, costs and disbursements necessary to commence such litigation".

32. In exchange, "[i]n consideration of the ongoing efforts and services of the Center to assist other victims of oppression and to deter further acts of terrorism, and in order to promote the Center's ability to carry out its goals and purposes" each claimant agreed to pay the Center, a portion of the net proceeds of any recovery, ranging from 15% to 20%, and to reimburse the Center's legal fees and expenditures. The Center and Claimant Agreements emphasize, however that the "total in the aggregate, including legal fees, expenditures and

FILED: NASSAU COUNTY CLERK 03/31/2017 01:35 PM
NYSCEF DOC. NO. 1
INDEX NO. 606919/2014
RECEIVED NYSCEF: 03/31/2017
Case 18-15691-CMG   Doc 43-4   Filed 05/08/18   Entered 05/08/18 21:30:37   Desc
Exhibit B - Operative complaint in Engelberg Derivative Litigation   Page 13 of 75

pledges is not to exceed 20% of Claimant's recovery from the Litigation." A representative

sample of the Center and Claimant Agreements is attached as **Exhibit 2** hereto.

33.    Thus, critical to the Center's ability to establish the Center and Claimant

Agreements is the assurance that the Center pays legal fees and expenses, and that the Center's

share will not exceed 20% of the Claimant's recovery, enabling the Claimant to retain 80% of

the recovery.

### III.    Litigations Are Brought on Behalf of Various Claimants

34.    After the enactments of the 1996 FSIA Amendments, Dr. Engelberg actively

worked to identify cases that met the Center's goals and retained counsel to commence cases

against Iran and Libya arising out of some of the most heinous terrorist acts in recent history.

35.    In each case, there was an express agreement between Dr. Engelberg, as attorney-

in-fact for the respective claimants, and the law firm regarding the terms on which the legal fees

would be paid. The fee arrangements varied, including in some cases straight contingency

arrangements and hybrids of hourly and contingent arrangements. In each case, Dr. Engelberg

was involved in negotiating the fee arrangement and the specific terms of compensation were

agreed to in writing at the inception of the arrangement.

36.    Several actions were brought against Iran, the Iranian Ministry of Intelligence and

Security ("MOIS") and the Iranian Islamic Revolutionary Guard Corp. ("IRGC") holding them

liable for damages from the terrorist attack in question because they provided material support

and assistance to Hezbollah and/or Hamas, the terrorist organization that orchestrated and carried

out the bombing(s). These included, among others, the following cases:

The Heiser Litigation

*Estate of Michael Heiser et al. v. Islamic Republic of Iran et al. (Case No. 00-239) (D.D.C.) and Estate of Miller Campbell, et al. v. Islamic Republic of Iran et al. (Case No. 00-2104)(D.D.C.)*

37.    These two cases were filed in 2000 on behalf of the family members and estates of 17 United States service members that were killed in the deadly truck bombing attack on June 25, 1996 of Khobar Towers, a residence on a United States military base in Dhahran, Saudi Arabia. The attack was carried out by individuals who referred to themselves as "Saudi Hezbollah" and effected through an explosion of a large gasoline truck outside the perimeter wall of the Khobar Towers complex. It was the largest non-nuclear explosion up to that time. Nineteen United States Air Force personnel were killed and hundreds of others were injured.

38.    After a long and protracted litigation, in 2006 the D.C. court awarded the 67 claimants, each of whom had given Dr. Engelberg individually, a power of attorney, a total of $254,431,903 in compensatory damages. In 2009, an additional $36,658,063 was awarded as well as $300,000,000 in punitive damages for a total judgment of $591,089,956 (the "Heiser Judgment").

2)    The Non-Heiser Litigations

a)    *Paul Alexander Blais et al v. Islamic Republic of Iran et al., Case No. 02-285 (D.D.C.).*

39.    Paul Blais, a permanent member of an aircrew in the United States Air Force and Curtis and Maria Taylor, his stepfather and biological mother, filed this case in 2002. Dr. Engelberg individually, was given powers of attorney by each of them to act on their behalf. Mr. Blais' aircrew has been sent to Saudi Arabia as part of a peacetime deployment of U.S. troops tasked with ensuring compliance with United Nations Security Council resolutions. He was one of the hundreds seriously injured in the Khobar Towers attack. After the explosion, Mr. Blais

FILED: NASSAU COUNTY CLERK 03/31/2017 01:35 PM

NYSCEF DOC. NO. 4    Case 18-15691-CMG    Doc 43-4    Filed 05/08/18    Entered 05/08/18 21:30:37    Desc    03/31/2017    INDEX NO. 606919/2014

Exhibit B - Operative complaint in Engelberg Derivative Litigation    Page 15 of 75

was rescued from the rubble, barely alive and unconscious. He was treated in the hospital for

three or four days before being identified. He suffered serious brain trauma, a deprivation of

oxygen, extensive scalp lacerations and was in a coma for approximately five weeks. In total,

Mr. Blais spent four months in hospital and received extensive rehabilitation for another six

months. He continues to suffer from depression, PSTD and survivor's guilt.

40.    In 2006, the D.C. Court entered judgment in plaintiffs' favor, awarding damages

as follows: $21,801,792 in lost wages and suffering to Paul Blais; $3,500,000 for pain and

suffering to Maria Taylor; and $3,500,000 in pain and suffering to Curtis Taylor.

b)    *Donna Marie Holland et al. v. Islamic Republic of Iran et al., Case No. 01-1924 (D.D.C.)*

41.    This case filed in 2001 by Donna Marie Holland, the widow, and sons, James

Holland and Chad Holland, of late Officer Robert Holland, a U.S. service member who served in

the Navy. Dr. Engelberg was given a power of attorney for the Estate of Robert Holland and by

Donna Marie Holland, individually, to act on her behalf.  The attack by Hezbollah was the most

deadly terrorist attack against American citizens prior to September 11, 2011. The October 23,

1983 Marine barracks bombing was in Beirut, Lebanon, during which 241 American servicemen

acting as part of a multinational U.S. peace keeping force were murdered in their sleep by a

suicide bomber. Officer Holland was killed instantly. However, given the nature of the blast, his

family was forced to wait to weeks for his body to be identified. The death of Officer Holland

had a profound emotional impact on his family.

42.    In March 2005, the D.C. court entered a judgment in favor of Donna Marie

Holland, James Holland and Chad Holland awarding damages as follows: $620,743 in

compensatory damages to Donna Holland; $310,371 in compensatory damages to James Holland

plus $12,000,000 for parental loss of consortium; and $310,371 in compensatory damages to

Chad Holland plus $12,000,000 for parental loss of consortium.

c)    *Diana Campuzano et al. v. Islamic Republic of Iran et al., Case No. 00-2328 (D.D.C.)*

43.    Plaintiffs Diana Campuzano, Avi Elishis and Gregg Salzman, each of whom gave

Dr. Engelberg individually, a power of attorney to act on their behalf, filed this case in 2000. The

claimants were at the crowded Ben Yehuda pedestrian street mall in Jerusalem, Israel on the

afternoon of September 4, 1997 when Hamas carried out a triple suicide bombing. The bombs

were packed with nails, screws, pieces of glass and chemical poisons, designed to cause

maximum pain. The detonated bombs killed five people and serious wounded nearly 200 others,

including the plaintiffs.

44.    After the bombing, Diana Campuzano was taken to the emergency room in a life

threatening condition. She was badly burned, her brain leaked cerebral spinal fluid from a

massive skull fracture and she was blind and hearing impaired. She remained in the hospital for

six weeks. Her permanent injuries include impaired vision, damage to the retina of her right eye,

cataracts in both eyes, a destroyed upper sinus cavity, loss of the ability to taste or smell, a

destroyed left eardrum, and depression and PTSD.

45.    Avi Elishis was 18 years old at the time of the bombing and was spending a year

in Israel after graduating from high school. After the bombing, Mr. Elishis was in critical

condition and received treatment for extensive injuries to his shrapnel-perforated lungs and had

surgery to remove screws lodged next to his heart and in his spleen, which caused him to bleed

into his abdomen. His recovery lasted almost two years and he was left with many permanent

injuries.

46.     Gregg Salzman spent eight days in the hospital receiving treatment for his first and second degree burns, a perforated eardrum and shrapnel wounds to his face. He suffers from permanent nerve damage to his upper lip, which has been treated with root canals, tooth extractions and titanium implant in his gums.

47.     In September 2003, the D.C. Court entered a judgment in favor of the plaintiffs, awarding damages as follows: $17,000,000 in compensatory damages and $1,952,725 for loss of prospective income to Diana Campuzano; $12,000,000 in compensatory damages to Avi Elishis; and $10,000,000 in compensatory damages to Gregg Salzman. Each of them was also awarded $37,500,000 in punitive damages.

       d)     *Linda Welch et al. v. Islamic Republic of Iran et al., Case No. 01863 (D.D.C.)*

48.     This case was filed in 2001 by Linda Welch, the wife, and sons, Christopher Welch and Brian Welch, of Kenneth Welch, a U.S. servicemen who died on September 20, 1984 in the suicide bombing at the United States Embassy Annex in East Beirut, Lebanon by Hezbollah that killed 24 people. In 2006, Linda Welch, Christopher Welch and Brian Welch, jointly filed an amended complaint with ACCJ claimants, Betty Welch, mother of late Warrant Officer Welch and his two brothers, Gerard Welch and Michael Welch, each of whom had given Dr. Engelberg individually, a power of attorney to act on their behalf.

49.     In 2007, the D.C. entered judgment awarding plaintiffs $32,698,304 in compensatory damages, in particular, $5,000,000 in compensatory damages to Betty Welch, $2,500,000 in compensatory damages to Gerard Welch and $2,500,000 in compensatory damages to Michael Welch.

50.     In addition to the Non-Heiser litigations in the early 2000s against Iran listed above, in 2008 the Center also helped bring other litigations against Iran, *Brewer et al v. Islamic*

*Republic of Iran et al.*, Case No. 08-cv-0534 (D.D.C.) and *Valencia et al. v. Islamic Republic of Iran*, Case No. 08-cv-533.

51.     The Brewer case was a sister case to the *Welch* litigation, filed by Richard Brewer, a United States marine who was seriously injured in the September 20, 1984 suicide bombing at the United States Embassy Annex in East Beirut, Lebanon, and his mother, Joyce Louise Leydet, who suffered serious emotional distress because of the attack.

52.     The complaint was filed on March 28, 2008. The D.C. court conducted an evidentiary hearing and took judicial notice of its findings of fact in the *Welch* case and on October 15, 2009 a judgment was entered awarding compensatory damages in the amount of $7,000,000 to Richard Brewer and $2,500,000 to Joyce Louise Leydet as well as $300,000,000 in punitive damages.

53.     The Valencia case was filed by claimants Cielito Valencia, Steven Wolfe and Sonya Turner Broadway, members of the U.S. Air Force who suffered various injuries as a result of the terrorist attack at the Khobar Towers, and Luz Southard, Airman Valencia's mother who suffered severe emotional distress.

54.     The complaint was filed on March 28, 2008. On March 31, 2011, the D.C. Court entered a judgment awarding compensatory damages of $10,150,000 to Cielito Valencia, $6,090,000 to Steven Wolfe, $10,150,000 to Sonya Broadway and $5,250,000 to Liz Southard.

55.     Apart from litigations against Iran, the Center also facilitated and funded the following two litigations against Libya for state sponsored terrorist attacks:

*Collett et al. v. Socialist People's Libyan Arab Jamahiriya, Civ. No. 01-2103 (D.D.C.)*

56.     On or about March 25, 1985, Alec Collett, a journalist who worked for the United Nations Bureau of the Associated Press on assignment in Beirut, Lebanon was captured and

brutally executed by the Abu Nidal Organization ("ANO") one of the world's most violent

terrorist groups, sponsored and materially supported at that time by the government of Libya.

57.    On October 9, 2001, with the Center and Dr. Engelberg's assistance, who hired

attorney Paul Gaston, Mr. Collett's wife and three children commenced the above action against

Libya for his abduction, torture and wrongful death.

2) *Franqui v. Syria et al., No. 106-cv-00374 (D.D.C.)*

58.    After the 1996 amendments to the FSIA, Rabbi Perr and Dr. Engelberg conceived

of bringing litigation against the state sponsors of the 1972 Lod Airport Massacre, one of the

most cold-blooded terrorist attacks at the time.

59.    On May 30, 1972, 250 Puerto Rican Americans were on a pilgrimage tour to

Israel, when three terrorists from the Japanese Red Army blocked off any escape from the

baggage claim area in Lod Airport and threw shrapnel grenades and fired 133 bullets at the

travelers. All told, 26 pilgrims died and 80 others pilgrims and by-standers were wounded, many

seriously.

60.    From 1998 to 2002, representatives of the Center met and worked with

international terrorism experts and investigative journalists who were familiar with the Lod

Airport Massacre to obtain evidence that Syria and Libya were responsible for this heinous

attack.

61.    In 2001, Dr. Engelberg engaged an attorney, Joshua Ambush, to initiate contact

with the families of some of the injured or killed victims to propose filing a lawsuit on their

behalf, enter into Center and Claimant Agreements and obtain powers of attorney on their behalf

62.    Although a long shot, Dr. Engelberg believed that history had done an injustice to

these victims. Compared to the justly notorious Munich Olympics massacre that had occurred

just three months later, the Lod Airport Massacre had been long forgotten. A civil action at least would redress this grievous historical injustice, and, perhaps, allow the injured and family members of those so brutally murdered to at last have their day in court.

63.     In 2006, on Dr. Engelberg's instructions, just prior to the expiration of the statute of limitations and to preserve the claims, Mr. Ambush, the attorney and agent for the Center, filed the initial complaint in the case on behalf of IO claimants: five estates and five injured parties. In March 2008, to take advantage of new legislation applicable to actions against Libya, Dr. Engelberg instructed Joshua Ambush to file a Second Amended Complaint. In late spring of 2008, with the increasing complexity of the motions and legal issues, Dr. Engelberg as attorney-in-fact for the claimants, engaged attorney Paul Gaston to assume lead responsibility for the case. On June 26, 2008, an opposition to a motion to dismiss was filed in the case.

