# EXHIBIT C

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NASSAU**

_____
:
MICHAEL ENGELBERG, derivatively on Behalf of          Index No. 606919/2014
THE AMERICAN CENTER FOR CIVIL JUSTICE, INC.,  :

            Plaintiff,                         :

          -v-                              :          **VERIFIED ANSWER**
                                       **AND COUNTERCLAIMS**
ELIEZER PERR, JEDIDIAH PERR, AND          :
MILTON POLLACK,
                             :

           Defendants.                     :

THE AMERICAN CENTER FOR CIVIL JUSTICE, INC.    :

          Nominal Defendant.               :
_____:


      Defendants Eliezer Perr, Jedidiah Perr, Milton Pollack (collectively, "Defendants"),

through their undersigned counsel, hereby answer the Complaint filed by Plaintiff Michael

Engelberg, M.D. ("Plaintiff" or "Dr. Engelberg"), assert Counterclaims and allege as follows:

## ANSWER

### NATURE OF THE CASE

      Defendants deny the fictional, malicious and defamatory nature of the case propounded by

Plaintiff, except admit that the American Center for Civil Justice, Inc. (the "ACCJ") was founded

in 1996.  Defendants aver that the true nature of the case is as follows:

      Relying upon willful and deliberate misrepresentations, Plaintiff attempts to paint a picture

of the ACCJ and the activities of the individual defendants that Plaintiff knows could not be farther

from the truth.  This action is Plaintiff's last ditch, desperate attempt to wrest control over millions

of charity dollars so that he can divert that money to himself as "executive compensation," as he

has done for over a decade while running another organization, the New York Center for Civil Justice, Tolerance & Values, Inc. ("NYCCJ"), all by himself with absolutely no board oversight. Indeed, for more than a decade, Plaintiff improperly paid himself more than $2 million from the charity funds he controlled. Moreover, as shown below, the charity funds that Plaintiff's NYCCJ controlled and from which he paid himself were obtained when Plaintiff improperly diverted $4.3 million from the ACCJ.

After years of improperly paying himself excessive salaries, Plaintiff realized that the well of charity funds at the NYCCJ would soon run dry. And so, for more than two years, Plaintiff has tried to get his hands on the charity funds of the ACCJ and American Center for Civil Justice Religious Liberty & Tolerance Inc. (the "New Jersey Center"), the organization that the ACCJ had contracted with to obtain collections on behalf of judgment claimants.

To obtain control of the ACCJ, Plaintiff brings this action which relies on the scurrilous assertion that the last 20 years of corporate activity of the ACCJ are fraudulent and should be ignored, and that the last 20 years of the activities of the ACCJ's board of directors (the "Board"), which Plaintiff had been a member of at various times, are invalid. Instead, according to Engelberg, corporate control of the ACCJ is maintained by three "members," Engelberg, Eliezer Perr and Milton Pollack, notwithstanding that since at least April 1999, the ACCJ has not acted as a membership organization and filed numerous documents, passed bylaws and issued board minutes confirming that the ACCJ was a non-membership corporation. Of course, the Complaint then alleges that the membership of Perr and Pollack should be revoked leaving Engelberg in sole control of the ACCJ and, more importantly, its charity funds – the real motivation for this lawsuit. Although Engelberg provided sworn testimony in another action that he was an unpaid "volunteer" of the ACCJ for the last 13 years, once in control, he would be free to pay himself excessive

salaries and pension benefits without Board approval or oversight as he has done for the last 13 years as the head of the NYCCJ as detailed below.

## A BRIEF SUMMARY OF THE ACCJ'S CORPORATE HISTORY AND ONGOING ACTIVITIES

The ACCJ was founded as a 501(c)(3) charity in 1996. Plaintiff was involved in helping found the ACCJ, joining with the ACCJ's founder, Eliezer Perr, and others after having been unable or unwilling to sustain a medical practice. It was Eliezer Perr who had extensive experience in international and human rights, with deep contacts internationally in the law enforcement and intelligence communities. Plaintiff, on the other hand, brought with him no such background or experience.

Although the original Certificate of Incorporation was silent as to the corporate structure, in April 1999, the ACCJ filed an amendment to the original Certificate of Incorporation confirming that the ACCJ was a non-membership corporation; this was corroborated and reinforced by another amendment in 2005. Corporate bylaws from 2007 and 2013 further confirm the ACCJ's non-membership status. This corporate structure went undisputed for many years. No one affiliated with the charity, including Plaintiff, challenged that structure. The ACCJ has never operated as a membership organization. Moreover, Plaintiff's objections to the constituency of the Board are contradicted by his attendance at board meetings, his signature on board minutes, statements he made under oath and his knowledge of board action for years without objection.

And for decades, the ACCJ has been advocating, very successfully, for victims of state-sponsored terrorism. This has been accomplished under the supervision of a dedicated board of directors, working with a small number of volunteers and salaried staff. The ACCJ, working in conjunction with attorneys it retained, has secured judgments totaling hundreds of millions of

dollars on behalf of claimants who have signed agreements with the ACCJ (the "Claimant and Center Agreements").

The ACCJ has also been involved in other matters on behalf of terror victims. For example, the ACCJ has been funding a federal lawsuit in Washington, DC on behalf of over 150 victims and family members of the November 2009 terror attack at Ft. Hood, Texas. ACCJ counsel, Neal Sher, represents the victims in that suit. Moreover, Sher was instrumental in securing Congressional legislation that led to the awarding of Purple Hearts and Defense of Freedom medals to victims. In addition to being recognized for their valor and sacrifices, awarding the Purple Hearts provided much needed financial and medical benefits to the recipients.

### The ACCJ's Charitable Donations Were Fully In Accord With Its Mission And The Law

Along with its advocacy and outreach on behalf of victims of terrorism, the ACCJ has since the first intake of monies contributed grants to educational institutions and other charities in furtherance of the ACCJ's mission. Plaintiff has been involved in the making of such grants and did not object to them until he realized that the money he has been using to pay himself excessive compensation at the NYCCJ would be running dry and he needed to obtain financial control over the ACCJ or New Jersey Center to continue his excessive salary. As noted in the contemporaneously-drafted minutes of an August 23, 2010 ACCJ Board of Directors meeting:

> Dr. Engelberg countered that insomuch as Jewish schools have been targeted throughout the world, and Jewish children are a constant target of Muslim terrorism as well as other forms violence and persecution, grants be provided to schools that are open to the concept of security, and who are willing to implement some form of security on their grounds, beginning with schools in the Jewish centers of NYC
> . . . .

New York law expressly recognizes the appropriateness of such donations by the ACCJ. The claims in Plaintiff's Complaint regarding charitable donations are not only pure hypocrisy, but

disingenuous and revisionist history.  Indeed, the NYCCJ, while spending the ACCJ's money from the Stethem claims, donated to similar charities as well.

## The Vital Collection Work Of The New Jersey Center

Similarly, Plaintiff's bogus claim that the New Jersey Center was improperly paid for its collections work on behalf of judgment claimants is a revisionist charade.  Pursuant to a contract between the ACCJ and the New Jersey Center entered into on April 12, 2007, and further amended and ratified in 2013 (the "New Jersey Contract"), and approved in both instances by the ACCJ's Board, the New Jersey Center undertook the responsibility of effectuating collections for judgment claimants on behalf of the ACCJ.  Prior to entering into the New Jersey Contract, the ACCJ had undertaken virtually no steps to locate and seize Iranian assets.  That work has now progressed on several fronts, including litigation in the U.S., the United Kingdom and Canada, and successful negotiations with the federal government regarding the satisfaction of the Iranian judgments.

Plaintiff has acknowledged that he knew of the role of the New Jersey Center; it was not a secret.  And he was in possession of the New Jersey Center's formation documents as early as December 2008, and, indeed, his NYCCJ donated thousands of dollars to the New Jersey Center. The New Jersey Center continues to this day to fulfill its obligations under the contract.

The allegations against Jed Perr and the New Jersey Center are refuted by facts of record, including Plaintiff's past admissions and his history of working with them on the very matters of which he now complains.

## Another Blatant Misrepresentation: The American Recovery Center

Plaintiff disingenuously makes claims about the incorporation of the American Recovery Center ("ARC").  However, Plaintiff was fully aware of ARC's intended purpose, which was not to benefit Jed Perr personally, but was to be owned by the New Jersey Center and used as a vehicle in collections work for non-ACCJ claimants.  Plaintiff was involved in the discussions concerning

-5-

whether the formation of a separate entity was needed for those purposes.  Plaintiff is also fully

aware that ARC never came to fruition and its status as an active company was revoked by New

Jersey.

### INDISPUTABLE FACTS SHOW THAT IT WAS PLAINTIFF WHO ENRICHED HIMSELF WITH MILLIONS OF DOLLARS OF CHARITABLE FUNDS

#### Plaintiff Enriched Himself Through the ACCJ

From 2001-2003, Plaintiff paid himself over $1.2 million.  During the same period, no

other ACCJ officer or director, including defendants Eliezer Perr and Milton Pollack, received any

compensation.  Moreover, Plaintiff also enjoyed the use of a leased luxury car paid for by the

ACCJ, as well as other perks.

#### Plaintiff's Improper Conduct in Connection With The Stethem Funds

In or around July 1998, the Raoul Wallenberg Center For Civil Justice, Inc., the

predecessor charity to the ACCJ, entered into an agreement with the family of Robert Dean

Stethem, who was kidnapped and killed by terrorists, pursuant to which the ACCJ undertook to

support litigation against the perpetrators of the crime.  DLA Piper was retained to prosecute the

case.  The ACCJ covered all expenses and paid significant legal fees.

Pursuant to the agreement, the Stethems pledged to give the ACCJ 20% of any recovery so

that the ACCJ could continue its work.  The litigation was indeed successful and the Stethems

collected over $21,000,000.  From that recovery, the ACCJ was entitled to approximately

$4,300,000.  Plaintiff arranged for those funds to instead be diverted to his NYCCJ.

In attempting to establish the legitimacy of depositing the Stethem funds in his NYCCJ,

Plaintiff has pointed to a series of "Acknowledgment[s] of Charitable Contributions" provided by

the NYCCJ to Stethem family members.  This obviously does not legitimize the diversion.  Each

such Acknowledgement states that "No goods or services are provided in return for this

205d2607f06ce5cf

contribution." That representation was blatantly false and Plaintiff knew it. He was well aware that the fees owed to the ACCJ and which he directed to his NYCCJ, were the direct result of services provided by the ACCJ. Plaintiff's actions are even more egregious considering that the Powers of Attorney for the Stethem family members were in his name (obtained while he was an employee of the ACCJ in conjunction with the Claimant and Center Agreements).

### Plaintiff's Conduct In Connection With The ACCJ Pension Fund

In or around 2001, the ACCJ authorized the creation of the American Center for Civil Justice Defined Benefit Pension Plan. Without informing the Board, Plaintiff then established the pension plan with himself as the sole beneficiary, made himself the manager of the pension plan, and hired his wife's company to manage its investments. Between 2001 and 2003, Plaintiff wrote ACCJ checks totaling over $340,000 to the pension plan. For more than a decade he filed IRS Form 5500 without the permission or knowledge of the Board. At this and all other relevant times, he remained the pension plan's sole beneficiary. In or around 2011, while a Director of the ACCJ and without the knowledge of the rest of the Board, Plaintiff unilaterally directed the dissolution of the pension plan and subsequent rollover of over $900,000 to his individual retirement account.

### Plaintiff Further Enriched Himself Through His Stewardship of the NYCCJ, Which He Privatized For Personal Gain

Having received more than four million dollars of ACCJ funds (which left the ACCJ with virtually no assets), Plaintiff illegally used most of those funds to enrich himself. It was not until recently that it became known that the primary activity of the NYCCJ was to line Plaintiff's pockets. The NYCCJ Form 990s reveal that after the infusion of the Stethem funds into the NYCCJ's account, Plaintiff's compensation from the NYCCJ was almost $1.6 million from 2003-2013. Additionally, Plaintiff established a pension fund from which he received more than

$400,000.  Thus, of the approximately $4,300,000 in Stethem fees—which has been the primary source of NYCCJ funding—approximately half of that went directly to Plaintiff.

Plaintiff's filings with the IRS reveal that the largest single expenditure of the NYCCJ has been Plaintiff's compensation.  Conspicuous by its absence is the reporting of any significant efforts to support or advocate on behalf of terror victims.

Indeed, his tax filings reveal no programmatic activity in furtherance of any mission.  The NYCCJ also made charitable gifts, which even taken as a whole were significantly smaller than the compensation Plaintiff paid himself.  If he was so deeply committed to promoting the interests of victims of terror, he would have devoted much of his available resources to fighting for their interests.  He did not.  Instead, those resources went directly to his pockets.  Plaintiff has no business being reinstated at the ACCJ, or indeed, running any charity at all.

Moreover, individuals he had identified as NYCCJ board members confronted him with serious accusations, including that the charity was governed solely by him; that no board of directors meetings had ever been called; and that drafts of the required IRS Form 990s had not been circulated to the board before filing.  It was demanded that Plaintiff explain how he could possibly justify taking large salaries without obtaining board approval.  Plaintiff did not, because he could not, provide any explanation for his unilateral and improper actions.

Recognizing that the NYCCJ board members were challenging Plaintiff's activities and realizing that the assets of the NYCCJ were almost exhausted, the allegations of the Complaint are intentional distortions calculated to seize control over the ACCJ's charity funds.  Ironically, the picture Plaintiff attempts to paint of Defendants allegedly enriching themselves through misappropriation and self-dealing is a self-portrait.  Plaintiff's pattern of behavior over the years

establishes that he is singularly unfit to serve on any board, and is not someone who should be entrusted with running a charitable institution.

1.      Defendants deny the allegations set forth in Paragraph 1 of the Complaint, except deny knowledge or information sufficient to form a belief as to whether Plaintiff resides at 75 Woodmere Blvd., South Woodmere, New York 11598.