64.     On August 14, 2008, while both the *Collett* and *Franqui* cases were pending, the United States and Libya entered into the U.S.-Libya Claims Settlement Agreement under which the United States was to receive $1.5 billion in funds from Libya to be used for the full and final settlement of all pending terrorism related claims of U.S. nationals against Libya (the "U.S.-Libya Claims Settlement Agreement").

### IV.     The ACCJ Cannot Fund Enforcement and Collection on Judgments: Separate Collection Fee Arrangements Are Made With Counsel As Iranian Assets are Located Worldwide

65.     Although the litigations against Iran had resulted in multi-million dollar judgments, the enforcement and collection on these judgments was extremely difficult and expensive. Identifying and attaching assets owned by Iran as well as compelling foreign countries to recognize these U.S. judgments posed a significant challenge and required ample resources.

FILED: NASSAU COUNTY CLERK 03/31/2017 01:35 PM

NYSCEF DOC. NO. 1

INDEX NO. 606919/2014

RECEIVED NYSCEF: 03/31/2017

Case 18-15691-CMG    Doc 43-4    Filed 05/08/18    Entered 05/08/18 21:30:37    Desc
Exhibit B - Operative complaint in Engelberg Derivative Litigation    Page 21 of 75

66.     By the mid-2000s the ACCJ had only limited funds. To finance these costly collection efforts, the Center decided to enter into separate fee arrangements with counsel authorized by Dr. Engelberg as attorney-in-fact.

67.     In 2007, the Center engaged the international law firm of DLA Piper LLP ("DLA") to assist with collection efforts with respect to the Heiser Judgment. The agreement with DLA was executed by Milton Pollack as President of the Center and Dr. Engelberg as the attorney-in-fact for all the Heiser claimants (the "2007 DLA Agreement") and is attached as hereto as **Exhibit 3**.

68.     Under the terms of the agreement, DLA was to receive a sliding scale of all recoveries as follows: (a) 10°/c, of all recoveries up to $100 million, plus payment for third party expenses and disbursements; (b) 15% of all recoveries between $100 million and $200 million, plus payment for third party expenses and disbursements; and (c) 20% of all recoveries over $200 million.

69.     In other words, the DLA collection fee was directly off the top from any funds recovered, after which the Center would receive its 20% share of the remaining amount under the terms of the original Center and Claimant Agreement.

70.     Third party expenses and disbursements, including costs of any co-counsel were to be absorbed by DLA as part of its fee arrangement and invoices submitted to the ACCJ for reimbursement.

71.     In or around 2008, the U.S. government filed an action, *In re 650 Fifth Avenue and Related Properties*, Civ. No. 08-10934 (S.D.N.Y.) (the "*650 Litigation*") against various entities that served as fronts for the Government of Iran, seeking forfeiture of, *inter alia*, all right, title and interest in certain assets (the "Defendant Properties"), including real property located at

650 Fifth Avenue in midtown Manhattan, a 36-story office building estimated to be worth between $500 and $700 million. On November 12, 2009, the United States filed an amended complaint in the case.

72.     On February 10, 2010, DLA filed a notice of claim on behalf of the judgment creditors in the Heiser Litigation, asserting ownership in the Defendant Properties in the 650 Litigation.

73.     From 2010 onwards, Dr. Engelberg worked with Neal Sher, an attorney he retained to assist with the Center's work and Jed Perr, who also had been assisting the Center since the mid-2000s, to retain and supervise counsel with respect to collection efforts.

74.     For years, Sher headed the Office of Special Investigations (OSI), the Justice Department's Nazi prosecution unit and received the Raoul Wallenberg Award for his work. In 2002 however, following charges of embezzlement, Sher resigned in disgrace from his position as chief of staff for the International Commission on Holocaust Era Insurance Claims and upon investigation by the D.C. bar disciplinary authorities, consented to disbarment in 2003.

75.     Dr. Engelberg had retained Sher on a monthly basis to assist with the Center's efforts in or around August 2009. Despite his troubled past, Dr. Engelberg believed Sher deserved a second chance and that his professional background and connections could be an asset to the Center. In June 2011, the ACCJ formally employed Sher as the Center's in-house counsel.

76.     On March 1, 2010, on Dr. Engelberg's instructions, Sher filed a notice of claim on behalf the judgment creditors in the Non-Heiser litigations asserting ownership in the Defendant Properties in the *650 Litigation*.

77.     During this time, as part of the ongoing collection efforts, negotiations also ensued in 2010 between Sher, Jed Perr, Dr. Engelberg and DLA to engage DLA for collection efforts on behalf of the judgment creditors in the Non-Heiser litigations in addition to the judgment creditors in the Heiser litigations. This resulted in a new agreement with DLA on July 14, 2011, which was executed by Dr. Engelberg as attorney-in-fact and Jed Perr acted for the ACCJ (the "2011 DLA Agreement") and is attached hereto as **Exhibit 4**.

78.     Under the terms of the new agreement, which superseded the previous 2007 DLA agreement, DLA agreed to represent the Heiser and Non-Heiser judgment creditors with respect to collection efforts.

79.     Once again, DLA's fees were on a sliding scale but with two significant differences. First, unlike the 2007 DLA Agreement, there was no 20% cap for recoveries over a certain amount. Rather, DLA was entitled to receive 15% of all recoveries up to $250 million and 10% of all recoveries above $250 million. Second, unlike the 2007 DLA Agreement, third party fees, including co-counsel expenses, were to be paid directly by the ACCJ.

80.     In or around 2011, other Iranian assets, believed to be in excess of $1.5 billion, were located and frozen by governmental authorities in the U.K.  DLA worked with Dr. Engelberg and other judgment creditor groups to negotiate the retention of Dan Sarooshi, an Oxford professor and renowned lawyer specializing in international law matters.  On April 11, 2012, an agreement for litigation cooperation in the U.K. was entered into between all the judgment creditor groups, which was executed by DLA as counsel for the Heiser and Non-Heiser judgment creditors and Dr. Engelberg as their attorney-in-fact (the "U.K.  Cooperation Agreement") and is attached hereto as **Exhibit 5**.

### V.    Litigation Against Libya Results in the Recovery of Funds

81.    As collection efforts were underway in the Iranian litigations, settlements under the U.S.-Libya Claims Settlement Agreement were being finalized. The result was payment of settlement proceeds under the Claims Settlement Agreement of $10 million per death and $3 million per injury.

82.    Although several claims had been brought in the *Collett* case, as result of limitations in the Claims Settlement Agreement and its implementing act, and because Mr. Collett was not a U.S. national, plaintiffs were entitled to recover only for the wrongful death claim.

83.    Thus, on January 27, 2009, the amount of $10,000,000 was transferred by the State Department to a Citibank checking account in the name of The Estate of Alec L. Collett, in full satisfaction and final settlement of the wrongful death claim. The Center had retained Stroock & Stroock & Lavan LLP to open The Estate of Alec L. Collett in October 2007.

84.    On February 3, 2009, Carter Ledyard & Milburn LLP was retained to distribute the proceeds of the settlement. The Center advanced a retainer fee of $10,000 which was to be reimbursed from the Estate when the Surrogate's Court approved distributions. A petition was filed in New York State Surrogate's Court for compromise of the wrongful death claim and the distribution of the proceeds of the settlement.

85.    Pursuant to the usual Center and Claimant Agreement dated July 15, 2000 between the ACCJ and Elaine Collett, individually and on behalf of the Estate of Alec Collett, the ACCJ was entitled to 20% of the recovery of settlement funds. In addition, the Center was also entitled to reimbursement of the $10,000 fee advanced to Carter Ledyard & Milburn LLP.

86.     The New York County Surrogate's Court approved the petition and in or around on September 29, 2009, a check drawn to the order of the ACCJ for the payment of $2,010,000 by Elaine Collett as the administratrix of the Estate, in full satisfaction of the amounts due. See **Exhibit 6** attached hereto.

87.     Recoveries from the *Franqui* case, involving five wrongful death and five personal injury claims, were also substantial, but piecemeal and incomplete. Shortly after learning of the claimants' ability to recover, Mr. Ambush, the attorney handling the case for the ACCJ, ceased communicating with the Center and Dr. Engelberg and sought to obtain new powers of attorney from the claimants and negotiate separate retainers with them, giving himself an additional share of the recovery. The Center retained Zuckerman Spaeder on January 13, 2009 and brought a legal action against Ambush in federal court in the District of Columbia, *The American Center for Civil Justice, Inc. v. Joshua M Ambush, Esq.*, 09-cv-00233 (D.D.C.) (the "Ambush Litigation"). The initial complaint was filed on February 6, 2009. The Center subsequently retained Pillsbury Winthrop LLP ("Pillsbury") on March 18, 2009, and an amended complaint was filed on March 23, 2009.

88.     With respect to four out of the five wrongful death claims, under the Center and Claimant Agreement, the ACCJ should have received 20% share of the recovery on each $10 million wrongful death claim settlement amount, for a total amount of $8 million. However, as a result of the dispute with Ambush, the D.C. court set aside $1.6 million in the Court registry.

89.     Pillsbury, therefore, received a check on behalf of the ACCJ for only $6.4 million, which was then deposited into the Center's primary checking account on April 20, 2009.

90.     With respect to the fifth wrongful death claim, given the multiple individuals that were part of the estate, its execution was the subject of a dispute in Puerto Rico, and the entire

FILED: NASSAU COUNTY CLERK 03/31/2017 01:35 PM    INDEX NO. 606919/2014

NYSCEF DOC. NO. 1   Case 18-15691-CMG    Doc 43-4    Filed 05/08/18   Entered 05/08/18 21:30:37   Desc   03/31/2017
Exhibit B - Operative complaint in Engelberg Derivative Litigation    Page 26 of 75

$10 million was deposited into a court registry in San Juan, Puerto Rico. Ultimately, the dispute was resolved. However, the Center's 20% share was also contested by the Puerto Rico attorney handling the case and, therefore, $2 million remains in the court registry and is subject to dispute.

91.     With respect to the five personal injury claims, one of the claims was denied. Of the remaining four, claimant Israel Fischel's case was handled by attorney Paul Gaston, and therefore, not subject to the Ambush dispute. The remaining three were handled by Ambush however, and a part of the recoveries from these claims was deposited into the D.C. court registry. Thus, instead of its usual 20°/c, share of the recovery on each $3 million personal injury claim settlement amount, which would have been $600,000, the ACCJ received $480,000 for each of these claims. A check for the amount of $960,000 (for two of the claims, $480,000 x 2) was received by Pillsbury and deposited into the ACCJ checking account on January 26, 2010.

92.     The ACCJ reported $6.4 million from the wrongful death claims, plus $960,000, from the personal injury claims, for a total receipt of $7,360,000, to the IRS on its annual informational report, Form 990, for 2009.

## DEFENDANTS' BREACH THEIR FIDUCIARY DUTIES AND ENGAGE IN FRAUD

93.     As monies were received from the Libyan settlements and recoveries became imminent from collection efforts in the Iranian litigations, the Perrs engaged in a blatant scheme to divert recoveries to other entities owned and controlled by them for their private benefit and used funds to advance their own personal causes, in breach of their fiduciary duties of loyalty, care and obedience, and effectively ousted the Plaintiff from the ACCJ, marginalizing his role as well as compromising his position as attorney-in-fact for the claimants.

FILED: NASSAU COUNTY CLERK 03/31/2017 01:35 PM
INDEX NO. 606919/2014

NYSCEF DOC. Case 18-15691-CMG   Doc 43-4   Filed 05/08/18   Entered 05/08/18 21:30:37   Desc RECEIVED NYSCEF: 03/31/2017
Exhibit B - Operative complaint in Engelberg Derivative Litigation    Page 27 of 75

I.    **Settlement Proceeds From the Libya Cases Were Unlawfully Assigned/ Transferred to Jed Perr's New Jersey Center**

94.    In or around September 2012, during his deposition in the Ambush Litigation, Dr. Engelberg learned that recoveries from the Libyan settlements had been unlawfully diverted to the New Jersey Center, the not-for-profit corporation controlled by Jed Perr.

95.    Although in or around September 29, 2009, a check for $2,010,000 had been drawn to the ACCJ as part of it share from the settlement of the *Collett* case pursuant to the Center and Claimant Agreement, the Perrs never reported the receipt of these funds on ACCJ' s Form 990 for 2009.

96.    Instead, the Form 990 for Jed Perr's New Jersey Center, which had minimal funds since its inception in 2001 and did not file any Form 990s from 2003 until 2007, suddenly reported a receipt in program service revenues in 2009 in the amount of $2,646,144 on its Form 990, attached hereto as **Exhibit 7**.

97.    During this time, the Center also was responding to an examination by the IRS and two Information Document Requests ("IDRs") issued on September 7, 2010 and February 28, 2011, including questions regarding the ACCJ's Form 990 for 2009. ACCJ had engaged attorney JoAnn Luehring of Roberts and Holland LLP, a leading tax controversy firm, to assist with the tax examination.

98.    Dr. Engelberg, who had been working closely with Ms. Luehring on gathering documents and information, raised his concern over the receipt of more than $2.6 million by Jed Perr's New Jersey Center.

99.    Rather than address Dr. Engelberg and Ms. Luehring's questions and concerns about the ACCJ's governance and provide information, the Perrs stonewalled them, and in December 2012, abruptly terminated Ms. Luehring's services. Despite personally assuring Ms.

Luehring six months earlier that ACCJ's accountants, Roth & Company LLP ("Roth & Co.") would not be handling matters, Rabbi Perr suddenly feigned "astonishment" that Roth & Co. was not involved. In an email dated November 14, 2012, attached hereto as **Exhibit 8**, Ms. Luehring brought this obvious pretext to the Board's attention.

100.    In or around early 2013, the Perrs hired attorney Marcus Owens of Caplin & Drysdale instead to assist with the examination.

101.    By now, Dr. Engelberg, a member of the ACCJ, a Board Member and the Center's Executive Director, had been completely marginalized, denied access to information · arbitrarily and without authority -- and was told he was no longer the Executive Director of the Center. In January 2013, he, therefore, hired independent counsel, Jonathan Bach of Cooley LLP, to represent his interests.