2.      Defendants deny the allegations set forth in Paragraph 2 of the Complaint, except admit that the ACCJ is a not-for-profit organization, organized under the laws of the State of New York, with its principal place of business at 4912 14th Avenue, Brooklyn, NY 11219, and recognized by the IRS as a tax exempt 501(c)(3) organization.

3.      Defendants deny the allegations set forth in Paragraph 3 of the Complaint, except admit that Eliezer Perr is an individual residing at 63 Hedge Drive, Lakewood, New Jersey 08701.

4.      Defendants deny the allegations set forth in Paragraph 4 of the Complaint, except admit that Jed Perr is an individual residing at 23 Fern Street, Lakewood, New Jersey 08701 and the son of Eliezer Perr.

5.      Defendants admit the allegations set forth in Paragraph 5 of the Complaint.

6.      Paragraph 6 of the Complaint does not call for an admission or denial and speaks for itself.

7.      Defendants deny the allegations set forth in Paragraph 7 of the Complaint, except admit that the New Jersey Center is a not-for-profit corporation incorporated in the State of New Jersey with its principal place of business at 422 Martin Luther King Drive, Lakewood, New Jersey 08701, and state that Jed Perr is an officer and one of five directors of the New Jersey Center.

8.      Defendants deny the allegations set forth in Paragraph 8 of the Complaint.

9.      Defendants deny the allegations set forth in Paragraph 9 of the Complaint.

10.     Defendants deny the allegations set forth in Paragraph 10 of the Complaint, except neither admit nor deny any allegation of law therein.

11.     Defendants deny the allegations set forth in Paragraph 11 of the Complaint, except neither admit nor deny any allegation of law therein.

12.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 12 of the Complaint, except neither admit nor deny any allegation of law therein.

13.     Defendants deny the allegations set forth in Paragraph 13 of the Complaint, except neither admit nor deny any allegation of law therein.

14.     Defendants deny the allegations set forth in Paragraph 14 of the Complaint, except neither admit nor deny any allegation of law therein.

15.     Defendants deny the allegations set forth in Paragraph 15 of the Complaint, except neither admit nor deny any allegation of law therein.

16.     Defendants deny the allegations set forth in Paragraph 16 of the Complaint, except neither admit nor deny any allegation of law therein.

17.     Defendants deny the allegations set forth in Paragraph 17 of the Complaint, except neither admit nor deny any allegation of law therein.

18.     Defendants deny the allegations set forth in Paragraph 18 of the Complaint.

19.     Defendants deny knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 19 of the Complaint, except admit that Eliezer Perr and Plaintiff had a long-standing, close relationship and that Plaintiff sought Eliezer Perr's advice and guidance.

20.     Defendants admit the allegations set forth in Paragraph 20 of the Complaint.

-10-

21.    Defendants admit the allegations set forth in Paragraph 21 of the Complaint.

22.    Defendants deny the allegations set forth in Paragraph 22 of the Complaint.

23.    Defendants deny the allegations set forth in Paragraph 23 of the Complaint, and state that the ACCJ assisted and supported Stephen Flatow and advocated for the Flatow Amendment.

24.    Defendants deny the allegations set forth in Paragraph 24 of the Complaint.

25.    Defendants admit the allegations set forth in Paragraph 25 of the Complaint.

26.    Defendants deny the allegations set forth in Paragraph 26 of the Complaint, and state that the express purposes in the original and amendment to the Certificate of Incorporation of the ACCJ are:

> To create, form and establish a civil rights organization for the benefit of victims of terrorism in the United States and abroad; to promote, foster, increase and advance the civil rights of victims of terrorism; to maintain a network of lawyers, researchers, journalists, investigators and government officials to further the purposes of this corporation; to identify and document terrorist acts committed and/or sponsored by individuals, groups or states; to identify sources, resources and assets of the perpetrators and sponsors of terrorism to advise victims of their rights and methods of addressing compensation for acts of terror; to advocate the passage of legislation that will make it a crime to sponsor, aid and abet terrorists and to promote legislation that will simplify and speed the collection of punitive damages; to encourage interest, awareness and activism in the American and world political arena with reference to the plight of victims of terrorism throughout the world; to initiate and promote civic and political programs beneficial to the victimized people of the world; to hold, conduct and organize meetings, discussions and forums to consider community opinions on issues affecting the health and the economic, educational and social welfare of victims of terrorism throughout the world; to aid, assist, cooperate, co-sponsor and otherwise engage in concerted action with private and governmental agencies and organizations on all programs designed, calculated and dedicated to the improvement of life for the aforesaid people; to solicit, collect and otherwise raise money for charitable, eleemosynary and benevolent purposes and to expend such monies for such purposes and generally to advance the accountability to the victims of terrorists and those who sponsor, aid and abet acts of terror throughout the world.

> In furtherance of its corporate purposes, the corporation shall have all the general powers enumerated in Section 202 of the Not-For-Profit Corporation Law,

together with the power to solicit grants and contributions for the corporate purposes.

Nothing herein shall authorize this corporation, directly or indirectly, to engage in or include among its purposes, any of the activities mentioned in the Not-For-Profit Corporation Law, Section 404(b)-(v).

Certification of Incorporation, dated November 21, 1996.

Said corporation is organized for charitable, religious and educational purposes, including for such purposes, the making of distributions to such organizations and those that are committed to perpetuate the causes of civil liberties, civil justice, religious freedom and tolerance as guaranteed by the United States Constitution, and those that qualify as exempt organizations under section 501(c)(3) of the Internal Revenue Code, or the corresponding section of any future federal tax code.

Certificate of Amendment of the Certificate of Incorporation, dated January 20, 2005.

27.    Defendants admit the allegations set forth in Paragraph 27 of the Complaint.

28.    Defendants deny knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 28 of the Complaint.

29.    Defendants deny the allegations set forth in Paragraph 29 of the Complaint, except admit that to accomplish one of its purposes, and on the premise that lawsuits are an effective deterrent to international terrorists and their financial backers, the ACCJ entered into written agreements with victims of terrorism or the estate representatives of murdered victims, under the terms of which, the ACCJ would advance funds for litigation and retain law firms and individual lawyers to prosecute the claims on behalf of victims of terrorism.

30.    Defendants deny the allegations set forth in Paragraph 30 of the Complaint, and state that the powers of attorney were signed by Plaintiff as a representative of the ACCJ.

31.    Defendants deny the allegations set forth in Paragraph 31 of the Complaint and refer to the particular agreements for the complete terms thereof.

-12-

32.      Defendants deny the allegations set forth in Paragraph 32 of the Complaint and refer to the particular agreements for the complete terms thereof.

33.      Defendants deny the allegations set forth in Paragraph 33 of the Complaint.

34.      Defendants deny the allegations set forth in Paragraph 34 of the Complaint.

35.      Defendants deny the allegations set forth in Paragraph 35 of the Complaint, except admit that certain fee agreements were entered into by the ACCJ on behalf of certain plaintiffs with various law firms in connection with lawsuits to be commenced against those responsible for certain terrorist attacks, and the terms of the fee agreements varied, and Plaintiff was one of the people involved in negotiating fee agreements.

36.      Defendants admit the allegations set forth in Paragraph 36 of the Complaint.

37.      Defendants admit the allegations set forth in Paragraph 37 of the Complaint.

38.      Defendants deny the allegations set forth in Paragraph 38 of the Complaint, except admit that after a long and protracted litigation, in 2006 the D.C. court awarded the 67 claimants a total of $254,431,903 in compensatory damages, and in 2009, an additional $36,658,063 was awarded as well as $300,000,000 in punitive damages for a total judgment of $591,089,956, and state that, in conjunction with the Claimant and Center Agreements, the 67 claimants each gave Plaintiff a power of attorney as a representative of the ACCJ.

39.      Defendants deny the allegations set forth in Paragraph 39 of the Complaint, except admit that Paul Blais, a permanent member of an aircrew in the United States Air Force and Curtis and Maria Taylor, his stepfather and biological mother, filed this case in 2002; Mr. Blais' aircrew had been sent to Saudi Arabia as part of a peacetime deployment of U.S. troops tasked with ensuring compliance with United Nations Security Council resolutions; he was one of the hundreds seriously injured in the Khobar Towers attack; after the explosion, Mr. Blais was rescued from the

rubble, barely alive and unconscious; he was treated in the hospital for three or four days before being identified; he suffered serious brain trauma, a deprivation of oxygen, extensive scalp lacerations and was in a coma for approximately five weeks, in total; in total, Mr. Blais spent four months in hospital and received extensive rehabilitation for another six months, and he continues to suffer from depression, PTSD and survivor's guilt; and state that, in conjunction with the Claimant and Center Agreements, Paul Blais, and Curtis and Maria Taylor each gave Plaintiff a power of attorney as a representative of the ACCJ.

40.    Defendants admit the allegations set forth in Paragraph 40 of the Complaint.

41.    Defendants deny the allegations set forth in Paragraph 41 of the Complaint, except admit that the *Holland* case was filed in 2001 by Donna Marie Holland, the widow, and sons, James Holland and Chad Holland, of late Officer Robert Holland, a U.S. service member who served in the Navy; the attack by Hezbollah was the most deadly terrorist attack against American citizens prior to September 11, 2011; the October 23, 1983 Marine barracks bombing was in Beirut, Lebanon, during which 241 American servicemen acting as part of a multinational U.S. peace keeping force were murdered in their sleep by a suicide bomber; Officer Holland was killed instantly, however, given the nature of the blast, his family was forced to wait weeks for his body to be identified; the death of Officer Holland had a profound emotional impact on his family; and state that, in conjunction with the Claimant and Center Agreements, the Estate of Robert Holland and Donna Marie Holland each gave Plaintiff a power of attorney as a representative of the ACCJ.

42.    Defendants admit the allegations set forth in Paragraph 42 of the Complaint.

43.    Defendants deny the allegations set forth in Paragraph 43 of the Complaint, except admit that Plaintiffs Diana Campuzano, Avi Elishis and Gregg Salzman filed this case in 2000; the claimants were at the crowded Ben Yehuda pedestrian street mall in Jerusalem, Israel on the

-14-

afternoon of September 4, 1997 when Hamas carried out a triple suicide bombing; the bombs were packed with nails, screws, pieces of glass and chemical poisons, designed to cause maximum pain; the detonated bombs killed five people and seriously wounded nearly 200 others, including the plaintiffs; and state that, in conjunction with the Claimant and Center Agreements, Diana Campuzano, Avi Elishis and Gregg Salzman each gave Plaintiff a power of attorney as a representative of the ACCJ.

44.     Defendants admit the allegations set forth in Paragraph 44 of the Complaint.

45.     Defendants admit the allegations set forth in Paragraph 45 of the Complaint.

46.     Defendants admit the allegations set forth in Paragraph 46 of the Complaint.

47.     Defendants admit the allegations set forth in Paragraph 47 of the Complaint.

48.     Defendants deny the allegations set forth in Paragraph 48 of the Complaint, except admit that the *Welch* case was filed in 2001 by Linda Welch, the wife, and sons, Christopher Welch and Brian Welch, of Kenneth Welch, a U.S. servicemen who died on September 20, 1984 in the suicide bombing at the United States Embassy Annex in East Beirut, Lebanon by Hezbollah that killed 24 people; in 2006, Linda Welch, Christopher Welch and Brian Welch, jointly filed an amended complaint with ACCJ claimants; and state that, in conjunction with the Claimant and Center Agreements, Betty Welch, Gerard Welch and Michael Welch each gave Plaintiff a power of attorney as a representative of the ACCJ.

49.     Defendants admit the allegations set forth in Paragraph 49 of the Complaint.

50.     Defendants deny the allegations set forth in Paragraph 50 of the Complaint.

51.     Defendants admit the allegations set forth in Paragraph 51 of the Complaint.

52.     Defendants admit the allegations set forth in Paragraph 52 of the Complaint.

53.     Defendants admit the allegations set forth in Paragraph 53 of the Complaint.

54.     Defendants admit the allegations set forth in Paragraph 54 of the Complaint.

55.     Defendants admit the allegations set forth in Paragraph 55 of the Complaint.

56.     Defendants admit the allegations set forth in Paragraph 56 of the Complaint.

57.     Defendants deny the allegations set forth in Paragraph 57 of the Complaint, except admit that pursuant to an agreement with the ACCJ, on October 9, 2001, Mr. Collett's wife and three children commenced the *Collett* action against Libya for his abduction, torture and wrongful death.

58.     Defendants deny the allegations set forth in Paragraph 58 of the Complaint, except admit that after the 1996 amendments to the FSIA, the ACCJ conceived of bringing litigation against the state sponsors of the 1972 Lod Airport Massacre, one of the most cold-blooded terrorist attacks at the time.

59.     Defendants admit the allegations set forth in Paragraph 59 of the Complaint.

60.     Defendants admit the allegations set forth in Paragraph 60 of the Complaint.

61.     Defendants deny the allegations set forth in Paragraph 61 of the Complaint, except admit that the ACCJ engaged an attorney, Joshua Ambush, to initiate contact with the families of some of the injured or killed victims to propose filing a lawsuit on their behalf, enter into the Claimant and Center Agreements and obtain powers of attorney on their behalves.

62.     Defendants deny knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 62 of the Complaint.

63.     Defendants deny the allegations set forth in Paragraph 63 of the Complaint.

64.     Defendants deny the allegations set forth in Paragraph 64 of the Complaint.

65.     Defendants admit the allegations set forth in Paragraph 65 of the Complaint.

66.    Defendants deny the allegations set forth in Paragraph 66 of the Complaint, except admit that by the mid-2000s the ACCJ had only limited funds, and state that this was a result of Plaintiff's excessive compensation and redirection of funds from the ACCJ to the NYCCJ.

67.    Defendants deny the allegations set forth in Paragraph 67 of the Complaint, except admit that an updated engagement was entered into with DLA Piper US LLP in 2007 to assist with collection efforts with respect to the Heiser Judgment, signed by Milton Pollack as President of the ACCJ, and Plaintiff as attorney-in-fact, who had obtained powers of attorney from certain claimants as a representative of the ACCJ.