102.    On January 31, 2013, Mr. Bach sent a Notice on behalf of Dr. Engelberg, attached hereto as **Exhibit 9**, calling for a Special Board Meeting of the ACCJ to discuss among other things, the status of the IRS examination and Form 990 filings and an accounting with respect to the $2,646,144 transferred to Jed Perr's New Jersey Center.

103.    On February 7, 2013, defendants, Rabbi Perr and Milton Pollack, refused to convene such a board meeting, noting that the proposed date and location were unacceptable and "unilaterally" dictated by Dr. Engelberg despite the fact, as Mr. Bach's February 13, 2013 letter, attached hereto as **Exhibit 10**, notes, repeated requests, both directly by Dr. Engelberg and through his counsel, to schedule a meeting at a mutually acceptable time and place with the Perrs to discuss matters and obtain information, including Board minutes, previously had been turned down.

FILED: NASSAU COUNTY CLERK 03/31/2017 01:35 PM
NYSCEF DOC. NO. 1 Case 18-15691-CMG Doc 43-4 Filed 05/08/18 Entered 05/08/18 21:30:37 Desc
Exhibit B - Operative complaint in Engelberg Derivative Litigation Page 29 of 75

INDEX NO. 606919/2014
RECEIVED NYSCEF: 03/31/2017

104.    Around the same time, requests for information by Mr. Bach from Roth & Co.,

the accountants and custodian of ACCJ records, was denied as the Perrs and the Center's

counsel, Sher, refused to provide authorization for their release.

105.    On April 24, 2013, the IRS sent a third IDR to the Center requesting records and

documents relating to the ACCJ's 2009, 2010 and 2011 tax years, which was subsequently

revised on May 13, 2013 ("IDR No.3").

106.    On May 9, 2013, Rabbi Perr called a special meeting of the Board for May 20,

2013. Dr. Engelberg advised that he would participate, but only if his attorney, Mr. Bach, was

present. Defendants Rabbi Perr and Milton Pollack and counsel for the Center, Sher, objected to

Mr. Bach's participation.

107.    In the interim, the ACCJ had requested certain documentation from Dr. Engelberg

in preparing its response to IDR No. 3. Having been shut out of the ACCJ, and given his

concerns, Dr. Engelberg advised Rabbi Perr that although he had no problem with providing the

information, he would prefer that his counsel Mr. Bach deal directly with ACCJ' s counsel,

Owens, at Caplin & Drysdale who was overseeing the response to the IRS examination.

108.    On or about June 24, 2013, counsel for the Center, Sher, raised spurious 'conflict

of interest' objections to Mr. Bach communicating directly with Owens.

109.    Ultimately, Mr. Bach and Owens communicated extensively during the course of

the preparing the response to the IRS examination and Mr. Bach raised with Owens, Dr.

Engelberg's concerns regarding the receipt of $2,010,000 by Jed Perr's New Jersey Center from

the settlement of the *Collett* case.

110.    Caplin & Drysdale shared drafts of its audit response with Mr. Bach, copies of

which are attached hereto as **Exhibit 11**. The ACCJ reported that it received no settlement funds

from the Collett case because, in 2007, the ACCJ had sought the assistance of Jed Perr's New Jersey Center to "pursue collections on behalf of the victims" and on April 12, 2007, the ACCJ had entered into an "arm's length agreement" (the "April 12, 2007 Agreement" or "Agreement") with the New Jersey Center and "as part of this Agreement [the] ACCJ assigned all of its rights, title to, and interest in Libyan claims to the [New Jersey] Center." The "arm's length agreement" was purportedly authorized at a Board Meeting on April 1, 2007. **No such meeting ever took place.**

111.    Mr. Bach requested copies of the minutes of the April 1, 2007 board meeting and the April 12, 2007 Agreement itself Dr. Engelberg was not aware of these documents even though he was a director of the Board at all relevant times, Executive Director of the Center from 2009 through 2012, and in charge of overseeing litigation and collection efforts. Moreover, despite requests for months to Rabbi Perr and Sher for copies of any documentation that might explain the approximately $2.6 million held by the New Jersey Center, neither he nor JoAnn Luehring had been provided any documents/explanation until then.

112.    The purported explanation in the response to the IDR and sudden inexplicable appearance of the April 1, 2007 Board minutes and April 12, 2007 Agreement, which are attached hereto **Exhibit 12**, was a post hoc fabrication.  In a detailed written response on September 17, 2013, attached hereto as **Exhibit 13**, Mr. Bach advised Owens of their apparent falsity. Nonetheless, over Mr. Bach's strenuous objections and written notice on December 13, 2013, a copy of which is attached hereto as **Exhibit 14**, that Dr. Engelberg "d[id] not endorse" the content, Caplin & Drysdale submitted the response to the IRS in or around the end of 2013, supported by an affidavit, signed under penalties of perjury by Rabbi Perr, as Executive Director of the Center, attesting to the accuracy of the submission.

113.    The response to the IRS examination was demonstrably false. The ACCJ never

entered into an "arm's-length agreement" with Jed Perr's New Jersey Center in 2007 that was

authorized by the Board.

*(i)    The April 12, 2007 Agreement Was Never Authorized*

114.    The April 1, 2007 Board minutes purportedly authorizing the April 12, 2007

Agreement were fabricated.

115.    Only Milton Pollack, who seems to have acted alone -- signed the minutes

reflecting that such a 'meeting' took place at all -- without the necessary quorum to authorize the

Agreement.

116.    A majority of the Board was required for the transaction of any business.

However, the three Board members at the time were Rabbi Perr, Dr. Engelberg and Milton

Pollack. Dr. Engelberg was not present at this "meeting" and the response to the IRS

examination categorically states that Rabbi Perr did not vote on the approval of the Agreement

(see EL 11December 13, 2013 draft at n.2). The minutes do not mention a quorum, nor do they

mention any recusal by Rabbi Perr.

117.    Nor do the minutes identify where the meeting was held and who was m

attendance to cover up this obvious deception.

*(ii) The April 12, 2007 Agreement Was Not "Arms-Length"*

118.    Apart from being unauthorized, the April 12, 2007 Agreement, signed by Milton

Pollack on behalf of the ACCJ, was not "arm's-length" . The explanation in the IRS response as

to why the Agreement was "arm's-length" is false and misleading.

119.    While acknowledging that Jed Perr is the principal officer and director of the New

Jersey Center and the son of Rabbi Perr, who is the ACCJ's present Executive Director, the IRS

examination response (see December 13, 2013 draft Ex. 11 at n.2) attempts to downplay this relationship as immaterial since the New Jersey Center and the ACCJ are not "related organizations" or an "interested person" of the other strictly for Form 990 reporting purposes.

120.    The instructions to a federal tax form defining whether an entity is independent for certain reporting purposes is hardly dispositive of whether in fact, an arm's-length relationship exists. In fact, Owens' strained reliance on the IRS instruction form flies in the face of both common sense -- father and son can hardly be seen to act at arm's-length -- as well as myriad state and federal laws that make it abundantly clear that such an intimate personal relationship cannot be seen as "arm's-length".

121.    The April 12, 2007 Agreement runs afoul of this most basic principle underlying innumerable state and federal statutes as the transaction, in effect, was a father, Rabbi Perr, transferring money to his son, Jed Perr, and taking advantage of his position to do so surreptitiously and in an unauthorized manner.

122.    Moreover, the IRS response, blatantly misrepresents that the "[New Jersey] Center and the ACCJ do not share any governance overlap" (see December 13, 2013 draft, Ex. 11 at n.2) when there was *in fact*, a governance overlap.

123.    Jed Perr was an officer of the ACCJ at the time. He has acted and represented himself to be an officer of the ACCJ over the years and continues to do so even today in his communications with the Iranian judgment creditors and DLA as evidenced by numerous documents referenced herein and correspondence over the course of years, which are attached hereto as composite **Exhibit 15**.

124.    And, as pleadings, such as the Second Amended Complaint in the 2009 Ambush Litigation, attached hereto as **Exhibit 16**, show, Rabbi Perr has been a Board member since the

Center's inception, in direct contradiction to the stated representation in the IRS audit response that he was "neither an official nor a Board member of the ACCJ" at the time.

*(iii) The Agreement Itself is a Sham*

125.    The 2007 Agreement states that the "ACCJ [does] not see itself able to effect collections and recovery against Iran and Libya" and, therefore, the ACCJ proposes that the New Jersey Center "undertake recovery efforts in order to initiate, assist and oversee various litigation actions (Recovery Efforts)" and "shall be the exclusively authorized entity representing Recovery Efforts on behalf of the ACCJ and ACCJ claimants'' for a period of IO years. (emphasis added). See Ex. 12.

126.    Moreover, the Agreement provided that the "New Jersey Center will assist and oversee various Agreements with attorneys responsible for enforcing the Judgments" and "interact and update Claimants throughout the collection process, as it deems necessary."

127.    The content of the 2007 Agreement is flatly contradicted by reality. Far from the New Jersey Center being the "**exclusive**" entity pursuing Recovery Efforts after 2007, it was the ACCJ that continued, and still continues to be, the primary organization working with law firms to pursue litigation and recoveries on behalf of claimants in Iran and Libya. In fact, it is difficult to ascertain what role -- if any -- Jed Perr's New Jersey Center has played with respect to recovery efforts.

128.    From 2007 through 2012, Dr. Engelberg continued to serve as the principal person supervising and overseeing all litigation and collection efforts and updating claimants throughout the process, acting solely in his capacity as a representative of the ACCJ having no affiliation with the New Jersey Center. When law firms were retained to pursue litigation and

FILED: NASSAU COUNTY CLERK 03/31/2017 01:35 PM    INDEX NO. 606919/2014

NYSCEF DOC. NO. 181    Case 18-15691-CMG    Doc 43-4    Filed 05/08/18    Entered 05/08/18 21:30:37    Desc    RECEIVED NYSCEF: 03/31/2017

Exhibit B - Operative complaint in Engelberg Derivative Litigation    Page 34 of 75

collection efforts, they entered into agreements with the ACCJ, not the New Jersey Center.

Numerous contemporaneous documents, attached hereto as composite Exhibit 17, evidence this:

- For example, with respect to the Libyan cases, after the Libyan Claims Settlement Agreement, as evidenced by Dr. Engelberg's affidavit dated June 10, 2009, submitted in the Surrogate's Court *In the Matter of the Application of Elaine L. Collett as Administrator of the Estate of Alec L. Collett*, it was the ACCJ, not the New Jersey Center, that retained Stroock & Stroock & Lavan LLP and Carter Ledyard & Milburn LLP to handle the application to open the estate and distribute settlement proceeds.

- Similarly, in the *Franqui* case, as an email exchange shows, Dr. Engelberg retained Paul Gaston in 2008 to assist with litigation and recovery efforts on behalf of the ACCJ, *not the New Jersey Center*. Indeed, the New Jersey Center was not a party to the subsequent Ambush Litigation where the ACCJ and the attorney Joshua Ambush were involved in extensive litigation concerning their rights to the recoveries of settlement funds.

- With respect to recovery efforts in the Iranian litigations, the same is true. Collection fee agreements with counsel were entered into by Dr. Engelberg and the ACCJ, *not the New Jersey Center*. Both the 2007 and 2011 DLA Agreements expressly recognize Dr. Engelberg as their principal contact at the ACCJ; are signed by Dr. Engelberg as attorney-in-fact and Milton Pollack and Jed Perr respectively, *as representatives of the ACCJ*; and specifically state that this "establishes an attorney-client relationship between DLA Piper USA LLP, the Judgment Creditors *and the ACCJ* with respect to the collection of the Judgment." (emphasis added).

- As a January 30, 2008, memorandum to all the claimants in the Heiser litigation updating them on the status of the ACCJ's collection efforts on their behalf notes, DLA Piper filed a motion in federal district court to authorize *the ACCJ, not the New Jersey Center*, to pursue collection efforts on their behalf

129.    To the extent Jed Perr was involved, he, too, held himself out as a representative of the ACCJ and not the New Jersey Center. In fact, Jed Perr is virtually the only individual who communicates on behalf of the ACCJ. As Ex. 15 shows, extensive correspondence with the Heiser and Non-Heiser judgment creditors, *signed by Jed Perr*, is also on behalf of and/or references the ACCJ, *not the New Jersey Center*.

➢ On July 14, 2011, Jed Perr, who was acting under Dr. Engelberg's supervision, identified himself as a representative *of the ACCJ* and on

33

FILED: NASSAU COUNTY CLERK 03/31/2017 01:35 PM

INDEX NO. 606919/2014

NYSCEF DOC. NO. 1    Case 18-15691-CMG    Doc 43-4    Filed 05/08/18    Entered 05/08/18 21:30:37    Desc    RECEIVED NYSCEF: 03/31/2017
Exhibit B - Operative complaint in Engelberg Derivative Litigation    Page 35 of 75

letterhead *of the ACCJ* sent a letter to the Heiser and Non-Heiser judgment creditors "updat[ing] them on new collection efforts we have been pursuing".

> ➤ On July 15, 2013, Jed Perr sent another letter to them *on ACCJ* letterhead, executed by him *as a representative of the ACCJ*, updating them of collection efforts and advising them that Neal Sher "has been working with the American Center for Civil Justice" and had filed claims on their behalf in the *650 Litigation* and since then had been actively involved in the litigation.

> ➤ On April 30, 2014, Jed Perr sent yet another letter to them *on ACCJ* letterhead, executed by him *as a representative of the ACCJ*, with another update on collection matters.

> ➤ On March 24, 2014, and May 28, 2014, Jed Perr sent letters to the Heiser and Non-Heiser judgment creditors respectively, once again *on ACCJ* letterhead referencing the ACCJ Center and Claimant Agreements signed by them years ago.

> ➤ Indeed, as recent as September 9, 2014 -- seven years after the 2007 Agreement purportedly authorized the New Jersey Center to "*exclusively*" pursue collection efforts and update claimants -- Jed Perr sent the Heiser and Non-Heiser judgment creditors a letter *on ACCJ* letterhead, *as a representative of the ACCJ*, with an Update on Enforcement Actions.

130.    None of the documents referenced above make any mention of the New Jersey Center. To claim that *after 2007*, pursuant to the April 12, 2007 Agreement, the New Jersey Center *exclusively* took over recovery efforts with respect to Iranian and Libyan litigations is pure fiction. The documentary evidence shows otherwise. Indeed, the New Jersey Center appears to have played no role in these recovery efforts.