68.    Defendants deny the allegations set forth in Paragraph 68 of the Complaint and refer to the 2007 DLA Agreement for the complete terms thereof.

69.    Defendants deny the allegations set forth in Paragraph 69 of the Complaint.

70.    Defendants deny the allegations set forth in Paragraph 70 of the Complaint and refer to the 2007 DLA Agreement for the complete terms thereof.

71.    Defendants deny knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 71 of the Complaint.

72.    Defendants deny the allegations set forth in Paragraph 72 of the Complaint, except admit that DLA Piper US LLP filed a notice of claim on behalf of the judgment creditors in the Heiser Litigation, asserting ownership in the Defendant Properties in the *650 Litigation*.

73.    Defendants deny the allegations set forth in Paragraph 73 of the Complaint.

74.    Defendants deny the allegations set forth in Paragraph 74 of the Complaint, except admit that Neal Sher headed the Office of Special Investigations (OSI), the Justice Department's Nazi prosecution unit, and received the Raoul Wallenberg Award for his work.

-17-

75.     Defendants deny the allegations set forth in Paragraph 75 of the Complaint, except admit that the ACCJ employed Neal Sher as a lawyer for the ACCJ beginning sometime in 2009.

76.     Defendants deny the allegations set forth in Paragraph 76 of the Complaint, except admit that on March 1, 2010, Neal Sher filed a notice of claim on behalf of the judgment creditors in the Non-Heiser litigations asserting ownership in the Defendant Properties in the *650 Litigation*.

77.     Defendants deny the allegations set forth in Paragraph 77 of the Complaint except admit that ACCJ entered into the 2011 DLA Agreement and refer to the 2011 DLA Agreement for the complete terms thereof.

78.     Defendants admit the allegations set forth in Paragraph 78 of the Complaint and refer to the 2011 DLA Agreement for the complete terms thereof.

79.     Defendants deny the allegations set forth in Paragraph 79 of the Complaint, except admit that ACCJ entered into the 2011 DLA Agreement and refer to the 2011 DLA Agreement for the complete terms thereof.

80.     Defendants deny the allegations set forth in Paragraph 80 of the Complaint, except admit that in or around 2011, Iranian assets, believed to be in excess of $1.5 billion, were located and frozen by governmental authorities in the U.K., and that Plaintiff signed the U.K. Cooperation Agreement, and further state that it contained a confidentiality provision, which Plaintiff violated by attaching the U.K. Cooperation Agreement to the Complaint.

81.     Defendants admit the allegations set forth in Paragraph 81 of the Complaint.

82.     Defendants deny the allegations set forth in Paragraph 82 of the Complaint, except neither admit nor deny any allegation of law therein.

83.     Defendants deny knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 83 of the Complaint.

-18-

84.    Defendants deny knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 84 of the Complaint.

85.    Defendants deny knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 85 of the Complaint, except admit that pursuant to the Claimant and Center Agreement dated July 15, 2000 between the ACCJ and Elaine Collett, individually and on behalf of the Estate of Alec Collett, the ACCJ was entitled to 20% of the recovery of settlement funds.

86.    Defendants deny the allegations set forth in Paragraph 86 of the Complaint, except admit that the New York County Surrogate's Court approved the petition and in or around September 29, 2009, four checks were drawn to the order of the ACCJ for a total payment of $2,010,000 by Elaine Collett, David Collett and Susan Maria Grant, in full satisfaction of the amounts due.

87.    Defendants admit the allegations set forth in Paragraph 87 of the Complaint.

88.    Defendants admit the allegations set forth in Paragraph 88 of the Complaint.

89.    Defendants admit the allegations set forth in Paragraph 89 of the Complaint.

90.    Defendants admit the allegations set forth in Paragraph 90 of the Complaint.

91.    Defendants admit the allegations set forth in Paragraph 91 of the Complaint.

92.    Defendants deny the allegations set forth in Paragraph 92 of the Complaint, except admit that the ACCJ's 2009 Form 990 reflects program service revenue of $7,360,000.

93.    Defendants deny the allegations set forth in Paragraph 93 of the Complaint.

94.    Defendants deny the allegations set forth in Paragraph 94 of the Complaint.

95.    Defendants deny the allegations set forth in Paragraph 95 of the Complaint, and refer to the Form 990 for 2009 for the complete terms thereof.

-19-

96.     Defendants deny the allegations set forth in Paragraph 96 of the Complaint, and refer to the Form 990 for the complete terms thereof .

97.     Defendants deny the allegations set forth in Paragraph 97 of the Complaint, except admit that the ACCJ engaged JoAnn Luehring of Roberts and Holland LLP to assist with an examination by the IRS and two Information Document Requests issued on September 7, 2010 and February 28, 2011.

98.     Defendants deny the allegations set forth in Paragraph 98 of the Complaint, except admit that Plaintiff worked closely with JoAnn Luehring with respect to the IRS examination.

99.     Defendants deny the allegations set forth in Paragraph 99 of the Complaint except admit that the ACCJ terminated Roberts and Holland LLP in December 2012.

100.    Defendants deny the allegations set forth in Paragraph 100 of the Complaint, except admit that in or around early 2013, the ACCJ hired attorney Marcus Owens, formerly the director of the IRS Exempt Organizations Division from 1990-2000, to assist the ACCJ with responding to the IRS examination.   Defendants further state that the ACCJ discussed the simultaneous engagement of Fred Goldberg and Emily Lam, both of Skadden, Arps, Slate, Meagher & Flom LLP with Fred Goldberg and Marcus Owens.

101.    Defendants deny the allegations set forth in Paragraph 101 of the Complaint, except deny knowledge and information sufficient to form a belief as to whether Plaintiff hired Jonathan Bach of Cooley LLP in January 2013.

102.    Defendants deny the allegations set forth in Paragraph 102 of the Complaint, except admit that, contrary to the ACCJ's Bylaws, on January 31, 2013, Mr. Bach sent an unsigned Notice purportedly on behalf of Plaintiff unilaterally purporting to call a Special Board Meeting of the ACCJ to be held at Mr. Bach's office.

-20-

103.    Defendants deny the allegations set forth in Paragraph 103 of the Complaint, except

admit in a letter dated February 7, 2013 and sent to Plaintiff, Eliezer Perr and Milton Pollack wrote,

among other things:

> We reiterate our view, as set forth in the email of ACCJ's Counsel, Neal Sher, of
> February 1, 2013, that it would beneficial to all to hold an informal meeting to
> discuss and hopefully resolve **all** issues. We are committed to addressing and
> resolving all of everyone's concerns and issues. . . . Should you nevertheless insist
> on a special board meeting, one will be convened, in accordance with the ACCJ
> By-laws and the New York Not-For-Profit Law, at ACCJ's offices and at a
> mutually convenient time. You will, of course, receive the appropriate notice.

February 7, 2013 Letter from Eliezer Perr and Milton Pollack to Plaintiff (emphasis added).

104.    Defendants deny the allegations set forth in Paragraph 104 of the Complaint.

105.    Defendants admit the allegations set forth in Paragraph 105 of the Complaint.

106.    Defendants deny the allegations set forth in Paragraph 106 of the Complaint, except

admit that on May 9, 2013, Eliezer Perr and Milton Pollack called for a meeting of the Board for

May 20, 2013 and that Plaintiff refused to participate in that meeting without the presence of his

personal attorney, Jonathan Bach.  The ACCJ determined that such participation by a personal

attorney would be inappropriate.

107.    Defendants deny the allegations set forth in Paragraph 107 of the Complaint, except

admit that the ACCJ had requested certain documents from Plaintiff, that were themselves

requested from the IRS, and Plaintiff did not provide them.

108.    Defendants deny the allegations set forth in Paragraph 108 of the Complaint.

109.    Defendants deny the allegations set forth in Paragraph 109 of the Complaint, except

admit Mr. Bach and Marcus Owens communicated during the course of preparing the response to

the IRS examination.

-21-

110.    Defendants deny the allegations set forth in Paragraph 110 of the Complaint, except admit that Caplin & Drysdale shared drafts of its audit response with Mr. Bach, and state that the drafts of the audit response speak for themselves.

111.    Defendants deny the allegations set forth in Paragraph 111 of the Complaint, except admit Mr. Bach was given copies of the minutes of the April 1, 2007 board meeting and the April 12, 2007 Agreement.

112.    Defendants deny the allegations set forth in Paragraph 112 of the Complaint, and refer to the IRS response and emails for the complete terms thereof, and state that Plaintiff failed to provide any documentation to Caplin & Drysdale after being requested to do so to substantiate his unsupported and false allegations.

113.    Defendants deny the allegations set forth in Paragraph 113 of the Complaint.

114.    Defendants deny the allegations set forth in Paragraph 114 of the Complaint.

115.    Defendants deny the allegations set forth in Paragraph 115 of the Complaint, except admit that Milton Pollack signed the April 1, 2007 Board minutes.

116.    Defendants deny the allegations set forth in Paragraph 116 of the Complaint, except admit that Plaintiff was not present at the April 1, 2007 Board meeting.

117.    Defendants deny the allegations set forth in Paragraph 117 of the Complaint, and state that the April 1, 2007 Board minutes speak for themselves.

118.    Defendants deny the allegations set forth in Paragraph 118 of the Complaint.

119.    Defendants deny the allegations set forth in Paragraph 119 of the Complaint.

120.    Defendants deny the allegations set forth in Paragraph 120 of the Complaint.

121.    Defendants deny the allegations set forth in Paragraph 121 of the Complaint.

122.    Defendants deny the allegations set forth in Paragraph 122 of the Complaint.

123.    Defendants deny the allegations set forth in Paragraph 123 of the Complaint.

124.    Defendants deny the allegations set forth in Paragraph 124 of the Complaint.

125.    Defendants deny the allegations set forth in Paragraph 125 of the Complaint and refer to the 2007 Agreement for the complete terms thereof.

126.    Defendants deny the allegations set forth in Paragraph 126 of the Complaint and refer to the 2007 Agreement for the complete terms thereof.

127.    Defendants deny the allegations set forth in Paragraph 127 of the Complaint.

128.    Defendants deny the allegations set forth in Paragraph 128 of the Complaint, except admit the ACCJ retained Stroock & Stroock & Lavan LLP, Carter Ledyard & Milburn, and Paul Gaston, and admit that the New Jersey Center was not a party to the Ambush Litigation, and refer to the DLA Agreements for the complete terms thereof.

129.    Defendants deny the allegations set forth in Paragraph 129 of the Complaint.

130.    Defendants deny the allegations set forth in Paragraph 130 of the Complaint and state that Plaintiff is well aware that the New Jersey Center was leading the collection efforts for judgment creditors and the ACCJ.

131.    Defendants deny the allegations set forth in Paragraph 131 of the Complaint.

132.    Defendants deny the allegations set forth in Paragraph 132 of the Complaint.

133.    Defendants deny the allegations set forth in Paragraph 133 of the Complaint.

134.    Defendants deny the allegations set forth in Paragraph 134 of the Complaint.

135.    Defendants deny the allegations set forth in Paragraph 135 of the Complaint, except neither admit nor deny any allegation of law therein.

136.    Defendants deny the allegations set forth in Paragraph 136 of the Complaint.

137.    Defendants deny the allegations set forth in Paragraph 137 of the Complaint.

138.     Defendants deny the allegations set forth in Paragraph 138 of the Complaint, except admit that the April 12, 2007 agreement states that "in lieu of funds, [it] is hereby assigning to [NEW JERSEY] CENTER, all ACCJ's interests in Libya claims," and further state that the ACCJ retained the New Jersey Center to pursue collections on judgments only, the April 12, 2007 Agreement did not assign to the New Jersey Center the ACCJ's rights and/or responsibilities to pursue claims that have not yet received judgments, and the *Franqui* cases were never reduced to judgment.

139.     Defendants deny the allegations set forth in Paragraph 139 of the Complaint, except admit that the ACCJ received $7,360,000 as proceeds from the *Franqui* case, and state that the IRS examination response speaks for itself.

140.     Defendants deny the allegations set forth in Paragraph 140 of the Complaint.

141.     Defendants admit the allegations set forth in Paragraph 141 of the Complaint.

142.     Defendants deny the allegations set forth in Paragraph 142 of the Complaint.

143.     Defendants deny the allegations set forth in Paragraph 143 of the Complaint and refer to the IDR for the complete terms thereof.

144.     Defendants deny the allegations set forth in Paragraph 144 of the Complaint, except admit that the New Jersey Center's Form 990 for 2009 showed the receipt of $2,646,144.

145.     Defendants deny the allegations set forth in Paragraph 145 of the Complaint.

146.     Defendants deny the allegations set forth in Paragraph 146 of the Complaint, and state that the New Jersey Center expended considerable funds, including to retain counsel, and engaged individuals from the intelligence community to locate Iranian assets in the United Kingdom as per the 2007 Agreement.

147.    Defendants deny the allegations set forth in Paragraph 147 of the Complaint, and state that Plaintiff was well aware of the formation of ARC and its purposes which are not as alleged in the Complaint.

148.    Defendants deny the allegations set forth in Paragraph 148 of the Complaint, and state that as documents reflect Plaintiff was well aware of, and involved with, the negotiations regarding, and potential participation of ARC with respect to, potential agreements with other judgment creditor groups.  The proposed work of ARC was entirely consistent with the mission of ACCJ.  No agreements were ever finalized.  ARC did not receive anything with respect to the potential agreements.  ARC was never operational and its status as an active company was revoked by New Jersey.

149.    Defendants deny knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 149 of the Complaint, except neither admit nor deny any allegation of law therein, and further deny that Jed Perr made any misrepresentations to DLA Piper US LLP regarding ARC.

150.    Defendants deny the allegations set forth in Paragraph 150 of the Complaint.

151.    Defendants deny the allegations set forth in Paragraph 151 of the Complaint, except admit that Plaintiff's counsel sent an email about ARC to Sharon Nokes and Marcus Owens and refer to the email for the complete contents thereof, and state that Plaintiff was well aware of, and involved with, the negotiations regarding ARC, contrary to the allegations of the Complaint.