131.    Equally fictitious is the claim in the IRS examination response (see Ex. 11, December 13, 2013 draft at p.7) that the ACCJ sought the assistance of the New Jersey Center "to pursue collections on behalf of the victims" and that the New Jersey Center "pursues monetary judgments awarded to victims of terrorism, providing support for legal actions necessary to recover those awards".

132.    The New Jersey Center was set up in 2001 and never had the resources to finance any collection efforts until the unlawful receipt of funds from the Libyan settlements in 2009.

FILED: NASSAU COUNTY CLERK 03/31/2017 01:35 PM

NYSCEF DOC. NO. 1

INDEX NO. 606919/2014

RECEIVED NYSCEF: 03/31/2017

Case 18-15691-CMG    Doc 43-4    Filed 05/08/18    Entered 05/08/18 21:30:37    Desc
Exhibit B - Operative complaint in Engelberg Derivative Litigation    Page 36 of 75

133.    In 2002, the organization filed a Short Form 990-EZ stating that the organization had gross receipts of less than $25,000.

134.    From 2003 until 2007, the New Jersey Center filed no returns at all.

135.    Ironically, in 2007 -- the year it supposedly took over recovery efforts because the ACCJ did not have funds -- the New Jersey Center filed a Form 990-N, reflecting annual gross receipts of $50,000 or less. At that time, only exempt organizations with less than $25,000 in annual gross receipts were excused from filing any returns at all.

136.    However in 2009 -- for the first time in eight years since its inception -- the New Jersey Center filed a Form 990, suddenly reporting the receipt of the approximately $2.6 million dollars (from the Libyan cases) in contributions and grants. As Ex. 7 shows, the Form 990 also lists $103,635 in program service expenses. Notably, however, for an organization purportedly providing **legal** support for collection efforts, a breakdown of expenses on page 10 of the Form 990 shows **no** fees for legal services, even though "pursuing legal claims and judgments together with law firms" is one of its three noted principal program service accomplishments.

137.    In short, Defendants "created" the April 12, 2007 Agreement and the minutes purportedly authorizing it and provided this false and misleading information to the IRS in a feeble attempt to post hoc justify their unlawful assignment/transfer of settlement funds from the Collett case to the New Jersey Center.

138.    Strikingly, the spurious nature of the April 12, 2007 Agreement is self-evident from the contents of the document itself As Exhibit 12 shows, the Agreement states that because the ACCJ did not have the financial resources to extend any funds to the New Jersey Center, "in lieu of funds, [it] is hereby assigning to the [NEW JERSEY] CENTER, _**all**_ ACCJ's interests in Libya claims" (emphasis added). If this indeed, were true, then the ACCJ should have transferred

FILED: NASSAU COUNTY CLERK 03/31/2017 01:35 PM

NYSCEF DOC. NO. 1

INDEX NO. 606919/2014

RECEIVED NYSCEF: 03/31/2017

Case 18-15691-CMG    Doc 43-4    Filed 05/08/18    Entered 05/08/18 21:30:37    Desc
Exhibit B - Operative complaint in Engelberg Derivative Litigation    Page 37 of 75

*all* of its receipts from the Libya claims, which would include settlement amounts from ***both*** the *Collett* and *Franqui* cases. It did not do that.

139.    According to Rabbi Perr, while the ACCJ received $7,360,000 as proceeds from the Franqui case, the ACCJ retained most of it in its bank account. According to the IRS examination response (see December 13, 2013 draft, Ex. 11) "more than $6 million of the Franqui proceeds remained in the ACCJ's bank accounts at the close of the 2009 tax year; approximately $5.9 million remained in ACCJ's bank accounts at the close of the 2010 tax year; and approximately $4.7 million remained in ACCJ's accounts at the close of the 2011 tax year."

140.    Indeed, not only did the ACCJ not transfer the $7,360,000 received from the Franqui case to the New Jersey Center -- as the terms of the April 12, 2007 Agreement would have required -- the ACCJ in fact, eventually received more than this amount which Defendants also failed to report to the IRS in its examination response as it was required to do.

141.    In addition to the $7,360,000 reported on its Form 990 for 2009, on April 30, 2010, Pillsbury advised the ACCJ by email dated April 30, 2010, a copy of which is attached hereto as **Exhibit 18**, that it had received by FedEx a cashier's check, in the additional amount of $480,000 in the Franqui case which, as **Exhibit 19** shows, was subsequently deposited in the ACCJ's money market account on May 4, 2010.

142.    At least another $240,000 was received by Jed Perr acting as agent for the ACCJ on January 7, 2010. Unlike the other personal injury claims that were subject to the Ambush dispute and the proceeds set aside in the D.C. court registry, the ACCJ was entitled to its full 20% share of the $3 million personal injury settlement for claimant Israel Fischel i.e., $600,000. In an email dated January 17, 2010, a copy of which is attached hereto as **Exhibit 20**, Jed Perr

FILED: NASSAU COUNTY CLERK 03/31/2017 01:35 PM

NYSCEF DOC. Case 18-15691-CMG    Doc 43-4    Filed 05/08/18    Entered 05/08/18 21:30:37    Desc
Exhibit B - Operative complaint in Engelberg Derivative Litigation    Page 38 of 75

INDEX NO. 606919/2014

RECEIVED NYSCEF: 03/31/2017

acknowledged that the ACCJ had received $540,000 of this amount and "deposited" $240,000 -- in all likelihood with the New Jersey Center - since the ACCJ shows no record of this.

143.    Neither of these two amounts was reported to the IRS in its response to Question 6 of IDR No. 3 requesting information as **to all** cases that resulted in as settlement, award, or payment that the ACCJ received in excess of $10,000.

144.    On the other hand, as Ex. 7 shows, the New Jersey Center's Form 990 showed the receipt of 2,646,144 on its Form 990 for 2009. Upon information and belief, in addition to the $2,010,000 unlawfully assigned/transferred to the New Jersey Center from the Collett matter, part of these additional, unreported monies from the Franqui case were also unlawfully assigned/transferred to Jed Perr's New Jersey Center in breach of Defendants' fiduciary duties.

144A.    More recent evidence of the lack of any independent governance as between the ACCJ and the New Jersey Center is found in minutes of an ACCJ Board meeting held on September 1, 2013 (Exhibit 60, p. 2 of minutes), in which the Board authorized ACCJ's General Counsel, Neal Sher, to "reaffirm and update" the April 12, 2007 Agreement.  There was no substantive discussion of the proposed amendment and no disclosure of what terms would be amended. (Discovery in this action has revealed that the amended terms were designed to benefit the New Jersey Center substantially, without benefit to ACCJ and to its financial detriment.) The Board minutes continue with discussion of a proposal to merge the New Jersey Center into the ACCJ, in order to "absorb its very substantial assets," which was approved subject to satisfaction of two minor conditions.  These assets, of course, were the very same assets that were improperly transferred to the New Jersey Center from the ACCJ, as detailed above.

FILED: NASSAU COUNTY CLERK 03/31/2017 01:35 PM INDEX NO. 606919/2014

NYSCEF DOC. NO. 1 Case 18-15691-CMG Doc 43-4 Filed 05/08/18 Entered 05/08/18 21:30:37 Desc 03/31/2017
Exhibit B - Operative complaint in Engelberg Derivative Litigation Page 39 of 75

## II.   As Iranian Assets Are Located in the U.K, Jed Perr Uses His Position to Engage in Self-Dealing

145.   Defendant Jed Perr also engaged in self-dealing and breached his fiduciary duties of loyalty, care and obedience by usurping business opportunities for his for-profit limited liability company, ARC.

146.   In or around the spring of 2012, the ACCJ, which had already conducted the research, identified an Iranian asset in the U.K. and retained counsel, and was working with DLA on collection efforts in the U.K., invited other consortiums of attorneys and law firms representing unrelated plaintiffs that had judgments against Iran to join forces with it. In return for its efforts, the Center proposed that it be compensated for its efforts, risks and expenditure by a percentage of the recovery by these other judgment creditor groups.

147.   In April 2012, Jed Perr set up ARC, a sole member limited liability company owned by him personally, to usurp this opportunity for his private profit, which could jeopardize the ACCJ's tax-exempt status by violating the IRC's ban on private inurement.

148.   In or around October 2012, Dr. Engelberg learned that agreements had been negotiated and blessed by Sher as counsel for the Center, with other judgment creditor groups wherein ARC, *rather than the ACCJ*, had been retained as consultants to assist with the collection efforts in the U.K. ARC was to obtain a collection fee of potentially, at least $18 million.

149.   As DLA could only represent plaintiffs that had signed the Center and Claimant Agreement with the ACCJ, Dr. Engelberg made inquiries from DLA, and learned that Jed Perr misrepresented to DLA that ARC was somehow related to and/or a subsidiary of ACCJ.

150.   The chicanery was obvious from the face of the agreement(s) themselves, which while retaining ARC, as **Exhibit 21**, ¶ 6 attached hereto shows, categorically state "**ARC**" –

38

rather than the ACCJ, which had been engaged in collection efforts all along -"is also assisting the [Heiser and Non-Heiser judgment creditors] who are seeking to collect their judgments both in the United States and abroad." However, it is abundantly clear is that it was the ACCJ -- ***not ARC*** -- that had been assisting with these efforts.  Indeed, ARC did not even exist until April 2012.

151.    Once again, Dr. Engelberg expressed his concerns through counsel, Jonathan Bach in an email dated September 24, 2013 to Sharon Nokes and Marc Owens at Caplin & Drysdale no avail. A copy of the email is attached hereto as **Exhibit 22**.

### III.    As Recoveries From the Iranian Litigations Become Imminent, The Perrs and Sher Engage in Fraud

152.    By this time, in addition to assets located in the U.K, in late 2013, Iranian properties had also been located in Canada and in early 2014, recoveries in the *650 Litigation*, became imminent.

153.    On April 16, 2014, a settlement agreement was entered between the U.S. attorney for the Southern District of New York and various judgment creditor groups in the 650 Litigation on the distribution of funds once the properties forfeited were sold, which, in effect, would partially satisfy the multi-million dollar Heiser and Non-Heiser judgments.

154.    The Perrs and Sher saw this as an opportunity to recoup extra monies for themselves by changing the existing fee arrangements with claimants and sought to revoke Dr. Engelberg's power of attorney and fraudulently induce and coerce claimants into signing new center and claimant agreements with the ACCJ.

155.    In or around the first week of June 2014, Michael Welch, one of the Non-Heiser claimants contacted Dr. Engelberg who had by now been effectively -- and unlawfully -- ousted from the Center.

FILED: NASSAU COUNTY CLERK 03/31/2017 01:35 PM
NYSCEF DOC. Case 18-15691-CMG   Doc 43-4   Filed 05/08/18   Entered 05/08/18 21:30:37   Desc 03/31/2017
Exhibit B - Operative complaint in Engelberg Derivative Litigation   Page 41 of 75

INDEX NO. 606919/2014

156.     Mr. Welch had received a letter dated May 28, 2104, from Jed Perr, acting on

behalf of the ACCJ, sent to all the Non-Heiser Judgment Creditors (the "May 28, 2014 Letter")

advising them that claims had been filed on their behalf in Canada where Iranian assets had been

located that a mutual cooperation settlement agreement was being negotiated between Torys LLP

(that has been retained by the Center in Canada to represent the Heiser and Non-Heiser

claimants) and various other judgment creditor groups that would give the ACCJ claimants the

best chance of sharing in the assets; and that the mutual cooperation settlement agreement

needed to be executed on their behalf The May 28, 2014 Letter enclosed a new center and

claimant agreement (the "May 28, 2014 Agreement") which purported to give the ACCJ a so-

called Limited Power of Attorney in this regard, which was not, in fact, limited to collection

efforts in Canada at all. The May 28, 2014 Letter and Agreement are attached hereto as **Exhibit**

**23**.

157.     Puzzled by this, as Dr. Engelberg held valid general powers of attorney on his

behalf, upon receipt of the May 28, 2014 Letter and enclosed May 28, 2014 Agreement, Mr.

Welch contacted Jed Perr.

158.     Perr falsely and despicably informed Mr. Welch that the May 28, 2014

Agreement needed to be signed giving the ACCJ the "Limited Power of Attorney" as Dr.

Engelberg was having serious health problems and that he should not contact him as it was

private and personal.

159.     Nonetheless, given his long-standing relationship with Dr. Engelberg and

concerned and distressed to hear about his condition, Mr. Welch called Dr. Engelberg to inquire

about his health. In the course of that conversation, Dr. Engelberg learned of the May 28, 2014

Agreement for the first time. He was neither consulted nor apprised of the new agreement even though he was the attorney-in-fact for the Non-Heiser Judgment Creditors.

160.    The May 28, 2014 Agreement sought to revoke Dr. Engelberg's power of attorney and alter the current fee structure in place to the detriment of the Non-Heiser Judgment Creditors.

161.    While purporting to give the ACCJ "a Limited Power of Attorney" the scope of the power of attorney was anything but ''Limited'' as it authorized the Center, among other things, "to engage counsel to enforce the Judgment [and] the authority to settle litigation" *not just in Canada but anywhere in the world*. Indeed, the May 28, 2014 Agreement made no mention of Canada and in essence was a blanket authorization to act on behalf of the Non-Heiser claimants in all matters relating to their individual litigation worldwide and effectively revoked Dr. Engelberg's general power of attorney.

162.    More disturbingly, the May 28, 2014 Agreement increased the fees to attorneys and other personnel to 36% from the current fee arrangement in place pursuant to the original Center and Claimant Agreements and the 2011 DLA Agreement by providing that:

> In consideration of the ongoing efforts and services and services of the ACCJ on behalf of Claimant, and in further consideration of promoting ACCJ's ability to carry out its goals and purposes, Claimant agrees and accepts that the Claimant shall be obligated to pay up to 36% (Thirty Six Percent) of All Recoveries."

163.    Under the existing fee arrangement, after DLA received its collection fees of 15% or 10% off the top, the ACCJ would get its usual 20%, including litigation fees, of the remaining 85% or 90% *i.e.*, 17% or 18% respectively. The claimant thus, would pay total legal fees (litigation and collection) in the amount of either 32% (15% + 17%) or 28% (10% + 18%) respectively. In effect, the May 28, 2014 Agreement therefore increased the total legal fees to 36%.