152.    Defendants deny the allegations set forth in Paragraph 152 of the Complaint, and state that in furtherance of its collection efforts pursuant to the 2007 Agreement, the New Jersey Center became aware that there were Iranian assets in Canada, and Torys LLP was retained to pursue Iranian assets.  The New Jersey Center has been paying those fees.

153.    Defendants deny the allegations set forth in Paragraph 153 of the Complaint, except admit that on April 16, 2014, an agreement was reached between the U.S. Attorney for the Southern District of New York and various judgment creditor groups in the *650 Litigation*, on the distribution of funds once the properties forfeited were sold, which would help compensate the long-suffering victims of Iranian acts of terror.  The New Jersey Center, acting pursuant to the 2007 Agreement and in conjunction with DLA Piper US LLP, attorney for Heiser claimants, and Neal Sher, attorney for the Non-Heiser claimants, actively participated in reaching this agreement.

154.    Defendants deny the allegations set forth in Paragraph 154 of the Complaint.

155.    Defendants deny the allegations set forth in Paragraph 155 of the Complaint except deny knowledge or information sufficient to form a belief as to the truth of the allegations as to whether Welch contacted Plaintiff.

156.    Defendants deny the allegations set forth in Paragraph 156 of the Complaint, except admit that Mr. Welch had received a letter dated May 28, 2104, from Jed Perr, acting pursuant to the 2007 Agreement, sent to all the Non-Heiser Judgment Creditors (the "May 28, 2014 Letter") advising them that claims had been filed on their behalf in Canada where Iranian assets had been located; that a mutual cooperation settlement agreement was being negotiated by Torys LLP that had been retained to represent the Heiser and Non-Heiser claimants; neither admit nor deny any allegation of law in the second sentence; and state that Plaintiff, in the early 2000s, had received powers of attorney as an employee of the ACCJ in conjunction with the Claimant and Center Agreements, at the relevant time, Plaintiff cut off communication with the ACCJ, and thus the ACCJ sought powers of attorneys to facilitate the effective retention of counsel and in pursuit of collections, also pursuant to the Claimant and Center Agreements.

-26-

157.     Defendants deny the allegations set forth in Paragraph 157 of the Complaint, except admit that Mr. Welch contacted Jed Perr.

158.     Defendants deny the allegations set forth in Paragraph 158 of the Complaint.

159.     Defendants deny the allegations set forth in Paragraph 159 of the Complaint, except deny knowledge and information sufficient to form a belief as to the truth of the allegations concerning Mr. Welch and Plaintiff speaking to one another.

160.     Defendants deny the allegations set forth in Paragraph 160 of the Complaint.

161.     Defendants deny the allegations set forth in Paragraph 161 of the Complaint, except neither admit nor deny any allegation of law therein, and state that the power of attorney set forth was in furtherance of Claimant and Center Agreements and clearly limited to the ongoing collection efforts worldwide and did not extend, for example, to general control over individual accounts or estate matters.

162.     Defendants deny the allegations set forth in Paragraph 162 of the Complaint, and state that Plaintiff is well aware that the May 28, 2014 Agreement did not increase the fees to claimants and that Plaintiff's allegations are designed to malign and defame Defendants.  The original litigation engagement agreements entered into in the early 2000s provided for a 20% fee for the legal and other costs related to bringing the initial lawsuit culminating in a judgment (the "Litigation Fee").  In 2011, with Plaintiff's knowledge and active participation, the claimants entered into collection agreements that provided for an additional up to 20% for legal and consultant fees related to collections (with no additional pledge to the ACCJ) (the "Collection Fee").  The May 28, 2014 Agreement combined the 20% Litigation Fee and 20% Collection Fee for a total of 36%.  The 36% covers any and all expenses.

-27-

163.    Defendants deny the allegations set forth in Paragraph 163 of the Complaint, and state that as explained in Paragraph 162, the fees were never raised.

164.    Defendants deny the allegations set forth in Paragraph 164 of the Complaint, and state that neither the May 28, 2014 agreement nor the prior agreements specifically identified all relevant attorneys or other personnel that would share in the recovery, and there never was any agreement, either written or oral, for ARC to share in any such recovery.

165.    Defendants deny knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 165 of the Complaint.

166.    Defendants deny knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 166 of the Complaint.

167.    Defendants deny the allegations set forth in Paragraph 167 of the Complaint, except admit that counsel for the ACCJ sent a letter dated June 10, 2014 to Plaintiff's counsel and that representatives of the ACCJ advised DLA that Plaintiff was not a representative of the ACCJ and refer to the letter for the complete terms thereof.

168.    Defendants deny the allegations set forth in Paragraph 168 of the Complaint, except admit that Plaintiff was appointed to the Board at a May 9, 2010 Board meeting to complete the remaining term of a member who had resigned, Plaintiff's term was to expire in May 2011, and that he was subsequently replaced on the Board when an additional member was appointed.

169.    Defendants deny the allegations set forth in Paragraph 169 of the Complaint, except admit that a copy of the May 9, 2010 Board minutes is attached as Exhibit 26 to the Complaint, and that Plaintiff signed the May 9, 2010 Board minutes, which show that Plaintiff was neither an officer nor director of the ACCJ as of May 9, 2010.

170.    Defendants admit the allegations set forth in Paragraph 170 of the Complaint.

171.    Defendants deny the allegations set forth in Paragraph 171 of the Complaint, except neither admit nor deny any allegation of law therein.

172.    Defendants deny the allegations set forth in Paragraph 172 of the Complaint, except admit that the ACCJ amended its bylaws in April 2007, neither admit nor deny any allegation of law therein, and state that the ACCJ never operated as a membership organization, Plaintiff never paid any membership dues, and Plaintiff admitted that the ACCJ was not a membership organization in numerous documents, including in a submission to the New York Secretary of State.

173.    Defendants deny the allegations set forth in Paragraph 173 of the Complaint.

174.    Defendants deny the allegations set forth in Paragraph 174 of the Complaint, and state that the 2009 Form 990 and the Ambush Declaration speak for themselves, and for the reasons set forth above, Jonathan Tendler, Mark Hirschman and Milton Pollack were correctly identified in the 2009 Form 990 as directors of the ACCJ's Board, as Plaintiff himself has also testified under oath.

175.    Defendants deny the allegations set forth in Paragraph 175 of the Complaint, except admit that the May 9, 2010 minutes, signed by Plaintiff, demonstrate that Plaintiff and Eliezer Perr returned to the Board as directors, and that Eliezer Perr was named President/Executive Director of the Center.

176.    Defendants deny the allegations set forth in Paragraph 176 of the Complaint.

177.    Defendants deny the allegations set forth in Paragraph 177 of the Complaint but admit that Exhibit 31 to the Complaint wrongly references Plaintiff as the President of the ACCJ.

178.      Defendants admit the allegations set forth in Paragraph 178 of the Complaint, and state that Eliezer Perr was elected as the executive director of the ACCJ on May 9, 2010, as reflected in the May 9, 2010 meeting minutes, signed by Plaintiff.

179.      Defendants deny the allegations set forth in Paragraph 179 of the Complaint.

180.      Defendants deny the allegations set forth in Paragraph 180 of the Complaint, and state that the 2010 Form 990 affirmatively states that the Center had a written conflict of interest policy. *See* Compl. Ex. 54 (2010 Form 990).

181.      Defendants deny the allegations set forth in Paragraph 181 of the Complaint.

182.      Defendants deny knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 182 of the Complaint.

183.      Defendants deny knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 183 of the Complaint.

184.      Defendants deny the allegations set forth in Paragraph 184 of the Complaint. *See supra* Paragraphs 162-63.

185.      Defendants deny the allegations set forth in Paragraph 185 of the Complaint. *See supra* Paragraphs 162-64.

186.      Defendants deny the allegations set forth in Paragraph 186 of the Complaint, and state that the information that Plaintiff claims was omitted from the March 24 letter was in fact contained in the agreement attached to that letter.

187.      Defendants admit the allegations set forth in Paragraph 187 of the Complaint, and state that the 2011 Agreement with the claimants allows up to 20% for both DLA Piper US LLP fees and other legal and expert fees.

188.      Defendants deny the allegations set forth in Paragraph 188 of the Complaint.

189.    Defendants deny the allegations set forth in Paragraph 189 of the Complaint, except admit that the ACCJ is not incorporated in New Jersey.  Defendants further state that the *Brewer* plaintiffs were always New Jersey Center clients and Jed Perr held powers of attorney.

190.    Defendants deny knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 190 of the Complaint.

191.    Defendants deny the allegations set forth in Paragraph 191 of the Complaint, except deny knowledge and information sufficient to form a belief as to the truth of Plaintiff trying to get more information.

192.    Defendants deny knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 192 of the Complaint, except neither admit nor deny any allegation of law therein.

193.    Defendants deny the allegations set forth in Paragraph 193 of the Complaint, except admit that Daniel Kurtz made a request for information on a July 10, 2014 telephone conversation with Marcus Owens, outside counsel for the ACCJ and his colleague Sharon Nokes; Marcus Owens advised that he would consult with the ACCJ; and in a July 11, 2014 email to Marcus Owens, Carla Gant of Skadden Arps stated that Plaintiff had not been apprised of any details of either the Canadian litigation or proposed settlement agreement and looked forward to receiving "details as to the Canadian litigation, the settlement and any fee arrangement, and why the Center believes it [to be] in the best interest of the judgment creditors, for [Dr. Engelberg's] assessment." Compl. Ex. 37 (July 11, 2014 Email from Carla Gant to Marcus Owens).

194.    Defendants admit the allegations set forth in Paragraph 194 of the Complaint.

195.    Defendants deny the allegations set forth in Paragraph 195 of the Complaint, except admit that Marcus Owens sent a copy of the letter and advised that the ACCJ was ready to provide additional information if requested to do so.

196.    Defendants deny the allegations set forth in Paragraph 196 of the Complaint, except admit that the July 15, 2014 letter advised the remaining Non-Heiser claimants who had not yet signed the May 28, 2014 Agreement that, should they wish to have the ACCJ represent their interests and be included in the Canadian mutual cooperation settlement agreement and be a part of the Center's judgment creditor group, they needed to execute the May 28, 2014 Agreement and requested that a response be provided in writing by July 17, 2014.

197.    Defendants deny the allegations set forth in Paragraph 197 of the Complaint, except admit that by letter dated July 17, 2014, Daniel Kurtz alleged that Plaintiff had no intention of impeding a settlement in Canada and refer to the letter for the complete terms thereof.

198.    Defendants deny knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 198 of the Complaint, except neither admit nor deny any allegation of law therein.

199.    Defendants deny the allegations set forth in Paragraph 199 of the Complaint.

200.    Defendants deny the allegations set forth in Paragraph 200 of the Complaint.

201.    Defendants deny knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 201 of the Complaint.

202.    Defendants deny the allegations set forth in Paragraph 202 of the Complaint, and refer to the emails for the complete terms thereof.

203.    Defendants deny the allegations set forth in Paragraph 203 of the Complaint.  *See supra* Paragraphs 162-63.

204.    Defendants deny the allegations set forth in Paragraph 204 of the Complaint.

205.    Defendants deny the allegations set forth in Paragraph 205 of the Complaint.

206.    Defendants deny the allegations set forth in Paragraph 206 of the Complaint, and refer to the letter for the complete terms thereof.

207.    Defendants deny the allegations set forth in Paragraph 207 of the Complaint, and refer to the email for the complete terms thereof.

208.    Defendants deny knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 208 of the Complaint.

209.    Defendants deny the allegations set forth in Paragraph 209 of the Complaint, except deny knowledge and information sufficient to form a belief as to the truth of the allegations with respect to what Torys LLP allegedly said to Plaintiff.

210.    Defendants deny the allegations set forth in Paragraph 210 of the Complaint.

211.    Defendants deny the allegations set forth in Paragraph 211 of the Complaint.

212.    Defendants deny the allegations set forth in Paragraph 212 of the Complaint, except admit that Marcus Owens sent the August 12, 2014 letter, attached as Exhibit 48 to the Complaint, to Daniel Kurtz and refer to the letter for the complete terms thereof and deny knowledge or information sufficient to form a belief as to what Mr. Welch discussed with Plaintiff and state that the letter pointed out that Plaintiff's characterization of the fee structure was incorrect.

213.    Defendants deny the allegations set forth in Paragraph 213 of the Complaint, except admit that Daniel Kurtz sent the August 13, 2014 letter, attached as Exhibit 49 to the Complaint, to Marcus Owens and state that it failed to explain or defend Plaintiff's position that his characterization of the fee structure was in fact not incorrect.

214.     Defendants deny the allegations set forth in Paragraph 214 of the Complaint, and state that pursuant to the 2007 Agreement Jed Perr sent a letter on September 9, 2014 to judgment creditors.

215.     Defendants deny the allegations set forth in Paragraph 215 of the Complaint, except admit that on September 11, 2014, Eliezer Perr sent a Notice of Annual Board Meeting for the ACCJ to be held on September 18, 2014 to discuss, among other things, the annual ACCJ Board membership.

216.     Defendants deny the allegations set forth in Paragraph 216 of the Complaint, and state that the Eliezer Perr sent Plaintiff an email dated September 17, 2014, which stated that "Participation by your attorneys: As I'm sure you recall, at the May 2013 Board Meeting it was decided that your personal attorney could not participate and we see no reason to deviate from that position.  Accordingly, it would be inappropriate for either Ms. Katar or Mr. Kurtz to participate in tomorrow'[s] meeting," and neither Plaintiff nor his attorneys challenged that decision at the time.  Compl. Ex. 51 (September 17, 2014 Email from Eliezer Perr to Plaintiff).

217.     Defendants deny the allegations set forth in Paragraph 217 of the Complaint, except admit that Plaintiff participated telephonically, and further state that neither at this board meeting nor at any time prior had Plaintiff ever taken the position that the ACCJ was a member corporation or that he could not be replaced on the Board of Directors or that the Board of Directors was invalidly constituted.