164.    In other words, the May 28, 2014 Agreement provided for additional fees collected off the top of any recoveries, with no explanation or accounting for the increase, simply stating that this 36% "will cover all fees and expenses of all attorneys, both for litigation and recovery efforts, and other personnel retained in the United States and in other countries" with no basis for the increase whatsoever. Nor did it identify which attorneys and "other personnel" would share in the recovery and how much. That ARC, owned and controlled by Jed Perr, might be "other personnel" is unclear.

165.    Concerned that the May 28, 2014 Letter and Agreement was not in the best interest of the claimants, Dr. Engelberg attempted to contact the other Non-Heiser claimants as well as the Heiser claimants to inquire whether they had received a similar agreement.

166.    He also contacted DLA requesting information on the Canadian recovery effort.

167.    However, by letter dated June 10, 2014, counsel for the Center, Sher, advised Allen Bromberger, then counsel representing Dr. Engelberg at the time, that he cease and desist from contacting ACCJ claimants, as he was no longer a representative or Board member of ACCJ. A copy of the letter is attached hereto as **Exhibit 24**. Representatives of the Center also advised DLA, as **Exhibit 25** attached hereto, shows, that DLA was not authorized to provide any information to Dr. Engelberg, falsely stating that Dr. Engelberg was no longer ''an employee of the American Center, an independent contractor of the American Center, or a member of the Board of the American Center.''

168.    According to Sher -- and purely fictional -- Dr. Engelberg had only been appointed to the Board at a May 9, 2010 Board meeting to complete the remaining term of a member who had resigned. By the terms of that appointment, Dr. Engelberg's term was to expire

in May 2011. His membership on the Board terminated in July 2013 when additional members were appointed.

169.    The Center provided purported minutes of the May 9, 2010 Board meeting. A copy of the May 9, 2010 Board minutes is attached hereto as **Exhibit 26**. The May 9, 2010 Board minutes were fabricated and are demonstrably false.

170.    The minutes state that a quorum was present as all the directors of the ACCJ were present: Milton Pollack, Jonathan Tendler and Mark Hirschman. These three individuals are the directors listed on the Center's Form 990 for 2009.

171.    However, under New York law, only members of a corporation can appoint and remove Board members and pursuant to the ACCJ's By-Laws, a copy of which is attached hereto as **Exhibit 27**, the Plaintiff is one of two members of the organization and never authorized the appointment of either Jonathan Tendler or Mark Hirschman to the Board.

172.    Allegedly, the Center amended its by-laws in April 2007, a copy of which is attached hereto as **Exhibit 28**, which state that the ACCJ shall have no members. However, a vote of the members is required to eliminate members. No such vote took place and there is no evidence that it did. Certainly, Dr. Engelberg as a member of the ACCJ did not vote to remove himself or change the constitution of the Center to his own detriment.

173.    And as a member of the ACCJ, Dr. Engelberg has never authorized the appointment of removal of any Board members since 1999. They have been the same all along: Dr. Engelberg, Rabbi Perr and Milton Pollack.

174.    Indeed, Jonathan Tendler, Mark Hirschman and Milton Pollack, as the three named directors on the Center's Form 990 for 2009 is flatly contradicted by sworn pleadings in the Ambush Litigation in 2009 attesting to the fact that Dr. Engelberg and Rabbi Perr have been

Board members since 1996. Indeed, in his April 13, 2009 Declaration in the Ambush Litigation, attached hereto as **Exhibit 29**, Rabbi Perr swore under penalty of perjury that "I have served on the Board of Directors of The American Center for Civil Justice (the "ACCJ"), previously known as the Raoul Wallenberg Center for Civil Justice, since its formation in 1996 . . . and I currently serve on [the ACCJ's] Board."

175.    Further, the May 9, 2010 minutes purport to elect Dr. Engelberg and Rabbi Perr as new board members, and Rabbi Perr as the President/Executive Director of the Center. But numerous contemporaneous documents evidence that between 2009 and 2012, Dr. Engelberg, *in fact*, was the Center's President/Executive Director.

176.    For example, a March 18, 2009 retention agreement with Pillsbury in the Ambush Litigation, attached hereto as **Exhibit 30**, was executed by Dr. Engelberg as President of the ACCJ.

177.    Amended complaints in the Ambush Litigation in 2009, attached hereto as **Exhibit 31**, also state in paragraph 7 that "Dr. Michael Engelberg . . . is the current president of the Center."

178.    Indeed, in connection with the Ambush Litigation, Rabbi Perr submitted a sworn declaration on June 17, 2011, *after* the May 9, 2010 meeting purportedly electing him as the Center's Executive Director, stating in paragraph 18 that "The Center's Executive Director, [is] Dr. Michael Engelberg". The Rabbi's declaration is attached hereto as **Exhibit 32**.

179.    The evident falsity of the May 9, 2010 Board minutes is further exemplified by the fact that the minutes state that a copy of the ACCJ's Conflict of Interest Policy were circulated at the "meeting." However, the Conflict of Interest Policy, attached hereto as **Exhibit 33**, it is a generic document and makes no mention of the ACCJ and appears to have been

44

cribbed from an unrelated organization, referring under Article V(d) to the prohibition of

"physicians" who receive compensation from membership on any committee.

180.    Moreover, the Conflict of Interest Policy states that it was adopted in May 2008,

which is flatly contradicted by the ACCJ's Form 990 for the year 2010, where, in response to the

question as to whether the Center had a written conflict of interest of policy, it affirmatively

states that it does not.

181.    In any event, irrespective of Sher's false claims, Dr. Engelberg held valid powers

of attorneys on behalf of the Heiser and Non-Heiser claimants and continued to reach out to them

to protect their interests.

182.    In or around the end of June 2014, Dr. Engelberg learned that two of the Non-

Heiser claimants, Paul Blais and Avi Elishis had already signed the May 28, 2014 Agreement.

183.    In or around the same time, Dr. Engelberg also learned that on March 24, 2014,

Jed Perr had sent a similar letter and agreement to the Heiser Judgment Creditors as well which

they had signed. A copy of the March 24, 2014 Letter and Agreement is attached hereto as

**Exhibit 34**.

184.    Similar to the May 28, 2014 Agreement, the March 24, 2014 Agreement sought to

increase the fee arrangement providing that:

> Claimant agrees and accepts that the Claimant shall be obligated to pay up to 36%
> of All Recoveries (i.e., Claimant shall pay to DLA 15% of any amount up to the
> first $250 million of All Recoveries, 10% of any amounts above $250 million of
> All Recoveries, and an additional amount for All Recoveries paid to the ACCJ
> and/or other professionals retained by ACCJ all of which amounts shall not in the
> aggregate exceed 36% of All Recoveries). These fees will cover all fees and
> expenses of all attorneys and other personnel retained in the United States and in
> other countries.

185.    Once again, the March 24, 2014 Agreement provided for additional fees collected

off the top of any recoveries with no explanation or accounting for the increase and simply stated

that the increased fee of 36% includes "an additional amount for All Recoveries paid to ACCJ and/or other professionals retained by the ACCJ", without identifying who these "other professionals" are, their role, or their share in the recovery, thereby allowing for the diversion of funds to private entities such as Jed Perr's ARC.

186.    The March 24, 2014 Letter intentionally obscured what the new arrangement meant for the claimants. Similar to the May 28, 2014 Agreement, it stated that "our attorney is requesting that the agreements be updated and streamlined", yet failed to identify any significant changes vis a vis the original Center and Claimants Agreements and assured claimants "that there are no changes to the aggregate cap on legal fees" without specifying *which* legal fees. It also misrepresented that "total fees for **both litigation and collection** have previously been capped at 36%".

187.    While there was a 20% cap on the ACCJ's recovery from litigation including legal fees, provided for in the original Center and Claimant Agreements, fees for collection for DLA were separately negotiated and as per the 2011 DLA Agreement, on a sliding scale of 15% of All Recoveries up to $250 million and 10% of All Recoveries above $10 million.

188.    The Heiser judgment creditors were thus fraudulently induced into signing this new agreement under the misimpression that Dr. Engelberg sanctioned it as their attorney-in-fact even though it increased the fee structure and was not in their best interest.

189.    In or around June 10, 2014, Dr. Engelberg also learned that an agreement virtually identical to the May 28, 2014 agreement also had been sent to the Brewer plaintiffs with one crucial and striking difference. Rather than an agreement with the ACCJ, the new agreement was with "the American Center for Civil Justice, Inc., **a corporation incorporated in the State of New Jersey"**. The ACCJ is **not** incorporated in New Jersey. This therefore was yet another

FILED: NASSAU COUNTY CLERK 03/31/2017 01:35 PM
INDEX NO. 606919/2014
NYSCEF DOC. NO. 1
Case 18-15691-CMG   Doc 43-4   Filed 05/08/18   Entered 05/08/18 21:30:37   Desc
RECEIVED NYSCEF: 03/31/2017
Exhibit B - Operative complaint in Engelberg Derivative Litigation   Page 48 of 75

attempt by the Perrs to create confusion and divert funds to an entity with a similar name to the

ACCJ, The American Center for Civil Justice, Religious Liberty and Tolerance, Inc., i.e., Jed

Perr's New Jersey Center. Indeed, **months after this agreement** was sent out, on July 31, 2014,

the Perrs registered the ACCJ as a foreign corporation registered to do business in New Jersey, in

a veiled attempt to cover up this obvious deception.

190.     Upon receipt of this new agreement, a copy of which is attached as **Exhibit 35**

hereto, on June 10, 2014, claimant Richard Brewer sent Dr. Engelberg an email, attached hereto

as **Exhibit 36**, expressing his surprise that the agreement stated that the American Center for

Civil Justice was incorporated in New Jersey. Frustrated that as "claimants [they had] put a great

deal of trust in the Center and at the 11th hour to have this kind of nonsense flying around [was]

very upsetting" he demanded that "[a]ll this needs to come to an end very  soon."

191.     Increasingly concerned now that the remaining Non-Heiser claimants who had not

signed the May 28, 2014 Agreement were being misled by the Perrs and without any detailed

information about the Canadian litigation and mutual settlement cooperation agreement, Dr.

Engelberg, individually, and through counsel, repeatedly tried to get more information.

192.     On a telephone conversation in or around July 10, 2014, Richard Kremen of DLA,

informed Dr. Engelberg and the undersigned counsel that he could not share any information on

the Canadian settlement as it was "confidential" *even though* Dr. Engelberg was the attorney-in-

fact for the Heiser claimants that DLA represented in the Canadian case and was entitled to the

information.

193.     The undersigned counsel made a similar request for information on a July 10,

2014 telephone conversation with Owens, outside counsel for the ACCJ and his partner Sharon

Nokes. Owens advised that he would consult with the Perrs and provide further details. In a July

11, 2014 email to Owens, the undersigned counsel reiterated that Dr. Engelberg had not been apprised of any details of either the Canadian litigation or proposed settlement agreement and looked forward to receiving "details as to the Canadian litigation, the settlement and any fee arrangement, and why the Center believed it [to be] in the best interest of the judgment creditors, for [Dr. Engelberg's] assessment."

194.    On Friday July 11, 2014, Owens responded that he had "relayed Dr. Engelberg's request to his client and hope[d] to be able to respond [on the] weekend." A copy of the July 11, 2014 email exchange is attached hereto as **Exhibit 37**.

195.    However, rather than Owens providing the requested information, on July 15, 2014, Jed Perr sent a letter to the remaining Non-Heiser claimants, Gerard Welch, Michael Welch, Donna Holland, James Holland, Chad Holland, Diana Campuzano and Gregg Salzman who had not yet signed the May 28, 2014 Agreement. Owens sent a copy of the letter to the undersigned counsel and advised that Sher was available should Dr. Engelberg "have any questions regarding the settlement process or proposed settlement." A copy of Owens' email and enclosed July 15, 2014 letter by Jed Perr is attached hereto as **Exhibit 38**.

196.    The July 15, 2014 Letter advised the remaining Non-Heiser claimants who had not yet signed the May 28, 2014 Agreement that, should they wish to have the Center represent their interests and be included in the Canadian mutual cooperation settlement agreement and be a part of the Center's judgment creditor group, they needed to execute the May 28, 2014 Agreement and demanded that a response be provided in writing by July 17, 2014.

197.    By letter dated July 17, 2014, attached hereto as **Exhibit 39**, Dr. Engelberg's counsel advised the Perrs that Dr. Engelberg had no intention of impeding a settlement in Canada.  However, without any information as to the Canadian litigation and the settlement,

requested from Owens and DLA to no avail, Dr. Engelberg could not in good faith advise the Non-Heiser claimants to endorse a settlement agreement of which neither he nor the claimants knew anything.

198.    Should the settlement agreement be in the best interest of the remaining Non-Heiser judgment creditors who he represented as attorney-in-fact, Dr. Engelberg was willing and authorized to execute the mutual cooperation settlement agreement on their behalf as had been done so on previous occasions as with the U.K. Cooperation Agreement.

199.    The May 28, 2014 Agreement was entirely superfluous, and clearly contrary to the Center's representation. Its execution was irrelevant to the Non-Heiser judgment creditors' ability to participate as part of the ACCJ's judgment creditor group in the Canadian litigation.

200.    The May 28, 2014, Agreement's only ostensible purpose was to revoke Dr. Engelberg's general power of attorney and alter the current fee structure in place to claimants' detriment. Indeed, the July 15, 2014 Letter conceded as much by stating that the May 28, 2014 Agreement would authorize Sher (instead of Dr. Engelberg) to enter into the settlement agreement on behalf of the Non-Heiser claimants.

201.    Thus, the undersigned counsel advised that, as attorney-in-fact, Dr. Engelberg could not recommend or authorize the execution of the May 28, 2014 Agreement itself which was neither necessary for the Non-Heiser claimants ability to participate in the settlement agreement nor in their best interest, but rather, served the interest of the Center, attorneys and others who ultimately would share in increased fees.