218.     Defendants deny the allegations set forth in Paragraph 218 of the Complaint.

219.     Defendants deny the allegations set forth in Paragraph 219 of the Complaint, except admit that under the Claimant and Center Agreements, claimants agreed to pay the Center a portion of the net proceeds of any recovery, and that Exhibit 2 to the Complaint states that "[i]n further

-34-

consideration of the ongoing efforts and services of the Center to assist other victims of oppression and to deter further acts of terrorism, and in order to promote the Center's ability to carry out its goals and purposes . . . ." Compl. Ex. 2 (Claimant and Center Agreement).

220.    Defendants deny the allegations set forth in Paragraph 220 of the Complaint, and state that the express purposes in the original and amendment to the Certificate of Incorporation are:

> To create, form and establish a civil rights organization for the benefit of victims of terrorism in the United States and abroad; to promote, foster, increase and advance the civil rights of victims of terrorism; to maintain a network of lawyers, researchers, journalists, investigators and government officials to further the purposes of this corporation; to identify and document terrorist acts committed and/or sponsored by individuals, groups or states; to identify sources, resources and assets of the perpetrators and sponsors of terrorism to advise victims of their rights and methods of addressing compensation for acts of terror; to advocate the passage of legislation that will make it a crime to sponsor, aid and abet terrorists and to promote legislation that will simplify and speed the collection of punitive damages; to encourage interest, awareness and activism in the American and world political arena with reference to the plight of victims of terrorism throughout the world; to initiate and promote civic and political programs beneficial to the victimized people of the world; to hold, conduct and organize meetings, discussions and forums to consider community opinions on issues affecting the health and the economic, educational and social welfare of victims of terrorism throughout the world; to aid, assist, cooperate, co-sponsor and otherwise engage in concerted action with private and governmental agencies and organizations on all programs designed, calculated and dedicated to·the improvement of life for the aforesaid people; to·solicit, collect and otherwise raise money for charitable, eleemosynary and benevolent purposes and to expend such monies for such purposes and generally to advance the accountability to the victims of terrorists and those who sponsor, aid and abet acts of terror throughout the world.

> In furtherance of its corporate purposes, the corporation shall have all the general powers enumerated in Section 202 of the Not-For-Profit Corporation Law, together with the power to solicit grants and contributions for the corporate purposes.

> Nothing herein shall authorize this corporation, directly or indirectly, to engage in or include among its purposes, any of the activities mentioned in the Not-For-Profit Corporation Law, Section 404(b)-(v).

Certification of Incorporation, dated November 21, 1996.

-35-

> Said corporation is organized for charitable, religious and educational purposes, including for such purposes, the making of distributions to such organizations and those that are committed to perpetuate the causes of civil liberties, civil justice, religious freedom and tolerance as guaranteed by the United States Constitution, and those that qualify as exempt organizations under section 501(c)(3) of the Internal Revenue Code, or the corresponding section of any future federal tax code.

Certificate of Amendment of the Certificate of Incorporation, dated January 20, 2005.

221.    Defendants deny the allegations set forth in Paragraph 221 of the Complaint.

222.    Defendants deny the allegations set forth in Paragraph 222 of the Complaint, and state that the following is contained in the August 23, 2010 Board of Directors meeting minutes for the American Center for Civil Justice:

> **Dr. Engelberg** countered that insomuch as Jewish schools have been targeted throughout the world, and Jewish children are a constant target of Muslim terrorism as well as other forms of violence and persecution, grants be provided to schools that are open to the concept of security, and who are willing to implement some form of security on their grounds, beginning with schools in the Jewish centers of NYC, Monsey NY, Lakewood NJ, and see how it goes.

August 23, 2010 Board Minutes (emphasis added).

223.    Defendants deny the allegations set forth in Paragraph 223 of the Complaint, and state that all contributions made to other charitable organizations by the ACCJ were legitimate charitable contributions and were consistent with New York law and the ACCJ's express purposes.

224.    Defendants deny the allegations set forth in Paragraph 224 of the Complaint.

225.    Defendants deny the allegations set forth in Paragraph 225 of the Complaint.

226.    Defendants deny the allegations set forth in Paragraph 226 of the Complaint, and state that Eliezer Perr's brother, Yechiel Perr, is one of four officers of the Yeshiva of Far Rockaway and is not a member of its board of directors, and the institution has no owners.

227.    Defendants deny the allegations set forth in Paragraph 227 of the Complaint, except admit that the May 20, 2013 meeting minutes show that in 2013 Eliezer Perr and Milton Pollack

approved a grant of $100,000 of ACCJ funds to Mesila International Inc., an organization described by Eliezer Perr, as being "dedicated to teaching financial literacy and responsibility by combating the increase in personal debt widespread mismanagement of personal funds and raising awareness about the importance of financial stability and independence;" according to Eliezer Perr, Mesila International Inc. holds "workshops, seminars and counseling courses, all aimed at raising awareness for responsible financial management" and "provides preventive education through a financial management curriculum taught in high schools across the globe as well as courses in other post high school programs;" deny knowledge and information sufficient to form a belief as to the truth of the allegations set forth in the last two sentences of Paragraph 227; and refer to the 2012 Form 990 for Mesila International for the complete terms thereof.

228.    Defendants deny the allegations set forth in Paragraph 228 of the Complaint, and state that Plaintiff, as with all charitable contributions made by the ACCJ over its fourteen year history of such contributions, never criticized, tried to prevent, or opposed any charitable contribution except in connection with this lawsuit, and that the ACCJ Board approved the donation, as reflected in the September 1, 2013 Board minutes:

> Next on the agenda was Security & educational grants. Elie Perr stated that the National Society of Hebrew Day Schools' (NSHDS), whose membership consists of over 675 day schools with a total student enrollment of over 190,000. It is therefore advisable that ACCJ's policy of charity tithing to educational institutions be done by donating to the NSHDS. Elie Perr made a motion to contribute $250,000.00 towards their fund which is managed and distributed by NSHDS. Joel Seitler and Victoria Nolon, seconded the motion. The Board agreed and the motion was carried unanimously.

Compl. Ex. 60 (September 1, 2013 Board Minutes).

229.    Defendants deny the allegations set forth in Paragraph 229 of the Complaint.

230.    Defendants deny the allegations set forth in Paragraph 230 of the Complaint, except neither admit nor deny any allegation of law therein.

-37-

231.    Defendants deny the allegations set forth in Paragraph 231 of the Complaint.

232.    Defendants deny the allegations set forth in Paragraph 232 of the Complaint.

233.    Defendants deny the allegations set forth in Paragraph 233 of the Complaint.

234.    Defendants deny the allegations set forth in Paragraph 234 of the Complaint.

235.    Defendants deny the allegations set forth in Paragraph 235 of the Complaint.

236.    Defendants neither admit nor deny the allegations set forth in Paragraph 236 of the Complaint because they involve questions of law, except admit that Plaintiff has not made a demand on the ACCJ Board.

237.    Defendants deny the allegations set forth in Paragraph 237 of the Complaint.

238.    Defendants deny the allegations set forth in Paragraph 238 of the Complaint.

239.    Defendants deny the allegations set forth in Paragraph 239 of the Complaint.

240.    Defendants deny the allegations set forth in Paragraph 240 of the Complaint, except neither admit nor deny any allegation of law therein.

241.    Defendants hereby incorporate their responses contained in the previously numbered paragraphs as if set forth fully herein.

242.    Defendants deny the allegations set forth in Paragraph 242 of the Complaint.

243.    Defendants deny the allegations set forth in Paragraph 243 of the Complaint.

244.    Defendants deny the allegations set forth in Paragraph 244 of the Complaint.

245.    The 2009 Form 990 for the ACCJ speaks for itself.

246.    The 2009 Form 990 for the New Jersey Center speaks for itself.

247.    The IRS examination response speaks for itself.

248.    Defendants deny the allegations set forth in Paragraph 248 of the Complaint.

249.    Defendants deny the allegations set forth in Paragraph 249 of the Complaint.

250.     Defendants deny the allegations set forth in Paragraph 250 of the Complaint.

251.     Defendants deny the allegations set forth in Paragraph 251 of the Complaint.

252.     Defendants, upon information and belief, deny the allegations set forth in Paragraph 252 of the Complaint, and state that on May 4, 2010, $480,000 was deposited into the bank by the ACCJ, which received the money as settlement proceeds from the *Franqui* case.

253.     Defendants deny the allegations set forth in Paragraph 253 of the Complaint.

254.     Defendants deny the allegations set forth in Paragraph 254 of the Complaint.

255.     Defendants deny the allegations set forth in Paragraph 255 of the Complaint.

256.     Defendants deny the allegations set forth in Paragraph 256 of the Complaint.

257.     Defendants deny the allegations set forth in Paragraph 257 of the Complaint.

258.     Defendants deny the allegations set forth in Paragraph 258 of the Complaint.

259.     Defendants deny the allegations set forth in Paragraph 259 of the Complaint.

260.     Defendants hereby incorporate their responses contained in the previously numbered paragraphs as if set forth fully herein.

261.     Defendants deny the allegations set forth in Paragraph 261 of the Complaint.

262.     Defendants deny the allegations set forth in Paragraph 262 of the Complaint, and state that in 2012 Jed Perr filed paperwork with the Secretary of State with respect to ARC, which was never operational and on November 16, 2014, the Secretary of State of New Jersey issued a Certificate of Revocation of ARC's status as an active New Jersey business entity.

263.     Defendants deny the allegations set forth in Paragraph 263 of the Complaint.

264.     Defendants deny the allegations set forth in Paragraph 264 of the Complaint.

265.     Defendants hereby incorporate their responses contained in the previously numbered paragraphs as if set forth fully herein.

-39-

266.    Defendants deny the allegations set forth in Paragraph 266 of the Complaint.

267.    Defendants deny the allegations set forth in Paragraph 267 of the Complaint.

268.    Defendants deny the allegations set forth in Paragraph 268 of the Complaint.

269.    The 2009 Form 990 for the ACCJ speaks for itself.

270.    The 2009 Form 990 for the New Jersey Center speaks for itself.

271.    The IRS examination response speaks for itself.

272.    Defendants deny the allegations set forth in Paragraph 272 of the Complaint.

273.    Defendants deny the allegations set forth in Paragraph 273 of the Complaint.

274.    Defendants deny the allegations set forth in Paragraph 274 of the Complaint.

275.    Defendants deny the allegations set forth in Paragraph 275 of the Complaint.

276.    Defendants, upon information and belief, deny the allegations set forth in Paragraph 276 of the Complaint, and state that on May 4, 2010, $480,000 was deposited into the bank by the ACCJ, which received the money as settlement proceeds from the *Franqui* case.

277.    Defendants deny the allegations set forth in Paragraph 277 of the Complaint.

278.    Defendants deny the allegations set forth in Paragraph 278 of the Complaint.

279.    Defendants deny the allegations set forth in Paragraph 279 of the Complaint.

280.    Defendants hereby incorporate their responses contained in the previously numbered paragraphs as if set forth fully herein.

281.    Defendants deny the allegations set forth in Paragraph 281 of the Complaint.

282.    Defendants deny the allegations set forth in Paragraph 282 of the Complaint.

283.    Defendants deny the allegations set forth in Paragraph 283 of the Complaint.

-40-

284.    Defendants deny the allegations set forth in Paragraph 284 of the Complaint, except admit that on December 16, 2013, the ACCJ submitted a response to IDR #3, which was issued as part of the IRS examination.

285.    The response to IDR #3 speaks for itself.

286.    Defendants deny the allegations set forth in Paragraph 286 of the Complaint.

287.    Defendants deny the allegations set forth in Paragraph 287 of the Complaint.

288.    Defendants deny the allegations set forth in Paragraph 288 of the Complaint.

289.    Defendants deny the allegations set forth in Paragraph 289 of the Complaint.

290.    Defendants deny the allegations set forth in Paragraph 290 of the Complaint.

291.    Defendants deny the allegations set forth in Paragraph 291 of the Complaint.

292.    Defendants hereby incorporate their responses contained in the previously numbered paragraphs as if set forth fully herein.

293.    Defendants deny the allegations set forth in Paragraph 293 of the Complaint.

294.    Defendants deny the allegations set forth in Paragraph 294 of the Complaint.

295.    Defendants deny the allegations set forth in Paragraph 295 of the Complaint.

296.    The 2009 Form 990 for the ACCJ speaks for itself.

297.    The 2009 Form 990 for the New Jersey Center speaks for itself.

298.    The IRS examination response speaks for itself.

299.    Defendants deny the allegations set forth in Paragraph 299 of the Complaint.

300.    Defendants deny the allegations set forth in Paragraph 300 of the Complaint.

301.    Defendants deny the allegations set forth in Paragraph 301 of the Complaint.

302.    Defendants deny the allegations set forth in Paragraph 302 of the Complaint.

303.    Defendants, upon information and belief, deny the allegations set forth in Paragraph 303 of the Complaint, and state that on May 4, 2010, $480,000 was deposited into the bank by the ACCJ, which received the money as settlement proceeds from the *Franqui* case.

304.    Defendants deny the allegations set forth in Paragraph 304 of the Complaint.

305.    Defendants deny the allegations set forth in Paragraph 305 of the Complaint.

306.    Defendants deny the allegations set forth in Paragraph 306 of the Complaint.

307.    Defendants deny the allegations set forth in Paragraph 307 of the Complaint.

308.    Defendants deny the allegations set forth in Paragraph 308 of the Complaint.

309.    Defendants deny the allegations set forth in Paragraph 309 of the Complaint.

310.    Defendants deny the allegations set forth in Paragraph 310 of the Complaint.

311.    Defendants deny the allegations set forth in Paragraph 311 of the Complaint.

312.    Defendants hereby incorporate their responses contained in the previously numbered paragraphs as if set forth fully herein.