202.    On July 18, 2014, the undersigned counsel spoke to Sher who provided some limited information regarding the Canadian settlement but would not -- as he most likely could not - provide any plausible explanation for the increased fees to 36%. By email dated July 18,

FILED: NASSAU COUNTY CLERK 03/31/2017 01:35 PM INDEX NO. 606919/2014

NYSCEF DOC. NO. 1 Case 18-15691-CMG   Doc 43-4   Filed 05/08/18   Entered 05/08/18 21:30:37   Desc RECEIVED NYSCEF: 03/31/2017
Exhibit B - Operative complaint in Engelberg Derivative Litigation    Page 51 of 75

2014, the undersigned reiterated the request to Sher so that Dr. Engelberg would have a "better understanding of the fee arrangements of the various attorneys and 'other personnel' included in the Canadian litigation." Sher responded that he was not in the office and did not have access to his files. A copy of the July 18, 2014 email exchange is attached hereto as **Exhibit 40**.

203.    On July 23, 2014, rather than Sher, the person supposed to be able to answer questions and provide information, Owens responded in writing, attempting to "explain" the additional fees as being part of a previously agreed upon 20% cap on collection fees to DLA, even though the 2011 DLA Agreement by its very terms does not provide for any such fee arrangement.

204.    Notably, Owens provided **no response at all** to the issue of the so-called "Limited Power of Attorney" not being limited to Canada and a red herring designed to revoke Dr. Engelberg's general power of attorney.

205.    Further, Owens falsely stating that "Torys has advised the ACCJ that **all claimants wishing to sign onto the proposed Canadian settlement must do so before the end of this week**, or the entire arrangement may be compromised, to the detriment of all ACCJ claimants" and if the Non-Heiser claimants who Dr. Engelberg represented wished to participate in the settlement they provide their written authorization to the ACCJ by the close of business the next day. A copy of Owens email is attached hereto as **Exhibit 41**.

206.    By letter dated July 24, 2014, a copy of which is attached hereto as **Exhibit 42**, counsel for the undersigned advised Owens that since time was of the essence, Dr. Engelberg was authorized and willing to execute the Canadian mutual cooperation settlement agreement itself on behalf of the claimants he represented as attorney-in-fact and requested that he provide a copy the settlement agreement for his review and execution.

50

207.     Rather than provide a copy of the settlement agreement for execution, by email dated July 24, 2014, Owens advised that **"the time (had) expired for claimants to authorize the Center's chosen counsel, Neal Sher, to represent them as interim U.S. counsel", and falsely represented that the Non-Heiser claimants that Dr. Engelberg represents would therefore "no longer be represented by the Center's chosen U.S. and Canadian counsel (Torys LLP) for the purposes of the Canadian action and any related settlement agreement."** A copy of Owens' July 24, 2014 email is attached hereto as **Exhibit 43**.

208.     To protect their interest, Dr. Engelberg at his own personal expense, engaged separate Canadian counsel on behalf of the Non-Heiser claimants he represented, who advised Torys LLP by email dated August 7, 2014 that he had been retained by Dr. Engelberg, the attorney-in-fact for the Heiser and remaining Non-Heiser claimants who had not signed the May 28, 2014 Agreement, and that "[Torys LLP] take no steps in [the Canadian actions] or the settlement thereof without first advising [him] of the proposed steps or settlement". A copy of the August 7, 2014 email to Torys LLP is attached hereto as **Exhibit 44**.

209.     Upon learning of this fact -- contrary to Owens' previous representation -- on August 18, 2014, Torys LLP sent the mutual cooperation settlement agreement by email for Dr. Engelberg's assessment and review. The August 18, 2014 email is attached hereto as **Exhibit 45**. Determining that it was in the best interest of Non-Heiser claimants he represented, Dr. Engelberg thereafter executed the agreement as their attorney-in-fact based on the powers of attorneys he holds on their behalf. A copy of the executed agreement is attached hereto as **Exhibit 46**.

210.     In essence, the Perrs and Sher were willing to lie and compromise the claims of the remaining Non-Heiser claimant altogether unless they signed the May 28, 2014 Agreement,

at the expense of the Center's reputation as a charitable advocacy organization dedicated to representing their interests.

211.    Claimants were outraged and Mr. Welch wrote an email to Jed Perr, attached hereto **Exhibit 47**, expressing his anger at being "deceived" and "misled" by the Perrs and that he was not going to take the "threat to throw [him] out of the Canada case" "lying down" and to "stop trying to bully, lie, and deceive [him] and other families of Terrorism."

212.    Mr. Welch expressed his frustration and anger to Dr. Engelberg as well, and as the attorney-in-fact, Dr. Engelberg has continued to try and set the record straight and protect their interests, only to be threatened and intimidated by the Perrs. On August 12, 2014, Owens sent a letter to the undersigned, a copy of which is attached hereto as **Exhibit 48**, demanding that Dr. Engelberg cease communicating with claimants as he was "perpetuat[ing] and disseminat[ing] [] inaccuracies" and that he "correct [these] misimpressions" because the claim that the May 28, 2014 Agreement substantially increased the fee structure to 36% was "simply incorrect".

213.    By letter dated August 13, 2014, a copy of which is attached hereto as **Exhibit 49**, the undersigned counsel responded, advising Owens that, he, and his clients' disagreement with the characterization of the May 28, 2014 Agreement's fee structure, did not make it "simply incorrect" and that Owens' self-serving mischaracterization of Dr. Engelberg's communications, therefore, did not merit any "correction".

214.    The Perrs however, remain undeterred and continue to mischaracterize, mislead and deceive claimants. On September 9, 2014, Jed Perr, once again acting on behalf of the ACCJ, wrote to the Heiser and Non-Heiser claimants updating them on the post-judgment execution efforts and misrepresented that "[a]lthough under the previously signed agreements

there is a 20% fee for collections, and 20% fee for litigation, we will be deducting only 36% which will cover all attorney fees and other expenses." As previously stated, under the terms of the 2011 DLA Agreement there is no 20% fee for collections. But even more egregious is the fact that Jed Perr intends to deduct 36% even though the remaining Non-Heiser claimants that Dr. Engelberg represents, explicitly rejected signing the May 28, 2014 Agreement authorizing this amount. A copy of the letter is attached hereto as **Exhibit 50**.

215.    Besides continuing to mislead the claimants, the Perrs also continue to marginalize the Plaintiff and seek to remove him from the Center. On September 11, 2014, Rabbi Perr sent a Notice of Annual Board Meeting for the ACCJ to be held on September 18, 2014 to discuss, among other things, the annual ACCJ Board membership.

216.    Upon receipt of this notice as a Board member, Dr. Engelberg asked for clarification, and as he is represented by counsel, requested that the undersigned be allowed to participate. By email dated September 17, 2014, a copy of which is attached hereto as **Exhibit 51**, Rabbi Perr refused, stating that it was "inappropriate" for them to do so.

217.    On September 18, 2014, Dr. Engelberg participated telephonically. Predictably, the first agenda item discussed was replacing Dr. Engelberg on the Board. Over the Plaintiff's strenuous objection that the Board is not, and has not been properly constituted in accordance with New York law, the majority of the alleged Board, nonetheless, unlawfully voted to replace Dr. Engelberg.

**IV.    The Perrs Use ACCJ to Fund Personal Causes**

218.    The Perrs• complete lack of regard for either the claimants• wishes and interests or the Center's reputation and mission is further exemplified by the fact that they have continued

to use the organization's resources to fund personal causes in violation of the Center and Claimant Agreements and the ACCJ's charitable purpose.

219.    Under the Center and Claimant Agreements, claimants agreed to pay the Center a portion of the net proceeds of any recovery. As Ex.2 shows, Claimants gave a share of the recovery to the ACCJ "[i]n further consideration of the ongoing efforts and services of the Center to assist other victims of oppression and deter further acts of terrorism, and in order to promote the Center's ability to carry out its goals and purposes."

220.    As stated in its Certificate of Incorporation, a copy of which is attached hereto as **Exhibit 52**, the purpose for which the Center was formed is "to create, form, and establish a civil rights organization for the benefit of victims of terrorism in the United States and abroad."

221.    The use of ACCJ funds, therefore, is restricted.

222.    However, the Perrs have used ACCJ resources to fund various Jewish religious and educational organizations to most of which they have personal and financial ties that simply have nothing to do with benefiting or assisting victims of terrorism.

223.    In 2009 for example, as the ACCJ's Form 990, attached hereto as **Exhibit 53**, shows, the Perrs donated $25,000 of ACCJ funds to Hilda Birn HS, an all female Jewish private school in Brooklyn, New York. Upon information and belief, the donation was made to pay for the school tuition for Rabbi Perr's grandchildren who attend this school.

224.    In addition, in 2010, as the ACCJ's Form 990, attached hereto as **Exhibit 54**, shows, the Perrs donated $25,000 of ACCJ funds to The Cheder, an all male Jewish private school in Brooklyn, New York. Upon information and belief, once again, the donation was made to pay for the school tuition for Rabbi Perr's other grandchildren who attend this school. The Perrs also donated $12,500 of ACCJ funds to the Chabad Jewish Center of Puerto Rico.

225.    In 2011, as the ACCJ's Form 990 attached hereto as **Exhibit 55**, shows, the Perrs donated the following additional ACCJ funds:

- $100,000 to Bais [sic] Hatalmud, a Yeshiva in Brooklyn, New York, Jed Perr's brother is the Rabbi at this institution.

- $200,000, its second largest religious grant, to Beth Medrash Govoha, a Yeshiva located in Lakewood, New Jersey where the Perrs live. Recently featured in the New York Times article, 'The Beggars of Lakewood', attached hereto as Exhibit 56, it is the nation's largest Yeshiva and one of many in Lakewood that supports giving money to the poor and needy. The Perrs are both alumni of this institution.

- $50,000 to the Stam Gemilas Chesed Fund, which supports religious educational institutions and provides humanitarian aid to impoverished families. Upon information and belief, these funds were used to support school(s) where Rabbi Perr's grandchildren are students.

- $25,000 to Yeshiva of Spring Valley in Suffern, New York. Rabbi Perr's nephew's children attend this Yeshiva.

226.    In 2012, as the ACCJ's Form 990, attached hereto as **Exhibit 57,** shows, the Perrs donated $50,000 of ACCJ funds to Yeshiva of Far Rockaway in New York. Defendant Elie Perr's brother, Yechiel Perr owns this institution.

227.    Minutes of a May 20, 2013 Board meeting, attached hereto as **Exhibit 58**, show that in 2013 Rabbi Perr and Milton Pollack approved a grant of $100,000 of ACCJ funds to Mesila International Inc., an organization described by Rabbi Perr, as being "dedicated to teaching financial literacy and responsibility by combating the increase in personal debt widespread mismanagement of personal funds and raising awareness about the importance of financial stability and independence." According to Rabbi Perr, Mesila International Inc. holds "workshops, seminars and counseling courses, all aimed at raising awareness for responsible financial management" and "provides preventive education through a financial management curriculum taught in high schools across the globe as well as courses in other post high school programs". Yet, Mesila International has no employees or the resources to carry out this 'noble'

FILED: NASSAU COUNTY CLERK 03/31/2017 01:35 PM
NYSCEF DOC. NO. 11    INDEX NO. 606919/2014
RECEIVED NYSCEF: 03/31/2017

Case 18-15691-CMG   Doc 43-4   Filed 05/08/18   Entered 05/08/18 21:30:37   Desc
Exhibit B - Operative complaint in Engelberg Derivative Litigation   Page 57 of 75

mission. On its Form 990 for 2012, attached hereto as **Exhibit 59**, the organization reported no

expenses for compensation and net revenues of only $20,427 as the organization gave $187,000,

-- the bulk of its resources -- as a 'grant' to an unnamed entity (or entities) in Israel to ''help debt

ridden indigent individuals restructure and improve their lives.''

228.    Minutes of a September 1, 2013 Board meeting, attached hereto as **Exhibit 60**,

also show that Rabbi Perr donated $250,000 of ACCJ funds, as part of its alleged "policy of

charity tithing to educational institutions", to the National Society of Hebrew Day Schools (the

"NHSDS"), an Orthodox Jewish organization that fosters and promotes Torah-based Jewish

religious education in North America by supporting and developing a loosely affiliated network

of 760 independent private Jewish day schools catering to more than 250,000 children, yeshivas

and kollelim.

229.    As officers and directors of the Board, Defendants breached their fiduciary duties

of loyalty, care and obedience by donating $837,500 of ACCJ funds in breach of the Center and

Claimant Agreements, to these various organizations and entities that have nothing to do with the

Center's mission but rather advance their own personal agenda. Such a blatant misuse of a

charitable organization's funds must be accounted for.

### DERIVATIVE ACTION AND DEMAND FUTILITY ALLEGATIONS

230.    Plaintiff brings this action derivatively in the right and for the benefit of the ACCJ

to redress the injuries suffered by the ACCJ as a direct result of the breach of fiduciary duties

alleged herein. The ACCJ is named as a nominal defendant solely in a derivative capacity.

231.    Plaintiff will adequately and fairly represent the interests of the ACCJ m

enforcing and protecting its rights.

232.    Pursuant to its by-laws, the ACCJ is, and continues to be a membership organization.

233.    Plaintiff is, and has continuously been one of two members of the ACCJ during the wrongful conduct alleged herein.

234.    As a membership organization, the ACCJ Board is not self-perpetuating. Under New York law, only the members can appoint or remove Board members. Since 1999, the ACCJ Board consists of the following three directors: Dr. Engelberg, Rabbi Perr and Milton Pollack. As a member, the Plaintiff has not authorized the appointment or removal of any members of the Board since then.

235.    The alleged present Board therefore, is, invalidly constituted.

236.    Plaintiff has not made any formal demand on the alleged ACCJ Board to commence an action in connection with the wrongs alleged herein because such demand would be futile and useless, and must be excused.

237.    For two years, Plaintiff has repeatedly raised his concerns regarding the unlawful transfer of over $2 million dollars to Jed Perr's New Jersey Center and that Jed Perr was using his position at the ACCJ to usurp business opportunities and engage in self-dealing through his private limited liability company, ARC.

238.    From raising his concerns through attorney JoAnn Luehring who was assisting the ACCJ through the audit response, only to see her services abruptly terminated when she made further inquiries; to formally requesting information and Board meetings through counsel Jonathan Bach which were repeatedly turned down; to raising the issues with Caplin & Drysdale during the audit process; Plaintiff's efforts to obtain information and have the alleged new Board

take action have been thwarted at each turn by the father and son duo, defendants Rabbi Perr and

Jed Perr, who effectively control the organization and the alleged Board.