313.    Defendants deny the allegations set forth in Paragraph 313 of the Complaint.

314.    Defendants deny the allegations set forth in Paragraph 314 of the Complaint, except admit that in 2012 Jed Perr filed paperwork with the Secretary of State with respect to forming ARC, a limited liability company, which was never operational and for which the Secretary of State has now issued a certificate of revocation.

315.    Defendants deny the allegations set forth in Paragraph 315 of the Complaint.

316.    Defendants deny the allegations set forth in Paragraph 316 of the Complaint.

317.    Defendants hereby incorporate their responses contained in the previously numbered paragraphs as if set forth fully herein.

318.    Defendants deny the allegations set forth in Paragraph 318 of the Complaint.

-42-

319.    Defendants deny the allegations set forth in Paragraph 319 of the Complaint.

320.    Defendants deny the allegations set forth in Paragraph 320 of the Complaint.

321.    Defendants deny the allegations set forth in Paragraph 321 of the Complaint.

322.    Defendants deny the allegations set forth in Paragraph 322 of the Complaint, except admit that in 2013, the ACCJ Board approved the grant of $100,000 to Mesila International Inc., an organization dedicated to help debt ridden indigent individuals restructure and improve their lives and a donation of $250,000 to the National Society of Hebrew Day Schools, an orthodox Jewish organization that fosters and promotes Torah-based Jewish religious education in North America.

323.    Defendants deny the allegations set forth in Paragraph 323 of the Complaint.

324.    Defendants deny the allegations set forth in Paragraph 324 of the Complaint.

325.    Defendants deny the allegations set forth in Paragraph 325 of the Complaint.

326.    Defendants deny the allegations set forth in Paragraph 326 of the Complaint.

327.    Defendants deny the allegations set forth in Paragraph 327 of the Complaint.

328.    Defendants deny the allegations set forth in Paragraph 328 of the Complaint.

329.    Defendants deny the allegations set forth in Paragraph 329 of the Complaint.

330.    Defendants deny the allegations set forth in Paragraph 330 of the Complaint.

331.    Defendants hereby incorporate their responses contained in the previously numbered paragraphs as if set forth fully herein.

332.    Defendants deny the allegations set forth in Paragraph 332 of the Complaint.

333.    Defendants deny the allegations set forth in Paragraph 333 of the Complaint.

334.    Defendants deny the allegations set forth in Paragraph 334 of the Complaint.

335.    Defendants deny the allegations set forth in Paragraph 335 of the Complaint.

336.    Defendants deny the allegations set forth in Paragraph 336 of the Complaint, except admit that in 2013, the ACCJ Board approved the grant of $100,000 to Mesila International Inc., an organization dedicated to help debt ridden indigent individuals restructure and improve their lives and a donation of $250,000 to the National Society of Hebrew Day Schools, an orthodox Jewish organization that fosters and promotes Torah-based Jewish religious education in North America.

337.    Defendants deny the allegations set forth in Paragraph 337 of the Complaint.

338.    Defendants deny the allegations set forth in Paragraph 338 of the Complaint.

339.    Defendants deny the allegations set forth in Paragraph 339 of the Complaint.

340.    Defendants deny the allegations set forth in Paragraph 340 of the Complaint.

341.    Defendants hereby incorporate their responses contained in the previously numbered paragraphs as if set forth fully herein.

342.    Defendants deny the allegations set forth in Paragraph 342 of the Complaint.

343.    Defendants deny the allegations set forth in Paragraph 343 of the Complaint, and state that Eliezer Perr was elected as President/Executive Director at the May 9, 2010 meeting of the ACCJ Board, and has held that position since that time.

344.    Defendants deny the allegations set forth in Paragraph 344 of the Complaint.

345.    Defendants deny the allegations set forth in Paragraph 345 of the Complaint.

346.    Defendants deny the allegations set forth in Paragraph 346 of the Complaint.

347.    Defendants deny the allegations set forth in Paragraph 347 of the Complaint, except admit that in 2013, the ACCJ Board approved the grant of $100,000 to Mesila International Inc., an organization dedicated to help debt ridden indigent individuals restructure and improve their lives and a donation of $250,000 to the National Society of Hebrew Day Schools, an orthodox

Jewish organization that fosters and promotes Torah-based Jewish religious education in North America.

348.    Defendants deny the allegations set forth in Paragraph 348 of the Complaint.

349.    Defendants deny the allegations set forth in Paragraph 349 of the Complaint.

350.    Defendants deny the allegations set forth in Paragraph 350 of the Complaint.

351.    Defendants deny the allegations set forth in Paragraph 351 of the Complaint.

352.    Defendants deny the allegations set forth in Paragraph 352 of the Complaint.

353.    Defendants deny the allegations set forth in Paragraph 353 of the Complaint.

354.    Defendants hereby incorporate their responses contained in the previously numbered paragraphs as if set forth fully herein.

355.    Defendants deny the allegations set forth in Paragraph 355 of the Complaint.

356.    Defendants deny the allegations set forth in Paragraph 356 of the Complaint.

357.    Defendants deny the allegations set forth in Paragraph 357 of the Complaint.

358.    Defendants neither admit nor deny the allegations set forth in Paragraph 358 of the Complaint because they involve questions of law.

359.    Defendants deny the allegations set forth in Paragraph 359 of the Complaint.

**AS AND FOR A FIRST AFFIRMATIVE DEFENSE**

**LACK OF CAPACITY/STANDING**

360.    Plaintiff lacks the capacity and standing to bring any of his causes of action because he is not a member, director or officer of the ACCJ.

**AS AND FOR A SECOND AFFIRMATIVE DEFENSE**

**STATUTES OF LIMITATIONS**

361.    Plaintiff's causes of action are barred, in whole or in part, by the applicable Statutes of Limitations.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

## FAILURE TO STATE A CAUSE OF ACTION

362.    Each of Plaintiff's claims is barred, in whole or in part, for failure to state a cause of action.  For each of Plaintiff's claims, he fails to plead facts necessary to establish a cause of action under applicable law.

363.    Without limitation, Plaintiff's first, second, third, fifth, and sixth causes of action fail to plead that Defendants owed a fiduciary duty to the ACCJ at relevant times; each of Plaintiff's claims fails to plead that Defendants acted wrongfully or contrary to applicable law; Plaintiff fails to state any cause of action against defendant Jed Perr because he pleads only that Jed Perr was a *de facto* officer of the ACCJ; and Plaintiff fails to state a cause of action for a common law accounting because he has not alleged any need for an accounting or that Defendants personally received or possess any relevant funds, among other failures to plead adequate facts under applicable law.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

## LACHES

364.    Each of Plaintiff's causes of action are barred by the doctrine of laches.  Each of Plaintiff's causes of action is in equity.  On information and belief, Plaintiff had knowledge of the facts upon which he bases his causes of action for over a year and, in some cases, over seven years.

He delayed in asserting these causes of action without reason or excuse.  The ACCJ and individual defendants have been prejudiced and disadvantaged by this delay: *inter alia*, they have conducted business that might be unwound if Plaintiff's causes of action prevailed, and, on information and belief, evidence has been lost during Plaintiff's delay.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

## RATIFICATION

365.    Each of Plaintiff's causes of action are based on actions he alleges the ACCJ and individual defendants took at times when Plaintiff claims to have been a director or officer of the ACCJ.  Plaintiff promoted, approved, acquiesced, or otherwise ratified such actions.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

## UNCLEAN HANDS

366.    Plaintiff's fourth cause of action regards ACCJ responses to an IRS request for information.  Plaintiff was heavily involved in the preparation and review of those responses. Insofar as the ACCJ was injured by such contributions, Plaintiff was complicit in such injuries, barring this cause of action.

367.    Plaintiff's seventh, eighth, and ninth causes of actions regard charitable contributions of a type that Plaintiff promoted to the Board of Directors.  Insofar as the ACCJ was injured by such contributions, Plaintiff was complicit in such injuries, barring these causes of action.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

## BUSINESS JUDGMENT RULE

368.    Each of Plaintiff's causes of action concern ACCJ actions approved by a disinterested and informed Board of Directors acting in good faith.  Each claim is thus barred by the business judgment rule.

## AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE

## WAIVER AND ESTOPPEL

369.    Plaintiff has waived his right to assert that the ACCJ is a membership corporation. In April 1999, the ACCJ filed an amendment to its Certificate of Incorporation with the New York Department of State, in which Plaintiff unequivocally and affirmatively attested that "there is no membership."  Certificate of Amendment to Certificate of Incorporation, dated April 1999.

## AS AND FOR A NINTH AFFIRMATIVE DEFENSE

## LACK OF REPRESENTATIVE CAPACITY

370.     Plaintiff is not a proper representative of the ACCJ to bring the claims asserted herein.

## RESERVATION OF RIGHTS

371.    Defendants reserve the right to expand the scope of these defenses and assert additional defenses based on facts learned in discovery.

## COUNTERCLAIMS

1.      Defendants and Counterclaim-Plaintiffs Eliezer Perr, Jedidiah Perr, and Milton
Pollack ("Counterclaim Plaintiffs") seek to recover damages for numerous defamatory statements
made by Michael Engelberg concerning Counterclaim Plaintiffs.

2.      Relying upon willful and deliberate misrepresentations, in his Complaint,
Engelberg attempts to paint a picture of the American Center for Civil Justice, Inc. ("ACCJ") and
the activities of the individual defendants that Engelberg knows could not be farther from the truth.
This action is Engelberg's last ditch, desperate attempt to wrest control over millions of charity
dollars so that he can divert that money to himself as "executive compensation," as he has done
for over a decade while running another organization, the New York Center for Civil Justice,
Tolerance & Values, Inc. ("NYCCJ"), all by himself with absolutely no board oversight.  Indeed,
for more than a decade, Engelberg improperly paid himself more than $2 million from the charity
funds he controlled.

3.      After years of improperly paying himself excessive salaries, Engelberg realized that
the well of charity funds at the NYCCJ would soon run dry.  And so, for more than two years,
Engelberg has tried to get his hands on the charity funds of the ACCJ and American Center for
Civil Justice Religious Liberty & Tolerance Inc. (the "New Jersey Center"), the organization that
the ACCJ had contracted with to obtain collections on behalf of judgment claimants.  Hence, this
litigation.

4.      To obtain control of the ACCJ, Engelberg brings this action which relies on the
scurrilous assertion that the last 20 years of corporate activity of the ACCJ are fraudulent and
should be ignored, and that the last 20 years of the activities of the ACCJ's board of directors (the
"Board"), which Engelberg had been a member of at various times, are invalid.  Instead, according

-49-

to Engelberg, corporate control of the ACCJ is maintained by three "members," Engelberg, Eliezer

Perr and Milton Pollack, notwithstanding that since at least April 1999, the ACCJ has not acted as

a membership organization and filed numerous documents, passed bylaws and issued board

minutes confirming that the ACCJ was a non-membership corporation.  Of course, the Complaint

then alleges that the membership of Perr and Pollack should be revoked leaving Engelberg in sole

control of the ACCJ and, more importantly, its charity funds – the real motivation for this lawsuit.

Although Engelberg provided sworn testimony in another action that he was an unpaid "volunteer"

of the ACCJ for the last 13 years, once in control, he would be free to pay himself excessive

salaries and pension benefits without Board approval or oversight as he has done for the last 13

years as the head of the NYCCJ as detailed below.

### A BRIEF SUMMARY OF THE ACCJ'S CORPORATE HISTORY AND ONGOING ACTIVITIES

5.      The ACCJ was founded as a 501(c)(3) charity in 1996.  Engelberg was involved in

helping found the ACCJ, joining with the ACCJ's founder, Eliezer Perr, and others after having

been unable or unwilling to sustain a medical practice.  It was Eliezer Perr who had extensive

experience in international and human rights, with deep contacts internationally in the law

enforcement and intelligence communities.  Engelberg, on the other hand, brought with him no

such background or experience.

6.      Although the original Certificate of Incorporation was silent as to the corporate

structure, in April 1999, the ACCJ filed an amendment to the original Certificate of Incorporation

confirming that the ACCJ was a non-membership corporation; this was corroborated and

reinforced by another amendment in 2005.  Corporate bylaws from 2007 and 2013 further confirm

the ACCJ's non-membership status.  This corporate structure went undisputed for many years.  No

one affiliated with the charity, including Engelberg, challenged that structure.  The ACCJ has never

operated as a membership organization.  Moreover, Engelberg's objections to the constituency of the Board are contradicted by his attendance at board meetings, his signature on board minutes, statements he made under oath and his knowledge of board action for years without objection.

7.      For decades, the ACCJ has been advocating, very successfully, for victims of state-sponsored terrorism.  This has been accomplished under the supervision of a dedicated board of directors, working with a small number of volunteers and salaried staff.  The ACCJ, working in conjunction with attorneys it retained, has secured judgments totaling hundreds of millions of dollars on behalf of claimants who have signed agreements with the ACCJ (the "Claimant and Center Agreements").

8.      The ACCJ has also been involved in other matters on behalf of terror victims.  For example, the ACCJ has been funding a federal lawsuit in Washington, DC on behalf of over 150 victims and family members of the November 2009 terror attack at Ft. Hood, Texas.  The ACCJ was instrumental in securing Congressional legislation that led to the awarding of Purple Hearts and Defense of Freedom medals to victims.  In addition to being recognized for their valor and sacrifices, awarding the Purple Hearts provided much needed financial and medical benefits to the recipients.

## The ACCJ's Charitable Donations Were Fully In Accord With Its Mission And The Law

9.      Along with its advocacy and outreach on behalf of victims of terrorism, the ACCJ has since the first intake of monies contributed grants to educational institutions and other charities in furtherance of the ACCJ's mission.  Engelberg has been involved in the making of such grants and did not object to them until he realized that the money he has been using to pay himself excessive compensation at the NYCCJ would be running dry and he needed to obtain financial

control over the ACCJ or New Jersey Center to continue his excessive salary.  As noted in the

contemporaneously-drafted minutes of an August 23, 2010 ACCJ Board of Directors meeting:

> Dr. Engelberg countered that insomuch as Jewish schools have been targeted
> throughout the world, and Jewish children are a constant target of Muslim terrorism
> as well as other forms violence and persecution, grants be provided to schools that
> are open to the concept of security, and who are willing to implement some form
> of security on their grounds, beginning with schools in the Jewish centers of NYC
> . . . .