239. Indeed, defendant Board members Rabbi Perr and Milton Pollack have gone so

far as to fabricate documents and provide false and misleading information to the IRS in an

attempt cover-up the unlawful transfers of monies to defendant Jed Perr's New Jersey Center.

240. Under the circumstances, demand would be a futile and useless act because the

Board is invalidly constituted and members of the alleged Board were directly involved in the

wrongful acts complained of and breached their fiduciary duties of loyalty, care and obedience

### FIRST CAUSE OF ACTION
#### (Against Rabbi Perr and Jed Perr)
#### NEW YORK NOT-FOR-PROFIT CORPORATION LAW 720(a)(1)
#### BREACH OF FIDUCIARY DUTIES

241. Plaintiff repeats, reiterates and re-alleges each and every allegation, as though

fully set forth herein, all of the preceding paragraphs.

242. Defendant Rabbi Perr is, and was a Board member at all relevant times.

243. Defendant Jed Perr is, and was a *de facto* officer of the ACCJ at all relevant times.

244. In September 2012, a check for $2,010,000 was drawn to the ACCJ, representing

its share of the settlement proceeds from the *Collett* case.

245. The $2,010,000 in settlement proceeds from the *Collett* case was not reported on

the ACCJ's Form 990 for 2009.

246. The New Jersey Center reported a receipt in program service revenues in 2009 in

the amount of $2,646,144 on its Form 990 for 2009.

247. In its IRS examination response, sworn to for accuracy under penalty for perjury,

by defendant Rabbi Perr as Executive Director of the Center, the ACCJ reported that the

$2,010,000 in settlement proceeds from the *Collett* case was not received by the ACCJ as it had

FILED: NASSAU COUNTY CLERK 03/31/2017 01:35 PM

NYSCEF DOC. NO. 1

INDEX NO. 606919/2014

RECEIVED NYSCEF: 03/31/2017

Case 18-15691-CMG    Doc 43-4    Filed 05/08/18    Entered 05/08/18 21:30:37    Desc
Exhibit B - Operative complaint in Engelberg Derivative Litigation    Page 60 of 75

been assigned to New Jersey Center pursuant to an "arm's-length" agreement with the New

Jersey Center on April 12, 2007.

248.    The April 12, 2007 Agreement not authorized by the Board and, in fact, was a

complete fabrication.

249.    The transfer/assignment/conveyance therefore, was, unlawful.

250.    By virtue of their positions of control and authority as directors and/or officers of

the ACCJ, the Perrs were able to, and did, directly and indirectly control the management of the

ACCJ and knowingly unlawfully transferred/assigned/conveyed the $2,010,000 from the Collett

case to the New Jersey Center.

251.    On January 7, 2010, Jed Perr, acting as an officer of the ACCJ, received at least

$240,000 as part of the settlement proceeds from the *Franqui* case.

252.    On May 4, 2010, an additional $480,000 was received by the ACCJ as settlement

proceeds from the *Franqui* case.

253.    The Perrs never reported the receipt of these additional amounts from the *Franqui*

case on the ACCJ's Form 990 for 2009.

254.    By virtue of their positions of control and authority as directors and/or officers of

the ACCJ, the Perrs were able to, and did, directly and indirectly control the management of the

ACCJ and unlawfully transferred/assigned/conveyed a portion of these additional amounts from

the Franqui case to the New Jersey Center.

255.    The Perrs misappropriated the charitable assets and property of the ACCJ for their

own personal benefit and/or the benefit of relatives and insiders.

256.    The Perrs failed to administer with due care and in good faith, for charitable

purposes, the assets and property of the ACCJ.

FILED: NASSAU COUNTY CLERK 03/31/2017 01:35 PM INDEX NO. 606919/2014

NYSCEF DOC. NO. 1 Case 18-15691-CMG Doc 43-4 Filed 05/08/18 Entered 05/08/18 21:30:37 Desc RECEIVED NYSCEF: 03/31/2017
Exhibit B - Operative complaint in Engelberg Derivative Litigation Page 61 of 75

257.     The Perrs have failed to discharge their duties as officers and/or director of the

ACCJ with the degree of care, skill, prudence, diligence, and undivided loyalty required of them,

by allowing the diversion of funds from the ACCJ to themselves and/or their relatives and

insiders.

258.     By engaging in the following, the Perrs breached their fiduciary duties of care,

loyalty and obedience to the ACCJ and violated N-PCL §717.

259.     Accordingly, the Perrs are liable in restitution and damages to the ACCJ under N-

PCL §720(a)(l)(A) and (a)(l)(B) to account for their conduct in the neglect and violation of their

duties in the management and disposition of corporate assets, and for their conduct in

transferring ACCJ assets to themselves and/or their relatives and insiders, and causing loss and

waste of ACCJ's corporate assets.

**SECOND CAUSE OF ACTION:**
**(Against Jed Perr)**
**<u>NEW YORK NOT-FOR-PROFIT CORPORATION LAW § 720(a)(l)</u>**
**<u>BREACH OF FIDUCIARY DUTIES</u>**

260.     Plaintiff repeats, reiterates and re-alleges each and every allegation, as though

fully set forth herein, all of the preceding paragraphs.

261.     Defendant Jed Perr is, and was, a *de facto* officer of the ACCJ at all relevant

times.

262.     In 2012, defendant Jed Perr established ARC, a for-profit limited liability

company of which he is the sole member.

263.     In or around October 2012, defendant Jed Perr used his position at the ACCJ to

misrepresent the relationship between the ACCJ and ARC to usurp business opportunities for

ARC, which he personally owns, constituting self-dealing and private inurement and unjustly

enriched himself at the Center's expense.

FILED: NASSAU COUNTY CLERK 03/31/2017 01:35 PM INDEX NO. 606919/2014

NYSCEF DOC. Case 18-15691-CMG   Doc 43-4   Filed 05/08/18   Entered 05/08/18 21:30:37   Desc 03/31/2017
Exhibit B - Operative complaint in Engelberg Derivative Litigation    Page 62 of 75

264.    Accordingly, defendant Jed Perr has breached his fiduciary duties of care, loyalty and obedience and violated N-PCL§717, rendering him liable under N-PCL §720(a)(l)(B) for the acquisition by himself and/or loss or waste of charitable assets.

### THIRD CAUSE OF ACTION:
### (Against Rabbi Perr and Jed Perr)
### NEW YORK NOT-FOR-PROFIT CORPORATION LAW § 720(a)(2)
### UNLAWFUL CONVEYANCE, ASSIGNMENT OR TRANSFER

265.    Plaintiff repeats, reiterates and re-alleges each and every allegation, as though fully set forth herein, all of the preceding paragraphs.

266.    Defendant Rabbi Perr is, and was a Board member at all relevant times.

267.    Defendant Jed Perr is, and was a *de facto* officer of the ACCJ at all relevant times.

268.    In September 2012, a check for $2,010,000 was drawn to the ACCJ reflecting its share of the settlement proceeds from the *Collett* case.

269.    The $2,010,000 in settlement proceeds from the *Collett* case was not reported on the ACCJ's Form 990 for 2009.

270.    The New Jersey Center reported a receipt in program service revenues in 2009 in the amount of $2,646,144 on its Form 990 for 2009.

271.    In its IRS examination response, sworn to for accuracy under penalty of perjury by defendant Rabbi Perr as Executive Director of the Center, the ACCJ reported that the $2,010,000 in settlement proceeds from the *Collett* case was assigned to New Jersey Center pursuant to an agreement with the New Jersey Center on April 12, 2007.

272.    The April 12, 2007 Agreement was not authorized by the Board and, was in fact, a complete fabrication.

273.    The transfer/assignment/conveyance therefore, was, unlawful.

274.    By virtue of their positions of control and authority as directors and/or officers of the ACCJ, the Perrs were able to, and did, directly and indirectly control the management of the ACCJ and knowingly unlawfully transferred/assigned/conveyed the $2,010,000 from the *Collett* case to the New Jersey Center.

275.    On January 7, 2010, Jed Perr, acting as an officer of the ACCJ, received at least $240,000 as part of the settlement proceeds from the *Franqui* case.

276.    On May 4, 2010, an additional $480,000 was received by the ACCJ as settlement proceeds from the *Franqui* case.

277.    The Perrs never reported the receipt of these additional amounts from the *Franqui* case on ACCJ's Form 990 for 2009.

278.    By virtue of their positions of control and authority as directors and/or officers of the ACCJ, the Perrs were able to, and did, directly and indirectly control the management of the ACCJ and knowingly unlawfully transferred/assigned/conveyed a portion of these additional amounts from the Franqui case to the New Jersey Center.

279.    The transfer/assignment/conveyance of $2,010,000 from the *Collett* case and the transfer/assignment/conveyance of a portion of the additional unreported amounts from the *Franqui* case to the New Jersey Center therefore, should be set aside pursuant to N-PCL §720(a)(2).

### FOURTH CAUSE OF ACTION:
#### (Against Rabbi Perr and Milton Pollack)
#### NEW YORK NOT-FOR-PROFIT CORPORATION LAW § 706(d) and 714(c)
#### CONDUCT NECESSITATING REMOVAL AS OFFICER AND/OR DIRECTOR

280.    Plaintiff repeats, reiterates and re-alleges each and every allegation, as though fully set forth herein, all of the preceding paragraphs.

281.    Defendant Rabbi Perr is, and was a member of the Board at all relevant times.

282.    Defendant Milton Pollack is, and was a member of the Board at all relevant times.

283.    Defendant Rabbi Perr represented himself to be the Center's Executive Director at all relevant times.

284.    In or around the end of 2013, the ACCJ submitted a response to an IRS examination.

285.    The IRS examination response was supported by an affidavit, signed under penalties of perjury by Rabbi Perr, as Executive Director of the ACCJ, attesting to the accuracy of the submission.

286.    The IRS examination response falsely reported that the ACCJ received only $7,360,000 in settlement proceeds from the *Franqui* case.

287.    The IRS examination response also falsely reported that the ACCJ received no settlement funds from the *Collett* case, because on April 12, 2007 the ACCJ had entered into an arm's-length agreement with the New Jersey Center, authorized at a Board meeting on April 1, 2007, pursuant to which it had assigned all of its rights, title to, and interest from the Libya Cases to the New Jersey Center. The IRS examination response enclosed a copy of the April 12, 2007 Agreement signed by Milton Pollack.

288.    The April 12, 2007 Agreement was never authorized by the Board and, was in fact, a complete fabrication.

289.    Defendants Rabbi Perr and Milton Pollack therefore falsified documents and provided false information and documentation to the IRS.

290.    Accordingly, defendants Rabbi Perr and Milton Pollack should be removed for cause as directors of the Board pursuant to N-PCL §706(d).

FILED: NASSAU COUNTY CLERK 03/31/2017 01:35 PM

NYSCEF DOC. NO. Case 18-15691-CMG    Doc 43-4    Filed 05/08/18    Entered 05/08/18 21:30:37    Desc
Exhibit B - Operative complaint in Engelberg Derivative Litigation    Page 65 of 75

INDEX NO. 606919/2014

RECEIVED NYSCEF: 03/31/2017

291.    To the extent defendant Rabbi Perr represents himself to be the ACCJ's Executive

Director, he should be removed for cause as an officer of the ACCJ pursuant to N-PCL §714(c).

### FIFTH CAUSE OF ACTION:
### (Against Rabbi Perr and Jed Perr)
### NEW YORK NOT-FOR-PROFIT CORPORATION LAW §706(d) and 714(c)
### CONDUCT NECESSITATING REMOVAL AS OFFICER AND/OR DIRECTOR

292.    Plaintiff repeats, reiterates and re-alleges each and every allegation, as though

fully set forth herein, all of the preceding paragraphs.

293.    Defendant Rabbi Perr is, and was a member of the Board at all relevant times.

294.    Defendant Jed Perr is, and was a *de facto* officer of the ACCJ at all relevant times.

295.    In September 2012, a check for $2,010,000 was drawn to the ACCJ, reflecting its

share of the settlement proceeds from the *Collett* case.

296.    The $2,010,000 in settlement proceeds from the *Collett* case was not reported on

the ACCJ's Form 990 for 2009.

297.    The New Jersey Center reported a receipt in program service revenues in 2009 in

the amount of $2,646,144 on its Form 990 for 2009.

298.    In its IRS examination response, sworn to for accuracy under penalty of perjury

by defendant Rabbi Perr as Executive Director of the Center, the ACCJ reported that the

$2,010,000 in settlement proceeds from the *Collett* case was not received by the ACCJ as it had

been assigned to New Jersey Center pursuant to an agreement with the New Jersey Center on

April 12, 2007.

299.    The April 12, 2007 Agreement was not authorized by the Board and, was in fact,

completely fabricated.

300.    The transfer/assignment/conveyance therefore, was, unlawful.

FILED: NASSAU COUNTY CLERK 03/31/2017 01:35 PM
NYSCEF DOC. NO. 1  Case 18-15691-CMG   Doc 43-4   Filed 05/08/18   Entered 05/08/18 21:30:37   Desc   03/31/2017
Exhibit B - Operative complaint in Engelberg Derivative Litigation    Page 66 of 75

INDEX NO. 606919/2014

301.    By virtue of their positions of control and authority as directors and/or officers of the ACCJ, the Perrs were able to, and did, directly and indirectly control the management of the ACCJ and unlawfully transferred/assigned/conveyed the $2,010,000 from the *Collett* case to the New Jersey Center.

302.    On January 7, 2010, Jed Perr, acting as a representative of the ACCJ, received at least $240,000 as part of the settlement proceeds from the *Franqui* case.

303.    On May 4, 2010, an additional $480,000 was received by the ACCJ as settlement proceeds from the *Franqui* case.

304.    The Perrs never reported the receipt of these additional amounts from the *Franqui* case on the ACCJ's Form 990 for 2009.

305.    By virtue of their positions of control and authority as directors and/or officers of the ACCJ, the Perrs were able to, and did, directly and indirectly control the management of the ACCJ and knowingly unlawfully transferred/assigned/conveyed a portion of these additional amounts from the *Franqui* case to the New Jersey Center.