New York law expressly recognizes the appropriateness of such donations by the ACCJ.  The

claims in Engelberg's Complaint regarding charitable donations are not only pure hypocrisy, but

disingenuous and revisionist history.  Indeed, the NYCCJ, while spending the ACCJ's money from

the Stethem claims, donated to similar charities as well.

## The Vital Collection Work Of The New Jersey Center

10.    Similarly, Engelberg's bogus claim that the New Jersey Center was improperly paid

for its collections work on behalf of judgment claimants is a revisionist charade.  Pursuant to a

contract between the ACCJ and the New Jersey Center entered into on April 12, 2007, and further

amended and ratified in 2013 (the "New Jersey Contract"), and approved in both instances by the

ACCJ's Board, the New Jersey Center undertook the responsibility of effectuating collections for

judgment claimants on behalf of the ACCJ.  Prior to entering into the New Jersey Contract, the

ACCJ had undertaken virtually no steps to locate and seize Iranian assets.  That work has now

progressed on several fronts, including litigation in the U.S., the United Kingdom and Canada, and

successful negotiations with the federal government regarding the satisfaction of the Iranian

judgments.

11.    Engelberg has acknowledged that he knew of the role of the New Jersey Center; it

was not a secret.  And he was in possession of the New Jersey Center's formation documents as

early as December 2008, and, indeed, his NYCCJ donated thousands of dollars to the New Jersey

Center.  The New Jersey Center continues to this day to fulfill its obligations under the contract.

12.     The allegations against Jed Perr and the New Jersey Center are refuted by facts of

record, including Engelberg's past admissions and his history of working with them on the very

matters of which he now complains.

### Another Blatant Misrepresentation: The American Recovery Center

13.     Engelberg disingenuously makes claims about the incorporation of the American

Recovery Center ("ARC").  However, Engelberg was fully aware of ARC's intended purpose,

which was not to benefit Jed Perr personally, but was to be owned by the New Jersey Center and

used as a vehicle in collections work for non-ACCJ claimants.  Engelberg was involved in the

discussions concerning whether the formation of a separate entity was needed for those purposes.

Engelberg is also fully aware that ARC never came to fruition and its status as an active company

was revoked by New Jersey.

## INDISPUTABLE FACTS SHOW THAT IT WAS ENGELBERG WHO ENRICHED HIMSELF WITH MILLIONS OF DOLLARS OF CHARITABLE FUNDS

### Engelberg Enriched Himself Through the ACCJ

14.     From 2001-2003, Engelberg paid himself over $1.2 million.  During the same

period, no other ACCJ officer or director, including defendants Eliezer Perr and Milton Pollack,

received any compensation.  Moreover, Engelberg also enjoyed the use of a leased luxury car paid

for by the ACCJ, as well as other perks.

### Engelberg's Improper Conduct in Connection With The Stethem Funds

15.     In or around July 1998, the Raoul Wallenberg Center For Civil Justice, Inc., the

predecessor charity to the ACCJ, entered into an agreement with the family of Robert Dean

Stethem, who was kidnapped and killed by terrorists, pursuant to which the ACCJ undertook to

support litigation against the perpetrators of the crime.  DLA Piper was retained to prosecute the case.  The ACCJ covered all expenses and paid significant legal fees.

16.     Pursuant to the agreement, the Stethems pledged to give the ACCJ 20% of any recovery so that the ACCJ could continue its work.  The litigation was indeed successful and the Stethems collected over $21,000,000.  From that recovery, the ACCJ was entitled to approximately $4,300,000.  Engelberg arranged for those funds to instead be diverted to his NYCCJ.

17.     In attempting to establish the legitimacy of depositing the Stethem funds in his NYCCJ, Engelberg has pointed to a series of "Acknowledgment[s] of Charitable Contributions" provided by the NYCCJ to Stethem family members.  This obviously does not legitimize the diversion.  Each such Acknowledgement states that "No goods or services are provided in return for this contribution."  That representation was blatantly false and Engelberg knew it.  He was well aware that the fees owed to the ACCJ and which he directed to his NYCCJ, were the direct result of services provided by the ACCJ.  Engelberg's actions are even more egregious considering that the Powers of Attorney for the Stethem family members were in his name (obtained while he was an employee of the ACCJ in conjunction with the Claimant and Center Agreements).

**Engelberg's Conduct In Connection With The ACCJ Pension Fund**

18.     In or around 2001, the ACCJ authorized the creation of the American Center for Civil Justice Defined Benefit Pension Plan.  Without informing the Board, Engelberg then established the pension plan with himself as the sole beneficiary, made himself the manager of the pension plan, and hired his wife's company to manage its investments.  Between 2001 and 2003, Engelberg wrote ACCJ checks totaling over $340,000 to the pension plan.  For more than a decade he filed IRS Form 5500 without the permission or knowledge of the Board.  At this and all other relevant times, he remained the pension plan's sole beneficiary.  In or around 2011, while a

Director of the ACCJ and without the knowledge of the rest of the Board, Engelberg unilaterally directed the dissolution of the pension plan and subsequent rollover of over $900,000 to his individual retirement account.

### Engelberg Further Enriched Himself Through His Stewardship of the NYCCJ, Which He Privatized For Personal Gain

19.     Having received more than four million dollars of ACCJ funds (which left the ACCJ with virtually no assets), Engelberg illegally used most of those funds to enrich himself.  It was not until recently that it became known that the primary activity of the NYCCJ was to line Engelberg's pockets.  The NYCCJ Form 990s reveal that after the infusion of the Stethem funds into the NYCCJ's account, Engelberg's compensation from the NYCCJ was almost $1.6 million from 2003-2013.  Additionally, Engelberg established a pension fund from which he received more than $400,000.  Thus, of the approximately $4,300,000 in Stethem fees—which has been the primary source of NYCCJ funding—approximately half of that went directly to Engelberg.

20.     Engelberg's filings with the IRS reveal that the largest single expenditure of the NYCCJ has been Engelberg's compensation.  Conspicuous by its absence is the reporting of any significant efforts to support or advocate on behalf of terror victims.

21.     Indeed, his tax filings reveal no programmatic activity in furtherance of any mission.  The NYCCJ also made charitable gifts, which even taken as a whole were significantly smaller than the compensation Engelberg paid himself.  If he was so deeply committed to promoting the interests of victims of terror, he would have devoted much of his available resources to fighting for their interests.  He did not.  Instead, those resources went directly to his pockets.  Engelberg has no business being reinstated at the ACCJ, or indeed, running any charity at all.

22.     Moreover, individuals he had identified as NYCCJ board members confronted him with serious accusations, including that the charity was governed solely by him; that no board of

directors meetings had ever been called; and that drafts of the required IRS Form 990s had not

been circulated to the board before filing.  It was demanded that Engelberg explain how he could

possibly justify taking large salaries without obtaining board approval.  Engelberg did not, because

he could not, provide any explanation for his unilateral and improper actions.

23.     Recognizing that the NYCCJ board members were challenging Engelberg's

activities and realizing that the assets of the NYCCJ were almost exhausted, the allegations of the

Complaint are intentional distortions calculated to seize control over the ACCJ's charity funds.

Ironically, the picture Engelberg attempts to paint of Defendants allegedly enriching themselves

through misappropriation and self-dealing is a self-portrait.  Engelberg's pattern of behavior over

the years establishes that he is singularly unfit to serve on any board, and is not someone who

should be entrusted with running a charitable institution.

24.     As detailed below, the Complaint brought by Engelberg is filled with numerous

intentionally false and defamatory statements regarding Counterclaim Plaintiffs.  Equally as

egregious as Engelberg's commencement of this spurious action is his conduct after commencing

the action.  Since the filing of this action, Engelberg set out on an extensive and malicious

campaign to defame Counterclaim Plaintiffs by circulating the Complaint to newspapers,

claimants with contracts with the ACCJ, ACCJ board members, and attorneys who work with the

Counterclaim Plaintiffs, among others.

25.     Engelberg has attempted to dissuade others from working with Counterclaim

Plaintiffs and terminate relationships with them.  Engelberg's campaign has caused irreparable

damage to the reputation and business of Counterclaim Plaintiffs.

**Defamatory Statements of Engelberg in the Complaint**
**Regarding Counterclaim Plaintiffs**

-56-

26.     The Complaint in this action, which as set forth below has been circulated by Engelberg to newspapers and others as described below, contains hundreds of intentionally false statements about Counterclaim Plaintiffs.

27.     An outline of the hundreds of defamatory statements contained in the Complaint are excerpted below from the "Nature of the Case."  Thus, Engelberg intentionally misrepresents that Eliezer Perr and Jedidiah Perr:

- "privatiz[ed]" the ACCJ and "used their respective positions of authority as officers and directors to siphon off, both directly and indirectly, over $20 million dollars of charitable funds to other shell for-profit and not-for-profit entities, owned and controlled by them" (Nature of the Case);

- "used ACCJ funds for private gain and caused ACCJ to violate the Internal Revenue Code's (the 'IRC') ban on private inurement [and] essentially have treated the ACCJ as their own personal piggy bank, donating over $800,000 to various Jewish religious and educational organizations entirely unrelated to, and beyond the scope of the Center's charitable mission" (Nature of the Case);

- "unlawfully" transferred $2.5 million dollars of settlement proceeds to the New Jersey Center;") (Nature of the Case);

- used their positions at the ACCJ to establish the American Recovery Center, LLC," to "usurp business opportunities" of the ACCJ by making "misrepresentations" that "the ACCJ and ARC were somehow related to each other" and thereby "agreements were entered into with third parties, in which ARC, rather than the ACCJ, was retained as the consultant to assist with collection efforts for service fees potentially worth a minimum of $18 million" (Nature of the Case);

- "fabricated documents *post hoc,* including Board minutes";

- "provid[ed] false and misleading information to the Internal Revenue Service" (Nature of the Case);

- "ousted the Plaintiff from the organization, falsely claiming that he was no longer a representative, Board Member or the Executive Director of the Center" (Nature of the Case); and

- "fraudulently induced and sought to coerce claimants into signing new agreements with the ACCJ that would provide for additional fees to private

persons and/or entities, including Jed Perr's ARC, as 'other professionals/personnel.'" (Nature of the Case).

28.     There are numerous, additional intentionally false categories of defamatory statements made by Engelberg in the Complaint.  A few of the additional defamatory statements are that:

- the "Perrs" never reported receipt of certain funds on the ACCJ's form 990 for 2009 (¶ 95);

- the May 28, 2014 Agreement improperly "increased the fees to attorneys and other personnel to 36%" (¶ 162);

- the May 9, 2010 Board minutes "were fabricated and demonstrably false" (¶ 169);

- the Heiser claimants were "fraudulently induced into signing this new agreement under the misimpression that Dr. Engelberg sanctioned it as their attorney-in-fact" (¶ 188);

- the *Brewer* plaintiffs were provided with an agreement with the New Jersey Center, which was an "attempt by the Perrs to create confusion and divert funds to an antity with a similar name to the ACCJ" and the filing by the ACCJ "as a foreign corporation registered to do business in New Jersey [was] a veiled attempt to cover up this obvious deception" (¶ 189);

- the Perrs "were willing to lie and compromise the claims of the remaining Non-Heiser clamants unless they signed the May 28, 2014 Agreement" (¶ 210);

- Jed Perr lied to claimants when he wrote to claimants and "misrepresented that '[a]lthough under the previously signed agreements there is a 20% fee for collections, and 20% fee for litigation, we will be deducting only 36% which will cover all attorney fees and other expenses.'" (¶ 211);

- the Board of the ACCJ was not properly constituted and "unlawfully" voted to replace him on the Board (¶ 217);

- the Perrs have improperly used the ACCJ's resources to fund organizations "most of which they have personal and financial ties" (¶ 222);

- Rabbi Perr and Milton Pollack "fabricate[d] documents and provide[d] misleading information to the IRS in an attempt[ed] . . . cover-up" (¶¶ 239, 289);

- the Perrs "misappropriated the charitable assets and property of the ACCJ for their own personal benefit and/or the benefit of relatives and insiders" (¶ 255);

- the "April 12, 2007 Agreement was not authorized by the Board, and was in fact, a complete fabrication" (¶ 272); and

- "Jed Perr used his position at the ACCJ to misrepresent the relationship between the ACCJ and ARC to usurp business opportunities for ARC, which he personally owns, constituting self-dealing and private inurement and unjust enriched himself at the Center's expense" (¶ 315).

29.     Engelberg knew that every single one of these allegations (and many more) which are repeated throughout the Complaint was false.

30.     For example, Engelberg was fully aware that the ACCJ's charitable donations to private schools and organizations were fully in compliance with the agreements with claimants, its mission and the law.  From the very beginning of its intake of fees, the ACCJ and Engelberg contributed grants to educational institutions and other charities as part of the ACCJ's mission. Engelberg was involved in the making of such grants and did not object to them until he realized that the money he has been using to pay himself excessive compensation at the NYCCJ would be running dry and he needed to obtain financial control over the ACCJ or New Jersey Center to continue his excessive salary.  As noted in the contemporaneously-drafted minutes of an August 23, 2010 ACCJ Board of Directors meeting:

> Dr. Engelberg countered that insomuch as Jewish schools have been targeted throughout the world, and Jewish children are a constant target of Muslim terrorism as well as other forms violence and persecution, grants be provided to schools that are open to the concept of security, and who are willing to implement some form of security on their grounds, beginning with schools in the Jewish centers of NYC.

31.     Indeed, upon receiving more than $4 million that represented the fee owed to the ACCJ from the Stethems, Engelberg made donations to the same private schools and charities about which he accuses the Counterclaim Plaintiffs of making improper donations including schools attended by his own children.