306.    The Perrs misappropriated the charitable assets and property of the ACCJ for their own personal benefit and/or the benefit of relatives and insiders.

307.    The Perrs failed to administer with due care and in good faith, for charitable purposes, the assets and property of the ACCJ.

308.    The Perrs have failed to discharge their duties as officers and/or director of the ACCJ with the degree of care, skill, prudence, diligence, and undivided loyalty required of them, by allowing the diversion of funds from the ACCJ to themselves and/or their relatives and insiders.

FILED: NASSAU COUNTY CLERK 03/31/2017 01:35 PM

NYSCEF DOC. NO. 18 Case 18-15691-CMG   Doc 43-4   Filed 05/08/18   Entered 05/08/18 21:30:37   Desc
Exhibit B - Operative complaint in Engelberg Derivative Litigation   Page 67 of 75

INDEX NO. 606919/2014

RECEIVED NYSCEF: 03/31/2017

309.    By engaging in the following, the Perrs breached their fiduciary duties of care, loyalty and obedience to the ACCJ and violated N-PCL §717.

310.    Accordingly, defendant Rabbi Perr should be removed for cause as director of the Board pursuant to N-PCL §706(d) and defendant Jed Perr should be removed for cause as an officer pursuant to N-PCL §714(c).

311.    To the extent defendant Rabbi Perr represents himself to be the Executive Director of the Center, he should be removed for cause as an officer of the ACCJ pursuant to N-PCL §714(c).

### SIXTH CAUSE OF ACTION:
#### (Against Jed Perr)
#### NEW YORK NOT-FOR-PROFIT CORPORATION LAW §714(c)
#### CONDUCT NECESSITATING REMOVAL AS OFFICER

312.    Plaintiff repeats, reiterates and re-alleges each and every allegation, as though fully set forth herein, all of the preceding paragraphs.

313.    Defendant Jed Perr is, and was a *de facto* officer of the ACCJ at all relevant times.

314.    In 2012, defendant Jed Perr set up ARC, a for-profit limited liability company of which he is the sole member.

315.    In or around October 2012, defendant Jed Perr used his position at the ACCJ to misrepresent the relationship between the ACCJ and ARC to usurp business opportunities for ARC, which he personally owns, constituting self-dealing and private inurement and unjustly enriched himself at the Center's expense.

316.    Accordingly, defendant Jed Perr has breached his fiduciary duties of care, loyalty and obedience and violated N-PCL §717 as an officer of the ACCJ and should be removed for cause as officer of the ACCJ pursuant to N-PCL §714(c).

FILED: NASSAU COUNTY CLERK 03/31/2017 01:35 PM
NYSCEF DOC. NO. 1
INDEX NO. 606919/2014
RECEIVED NYSCEF: 03/31/2017

Case 18-15691-CMG   Doc 43-4   Filed 05/08/18   Entered 05/08/18 21:30:37   Desc
Exhibit B - Operative complaint in Engelberg Derivative Litigation   Page 68 of 75

### SEVENTH CAUSE OF ACTION:
#### (Against Defendants)
### NEW YORK NOT-FOR-PROFIT CORPORATION LAW §720(a)(l)
### BREACH OF FIDUCIARY DUTIES

317.     Plaintiff repeats, reiterates and re-alleges each and every allegation, as though fully set forth herein, all of the preceding paragraphs.

318.     Defendant Rabbi Perr is, and was a Board member at all relevant times.

319.     Defendant Jed Perr is, and was a *de facto* officer of the ACCJ at all relevant times.

320.     Defendant Milton Pollack is, and was a member of the Board at all relevant times.

321.     Between 2009 and 2013, the Perrs donated $837,500 of ACCJ funds to Jewish religious and educational organizations.

322.     In 2013, Rabbi Perr and Milton Polack approved the grant of $100,000 to Mesila International Inc., an organization dedicated to help debt ridden indigent individuals restructure and improve their lives and a donation of $250,000 to the National Society of Hebrew Day Schools, an orthodox Jewish organization that fosters and promotes Torah-based Jewish religious education in North America.

323.     These conveyances were made in violation of the Center and Claimant Agreements and the Center's mission which restrict the use of the organization's charitable funds to benefit victims of terror.

324.     The conveyances therefore, were ultra vires as well as in violation of their duty of obedience requiring them to be faithful to the ACCJ's mission.

325.     By virtue of their positions of control and authority as directors and/or officers of the ACCJ, Defendants were able to, and did, directly and indirectly control the management of the ACCJ and knowingly unlawfully conveyed over $800,000 to organizations and entities

entirely unrelated to the Center's mission and in violation of the Center and Claimant Agreements.

326.    Defendants misappropriated the charitable assets and property of the ACCJ to advance their own personal causes.

327.    Defendants failed to administer with due care and in good faith, for charitable purposes, the assets and property of the ACCJ.

328.    Defendants have failed to discharge their duties as officers and/or director of the ACCJ with the degree of care, skill, prudence, diligence, and undivided loyalty required of them and their duty of obedience, by allowing the diversion of funds from the ACCJ to organizations and entities that do not advance the Center's mission and violate the Center and Claimant Agreements.

329.    By engaging in the following, Defendants breached their fiduciary duties of care, loyalty and obedience to the ACCJ and violated N-PCL §717.

330.    Accordingly, Defendants are liable in restitution and damages to the ACCJ under N-PCL §720(a)(l)(A) and (a)(l)(B) to account for their conduct in the neglect and violation of their duties in the management and disposition of corporate assets, and for their conduct in transferring ACCJ assets to organizations and entities unrelated to the Center's mission, and causing loss and waste of ACCJ's corporate assets.

**EIGHTH CAUSE OF ACTION:**
**(Against Defendants)**
**NEW YORK NOT-FOR-PROFIT CORPORATION LAW §720(a)(2)**
**UNLAWFUL CONVEYANCE, ASSIGNMENT OR TRANSFER**

331.    Plaintiff repeats, reiterates and re-alleges each and every allegation, as though fully set forth herein, all of the preceding paragraphs.

332.    Defendant Rabbi Perr is, and was a Board member at all relevant times.

333. Defendant Jed Perr is, and was a *de facto* officer of the ACCJ at all relevant times.

334. Defendant Milton Pollack is, and was a member of the Board at all relevant times.

335. Between 2009 and 2013, the Perrs donated $837,500 of ACCJ funds to Jewish religious and educational organizations.

336. In 2013, Rabbi Perr and Milton Polack approved the grant of $100,000 to Mesila International Inc., an organization dedicated to help debt ridden indigent individuals restructure and improve their lives and a donation of $250,000 to the National Society of Hebrew Day Schools, an orthodox Jewish organization that fosters and promotes Torah-based Jewish religious education in North America.

337. These conveyances were made in violation of the Center and Claimant Agreements and the Center's mission which restrict the use of the organization's charitable funds to benefit victims of terror.

338. The conveyances therefore, were ultra vires as well as in violation of their duty of obedience requiring them to be faithful to the ACCJ's mission.

339. By virtue of their positions of control and authority as directors and/or officers of the ACCJ, Defendants were able to, and did, directly and indirectly control the management of the ACCJ and knowingly unlawfully conveyed over $800,000 to organizations and entities entirely unrelated to the Center's mission and in violation of the Center and Claimant Agreements.

340. The conveyances therefore, should be set aside pursuant to N-PCL §720(a)(2).

## NINTH CAUSE OF ACTION
### (Against Defendants)
### NEW YORK NOT-FOR-PROFIT CORPORATION LAW § 706(d) and 714(c)
### CONDUCT NECESSITATING REMOVAL AS OFFICER AND/OR DIRECTOR

341.    Plaintiff repeats, reiterates and re-alleges each and every allegation, as though fully set forth herein, all of the preceding paragraphs.

342.    Defendant Rabbi Perr is, and was a member of the Board at all relevant times.

343.    Defendant Rabbi Perr represented himself to be the Center's Executive Director from 20IO onwards.

344.    Defendant Jed Perr is, and was a *de facto* officer of the ACCJ at all relevant times.

345.    Defendant Milton Pollack is, and was a member of the Board at all relevant times.

346.    Between 2009 and 2013, the Perrs donated $837,500 of ACCJ funds to Jewish religious and educational organizations.

347.    In 2013, Rabbi Perr and Milton Polack approved the grant of $100,000 to Mesila International Inc., an organization dedicated to help debt ridden indigent individuals restructure and improve their lives and a donation of $250,000 to the National Society of Hebrew Day Schools, an orthodox Jewish organization that fosters and promotes Torah-based Jewish religious education in North America.

348.    These conveyances were made in violation of the Center and Claimant Agreements and the Center's mission which restrict the use of the organization's charitable funds to benefit victims of terror.

349.    The conveyances therefore, were, unlawful and in violation of Defendant's duty of obedience.

350.    By virtue of their positions of control and authority as directors and/or officers of the ACCJ, Defendants were able to, and did, directly and indirectly control the management of

70

the ACCJ and knowingly unlawfully conveyed over $800,000 to organizations and entities

entirely unrelated to the Center's mission and in violation of the Center and Claimant

Agreements.

351.    By engaging in the following, Defendants breached their fiduciary duties of care,

loyalty and obedience to the ACCJ and violated N-PCL §717.

352.    Accordingly, defendants Rabbi Perr and Milton Pollack should be removed for

cause as Board members pursuant to N-PCL §706(d) and defendant Jed Perr should be removed

for cause as an officer of the ACCJ pursuant to N-PCL §714(c).

353.    To the extent defendant Rabbi Perr represents himself to be the ACCJ's Executive

Director, he should be removed for cause as an officer of the ACCJ pursuant to N-PCL §714(c).

### TENTH CAUSE OF ACTION
### (Against Defendants and Joined Defendant)
### DEMAND FOR ACCOUNTING

354.    Plaintiff repeats, reiterates and re-alleges each and every allegation, as though

fully set forth herein, all of the preceding paragraphs.

355.    Defendant Rabbi Perr is, and was a member of the Board at all relevant times.

356.    Defendant Jed Perr is, and was a *de facto* officer of the ACCJ at all relevant times.

357.    Defendant Milton Pollack is, and was a member of the Board at all relevant times.

358.    As officers and directors of the ACCJ, Defendants owe fiduciary duties and are

charged with administering with due care and in good faith, for charitable purposes, the assets

and property of the ACCJ.

359.    Given Defendants' misuse and misappropriation of the charitable assets and

property of the ACCJ alleged herein, and their failure to provide an accounting with respect to

the $2,646,144 transferred to Jed Perr's New Jersey Center, Plaintiff demands a full accounting

from 2009 until the present of monies and other assets held, transferred or received by the ACCJ, for the benefit of victims of terror.

359A.  Plaintiff further demands that the New Jersey Center, as the alter ego of the ACCJ and/or the individual Defendants, be required to provide an accounting of, and restore, all the monies, assets, revenues, and opportunities it has appropriated that rightfully belong to ACCJ.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a judgment in his favor and against Defendants, awarding the following relief:

(a)    Compelling defendant Jed Perr to account for his official conduct and holding him liable for his misappropriation of corporate assets in an amount to be determined at trial;

(b)    Compelling defendant Rabbi Perr to account for his official conduct and holding him liable for his misappropriation of corporate assets in an amount to be determined at trial;

(c)    Removing defendant Jed Perr as an officer of the ACCJ;

(d)    Removing defendant Milton Pollack as a director of the Board of the ACCJ;

(e)    Removing defendant Rabbi Perr as a director of the Board of the ACCJ and as Executive Director of the ACCJ;

(f)    Ordering an accounting of monies and other assets held, transferred or received by the ACCJ and the New Jersey Center for the benefit of victims of terror, between 2009 until present, and ordering the New Jersey Center to make restitution of funds and assets, and future revenues, to the ACCJ according to proof;

(g)    Ordering that the ACCJ and the New Jersey Center and any of its or their members, officers, agents, employees or attorneys, including but not limited to DLA and Torys LLP, deposit any funds received as recoveries on claimant(s)' judgments or settlements with claimants from 2013 onwards, into the Court's registry pending resolution of this lawsuit;

(h)    Ordering a reconstitution of the ACCJ Board by its members to comprise of five individuals: the Plaintiff, Rabbi Perr and three other independent directors;

(i)    Attorneys' fees and costs pursuant to N-PCL §623(e); and

FILED: NASSAU COUNTY CLERK 03/31/2017 01:35 PM
INDEX NO. 606919/2014
NYSCEF DOC. NO. 1 RECEIVED NYSCEF: 03/31/2017

Case 18-15691-CMG   Doc 43-4   Filed 05/08/18   Entered 05/08/18 21:30:37   Desc
Exhibit B - Operative complaint in Engelberg Derivative Litigation   Page 74 of 75

(j)      Any such other relief as this Court may deem just and proper.

Dated: New York, New York
         March 28, 2017

LIVINGSTON HOWE LLP
Attorneys for Plaintiff

By:  /s/ David D Howe
         David D. Howe
         Jeffrey E. Livingston
747 Third Avenue, 20th Floor
New York, New York 10017
Tel.: (212) 986-7887
E-mail: david@livingstonhowe.com

*Attorneys for Plaintiff, Dr. Michael Engelberg*

FILED: NASSAU COUNTY CLERK 03/31/2017 01:35 PM
INDEX NO. 606919/2014

NYSCEF DOC. NO. 404
Case 18-15691-CMG    Doc 43-4    Filed 05/08/18    Entered 05/08/18 21:30:37    Desc
RECEIVED NYSCEF: 03/31/2017
Exhibit B - Operative complaint in Engelberg Derivative Litigation    Page 75 of 75

## VERIFICATION

STATE OF NEW YORK    )
                              ) ss.:
COUNTY OF NEW YORK  )

Dr. Michael Engelberg, being duly sworn, deposes and says that he is the plaintiff in the above-entitled action; that he has read the foregoing Amended Complaint, and states that, to deponent's knowledge, the same is true except as to matters alleged upon information and belief, and as to those matters, deponent believes it to be true.

_____
Dr. Michael Engelberg

Sworn to before me this
28th day of  March, 2017

_____
Notary Public

DAVID D. HOWE
Notary Public, State of New York
No. 02HO5023125
Qualified in Westchester County
Commission Expires 01/31/96
05/05/2018

74