32.    Similarly, Engelberg was fully aware of ARC's intended purpose, which was not to benefit Jed Perr personally, but was to be used as a vehicle in collections work for non-ACCJ claimants.  Engelberg participated in the discussions concerning whether the formation of a separate entity owned to be owned by the New Jersey Center was needed for those purposes. Engelberg is also fully aware that ARC never operated as a business or entered into any agreements and was and is an inactive company.

33.    Engelberg was also fully aware that the New Jersey Center was active in collections work on behalf of the ACCJ's claimants when the ACCJ had not been particularly successful to locate and seize Iranian assets.  Engelberg routinely referred individuals to the New Jersey Center and Jed Perr regarding collections questions.  Engelberg was aware of the existence of the New Jersey Center and had made donations to the New Jersey Center to support its work.

34.    Engelberg's claim that the agreement between the ACCJ and the New Jersey Center was fabricated and not approved by the Board was also intentionally false.  Engelberg claims that he was on the Board in 2007 so the agreement and Board approval must have been fabricated. However, in another action, Engelberg testified that during the same time frame, he was not a Board member or officer and any work that he performed for the ACCJ at that time was on a "voluntary" basis.  He also signed Board minutes in 2010 indicating that he was "returning" to the Board.  His repeated claims of fabricated Board minutes and agreements were knowingly false. Engelberg was also fully aware that the collections work of the New Jersey Center had progressed on several fronts, including litigation in the U.S., the United Kingdom and Canada, and serious negotiations with the federal government regarding the satisfaction of the Iranian judgments.

35.    Engelberg was also fully aware that he used ACCJ funds to improperly enrich himself, not Counterclaim Plaintiffs.  Without board knowledge or approval, Engelberg used

almost half of the millions of dollars that the NYCCJ received in connection with the ACCJ's recovery for the Stethem family to pay himself salary and pension contributions. Indeed, Engelberg's filings with the IRS reveal that the largest single expenditure of the NYCCJ has been Engelberg's compensation. Conspicuous by its absence is the reporting of any significant efforts to support or advocate on behalf of terror victims. The NYCCJ had no programmatic activity, yet Engelberg paid himself more than $2 million.

36.    The allegations of the Complaint were intentional distortions calculated to seize control over the ACCJ's charity funds. Ironically, the picture Engelberg attempts to paint of Defendants allegedly enriching themselves through misappropriation and self-dealing is a self-portrait. Engelberg's pattern of behavior over the years establishes that he is singularly unfit to serve on any board, and is not someone who should be entrusted with running a charitable institution.

### Engelberg's False Oral Statements to Heiser Creditors

37.    On or around May 28, 2014, the ACCJ sent a letter to a certain group of judgment creditors (the "Non-Heiser Judgment Creditors") advising them of claims filed on their behalf in Canada and requesting that they execute an updated Claimant and Center Agreement with the ACCJ (the "May 28, 2014 Letter").

38.    This updated Claimant and Center Agreement contained a provision stating that "Claimant agrees and accepts that the Claimant shall be obligated to pay up to 36% of All Recoveries."

39.    Under the previous agreements between the ACCJ and the Non-Heiser Judgment Creditors, the Non-Heiser Judgment Creditors agreed to pay up to 20% of their total recovery for

legal and collection fees and 20% of the remaining 80% of the recovery—*i.e.*, 16% of the total recovery—would go to the ACCJ for its efforts.

40.    Thus, at the time of the May 28, 2014 Letter,  the Non-Heiser Judgment Creditors were obligated under other agreements to pay up to 36% of their recoveries.

41.    As such, the updated Claimant and Center Agreement clarified this obligation, but did not alter it.

42.    On July 23, 2014, ACCJ counsel sent a letter explaining to Engelberg that the updated Claimant and Center Agreement did not alter previous payment obligations of the Non-Heiser Judgment Creditors.

43.    However, on information and belief, Engelberg was aware at the time of the sending of the May 28, 2014 Letter that the Non-Heiser Judgment Creditors were obligated to pay up to 36% of their recoveries under previous agreements, and therefore Engelberg was aware that the updated Claimant and Center Agreement did not alter this obligation.

44.    Nonetheless, upon information and belief, between June 2014 and at least September 18, 2014, Engelberg falsely and in bad faith told Non-Heiser Judgment Creditors that the Counterclaim Plaintiffs and the ACCJ were using the updated Claimant and Center Agreement to deceive the Non-Heiser Judgment Creditors into increasing their payment obligations to the ACCJ.

45.    By making such false statements to third parties about the Counterclaim Plaintiffs that would tend to injure Counterclaim Plaintiffs in their business with the ACCJ and the New Jersey Center, Engelberg defamed the ACCJ *per se*.

## The Complaint is Widely Circulated by Engelberg

46.     After the action was commenced, on or about January 1, 2015, Engelberg circulated the Complaint containing the false and defamatory statements detailed above to newspapers including the Forward.  Relying on the false statements in the Complaint and an interview with Engelberg, the Forward stated that Counterclaim Plaintiffs blatantly abused their authority, moved $20 million to other groups controlled by Counterclaim Plaintiffs, lied to the IRS, used the ACCJ as their own personal piggy bank to distribute charity funds to Orthodox yeshivas, improperly formed the New Jersey Center and ARC, lied to claimants and diverted $18 million from the ACCJ, and fabricated Board minutes and the agreement with the New Jersey Center concerning collections work, among other things.

47.     On or about January 9, 2016, the Complaint which Engelberg knew contained the numerous defamatory statements detailed above, was sent by Engelberg to Reed Rubinstein, an attorney with whom the ACCJ worked and who represents a group of claimants with contract with the ACCJ.

48.     On or about January 12, 2016, the Complaint was also sent by Engelberg to Lourdes Morera, an attorney that worked with the ACCJ in Puerto Rico.

49.     Engelberg also circulated the Complaint directly to various claimants who have contract with the ACCJ.

## AS AND FOR A FIRST COUNTERCLAIM
### (DEFAMATION/LIBEL)

50.     Counterclaims Plaintiffs repeat and reallege the allegations in the preceding paragraphs as if fully set forth below.

51.     The written statements of fact in the Complaint described above ("Written Statements") were false.

52.     Engelberg's ' Written Statements in the Complaint were published to third parties, including the Forward, Reed Rubinstein, Lourdes Morera, and various claimants, and not privileged in any manner.

53.     Engelberg's Written Statements were made with the knowledge that they were untrue, or at least with reckless disregard of their truth or falsity, reckless disregard of their truth or falsity and/or with malice.

54.     Engelberg's Written Statements were libelous and harmful because they contain allegations directly injurious to Counterclaim Plaintiffs' business in connection with the ACCj and New Jersey Center.

55.     Engelberg's Written Statements improperly accuse Counterclaim Plaintiffs of criminal activity and lack of integrity for Counterclaim Plaintiffs' business.

56.     By reason of the conduct of Engelberg, Counterclaim Plaintiffs have been damaged in an amount to be determined but in no event less than $10,000,000.

57.     By reason of Engelbergs' malicious actions against Level, Counterclaim Plaintiffs are also entitled to punitive damages in an amount to be determined at trial.

## AS AND FOR A SECOND COUNTERCLAIM
### (SLANDER)

58.     Counterclaim Plaintiffs repeat and reallege the facts and allegations contained in the preceding paragraphs as if fully set forth herein.

59.     The oral statements of fact concerning Counterclaim Plaintiffs described above ("Oral Statements") were false.

60.     Engelberg's Oral Statements were published to third parties, including the Forward, Reed Rubinstein, Lourdes Morera, and various claimants, and not privileged in any manner.

61.     Engelberg's Oral Statements were made with the knowledge that they were untrue, or at least with reckless disregard of their truth or falsity, reckless disregard of their truth or falsity and/or with malice.

62.     Engelberg's Oral Statements were slanderous per se because they contain allegations directly injurious to Counterclaim Plaintiffs' business in connection with the ACCJ and New Jersey Center.

63.     Engelberg's Oral Statements improperly accuse Counterclaim Plaintiffs of criminal activity and lack of integrity for Counterclaim Plaintiffs' business.

64.     By reason of the conduct of Engelberg, Counterclaim Plaintiffs have been damaged in an amount to be determined but in no event less than $10,000,000.

65.     By reason of Engelbergs' malicious actions against Counterclaim Plaintiffs, Counterclaim Plaintiffs are also entitled to punitive damages in an amount to be determined at trial.

## AS AND FOR A THIRD COUNTERCLAIM
### (COMMON LAW BREACH OF FIDUCIARY DUTY)

66.     Counterclaim Plaintiffs repeat and reallege the facts and allegations contained in the preceding paragraphs as if fully set forth herein.

67.     Between May 9, 2010, and September 18, 2014, Engelberg was a director of the ACCJ.

68.     As such, at all relevant times, Engelberg owed Eliezer Perr and Pollack fiduciary duties of care, loyalty, and obedience.

-65-

69.     By defaming Eliezer Perr and Pollack and the ACCJ *per se*, Engelberg breached his fiduciary duties to defendants Eliezer Perr and Pollack and N.Y. N-PCL § 717.

70.     Therefore, Eliezer Perr and Pollack are entitled to a judgment against Engelberg for damages in an amount to be determined at trial.

### AS AND FOR A FOURTH COUNTERCLAIM
### NEW YORK CIVIL PRACTICE LAW AND RULES § 3001
### (DECLARATORY JUDGMENT THAT MICHAEL ENGELBERG IS NEITHER A
### MEMBER NOR DIRECTOR OF THE ACCJ)

71.     In his Complaint in this proceeding, Engelberg asserts that he is a member and director of the ACCJ.

72.     Engelberg is not, however, a member of the ACCJ.

73.     The ACCJ was not incorporated as, and has never operated as, a membership corporation, and therefore the ACCJ has never had any members within the meaning of N.Y. N-PCL § 601.

74.     He is now time-barred from asserting any alleged member status.

75.     Engelberg never paid any membership dues, as would be required for him to be a member.

76.     Engelberg did not sign the ACCJ's Certificate of Incorporation, and was not issued a membership card or capital certificate evidencing any membership.  And nowhere in the Bylaws is Engelberg designated as a member.

77.     In 2007 the Bylaws were amended.  The amended bylaws state that:

In accord with the Not-for-Profit Corporation Law of the State of New York, §601(a), ***ACCJ shall have no members***.

Compl. Ex. 28 (2007 Amended Bylaws (emphasis added)).

78.     In September 2013, the bylaws were once again amended, and stated the "ACCJ shall have no members."  2013 Amended Bylaws of ACCJ.

-66-

79.     In the alternative, if the ACCJ was incorporated as a membership corporation, the two purported members—Engelberg and Eliezer Perr—revoked or dissolved any such membership at least by April of 1999.

80.     In April 1999, the ACCJ filed an amendment to its Certificate of Incorporation with the New York Department of State, in which Engelberg and Eliezer Perr attested that "there is no membership."  Certificate of Amendment to Certificate of Incorporation, dated April 1999.

81.     In addition, Engelberg is not a director of the ACCJ.

82.     At a meeting of the Board of Directors of the ACCJ on September 18, 2014, a quorum of the directors voted to replace Engelberg as a director in accordance with the ACCJ's Bylaws.

83.     Engelberg has not since been reelected to the Board of Directors of the ACCJ.

84.     Therefore, Engelberg is not a member or director of the ACCJ as he purports in his Complaint.

85.     By reason of the foregoing, an actual and justiciable controversy exists between the Counterclaim Plaintffs, the ACCJ and Engelberg.  Therefore, Counterclaim Plaintiffs seek a declaratory judgment that Engelberg is not a member or director of the ACCJ.

**WHEREFORE**, Counterclaim Plaintiffs pray that the Court enter judgment as follows:

A.     Awarding them compensatory damages as against Engelberg, in an amount to be determined at trial, but in no event less than $10,000,000 for the first, second and third counterclaims;

B.     Awarding them special compensatory damages as against Engelberg, in an amount to be determined at trial;

C.      Awarding them punitive and exemplary damages as against Engelberg, in an

amount to be determined at trial;

D.      Issuing an order declaring that Engelberg is not a member or director of the ACCJ;

E.      Awarding them on each cause of action all costs and attorneys' fees incurred in

commencing and prosecuting this action;

F.      Dismissing the Complaint in its entirety with prejudice;

G.      Awarding them pre-judgment and post-judgment interest at the legal rate; and

H.      Awarding them such other and further relief as to this Court deems just and proper.


Dated: March 16, 2016                          Respectfully submitted,

                                               KOFFSKY SCHWALB LLC

                                               By:  /s/ Efrem Schwalb
                                               Efrem Schwalb
                                               349 Fifth Avenue, Suite 733
                                               New York, New York  10016
                                               (646) 553-1590


                                               Neal M. Sher
                                               551 Fifth Avenue, 31st Floor
                                               New York, NY 10176
                                               Telephone:  (347) 306-2860

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NASSAU**

---

|  |  |  |
|---|---|---|
| MICHAEL ENGELBERG, derivatively on Behalf of THE AMERICAN CENTER FOR CIVIL JUSTICE, INC., | : | Index No. 606919/2014 |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| -v- | : | **VERIFICATION** |
|  | : |  |
| ELIEZER PERR, JEDIDIAH PERR, AND MILTON POLLACK, | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |
| THE AMERICAN CENTER FOR CIVIL JUSTICE, INC. | : |  |
|  | : |  |
| Nominal Defendant. | : |  |

---

Efrem Schwalb, an attorney licensed to practice law in the State of New York, affirms the following under the penalty of perjury:

I am co-counsel for the Defendants. This verification is made by the undersigned and not by the Defendants because Defendants do not reside and are not in the county in which the undersigned is located. I have read the foregoing Verified Answer and Counterclaims and know the contents thereof. The foregoing Verified Answer and Counterclaims is true to my knowledge, except as to those statements made upon information and belief, and as to those matters I believe them to be true, and is based on facts and information related to me by my clients, personal knowledge and upon a review of the file.

Dated: New York, New York
        March 16, 2016

_____
EFREM SCHWALB