# EXHIBIT D

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MICHAEL ENGELBERG, derivatively on behalf of The
American Center for Civil Justice, Inc.,

        Plaintiff,

        - v -

ELIEZER PERR, JEDIDIAH PERR, MILTON POLLACK,
and AMERICAN CENTER FOR CIVIL JUSTICE,
RELIGIOUS LIBERTY AND TOLERANCE, INC.

        Defendants,

THE AMERICAN CENTER FOR CIVIL JUSTICE, INC.,

        Nominal Defendant,

THE NEW YORK CENTER FOR CIVIL JUSTICE,
TOLERANCE & VALUES, INC.,

        Additional Defendant on Counterclaims.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Index No. 606919/2014

IAS Part 1

Justice Assigned:
Hon. Stephen A. Bucaria, J.S.C.

**SECOND AMENDED
VERIFIED ANSWER AND
COUNTERCLAIMS**

        Defendant and Counterclaim-Plaintiff THE AMERICAN CENTER FOR CIVIL

JUSTICE, INC. ("Defendant", "Counterclaim-Plaintiff", or "ACCJ"), through its undersigned

counsel, for its Second Amended Verified Answer and Counterclaims, hereby answers the

Amended Verified Derivative Complaint filed by Plaintiff Michael Engelberg, M.D. ("Plaintiff",

"Counterclaim-Defendant", or "Engelberg") (NYSCEF Doc. No. 264) ("Complaint"), asserts

Counterclaims, and alleges as follows:

**ANSWER**

**NATURE OF THE CASE / COUNTER-STATEMENT OF THE CASE**

        Defendant denies the fictional, malicious, and defamatory nature of the case propounded

by Plaintiff, except admits that ACCJ was founded in 1996. Defendant further contends that

Plaintiff has malevolently commenced this action in support of an ulterior motive for illicit

D:\TWLFPLLC\

financial gain (discussed below) and solely for the purpose of defaming ACCJ (as well as the individual defendants named in this action) by: (a) his widespread publication of the Complaint, which contains hundreds of defamatory statements such that it is the epitome of libel per se; and (b) having made false oral statements to third parties in connection with such publication. The true nature of the case is as follows:

Relying upon willful and deliberate misrepresentations, Plaintiff attempts to paint a picture of ACCJ that he knows could not be farther from the truth. This action is Plaintiff's last ditch, desperate attempt to control and divert millions of charity dollars to himself as "executive compensation," just as he has done for over a decade while running another organization that is his alter ego—Additional Defendant on Counterclaims THE NEW YORK CENTER FOR CIVIL JUSTICE, TOLERANCE & VALUES, INC. ("NYCCJ")—all by himself with absolutely no board oversight.

Plaintiff claims to have used his own "independent" assets to finance ACCJ. The truth, however, is that for more than a decade, Plaintiff improperly paid himself more than $2 million from charity funds he controlled. Members of NYCCJ's Board of Directors sued him and his spouse, Mindy Engelberg, in March of 2016 for misconduct spanning a period of years connected to these improper payments, as well as his control and looting of NYCCJ.

The alleged misconduct includes, without limitation: (a) Plaintiff's running NYCCJ by himself out of his house using the corporation's substantial assets as his private bank; (b) paying himself salaries and retirement benefits without NYCCJ Board approval or knowledge; (c) appointing his wife to "oversee" a NYCCJ retirement plan as a trustee and causing the funds to be invested with her company so that additional fees could be earned by that family business; (d) filing fraudulent tax returns; (e) naming NYCCJ Board members who had never spoken to him;

(f) failing to inform Board members that NYCCJ possessed millions of dollars in assets; and (g) conducting no programmatic activities. (*See* Complaint in *Orlow v. Engelberg*, No. 601689/2016 (Sup. Ct. Nassau County Mar. 14, 2016) ("*Orlow* Complaint") (attached hereto as Exhibit "A")).

After years of improperly paying himself excessive salaries, Plaintiff realized that the well of charity funds at NYCCJ would soon run dry. And so, for more than two years, Plaintiff has tried to get his hands on the charity funds of ACCJ and American Center for Civil Justice Religious Liberty & Tolerance Inc. (the "New Jersey Center"), an organization that ACCJ had contracted with to obtain collections on behalf of judgment claimants that was recently joined as a defendant.

To obtain control of ACCJ, Plaintiff brings this action, which relies on two scurrilous assertions: (a) that the last 20 years of corporate activity of ACCJ are fraudulent and should be ignored; and (b) that the last 20 years of the activities of ACCJ's board of directors (the "Board"), which Plaintiff had been a member of at various times, are invalid. Instead, according to Engelberg, corporate control of ACCJ today is maintained by three (not the current seven) Board members—Engelberg, Defendant Eliezer Perr, and Defendant Milton Pollack—on account of Plaintiff's claim that ACCJ was and is a "membership" organization that always required the approval of its members (Engelberg and Perr) to appoint or remove Board members.

However, as Engelberg well knows, ACCJ is not a membership organization and has not acted as a membership organization since at least April 1999. Indeed, ACCJ filed numerous documents with the IRS and New York State authorities (signed by Engelberg), passed bylaws, and issued Board minutes confirming that it was a non-membership organization. Further, Engelberg provided sworn testimony in another action that he was an unpaid "volunteer" of ACCJ for the last 13 years, negating his claim that he is a member of ACCJ.

3

D:\TWLFPLLC\

Based on his "membership" tale, Plaintiff then alleges that the Board membership of Perr and Pollack should be revoked allegedly on account of breaches of fiduciary duty, leaving Engelberg in sole control of ACCJ and, more importantly, its charity funds. Once in control of these funds, Engelberg would be free to pay himself excessive salaries and pension benefits as he has done for the last 13 years as the head of his alter ego, NYCCJ, as detailed below.

## A BRIEF SUMMARY OF ACCJ'S CORPORATE HISTORY AND ONGOING ACTIVITIES

ACCJ was founded as a 501(c)(3) charity in 1996. Plaintiff was involved in helping found ACCJ, joining with ACCJ's founder, Eliezer Perr, and others after having been unable or unwilling to sustain a medical practice. It was Eliezer Perr who had extensive experience in international and human rights, with deep contacts internationally in the law enforcement and intelligence communities. Plaintiff, on the other hand, brought with him no such background or experience.

Although the original Certificate of Incorporation was silent as to the corporate structure, in April 1999, ACCJ filed an amendment to the original Certificate of Incorporation confirming that ACCJ was a non-membership organization. This amendment, which was signed by Engelberg, was further corroborated and reinforced by another amendment in 2005. Corporate bylaws from 2007 and 2013 further confirmed ACCJ's non-membership status, and at no point did ACCJ ever operate as a membership organization.

This corporate structure went undisputed for at least the last seventeen (17) years. No one affiliated with the charity, including Plaintiff, challenged that structure until the present action, where doing so serves Plaintiff's purposes.

Moreover, Plaintiff's objections to the constituency of the Board (as reflected by, *inter alia*, the Complaint's Fourth, Fifth, and Ninth Causes of Action) are contradicted by his attendance at

4

Board meetings, his signature on Board minutes, statements he made under oath, and his knowledge of Board action for years without objection.

For decades, ACCJ has been advocating—very successfully—for victims of state-sponsored terrorism. This has been accomplished under the supervision of a dedicated Board, working with a small number of volunteers and salaried staff. ACCJ, working in conjunction with attorneys it retained, has secured judgments totaling hundreds of millions of dollars on behalf of claimants who have signed agreements with ACCJ (the "Claimant and Center Agreements").

ACCJ has also been involved in other matters on behalf of terror victims. For example, ACCJ has been funding a federal lawsuit in Washington, DC on behalf of over 150 victims and family members of the November 2009 terror attack at Ft. Hood, Texas. ACCJ's General Counsel, Neal Sher, represents the victims in that suit. Moreover, ACCJ was instrumental in securing Congressional legislation that led to the awarding of Purple Hearts and Defense of Freedom medals to victims. In addition to recognition of their valor and sacrifice, the award recipients obtained much needed financial and medical benefits.

### ACCJ's Charitable Donations Were Fully In Accord With Its Mission And The Law

Along with its advocacy and outreach on behalf of victims of terrorism, since its first intake of monies, ACCJ has contributed grants to educational and charitable institutions in furtherance of its non-profit mission. Plaintiff was thoroughly involved in the making of such grants. He signed checks to charities that he now claims improperly received ACCJ grants. He disingenuously objected to such grants in this action to garner news headlines only after he realized that the money he was using to pay himself excessive compensation at NYCCJ was running dry and that it would be necessary to gain financial control over ACCJ or the New Jersey Center to perpetuate his self-enrichment scheme. As noted in the contemporaneously-drafted minutes of an August 23, 2010

5

D:\TWLFPLLC\

Board meeting:

> **Dr. Engelberg** countered that insomuch as Jewish schools have been targeted
> throughout the world, and Jewish children are a constant target of Muslim terrorism
> as well as other forms violence and persecution, grants be provided to schools that
> are open to the concept of security, and who are willing to implement some form
> of security on their grounds, beginning with schools in the Jewish centers of NYC,
> Monsey NY, Lakewood NJ, and see how it goes.

New York law expressly recognizes the appropriateness of such donations by ACCJ.

Furthermore, the Plaintiff-controlled NYCCJ made—from funds earned by ACCJ—the exact

same type of donations that Plaintiff now incredulously claims were improperly made by ACCJ.

Indeed, Plaintiff made donations to yeshivas within miles of his home and which his children

attended for elementary school and high school. The claims in Plaintiff's Complaint regarding

charitable donations are thus not only pure hypocrisy but disingenuous and revisionist history.

## The Vital Collection Work Of The New Jersey Center

Similarly, Plaintiff's bogus claim that the New Jersey Center was improperly paid for its

collections work on behalf of judgment claimants is a revisionist charade. Pursuant to a contract

between ACCJ and the New Jersey Center entered into on April 12, 2007, further amended and

ratified in 2013 (the "New Jersey Contract"), and approved in both instances by ACCJ's Board,

the New Jersey Center undertook the responsibility of effectuating collections for judgment

claimants on behalf of ACCJ. Prior to entering into the New Jersey Contract, ACCJ had

undertaken virtually no steps to locate and seize Iranian assets. That work has now progressed on

several fronts, including litigation in the U.S., the United Kingdom, and Canada, and successful

negotiations with the federal government regarding the satisfaction of the Iranian judgments. The

New Jersey Center continues to this day to fulfill its obligations under the New Jersey Contract by

6

pursuing collections efforts and paying large legal fees in its efforts on behalf of the victims of terror attacks.

Plaintiff repeatedly acknowledged that he knew of the role of the New Jersey Center. He was in possession of the New Jersey Center's formation documents at least as early as December 2008. He was aware that Jed Perr headed the New Jersey Center, referred individuals to the New Jersey Center and Jed Perr regarding collections questions, and stated on numerous occasions that Jed Perr was in charge of collection efforts. He was also aware that ACCJ had agreed to pay the New Jersey Center for its work.

Furthermore, he was involved in transferring the funds that he complains about in the Complaint from ACCJ to the New Jersey Center. Indeed, Engelberg met with Jed Perr and the accountant of the New Jersey Center and NYCCJ in 2010 to discuss a merger of the New Jersey Center with Engelberg's NYCCJ, at which time the assets of the New Jersey Center and their source were known and discussed. Furthermore, Engelberg's NYCCJ donated thousands of dollars to the New Jersey Center.

As such, the allegations in the Complaint concerning Jed Perr, the New Jersey Center, and their relationship and involvement with ACCJ are refuted by facts of record, including Engelberg's past admissions and his history of working with all of these organizations on the very matters of which he now complains.

### Another Blatant Misrepresentation: The American Recovery Center

Plaintiff disingenuously makes claims about the incorporation of the American Recovery Center ("ARC"). However, he was fully aware of ARC's intended purpose, which was to be owned by the New Jersey Center and used as a vehicle in collections work for non-ACCJ claimants. Plaintiff was involved in the discussions concerning whether the formation of a separate

7

entity was needed for those purposes. Plaintiff is also fully aware that ARC never came to fruition, never operated, and its status as an active company was revoked by New Jersey.

## INDISPUTABLE FACTS SHOW THAT IT WAS PLAINTIFF WHO ENRICHED HIMSELF WITH MILLIONS OF DOLLARS OF CHARITABLE FUNDS

### Plaintiff Enriched Himself Through ACCJ

From 2001-2003, Plaintiff paid himself over $1.2 million. During the same period, no other ACCJ officer or director received any compensation. Moreover, Plaintiff also enjoyed the use of a leased luxury car paid for by ACCJ, as well as other perks.

### Plaintiff's Conduct In Connection With An ACCJ Pension Fund

In or around 2001, ACCJ authorized the creation of The American Center for Civil Justice Defined Benefit Pension Plan. Without informing the Board, Plaintiff then established the pension plan with himself as the sole beneficiary, made himself the manager of the pension plan, and hired his wife's company to manage its investments. He listed the address of the pension plan as his home address to conceal the Plan's existence from the directors and officers of ACCJ.

Between 2001 and 2003, Plaintiff wrote ACCJ checks totaling over $340,000 to the pension plan. For more than a decade, he filed IRS Forms 5500 without the permission or knowledge of the Board. At this and all other relevant times, he remained the pension plan's sole beneficiary.

In or around 2011, while a Director of ACCJ and without the knowledge of the rest of the Board (although he fraudulently signed documents stating that the entire Board so approved), Plaintiff unilaterally directed the dissolution of the pension plan and subsequent rollover of over $900,000 to his individual retirement account. Plaintiff then unilaterally made filings with the IRS fraudulently representing that ACCJ's Board had unanimously approved the dissolution of the plan.

8

D:\TWLFPLLC\

**Plaintiff's Improper Conduct In Connection With The Stethem Funds**

In or around July 1998, the Raoul Wallenberg Center For Civil Justice, Inc., the predecessor charity to ACCJ, entered into an agreement with the family of Robert Dean Stethem, who was kidnapped and killed by terrorists, pursuant to which ACCJ undertook to support litigation against the perpetrators of the crime. DLA Piper was retained to prosecute the case. ACCJ covered all expenses and paid significant legal fees.

Pursuant to their agreement with ACCJ, the Stethems pledged to give ACCJ 20% of any recovery so that ACCJ could continue its work. The litigation was indeed successful, and the Stethems collected over $21,000,000. From that recovery, ACCJ was entitled to approximately $4,300,000 ("Stethem Funds").

In 2002, the Stethem Funds did not end up going to ACCJ, but to Plaintiff's NYCCJ.

ACCJ agreed to allow NYCCJ to maintain the Stethem Funds in its bank account after Plaintiff and NYCCJ represented on a variety of occasions—including without limitation in or about November 2002 to Defendants Milton Pollack and Eliezer Perr—that NYCCJ had always been operated as a legitimate not-for-profit corporation which conducted regular activities for charitable and educational purposes and that all activities and spending were overseen by a valid board of directors that met regularly (the "Representations"). At the time Plaintiff and NYCCJ made the Representations, Plaintiff was an officer of ACCJ and controlled the financial accounts of both NYCCJ and ACCJ.

Additionally, ACCJ allowed NYCCJ to maintain the Stethem Funds only if Plaintiff and NYCCJ agreed, which they did, that: (i) NYCCJ would continue to be operated as a legitimate not-for-profit corporation with regular board meetings and oversight of all NYCCJ activities and spending, both of which would be consistent with NYCCJ's Certificate of Incorporation; (ii) the

9

D:\TWLFPLLC\

Stethem Funds would be used solely in furtherance of charitable activities; (iii) all funds needed by ACCJ to conduct its activities would be provided by NYCCJ upon demand by ACCJ; and (iv) breach of the aforementioned conditions would result in a return of the Stethem Funds to ACCJ upon demand (the "Stethem Funds Agreement").

Plaintiff and NYCCJ not only breached the Stethem Funds Agreement, but also deceived ACCJ. As set forth below, Plaintiff and NYCCJ did not utilize the Stethem Funds as agreed and otherwise breached the Stethem Funds Agreement. To divert attention from these multiple breaches, Plaintiff and NYCCJ paid certain of ACCJ's financial obligations so that Engelberg's misconduct and self-dealing would not be discovered by ACCJ.

### Plaintiff Further Enriched Himself Through His Stewardship Of NYCCJ, Which He Privatized For Personal Gain

Instead of utilizing the Stethem Funds as agreed, Plaintiff and NYCCJ improperly used most of those funds to enrich Plaintiff. However, it was not until June 2014 that ACCJ began to uncover Plaintiff's breaches of the Stethem Funds Agreement, fraudulent conduct, and unjust enrichment, which led ACCJ to demand that the Stethem Funds be returned to ACCJ.

At that time, Neal Sher, ACCJ's General Counsel, notified Engelberg via letter to his counsel that NYCCJ Board members had uncovered Plaintiff's continuous operation of NYCCJ as his alter ego and not as a legitimate not-for-profit corporation, rendering the Representations false. (*See* Letter of Neal Sher, Esq. to Allen Bromberger, Esq., dated June 11, 2014 (attached hereto as Exhibit "B")).

Specifically, Plaintiff had, *inter alia*, governed NYCCJ alone, never called any Board meetings, failed to distribute IRS and New York State tax filings for NYCCJ Board review prior to their filing, and listed phantom members of NYCCJ's Board in IRS filings (*see* Ex. B at 3)— intentional misconduct which ultimately became the foundation of the *Orlow* Complaint, and when

D:\TWLFPLLC\

brought to Plaintiff's attention, was met with deafening silence. (*See* Ex. A ¶¶ 38, 79, 86-89, 102, 116-17).

Sher also detailed how NYCCJ Form 990s revealed that after the infusion of the Stethem Funds into NYCCJ, Plaintiff's compensation from NYCCJ was close to $1.6 million from 2003-2013, notwithstanding that "very little programmatic activities" were listed for NYCCJ in those Form 990s. (*See* Ex. B at 6-7). Indeed, upon information and belief, NYCCJ had no programmatic activity while Plaintiff was paying himself this approximate $1.6 million.

In addition, Plaintiff established a NYCCJ pension fund in 2009 into which he siphoned a total of at least $350,000 from 2009 through 2011. (*See* Ex. A ¶ 47-61). Thus, approximately half of the approximate $4,300,000 in Stethem Funds went directly to Plaintiff.

Plaintiff's filings with the IRS make clear that the largest single expenditure of NYCCJ has been Plaintiff's compensation. Conspicuous by its absence is the reporting of any significant efforts to support or advocate on behalf of terror victims.

NYCCJ also made charitable gifts, the combined total of which was significantly smaller than the compensation Plaintiff paid himself. If Plaintiff were so deeply committed to promoting the interests of victims of terror, he would have devoted much of his available resources to fighting for their interests. He did not. Instead, those resources went directly into his pockets. Plaintiff has no business being reinstated at ACCJ, or indeed—as the *Orlow* Complaint demonstrates—running any charity at all.

In December 2014, realizing that NYCCJ Board members were on to the fraudulent activities of Plaintiff and NYCCJ and that the assets of NYCCJ were almost exhausted, Plaintiff commenced this action to seize control of ACCJ's charity funds.

11

D:\TWLFPLLC\

Plaintiff's meritless claims should be dismissed, and judgment should be awarded in ACCJ's favor on its counterclaims.

## RESPONSES TO COMPLAINT ALLEGATIONS

1.    Defendant denies the allegations set forth in Paragraph 1 of the Complaint, except denies knowledge or information sufficient to form a belief as to whether Plaintiff resides at 75 Woodmere Blvd., South Woodmere, New York 11598. Defendant further states that to the extent any Paragraph of the Complaint contains allegations of law, it neither admits nor denies such allegations of law therein and maintains this position even if it does not specifically identify such allegations of law in the responses contained in this Second Amended Verified Answer and Counterclaims.

2.    Defendant denies the allegations set forth in Paragraph 2 of the Complaint, except admits that ACCJ is a not-for-profit organization, organized under the laws of the State of New York, with its principal place of business at 4912 14th Avenue, Brooklyn, NY 11219, and is recognized by the IRS as a tax exempt 501(c)(3) organization.

3.    Defendant denies the allegations set forth in Paragraph 3 of the Complaint, except admits that Eliezer Perr is an individual residing at 63 Hedge Drive, Lakewood, New Jersey 08701.

4.    Defendant denies the allegations set forth in Paragraph 4 of the Complaint, except admits that Jed Perr is an individual residing at 23 Fern Street, Lakewood, New Jersey 08701, and is the son of Eliezer Perr.

5.    Defendant admits the allegations set forth in Paragraph 5 of the Complaint.

6.    Paragraph 6 of the Complaint does not call for an admission or denial and speaks for itself.

12

D:\TWLFPLLC\

7.      Defendant denies the allegations set forth in Paragraph 7 of the Complaint, except admits that the New Jersey Center is a not-for-profit corporation incorporated in the State of New Jersey with its principal place of business at 422 Martin Luther King Drive, Lakewood, New Jersey 08701, and states that Jed Perr is an officer and one of five directors of the New Jersey Center, which was recently joined as a defendant.

7A.      Defendant denies the allegations set forth in Paragraph 7A of the Complaint.

8.      Defendant denies the allegations set forth in Paragraph 8 of the Complaint.

9.      Defendant denies the allegations set forth in Paragraph 9 of the Complaint, except neither admits nor denies any allegation of law therein.

10.      Defendant denies the allegations set forth in Paragraph 10 of the Complaint, except neither admits nor denies any allegation of law therein.

11.      Defendant denies the allegations set forth in Paragraph 11 of the Complaint, except neither admits nor denies any allegation of law therein.

12.      Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 12 of the Complaint, except neither admits nor denies any allegation of law therein.

13.      Defendant denies the allegations set forth in Paragraph 13 of the Complaint, except neither admits nor denies any allegation of law therein.

14.      Defendant denies the allegations set forth in Paragraph 14 of the Complaint, except neither admits nor denies any allegation of law therein.

15.      Defendant denies the allegations set forth in Paragraph 15 of the Complaint, except neither admits nor denies any allegation of law therein.

13

D:\TWLFPLLC\

16.     Defendant denies the allegations set forth in Paragraph 16 of the Complaint, except neither admits nor denies any allegation of law therein.

17.     Defendant denies the allegations set forth in Paragraph 17 of the Complaint, except neither admits nor denies any allegation of law therein.

18.     Defendant denies the allegations set forth in Paragraph 18 of the Complaint.

19.     Defendant denies knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 19 of the Complaint.

20.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 20 of the Complaint.

21.     Defendant admits the allegations set forth in Paragraph 21 of the Complaint.

22.     Defendant denies the allegations set forth in Paragraph 22 of the Complaint.

23.     Defendant denies the allegations set forth in Paragraph 23 of the Complaint, and states that ACCJ assisted and supported Stephen Flatow and advocated for the Flatow Amendment.

24.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 24 of the Complaint.

25.     Defendant admits the allegations set forth in Paragraph 25 of the Complaint.

26.     Defendant denies the allegations set forth in Paragraph 26 of the Complaint, and states that the express purposes in the original and amendment to the Certificate of Incorporation of ACCJ are:

> To create, form and establish a civil rights organization for the benefit of victims of terrorism in the United States and abroad; to promote, foster, increase and advance the civil rights of victims of terrorism; to maintain a network of lawyers, researchers, journalists, investigators and government officials to further the purposes of this corporation; to identify and document terrorist acts committed and/or sponsored by individuals, groups or states; to identify sources, resources and assets of the perpetrators and sponsors of terrorism to advise victims of their rights

14

and methods of addressing compensation for acts of terror; to advocate the passage of legislation that will make it a crime to sponsor, aid and abet terrorists and to promote legislation that will simplify and speed the collection of punitive damages; to encourage interest, awareness and activism in the American and world political arena with reference to the plight of victims of terrorism throughout the world; to initiate and promote civic and political programs beneficial to the victimized people of the world; to hold, conduct and organize meetings, discussions and forums to consider community opinions on issues affecting the health and the economic, educational and social welfare of victims of terrorism throughout the world; to aid, assist, cooperate, co-sponsor and otherwise engage in concerted action with private and governmental agencies and organizations on all programs designed, calculated and dedicated to the improvement of life for the aforesaid people; to solicit, collect and otherwise raise money for charitable, eleemosynary and benevolent purposes and to expend such monies for such purposes and generally to advance the accountability to the victims of terrorists and those who sponsor, aid and abet acts of terror throughout the world.

In furtherance of its corporate purposes, the corporation shall have all the general powers enumerated in Section 202 of the Not-For-Profit Corporation Law, together with the power to solicit grants and contributions for the corporate purposes.

Nothing herein shall authorize this corporation, directly or indirectly, to engage in or include among its purposes, any of the activities mentioned in the Not-For-Profit Corporation Law, Section 404(b)-(v).

Certification of Incorporation, dated November 21, 1996.

Said corporation is organized for charitable, religious and educational purposes, including for such purposes, the making of distributions to such organizations and those that are committed to perpetuate the causes of civil liberties, civil justice, religious freedom and tolerance as guaranteed by the United States Constitution, and those that qualify as exempt organizations under section 501(c)(3) of the Internal Revenue Code, or the corresponding section of any future federal tax code.

Certificate of Amendment of the Certificate of Incorporation, dated January 20, 2005.

27.     Defendant admits the allegations set forth in Paragraph 27 of the Complaint.

28.     Defendant denies knowledge and information sufficient to form a belief as to the

truth of the allegations set forth in Paragraph 28 of the Complaint.

15

D:\TWLFPLLC\

29.     Defendant denies the allegations set forth in Paragraph 29 of the Complaint, except admits that to accomplish one of its purposes, and on the premise that lawsuits are an effective deterrent to international terrorists and their financial backers, ACCJ entered into written agreements with victims of terrorism or the estate representatives of murdered victims, under the terms of which ACCJ would advance funds for litigation and retain law firms and individual lawyers to prosecute claims on behalf of terrorism victims.

30.     Defendant admits the allegations set forth in Paragraph 30 of the Complaint.

31.     Defendant denies the allegations set forth in Paragraph 31 of the Complaint and refers to the particular agreements for the complete terms thereof.

32.     Defendant denies the allegations set forth in Paragraph 32 of the Complaint and refers to the particular agreements for the complete terms thereof.

33.     Defendant denies the allegations set forth in Paragraph 33 of the Complaint.

34.     Defendant denies the allegations set forth in Paragraph 34 of the Complaint.

35.     Defendant denies the allegations set forth in Paragraph 35 of the Complaint, except admits that certain fee agreements were entered into by ACCJ on behalf of certain plaintiffs with various law firms in connection with lawsuits to be commenced against those responsible for certain terrorist attacks, the terms of the fee agreements varied, and Plaintiff was one of the people involved in negotiating fee agreements.

36.     Defendant admits the allegations set forth in Paragraph 36 of the Complaint.

37.     Defendant admits the allegations set forth in Paragraph 37 of the Complaint.

38.     Defendant admits the allegations set forth in Paragraph 38 of the Complaint.

39.     Defendant admits the allegations set forth in Paragraph 39 of the Complaint.

40.     Defendant admits the allegations set forth in Paragraph 40 of the Complaint.

16

D:\TWLFPLLC\

41.     Defendant admits the allegations set forth in Paragraph 41 of the Complaint.

42.     Defendant admits the allegations set forth in Paragraph 42 of the Complaint.

43.     Defendant admits the allegations set forth in Paragraph 43 of the Complaint.

44.     Defendant admits the allegations set forth in Paragraph 44 of the Complaint.

45.     Defendant admits the allegations set forth in Paragraph 45 of the Complaint.

46.     Defendant admits the allegations set forth in Paragraph 46 of the Complaint.

47.     Defendant admits the allegations set forth in Paragraph 47 of the Complaint.

48.     Defendant admits the allegations set forth in Paragraph 48 of the Complaint.

49.     Defendant admits the allegations set forth in Paragraph 49 of the Complaint.

50.     Defendant denies the allegations set forth in Paragraph 50 of the Complaint.

51.     Defendant admits the allegations set forth in Paragraph 51 of the Complaint.

52.     Defendant admits the allegations set forth in Paragraph 52 of the Complaint.

53.     Defendant admits the allegations set forth in Paragraph 53 of the Complaint.

54.     Defendant admits the allegations set forth in Paragraph 54 of the Complaint.

55.     Defendant admits the allegations set forth in Paragraph 55 of the Complaint.

56.     Defendant admits the allegations set forth in Paragraph 56 of the Complaint.

57.     Defendant denies the allegations set forth in Paragraph 57 of the Complaint, except admits that pursuant to an agreement with ACCJ, on October 9, 2001, Mr. Collett's wife and three children commenced the *Collett* action against Libya for his abduction, torture and wrongful death.

58.     Defendant denies the allegations set forth in Paragraph 58 of the Complaint, except admits that after the 1996 amendments to the FSIA, ACCJ conceived of bringing litigation against the state sponsors of the 1972 Lod Airport Massacre, one of the most cold-blooded terrorist attacks at the time.

17

D:\TWLFPLLC\

59.     Defendant admits the allegations set forth in Paragraph 59 of the Complaint.

60.     Defendant admits the allegations set forth in Paragraph 60 of the Complaint.

61.     Defendant denies the allegations set forth in Paragraph 61 of the Complaint, except admits that ACCJ engaged an attorney, Joshua Ambush, to initiate contact with the families of some of the injured or killed victims to propose filing a lawsuit on their behalf, enter into the Claimant and Center Agreements, and obtain powers of attorney on their behalf.

62.     Defendant denies knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 62 of the Complaint.

63.     Defendant denies the allegations set forth in Paragraph 63 of the Complaint.

64.     Defendant denies the allegations set forth in Paragraph 64 of the Complaint.

65.     Defendant admits the allegations set forth in Paragraph 65 of the Complaint.

66.     Defendant denies the allegations set forth in Paragraph 66 of the Complaint, except admits that by the mid-2000s ACCJ had only limited funds, and states that this was a result of Plaintiff's excessive compensation and redirection of funds from ACCJ to NYCCJ.

67.     Defendant denies the allegations set forth in Paragraph 67 of the Complaint, except admits that an updated engagement was entered into with DLA Piper US LLP in 2007 to assist with collection efforts with respect to the *Heiser* Judgment, signed by Milton Pollack as President of ACCJ, and Plaintiff as attorney-in-fact, who had obtained powers of attorney from certain claimants.

68.     Defendant denies the allegations set forth in Paragraph 68 of the Complaint and refers to the 2007 DLA Agreement for the complete terms thereof.

69.     Defendant denies the allegations set forth in Paragraph 69 of the Complaint.

18

D:\TWLFPLLC\

70.     Defendant denies the allegations set forth in Paragraph 70 of the Complaint and refers to the 2007 DLA Agreement for the complete terms thereof.

71.     Defendant denies knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 71 of the Complaint.

72.     Defendant denies the allegations set forth in Paragraph 72 of the Complaint, except admits that DLA filed a notice of claim on behalf of the judgment creditors in the *Heiser* Litigation, asserting ownership in the Defendant Properties in the *650 Litigation*.

73.     Defendant denies the allegations set forth in Paragraph 73 of the Complaint.

74.     Defendant denies the allegations set forth in Paragraph 74 of the Complaint, except admits that Neal Sher headed the Office of Special Investigations (OSI), the Justice Department's Nazi prosecution unit, and received the Raoul Wallenberg Award for his work.

75.     Defendant denies the allegations set forth in Paragraph 75 of the Complaint, except admits that ACCJ employed Neal Sher as a lawyer for ACCJ beginning sometime in 2009.

76.     Defendant denies the allegations set forth in Paragraph 76 of the Complaint, except admits that on March 1, 2010, Neal Sher filed a notice of claim on behalf of the judgment creditors in the Non-*Heiser* litigations asserting ownership in the Defendant Properties in the *650 Litigation*.

77.     Defendant admits the allegations set forth in Paragraph 77 of the Complaint.

78.     Defendant denies the allegations set forth in Paragraph 78 of the Complaint and refers to the 2011 DLA Agreement for the complete terms thereof, except admits that under the 2011 DLA Agreement, DLA agreed to represent the *Heiser* and Non-*Heiser* judgment creditors with respect to collection efforts.

19

D:\TWLFPLLC\

79.     Defendant denies the allegations set forth in Paragraph 79 of the Complaint, except admits that ACCJ entered into the 2011 DLA Agreement and refers to the 2011 DLA Agreement for the complete terms thereof.

80.     Defendant denies the allegations set forth in Paragraph 80 of the Complaint, except admits that in or around 2011, Iranian assets, believed to be in excess of $1.5 billion, were located and frozen by governmental authorities in the U.K., and that Plaintiff signed the U.K. Cooperation Agreement as attorney-in-fact for certain claimants designated therein, and further states that the U.K. Cooperation Agreement contained a confidentiality provision, which Plaintiff violated by attaching it to the Complaint.

81.     Defendant admits the allegations set forth in Paragraph 81 of the Complaint.

82.     Defendant denies the allegations set forth in Paragraph 82 of the Complaint, except neither admits nor denies any allegation of law therein.

83.     Defendant denies knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 83 of the Complaint.

84.     Defendant denies knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 84 of the Complaint.

85.     Defendant denies knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 85 of the Complaint, except admits that pursuant to the Claimant and Center Agreement dated July 15, 2000 between ACCJ and Elaine Collett, individually and on behalf of the Estate of Alec Collett, ACCJ was entitled to 20% of the recovery of settlement funds.

86.     Defendant denies the allegations set forth in Paragraph 86 of the Complaint, except admits that the New York County Surrogate's Court approved the petition, and in or around

20

D:\TWLFPLLC\

September 29, 2009, four checks were drawn to the order of ACCJ for a total payment of $2,010,000 by Elaine Collett, David Collett and Susan Maria Grant, in full satisfaction of amounts due.

87.     Defendant admits the allegations set forth in Paragraph 87 of the Complaint.

88.     Defendant admits the allegations set forth in Paragraph 88 of the Complaint.

89.     Defendant admits the allegations set forth in Paragraph 89 of the Complaint.

90.     Defendant admits the allegations set forth in Paragraph 90 of the Complaint.

91.     Defendant admits the allegations set forth in Paragraph 91 of the Complaint.

92.     Defendant denies the allegations set forth in Paragraph 92 of the Complaint, except admits that ACCJ's 2009 Form 990 reflects program service revenue of $7,360,000.

93.     Defendant denies the allegations set forth in Paragraph 93 of the Complaint.

94.     Defendant denies the allegations set forth in Paragraph 94 of the Complaint.

95.     Defendant denies the allegations set forth in Paragraph 95 of the Complaint, and refers to ACCJ's Form 990 for 2009 for the complete terms thereof.

96.     Defendant denies the allegations set forth in Paragraph 96 of the Complaint, and refers to the New Jersey Center's Form 990 for the complete terms thereof.

97.     Defendant denies the allegations set forth in Paragraph 97 of the Complaint, except admits that ACCJ engaged JoAnn Luehring of Roberts and Holland LLP to assist with an examination by the IRS and two Information Document Requests issued on September 7, 2010 and February 28, 2011.

98.     Defendant denies the allegations set forth in Paragraph 98 of the Complaint, except admits that Plaintiff worked closely with JoAnn Luehring with respect to the IRS examination and further states that Plaintiff was uncooperative in meeting ACCJ requests for information that he

21

D:\TWLFPLLC\

had in his possession concerning the IRS examination, was otherwise uncooperative in assisting ACCJ's leadership, attorneys, and/or other representatives in responding to the IRS, and on account of these failures to cooperate, damaged ACCJ.

99. Defendant denies the allegations set forth in Paragraph 99 of the Complaint except admits that ACCJ terminated Roberts and Holland LLP in December 2012.

100. Defendant denies the allegations set forth in Paragraph 100 of the Complaint, except admits that in or around early 2013, ACCJ hired attorney Marcus Owens, formerly the director of the IRS Exempt Organizations Division from 1990-2000, to assist ACCJ with responding to the IRS examination. Defendant further states that ACCJ discussed the simultaneous engagement of Fred Goldberg and Emily Lam, both of Skadden, Arps, Slate, Meagher & Flom LLP, with Fred Goldberg and Marcus Owens.

101. Defendant denies the allegations set forth in Paragraph 101 of the Complaint, except denies knowledge and information sufficient to form a belief as to whether Plaintiff hired Jonathan Bach of Cooley LLP in January 2013.

102. Defendant denies the allegations set forth in Paragraph 102 of the Complaint, except admits that, contrary to ACCJ's Bylaws, on January 31, 2013, Mr. Bach sent an unsigned Notice purportedly on behalf of Plaintiff unilaterally purporting to call a Special Board Meeting of ACCJ to be held at Mr. Bach's office.

103. Defendant denies the allegations set forth in Paragraph 103 of the Complaint, except admits that Eliezer Perr and Milton Pollack wrote, among other things, in a letter dated February 7, 2013, and sent to Plaintiff:

22

D:\TWLFPLLC\

We reiterate our view, as set forth in the email of ACCJ's Counsel, Neal Sher, of February 1, 2013, that it would beneficial to all to hold an informal meeting to discuss and hopefully resolve **all** issues. We are committed to addressing and resolving all of everyone's concerns and issues. . . . Should you nevertheless insist on a special board meeting, one will be convened, in accordance with ACCJ By-laws and the New York Not-For-Profit Law, at ACCJ's offices and at a mutually convenient time. You will, of course, receive the appropriate notice.

February 7, 2013 Letter from Eliezer Perr and Milton Pollack to Plaintiff (emphasis added).

104.    Defendant denies the allegations set forth in Paragraph 104 of the Complaint.

105.    Defendant admits the allegations set forth in Paragraph 105 of the Complaint.

106.    Defendant denies the allegations set forth in Paragraph 106 of the Complaint, except admits that on May 9, 2013, Eliezer Perr and Milton Pollack called for a meeting of the Board for May 20, 2013, and that Plaintiff refused to participate in that meeting without the presence of his personal attorney, Jonathan Bach.  Defendant further states that it determined that such participation by a personal attorney would be inappropriate.

107.    Defendant denies the allegations set forth in Paragraph 107 of the Complaint, except admits that ACCJ had requested certain documents from Plaintiff that were themselves requested from the IRS, and Plaintiff did not provide them, causing damage to ACCJ.

108.    Defendant denies the allegations set forth in Paragraph 108 of the Complaint.

109.    Defendant denies the allegations set forth in Paragraph 109 of the Complaint, except admits Mr. Bach and Marcus Owens communicated during the course of preparing the response to the IRS examination.

110.    Defendant denies the allegations set forth in Paragraph 110 of the Complaint, except admits that Caplin & Drysdale shared drafts of its audit response with Mr. Bach, and states that the drafts of the audit response speak for themselves.

23

111. Defendant denies the allegations set forth in Paragraph 111 of the Complaint, except admits that Mr. Bach was given copies of the minutes of the April 1, 2007 board meeting and the April 12, 2007 Agreement (a/k/a the "New Jersey Contract").

112. Defendant denies the allegations set forth in Paragraph 112 of the Complaint, refers to the IRS response and emails for the complete terms thereof, and further states that Plaintiff failed to provide any documentation to Caplin & Drysdale after being requested to do so to substantiate his unsupported and false allegations.

113. Defendant denies the allegations set forth in Paragraph 113 of the Complaint.

114. Defendant denies the allegations set forth in Paragraph 114 of the Complaint.

115. Defendant denies the allegations set forth in Paragraph 115 of the Complaint, except admits that Milton Pollack signed the April 1, 2007 Board minutes.

116. Defendant denies the allegations set forth in Paragraph 116 of the Complaint, except admits that Plaintiff was not present at the April 1, 2007 Board meeting.

117. Defendant denies the allegations set forth in Paragraph 117 of the Complaint and further states that the April 1, 2007 Board minutes speak for themselves.

118. Defendant denies the allegations set forth in Paragraph 118 of the Complaint.

119. Defendant denies the allegations set forth in Paragraph 119 of the Complaint.

120. Defendant denies the allegations set forth in Paragraph 120 of the Complaint.

121. Defendant denies the allegations set forth in Paragraph 121 of the Complaint.

122. Defendant denies the allegations set forth in Paragraph 122 of the Complaint.

123. Defendant denies the allegations set forth in Paragraph 123 of the Complaint.

124. Defendant denies the allegations set forth in Paragraph 124 of the Complaint.

24

D:\TWLFPLLC\

125.    Defendant denies the allegations set forth in Paragraph 125 of the Complaint and refers to the 2007 New Jersey Contract for the complete terms thereof.

126.    Defendant denies the allegations set forth in Paragraph 126 of the Complaint and refers to the 2007 New Jersey Contract for the complete terms thereof.

127.    Defendant denies the allegations set forth in Paragraph 127 of the Complaint.

128.    Defendant denies the allegations set forth in Paragraph 128 of the Complaint, except that it admits: (a) that it retained Stroock & Stroock & Lavan LLP, Carter Ledyard & Milburn, and Paul Gaston; (b) that the New Jersey Center was not a party to the Ambush Litigation, and refers to the DLA Agreements for the complete terms thereof.

129.    Defendant denies the allegations set forth in Paragraph 129 of the Complaint.

130.    Defendant denies the allegations set forth in Paragraph 130 of the Complaint and states that Plaintiff was fully aware that the New Jersey Center was leading the collection efforts for judgment creditors and ACCJ.

131.    Defendant denies the allegations set forth in Paragraph 131 of the Complaint.

132.    Defendant denies the allegations set forth in Paragraph 132 of the Complaint.

133.    Defendant denies the allegations set forth in Paragraph 133 of the Complaint.

134.    Defendant denies the allegations set forth in Paragraph 134 of the Complaint.

135.    Defendant denies the allegations set forth in Paragraph 135 of the Complaint, except neither admits nor denies any allegation of law therein.

136.    Defendant denies the allegations set forth in Paragraph 136 of the Complaint.

137.    Defendant denies the allegations set forth in Paragraph 137 of the Complaint.

138.    Defendant denies the allegations set forth in Paragraph 138 of the Complaint, except admits that the 2007 New Jersey Contract states that "in lieu of funds, [it] is hereby

25

D:\TWLFPLLC\

assigning to [NEW JERSEY] CENTER, all ACCJ's interests in Libya claims," and further states that ACCJ retained the New Jersey Center to pursue collections on judgments only, the 2007 New Jersey Contract did not assign to the New Jersey Center ACCJ's rights and/or responsibilities to pursue claims that had not yet received judgments, and the claims comprising the *Franqui* case were never reduced to one or more judgments.

139.     Defendant denies the allegations set forth in Paragraph 139 of the Complaint, except admits that ACCJ received $7,360,000 as proceeds from the *Franqui* case, and states that the IRS examination response speaks for itself.

140.     Defendant denies the allegations set forth in Paragraph 140 of the Complaint.

141.     Defendant admits the allegations set forth in Paragraph 141 of the Complaint.

142.     Defendant denies the allegations set forth in Paragraph 142 of the Complaint.

143.     Defendant denies the allegations set forth in Paragraph 143 of the Complaint and refers to the IDR for the complete terms thereof.

144.     Defendant denies the allegations set forth in Paragraph 144 of the Complaint, except admits that the New Jersey Center's Form 990 for 2009 showed the receipt of $2,646,144.

144A.   Defendant denies the allegations set forth in Paragraph 144A of the Complaint, and further states that the September 1, 2013 Board minutes (Complaint Ex. 60) speak for themselves.

145.     Defendant denies the allegations set forth in Paragraph 145 of the Complaint.

146.     Defendant denies the allegations set forth in Paragraph 146 of the Complaint, and states that the New Jersey Center expended considerable funds, including but not limited those to retain counsel, and engaged individuals from the intelligence community to locate Iranian assets in the United Kingdom, in accordance with the 2007 New Jersey Contract.

26

D:\TWLFPLLC\

147.    Defendant denies the allegations set forth in Paragraph 147 of the Complaint, and further states that Plaintiff was fully aware of the formation of ARC and its purposes, which are not correctly alleged in the Complaint.

148.    Defendant denies the allegations set forth in Paragraph 148 of the Complaint, and further states that as documents reflect, Plaintiff was fully aware of and involved with the negotiations regarding—and potential participation of ARC with respect to—potential agreements with other judgment creditor groups.  The proposed work of ARC was entirely consistent with the mission of ACCJ.  No agreements were ever finalized, and ARC did not receive anything with respect to the potential agreements.  Furthermore, ARC was never operational, and the State of New Jersey revoked its status as an active company.

149.    Defendant denies knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 149 of the Complaint, except neither admits nor denies any allegation of law therein, and further denies that Jed Perr made any misrepresentations to DLA regarding ARC.

150.    Defendant denies the allegations set forth in Paragraph 150 of the Complaint.

151.    Defendant denies the allegations set forth in Paragraph 151 of the Complaint, except admits that Plaintiff's counsel in September 2013, Jonathan Bach, sent an email about ARC to Sharon Nokes and Marcus Owens, refers to that email for the complete contents thereof, and states that Plaintiff was fully aware of and involved with negotiations regarding ARC, contrary to the allegations of the Complaint.

152.    Defendant denies the allegations set forth in Paragraph 152 of the Complaint, contends that Paragraphs 152 through 215 of the Complaint and exhibits cited therein have no bearing or relation to the Complaint's ten causes of action, and states that in furtherance of its

27

collection efforts pursuant to the 2007 New Jersey Contract, the New Jersey Center became aware that there were Iranian assets in Canada, and that Torys LLP was retained to pursue those assets. Defendant further states that the New Jersey Center has been paying those fees.

153.    Defendant denies the allegations set forth in Paragraph 153 of the Complaint, except admits that on April 16, 2014, an agreement was reached between the U.S. Attorney for the Southern District of New York and various judgment creditor groups in the *650 Litigation* on the distribution of funds once the properties forfeited were sold, which would help compensate the long-suffering victims of Iranian acts of terror.  The New Jersey Center, acting pursuant to the 2007 New Jersey Contract and in conjunction with DLA, attorney for the *Heiser* claimants, and Neal Sher, attorney for the Non-*Heiser* claimants, actively participated in reaching this agreement.

154.    Defendant denies the allegations set forth in Paragraph 154 of the Complaint.

155.    Defendant denies the allegations set forth in Paragraph 155 of the Complaint, except denies knowledge or information sufficient to form a belief as to the truth of the allegations as to whether Welch contacted Plaintiff.

156.    Defendant denies the allegations set forth in Paragraph 156 of the Complaint, except admits that Mr. Welch had received a letter dated May 28, 2014, from Jed Perr, who was acting pursuant to the 2007 New Jersey Contract, that was sent to all the Non-*Heiser* Judgment Creditors (the "May 28, 2014 Letter") advising them that claims had been filed on their behalf in Canada where Iranian assets had been located and that a mutual cooperation settlement agreement was being negotiated by Torys LLP, which had been retained to represent the *Heiser* and Non-*Heiser* claimants.

Defendant neither admits nor denies any allegation of law in the second sentence and further states that: (a) in the early 2000s, Plaintiff had received powers of attorney from certain

28

claimants; (b) at the relevant time, Plaintiff cut off communication with ACCJ; and (c) as a result of Plaintiff's refusal to communicate with ACCJ, the latter—pursuant to the Claimant and Center Agreements—sought powers of attorneys to facilitate the effective retention of counsel to pursue collections.

157.    Defendant denies the allegations set forth in Paragraph 157 of the Complaint, except admits that Mr. Welch contacted Jed Perr.

158.    Defendant denies the allegations set forth in Paragraph 158 of the Complaint.

159.    Defendant denies the allegations set forth in Paragraph 159 of the Complaint, except denies knowledge and information sufficient to form a belief as to the truth of the allegations concerning Mr. Welch and Plaintiff speaking to one another.

160.    Defendant denies the allegations set forth in Paragraph 160 of the Complaint.

161.    Defendant denies the allegations set forth in Paragraph 161 of the Complaint, except neither admits nor denies any allegation of law therein, and states that the power of attorney described in this Paragraph was in furtherance of the Claimant and Center Agreements, was clearly limited to the ongoing collection efforts worldwide, and did not extend, for example, to general control over individual accounts or estate matters.

162.    Defendant denies the allegations set forth in Paragraph 162 of the Complaint and states that Plaintiff is fully aware that the May 28, 2014 Agreement did not increase the fees to claimants and that Plaintiff's allegations are designed to malign and defame Defendant and the individual defendants.  The original litigation engagement agreements entered into in the early 2000s provided for a 20% fee for the legal and other costs related to bringing the initial lawsuit culminating in a judgment (the "Litigation Fee").  In 2011, with Plaintiff's knowledge and active participation, the claimants entered into collections agreements that provided for up to an

29

additional 20% for legal and consultant fees related to collections (with no additional pledge to ACCJ) (the "Collection Fee"). The May 28, 2014 Agreement combined the 20% Litigation Fee and 20% Collection Fee for a maximum total fee of 36% (in that 20% of 80 is 16). This maximum 36% total fee covered any and all expenses.

163.    Defendant denies the allegations set forth in Paragraph 163 of the Complaint, and states that as explained in Answering Paragraph 162 above, the total fees charged to claimants were never raised.

164.    Defendant denies the allegations set forth in Paragraph 164 of the Complaint, and states that neither the May 28, 2014 Agreement nor the prior Claimant and Center Agreements specifically identified all relevant attorneys or other personnel that would share in the recovery, and there never was any agreement, either written or oral, for ARC to share in any such recovery.

165.    Defendant denies knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 165 of the Complaint.

166.    Defendant denies knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 166 of the Complaint.

167.    Defendant denies the allegations set forth in Paragraph 167 of the Complaint, except admits that counsel for ACCJ sent a letter dated June 10, 2014 to Plaintiff's counsel, representatives of ACCJ advised DLA that Plaintiff was not a representative of ACCJ, and refers to the two letters referenced in Paragraph 167 for the complete terms thereof.

168.    Defendant denies the allegations set forth in Paragraph 168 of the Complaint, except admits that Plaintiff was appointed to the Board at a May 9, 2010 Board meeting to complete the remaining term of a member who had resigned, Plaintiff's term was to expire in May 2011, and Plaintiff's membership on the Board expired after May 31, 2011.

30

D:\TWLFPLLC\

169.    Defendant denies the allegations set forth in Paragraph 169 of the Complaint, except admits that a copy of the May 9, 2010 Board minutes is attached as Exhibit 26 to the Complaint, and that Plaintiff signed the May 9, 2010 Board minutes, which show that Plaintiff was neither an officer nor director of ACCJ as of May 9, 2010.

170.    Defendant admits the allegations set forth in Paragraph 170 of the Complaint.

171.    Defendant denies the allegations set forth in Paragraph 171 of the Complaint, except neither admits nor denies any allegation of law therein.

172.    Defendant denies the allegations set forth in Paragraph 172 of the Complaint, except admits that ACCJ amended its bylaws in April 2007, neither admits nor denies any allegation of law therein, and further states that ACCJ never operated as a membership organization, Plaintiff never paid any membership dues, and Plaintiff admitted that ACCJ was not a membership organization in numerous documents, including in a submission to the New York Secretary of State.

173.    Defendant denies the allegations set forth in Paragraph 173 of the Complaint.

174.    Defendant denies the allegations set forth in Paragraph 174 of the Complaint, and states that ACCJ's 2009 Form 990 and the Ambush Declaration speak for themselves, and for the reasons set forth above, Jonathan Tendler, Mark Hirschman and Milton Pollack were correctly identified in ACCJ's 2009 Form 990 as directors of ACCJ's Board, as Plaintiff himself has also testified under oath.

175.    Defendant denies the allegations set forth in Paragraph 175 of the Complaint, except admits that the May 9, 2010 minutes, signed by Plaintiff, demonstrate that Plaintiff and Eliezer Perr returned to the Board as directors, and that Eliezer Perr was named President/Executive Director of the Center.

31

D:\TWLFPLLC\

176.     Defendant denies the allegations set forth in Paragraph 176 of the Complaint.

177.     Defendant denies the allegations set forth in Paragraph 177 of the Complaint but admits that Exhibit 31 to the Complaint incorrectly references Plaintiff as the President of ACCJ.

178.     Defendant admits the allegations set forth in Paragraph 178 of the Complaint, and states that Eliezer Perr was elected as the Executive Director of ACCJ on May 9, 2010, as reflected in the May 9, 2010 meeting minutes, signed by Plaintiff.  Defendant further states that the pertinent portion of Paragraph 18 of Exhibit 32 of the Complaint, quoted in full, is as follows: "The Center's Executive Director, Dr. Michael Engelberg, was deposed in the *Berganzo* case in Puerto Rico on May 4, 2011."

179.     Defendant denies the allegations set forth in Paragraph 179 of the Complaint.

180.     Defendant denies the allegations set forth in Paragraph 180 of the Complaint, and states that ACCJ's 2010 Form 990 affirmatively states that the corporation had a written conflict of interest policy.  (Compl. Ex. 54 (ACCJ's 2010 Form 990)).

181.     Defendant denies the allegations set forth in Paragraph 181 of the Complaint but admits that Plaintiff held valid powers of attorney on behalf of the *Heiser* and Non-*Heiser* claimants.

182.     Defendant denies knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 182 of the Complaint.

183.     Defendant denies knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 183 of the Complaint.

184.     Defendant denies the allegations set forth in Paragraph 184 of the Complaint.  *See supra* Paragraphs 162-64.

32

185.     Defendant denies the allegations set forth in Paragraph 185 of the Complaint.  *See supra* Paragraphs 162-64.

186.     Defendant denies the allegations set forth in Paragraph 186 of the Complaint, and further states that the information that Plaintiff claims was omitted from the March 24 letter was in fact contained in the agreement attached to that letter.

187.     Defendant admits the allegations set forth in Paragraph 187 of the Complaint, and further states that the 2011 DLA Agreement with ACCJ claimants allows up to 20% for both DLA fees and other legal and expert fees.

188.     Defendant denies the allegations set forth in Paragraph 188 of the Complaint.

189.     Defendant denies the allegations set forth in Paragraph 189 of the Complaint, except admits that ACCJ is not incorporated in New Jersey.  Defendant further states that the *Brewer* plaintiffs were always New Jersey Center claimants and that Jed Perr held powers of attorney.

190.     Defendant denies knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 190 of the Complaint.

191.     Defendant denies the allegations set forth in Paragraph 191 of the Complaint, except denies knowledge and information sufficient to form a belief as to the truth of Plaintiff trying to get more information.

192.     Defendant denies knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 192 of the Complaint, except neither admits nor denies any allegation of law therein.

193.     Defendant denies the allegations set forth in Paragraph 193 of the Complaint, except admits that Daniel Kurtz of Skadden Arps, Plaintiff's former counsel, made a request for

33

information in a July 10, 2014 telephone conversation with Marcus Owens, outside counsel for

ACCJ, and his colleague Sharon Nokes; Marcus Owens advised that he would consult with ACCJ;

and in a July 11, 2014 email to Marcus Owens, Carla Gant of Skadden Arps stated that Plaintiff

had not been apprised of any details of either the Canadian litigation or proposed settlement

agreement and looked forward to receiving "details as to the Canadian litigation, the settlement

and any fee arrangement, and why the Center believes it [to be] in the best interest of the judgment

creditors, for [Dr. Engelberg's] assessment." (Compl. Ex. 37 (July 11, 2014 Email from Carla

Gant to Marcus Owens)).

194.    Defendant admits the allegations set forth in Paragraph 194 of the Complaint.

195.    Defendant denies the allegations set forth in Paragraph 195 of the Complaint,

except admits that Marcus Owens sent a copy of the letter to Daniel Kurtz and advised that ACCJ

was ready to provide additional information if requested to do so.

196.    Defendant denies the allegations set forth in Paragraph 196 of the Complaint,

except admits that the July 15, 2014 letter advised the remaining Non-*Heiser* claimants who had

not yet signed the May 28, 2014 Agreement that, should they wish to have ACCJ represent their

interests and be included in the Canadian mutual cooperation settlement agreement and be a part

of the Center's judgment creditor group, they needed to execute the May 28, 2014 Agreement and

requested that a response be provided in writing by July 17, 2014.

197.    Defendant denies the allegations set forth in Paragraph 197 of the Complaint,

except admits that by letter dated July 17, 2014, Daniel Kurtz alleged that Plaintiff had no intention

of impeding a settlement in Canada and refers to the letter for the complete terms thereof.

34

D:\TWLFPLLC\

198.     Defendant denies knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 198 of the Complaint, except neither admits nor denies any allegation of law therein.

199.     Defendant denies the allegations set forth in Paragraph 199 of the Complaint.

200.     Defendant denies the allegations set forth in Paragraph 200 of the Complaint.

201.     Defendant denies knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 201 of the Complaint.

202.     Defendant denies the allegations set forth in Paragraph 202 of the Complaint, and refers to the email exchange referenced therein for the complete terms thereof.

203.     Defendant denies the allegations set forth in Paragraph 203 of the Complaint. *See supra* Paragraphs 162-64.

204.     Defendant denies the allegations set forth in Paragraph 204 of the Complaint.

205.     Defendant denies the allegations set forth in Paragraph 205 of the Complaint.

206.     Defendant denies the allegations set forth in Paragraph 206 of the Complaint, and refers to the letter for the complete terms thereof.

207.     Defendant denies the allegations set forth in Paragraph 207 of the Complaint, and refers to the email for the complete terms thereof.

208.     Defendant denies knowledge and information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 208 of the Complaint.

209.     Defendant denies the allegations set forth in Paragraph 209 of the Complaint, except denies knowledge and information sufficient to form a belief as to the truth of the allegations with respect to what Torys LLP allegedly communicated to Plaintiff.

210.     Defendant denies the allegations set forth in Paragraph 210 of the Complaint.

35

D:\TWLFPLLC\

211.	Defendant denies the allegations set forth in Paragraph 211 of the Complaint.

212.	Defendant denies the allegations set forth in Paragraph 212 of the Complaint, except admits that Marcus Owens sent the August 12, 2014 letter, attached as Exhibit 48 to the Complaint, to Daniel Kurtz, refers to the letter for the complete terms thereof, and denies knowledge or information sufficient to form a belief as to what Mr. Welch discussed with Plaintiff. Defendant further states that the August 12, 2014 letter pointed out that Plaintiff's characterization of the fee structure was incorrect.

213.	Defendant denies the allegations set forth in Paragraph 213 of the Complaint, except admits that Daniel Kurtz sent the August 13, 2014 letter, attached as Exhibit 49 to the Complaint, to Marcus Owens and further states that this letter failed to explain or defend Plaintiff's position that his characterization of the fee structure was in fact correct.

214.	Defendant denies the allegations set forth in Paragraph 214 of the Complaint and states that pursuant to the 2007 New Jersey Contract, Jed Perr sent a letter on September 9, 2014 to judgment creditors.

215.	Defendant denies the allegations set forth in Paragraph 215 of the Complaint, except admits that on September 11, 2014, Eliezer Perr sent a Notice of Annual Board Meeting for ACCJ to be held on September 18, 2014 to discuss, among other things, the annual ACCJ Board membership.

216.	Defendant denies the allegations set forth in Paragraph 216 of the Complaint, and further states that Eliezer Perr sent Plaintiff an email dated September 17, 2014, in which it was stated: "Participation by your attorneys: As I'm sure you recall, at the May 2013 Board Meeting it was decided that your personal attorney could not participate and we see no reason to deviate from that position.  Accordingly, it would be inappropriate for either Ms. Katar [sic] or Mr. Kurtz to

36

D:\TWLFPLLC\

participate in tomorrow'[s] meeting," and neither Plaintiff nor his attorneys challenged that decision at the time. (Compl. Ex. 51 (September 17, 2014 Email from Eliezer Perr to Plaintiff)).

217.    Defendant denies the allegations set forth in Paragraph 217 of the Complaint, except admits that Plaintiff participated telephonically, and further states that neither at this Board meeting nor at any time prior had Plaintiff ever taken the position that ACCJ was a member corporation, that he could not be replaced on the Board of Directors, or that the Board of Directors was invalidly constituted.

218.    Defendant denies the allegations set forth in Paragraph 218 of the Complaint.

219.    Defendant denies the allegations set forth in Paragraph 219 of the Complaint, except admits that under the Claimant and Center Agreements, claimants agreed to pay the Center a portion of the net proceeds of any recovery, and that Exhibit 2 to the Complaint states that "[i]n further consideration of the ongoing efforts and services of the Center to assist other victims of oppression and to deter further acts of terrorism, and in order to promote the Center's ability to carry out its goals and purposes . . . ." (Compl. Ex. 2 (Claimant and Center Agreement)).

220.    Defendant denies the allegations set forth in Paragraph 220 of the Complaint, and states that the express purposes in the original and amendment to the Certificate of Incorporation are:

> To create, form and establish a civil rights organization for the benefit of victims of terrorism in the United States and abroad; to promote, foster, increase and advance the civil rights of victims of terrorism; to maintain a network of lawyers, researchers, journalists, investigators and government officials to further the purposes of this corporation; to identify and document terrorist acts committed and/or sponsored by individuals, groups or states; to identify sources, resources and assets of the perpetrators and sponsors of terrorism to advise victims of their rights and methods of addressing compensation for acts of terror; to advocate the passage of legislation that will make it a crime to sponsor, aid and abet terrorists and to promote legislation that will simplify and speed the collection of punitive damages; to encourage interest, awareness and activism in the American and world political

D:\TWLFPLLC\

arena with reference to the plight of victims of terrorism throughout the world; to initiate and promote civic and political programs beneficial to the victimized people of the world; to hold, conduct and organize meetings, discussions and forums to consider community opinions on issues affecting the health and the economic, educational and social welfare of victims of terrorism throughout the world; to aid, assist, cooperate, co-sponsor and otherwise engage in concerted action with private and governmental agencies and organizations on all programs designed, calculated and dedicated to the improvement of life for the aforesaid people; to solicit, collect and otherwise raise money for charitable, eleemosynary and benevolent purposes and to expend such monies for such purposes and generally to advance the accountability to the victims of terrorists and those who sponsor, aid and abet acts of terror throughout the world.

In furtherance of its corporate purposes, the corporation shall have all the general powers enumerated in Section 202 of the Not-For-Profit Corporation Law, together with the power to solicit grants and contributions for the corporate purposes.

Nothing herein shall authorize this corporation, directly or indirectly, to engage in or include among its purposes, any of the activities mentioned in the Not-For-Profit Corporation Law, Section 404(b)-(v).

Certification of Incorporation, dated November 21, 1996.

Said corporation is organized for charitable, religious and educational purposes, including for such purposes, the making of distributions to such organizations and those that are committed to perpetuate the causes of civil liberties, civil justice, religious freedom and tolerance as guaranteed by the United States Constitution, and those that qualify as exempt organizations under section 501(c)(3) of the Internal Revenue Code, or the corresponding section of any future federal tax code.

Certificate of Amendment of the Certificate of Incorporation, dated January 20, 2005.

221. Defendant denies the allegations set forth in Paragraph 221 of the Complaint.

222. Defendant denies the allegations set forth in Paragraph 222 of the Complaint, and

states that the following is contained in the August 23, 2010 Board meeting minutes:

*Dr. Engelberg* countered that insomuch as Jewish schools have been targeted throughout the world, and Jewish children are a constant target of Muslim terrorism as well as other forms of violence and persecution, grants be provided to schools that are open to the concept of security, and who are willing to implement some

38

D:\TWLFPLLC\

form of security on their grounds, beginning with schools in the Jewish centers of NYC, Monsey NY, Lakewood NJ, and see how it goes.

August 23, 2010 Board Minutes (emphasis added).

223.    Defendant denies the allegations set forth in Paragraph 223 of the Complaint, and states that all contributions made to other charitable organizations by ACCJ were legitimate charitable contributions and were consistent with New York law and ACCJ's express purposes.

224.    Defendant denies the allegations set forth in Paragraph 224 of the Complaint.

225.    Defendant denies the allegations set forth in Paragraph 225 of the Complaint.

226.    Defendant denies the allegations set forth in Paragraph 226 of the Complaint, and further states that Eliezer Perr's brother, Yechiel Perr, is one of four officers of the Yeshiva of Far Rockaway, is not a member of its board of directors, and that said institution has no owners.

227.    Defendant denies the allegations set forth in Paragraph 227 of the Complaint, except admits that the May 20, 2013 meeting minutes (Compl. Ex. 58) show that in 2013 Eliezer Perr, Joel Seitler, and Milton Pollack approved a grant of $100,000 of ACCJ funds to Mesila International Inc., refers to those meeting minutes for an accurate description of the purposes and objectives of Mesila International Inc., denies knowledge and information sufficient to form a belief as to the truth of the allegations set forth in the last two sentences of Paragraph 227, and refers to the Mesila International 2012 Form 990 (Compl. Ex. 59) for the complete terms thereof.

228.    Defendant denies the allegations set forth in Paragraph 228 of the Complaint and further states that Plaintiff, as with all charitable contributions made by ACCJ over its fourteen-year history of such contributions, never criticized, tried to prevent, or opposed any ACCJ charitable contribution except in connection with this lawsuit, and that ACCJ's Board approved the NSHDS donation, as reflected in the September 1, 2013 Board minutes:

39

D:\TWLFPLLC\

Next on the agenda was Security & educational grants. Elie Perr stated that the National Society of Hebrew Day Schools' (NSHDS), whose membership consists of over 675 day schools with a total student enrollment of over 190,000. It is therefore advisable that ACCJ's policy of charity tithing to educational institutions be done by donating to the NSHDS. Elie Perr made a motion to contribute $250,000.00 towards their fund which is managed and distributed by NSHDS. Joel Seitler and Victoria Nolon, seconded the motion. The Board agreed and the motion was carried unanimously.

(Compl. Ex. 60 (September 1, 2013 Board Minutes)).

229.    Defendant denies the allegations set forth in Paragraph 229 of the Complaint.

230.    Defendant denies the allegations set forth in Paragraph 230 of the Complaint.

231.    Defendant denies the allegations set forth in Paragraph 231 of the Complaint.

232.    Defendant denies the allegations set forth in Paragraph 232 of the Complaint.

233.    Defendant denies the allegations set forth in Paragraph 233 of the Complaint.

234.    Defendant denies the allegations set forth in Paragraph 234 of the Complaint.

235.    Defendant denies the allegations set forth in Paragraph 235 of the Complaint.

236.    Defendant neither admits nor denies the allegations set forth in Paragraph 236 of the Complaint because they involve questions of law, except admits that Plaintiff has not made a demand on ACCJ's Board.

237.    Defendant denies the allegations set forth in Paragraph 237 of the Complaint.

238.    Defendant denies the allegations set forth in Paragraph 238 of the Complaint.

239.    Defendant denies the allegations set forth in Paragraph 239 of the Complaint.

240.    Defendant denies the allegations set forth in Paragraph 240 of the Complaint.

241.    Defendant hereby incorporates its responses contained in the previously numbered paragraphs as if set forth fully herein.

242.    Defendant denies the allegations set forth in Paragraph 242 of the Complaint.

40

D:\TWLFPLLC\

243.    Defendant denies the allegations set forth in Paragraph 243 of the Complaint.

244.    Defendant denies the allegations set forth in Paragraph 244 of the Complaint.

245.    Responding to Paragraph 245 of the Complaint, Defendant states that ACCJ's 2009 Form 990 speaks for itself.

246.    Responding to Paragraph 246 of the Complaint, Defendant states that the New Jersey Center's 2009 Form 990 speaks for itself.

247.    Responding to Paragraph 247 of the Complaint, Defendant states that the IRS examination response speaks for itself.

248.    Defendant denies the allegations set forth in Paragraph 248 of the Complaint.

249.    Defendant denies the allegations set forth in Paragraph 249 of the Complaint.

250.    Defendant denies the allegations set forth in Paragraph 250 of the Complaint.

251.    Defendant denies the allegations set forth in Paragraph 251 of the Complaint.

252.    Defendant, upon information and belief, denies the allegations set forth in Paragraph 252 of the Complaint, and states that on May 4, 2010, $480,000 was deposited into an ACCJ-controlled bank account such that ACCJ received this money as settlement proceeds from the *Franqui* case.

253.    Defendant denies the allegations set forth in Paragraph 253 of the Complaint.

254.    Defendant denies the allegations set forth in Paragraph 254 of the Complaint.

255.    Defendant denies the allegations set forth in Paragraph 255 of the Complaint.

256.    Defendant denies the allegations set forth in Paragraph 256 of the Complaint.

257.    Defendant denies the allegations set forth in Paragraph 257 of the Complaint.

258.    Defendant denies the allegations set forth in Paragraph 258 of the Complaint.

259.    Defendant denies the allegations set forth in Paragraph 259 of the Complaint.

41

D:\TWLFPLLC\

260.     Defendant hereby incorporates its responses contained in the previously numbered paragraphs as if set forth fully herein.

261.     Defendant denies the allegations set forth in Paragraph 261 of the Complaint.

262.     Defendant denies the allegations set forth in Paragraph 262 of the Complaint, and states that in 2012 Jed Perr filed paperwork with the New Jersey Secretary of State with respect to ARC, which was never operational, and on November 16, 2014, that Secretary of State issued a Certificate of Revocation of ARC's status as an active New Jersey business entity.

263.     Defendant denies the allegations set forth in Paragraph 263 of the Complaint.

264.     Defendant denies the allegations set forth in Paragraph 264 of the Complaint.

265.     Defendant hereby incorporates its responses contained in the previously numbered paragraphs as if set forth fully herein.

266.     Defendant denies the allegations set forth in Paragraph 266 of the Complaint.

267.     Defendant denies the allegations set forth in Paragraph 267 of the Complaint.

268.     Defendant denies the allegations set forth in Paragraph 268 of the Complaint.

269.     Responding to Paragraph 269 of the Complaint, Defendant states that ACCJ's Form 990 speaks for itself.

270.     Responding to Paragraph 270 of the Complaint, Defendant states that the New Jersey Center's 2009 Form 990 speaks for itself.

271.     Responding to Paragraph 271 of the Complaint, Defendant states that the IRS examination response speaks for itself.

272.     Defendant denies the allegations set forth in Paragraph 272 of the Complaint.

273.     Defendant denies the allegations set forth in Paragraph 273 of the Complaint.

274.     Defendant denies the allegations set forth in Paragraph 274 of the Complaint.

42

D:\TWLFPLLC\

275.    Defendant denies the allegations set forth in Paragraph 275 of the Complaint.

276.    Defendant, upon information and belief, denies the allegations set forth in Paragraph 276 of the Complaint, and states that on May 4, 2010, $480,000 was deposited into an ACCJ-controlled bank account such that ACCJ received this money as settlement proceeds from the *Franqui* case.

277.    Defendant denies the allegations set forth in Paragraph 277 of the Complaint.

278.    Defendant denies the allegations set forth in Paragraph 278 of the Complaint.

279.    Defendant denies the allegations set forth in Paragraph 279 of the Complaint.

280.    Defendant hereby incorporates its responses contained in the previously numbered paragraphs as if set forth fully herein.

281.    Defendant denies the allegations set forth in Paragraph 281 of the Complaint.

282.    Defendant denies the allegations set forth in Paragraph 282 of the Complaint.

283.    Defendant denies the allegations set forth in Paragraph 283 of the Complaint.

284.    Defendant denies the allegations set forth in Paragraph 284 of the Complaint, except admits that on December 16, 2013, ACCJ submitted a response to IDR #3, which was issued as part of the IRS examination.

285.    Responding to Paragraph 285 of the Complaint, Defendant states that the response to IDR #3 speaks for itself.

286.    Defendant denies the allegations set forth in Paragraph 286 of the Complaint.

287.    Defendant denies the allegations set forth in Paragraph 287 of the Complaint.

288.    Defendant denies the allegations set forth in Paragraph 288 of the Complaint.

289.    Defendant denies the allegations set forth in Paragraph 289 of the Complaint.

290.    Defendant denies the allegations set forth in Paragraph 290 of the Complaint.

43

D:\TWLFPLLC\

291.    Defendant denies the allegations set forth in Paragraph 291 of the Complaint.

292.    Defendant hereby incorporates its responses contained in the previously numbered paragraphs as if set forth fully herein.

293.    Defendant denies the allegations set forth in Paragraph 293 of the Complaint.

294.    Defendant denies the allegations set forth in Paragraph 294 of the Complaint.

295.    Defendant denies the allegations set forth in Paragraph 295 of the Complaint.

296.    Responding to Paragraph 296 of the Complaint, Defendant states that ACCJ's Form 990 speaks for itself.

297.    Responding to Paragraph 297 of the Complaint, Defendant states that the New Jersey Center's 2009 Form 990 speaks for itself.

298.    Responding to Paragraph 298 of the Complaint, Defendant states that the IRS examination response speaks for itself.

299.    Defendant denies the allegations set forth in Paragraph 299 of the Complaint.

300.    Defendant denies the allegations set forth in Paragraph 300 of the Complaint.

301.    Defendant denies the allegations set forth in Paragraph 301 of the Complaint.

302.    Defendant denies the allegations set forth in Paragraph 302 of the Complaint.

303.    Defendant, upon information and belief, denies the allegations set forth in Paragraph 303 of the Complaint, and states that on May 4, 2010, $480,000 was deposited into an ACCJ-controlled bank account such that ACCJ received this money as settlement proceeds from the *Franqui* case.

304.    Defendant denies the allegations set forth in Paragraph 304 of the Complaint.

305.    Defendant denies the allegations set forth in Paragraph 305 of the Complaint.

306.    Defendant denies the allegations set forth in Paragraph 306 of the Complaint.

44

D:\TWLFPLLC\

307.     Defendant denies the allegations set forth in Paragraph 307 of the Complaint.

308.     Defendant denies the allegations set forth in Paragraph 308 of the Complaint.

309.     Defendant denies the allegations set forth in Paragraph 309 of the Complaint.

310.     Defendant denies the allegations set forth in Paragraph 310 of the Complaint.

311.     Defendant denies the allegations set forth in Paragraph 311 of the Complaint.

312.     Defendant hereby incorporates its responses contained in the previously numbered paragraphs as if set forth fully herein.

313.     Defendant denies the allegations set forth in Paragraph 313 of the Complaint.

314.     Defendant denies the allegations set forth in Paragraph 314 of the Complaint and states that in 2012 Jed Perr filed paperwork with the New Jersey Secretary of State with respect to ARC, which was never operational, and on November 16, 2014, that Secretary of State issued a Certificate of Revocation of ARC's status as an active New Jersey business entity.

315.     Defendant denies the allegations set forth in Paragraph 315 of the Complaint.

316.     Defendant denies the allegations set forth in Paragraph 316 of the Complaint.

317.     Defendant hereby incorporates its responses contained in the previously numbered paragraphs as if set forth fully herein.

318.     Defendant denies the allegations set forth in Paragraph 318 of the Complaint.

319.     Defendant denies the allegations set forth in Paragraph 319 of the Complaint.

320.     Defendant denies the allegations set forth in Paragraph 320 of the Complaint.

321.     Defendant denies the allegations set forth in Paragraph 321 of the Complaint.

322.     Defendant denies the allegations set forth in Paragraph 322 of the Complaint, except admits that in 2013, ACCJ's Board approved the grant of $100,000 to Mesila International Inc., an organization dedicated to help debt-ridden indigent individuals restructure and improve

45

their lives, and approved a donation of $250,000 to the National Society of Hebrew Day Schools, an Orthodox Jewish organization that fosters and promotes Torah-based Jewish religious education in North America.

323. Defendant denies the allegations set forth in Paragraph 323 of the Complaint.

324. Defendant denies the allegations set forth in Paragraph 324 of the Complaint.

325. Defendant denies the allegations set forth in Paragraph 325 of the Complaint.

326. Defendant denies the allegations set forth in Paragraph 326 of the Complaint.

327. Defendant denies the allegations set forth in Paragraph 327 of the Complaint.

328. Defendant denies the allegations set forth in Paragraph 328 of the Complaint.

329. Defendant denies the allegations set forth in Paragraph 329 of the Complaint.

330. Defendant denies the allegations set forth in Paragraph 330 of the Complaint.

331. Defendant hereby incorporates its responses contained in the previously numbered paragraphs as if set forth fully herein.

332. Defendant denies the allegations set forth in Paragraph 332 of the Complaint.

333. Defendant denies the allegations set forth in Paragraph 333 of the Complaint.

334. Defendant denies the allegations set forth in Paragraph 334 of the Complaint.

335. Defendant denies the allegations set forth in Paragraph 335 of the Complaint.

336. Defendant denies the allegations set forth in Paragraph 336 of the Complaint, except admits that in 2013, ACCJ's Board approved the grant of $100,000 to Mesila International Inc., an organization dedicated to help debt-ridden indigent individuals restructure and improve their lives, and approved a donation of $250,000 to the National Society of Hebrew Day Schools, an Orthodox Jewish organization that fosters and promotes Torah-based Jewish religious education in North America.

46

D:\TWLFPLLC\

337. Defendant denies the allegations set forth in Paragraph 337 of the Complaint.

338. Defendant denies the allegations set forth in Paragraph 338 of the Complaint.

339. Defendant denies the allegations set forth in Paragraph 339 of the Complaint.

340. Defendant denies the allegations set forth in Paragraph 340 of the Complaint.

341. Defendant hereby incorporates its responses contained in the previously numbered paragraphs as if set forth fully herein.

342. Defendant denies the allegations set forth in Paragraph 342 of the Complaint.

343. Defendant denies the allegations set forth in Paragraph 343 of the Complaint, and states that Eliezer Perr was elected as President/Executive Director at the May 9, 2010 meeting of ACCJ Board and has held that position since that time.

344. Defendant denies the allegations set forth in Paragraph 344 of the Complaint.

345. Defendant denies the allegations set forth in Paragraph 345 of the Complaint.

346. Defendant denies the allegations set forth in Paragraph 346 of the Complaint.

347. Defendant denies the allegations set forth in Paragraph 347 of the Complaint, except admits that in 2013, ACCJ's Board approved the grant of $100,000 to Mesila International Inc., an organization dedicated to help debt-ridden indigent individuals restructure and improve their lives, and approved a donation of $250,000 to the National Society of Hebrew Day Schools, an Orthodox Jewish organization that fosters and promotes Torah-based Jewish religious education in North America.

348. Defendant denies the allegations set forth in Paragraph 348 of the Complaint.

349. Defendant denies the allegations set forth in Paragraph 349 of the Complaint.

350. Defendant denies the allegations set forth in Paragraph 350 of the Complaint.

351. Defendant denies the allegations set forth in Paragraph 351 of the Complaint.

47

352.    Defendant denies the allegations set forth in Paragraph 352 of the Complaint.

353.    Defendant denies the allegations set forth in Paragraph 353 of the Complaint.

354.    Defendant hereby incorporates its responses contained in the previously numbered paragraphs as if set forth fully herein.

355.    Defendant denies the allegations set forth in Paragraph 355 of the Complaint.

356.    Defendant denies the allegations set forth in Paragraph 356 of the Complaint.

357.    Defendant denies the allegations set forth in Paragraph 357 of the Complaint.

358.    Defendant neither admits nor denies the allegations set forth in Paragraph 358 of the Complaint because they involve questions of law.

359.    Defendant denies the allegations set forth in Paragraph 359 of the Complaint.

359A.  Defendant denies the allegations set forth in Paragraph 359A of the Complaint.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

## LACK OF CAPACITY/STANDING

360.    Plaintiff lacks the capacity or standing to bring any of his causes of action because he is not a member, director, or officer of ACCJ.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

## STATUTES OF LIMITATIONS

361.    Plaintiff's causes of action are barred, in whole or in part, by the applicable Statutes of Limitations.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

## FAILURE TO STATE A CAUSE OF ACTION

362.    Each of Plaintiff's claims is barred, in whole or in part, for failure to state a cause of action.

48

D:\TWLFPLLC\

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

## LACHES

363. One or more of Plaintiff's causes of action are based in equity and barred by the doctrine of laches. On information and belief, Plaintiff had knowledge of the facts upon which he bases these causes of action for over a year and, in some cases, over seven years. He delayed in asserting these causes of action without reason or excuse. ACCJ has been prejudiced and disadvantaged by this delay: *inter alia*, it has conducted business that might be unwound if Plaintiff prevails on his causes of action, and upon information and belief, evidence has been lost during Plaintiff's delay.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

## RATIFICATION

364. Each of Plaintiff's causes of action are based on actions taken when Plaintiff claims to have been a director or officer of ACCJ. Plaintiff promoted, approved, acquiesced, or otherwise ratified such actions.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

## UNCLEAN HANDS AND *IN PARI DELICTO*

365. All of Plaintiff's claims are barred by his unclean hands, including but not limited to his wrongful acts and/or misconduct at ACCJ and NYCCJ as described above in the Nature of the Case / Counter-Statement of the Case and below in the Counterclaims, all of which are incorporated as if fully set forth herein. These wrongful acts and/or misconduct disqualify him from serving in any capacity at any not-for-profit corporation.

366. Plaintiff was also intimately involved in all actions, transactions, and occurrences which he now claims were improper in his Complaint. As such, even if such actions, transactions,

49

D:\TWLFPLLC\

and occurrences were somehow improper—which is not the case—all of Plaintiff's claims are nonetheless barred because in such circumstances, he would be in pari delicto with all named defendants except for NYCCJ (i.e., he would be equally at fault and have the same unclean hands as these defendants).

**AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE**

**BUSINESS JUDGMENT RULE**

367.    Each of Plaintiff's causes of action concern ACCJ actions approved by a disinterested and informed Board of Directors acting in good faith.  Each claim is thus barred by the business judgment rule.

**AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE**

**WAIVER AND ESTOPPEL**

368.    Plaintiff has waived his right to assert that ACCJ is a membership corporation.  In April 1999, ACCJ filed an amendment to its Certificate of Incorporation with the New York Department of State, in which Plaintiff unequivocally and affirmatively attested that "there is no membership."  Certificate of Amendment to Certificate of Incorporation, dated April 1999.

369.    Plaintiff has made prior statements, taken prior positions, made omissions or failed to take action both while agency determinations were being made or after they were made (including, but not limited to an IRS audit relevant to this action), and has been informed of one or more agency determinations negating his allegations that render applicable here various doctrines of estoppel, including but not limited to equitable estoppel, judicial estoppel, and collateral estoppel (a/k/a issue preclusion), such that he is precluded from asserting his causes of action.

50

## AS AND FOR A NINTH AFFIRMATIVE DEFENSE

## LACK OF REPRESENTATIVE CAPACITY

370.    Plaintiff is not a proper representative of ACCJ to bring the claims asserted herein.

## AS AND FOR A TENTH AFFIRMATIVE DEFENSE

## FAILURE TO JOIN PERSON AS A PARTY

371.    Plaintiff has failed to join at least one juridical person which should be a party to this action such that this Court should not proceed in the absence of such person or persons.

## AS AND FOR AN ELEVENTH AFFIRMATIVE DEFENSE

## ARBITRATION

372.    Plaintiff's causes of action concerning or implicating the New Jersey Contract—which are derivative in nature and thus asserted on Defendant's behalf—should be dismissed in favor of enforcement of a provision in the New Jersey Contract requiring arbitration of any dispute between Defendant and the New Jersey Center.

## RESERVATION OF RIGHTS

373.    Defendant reserves the right to expand the scope of these defenses and assert additional defenses based on facts learned in discovery.

51

D:\TWLFPLLC\

## COUNTERCLAIMS

1.      Counterclaim-Plaintiff ACCJ seeks to recover damages incurred resulting from Counterclaim-Defendant Michael Engelberg's false and injurious statements, as well as tortious conduct, breach of contract, unjust enrichment, and other wrongful conduct, which was carried out in concert with Additional Defendant on Counterclaims THE NEW YORK CENTER FOR CIVIL JUSTICE, TOLERANCE & VALUES, INC. ("Additional Defendant" or "NYCCJ," and with Engelberg, "Counterclaim-Defendants"), Engelberg's alter ego.

2.      NYCCJ is a not-for-profit corporation, organized under the laws of the State of New York, with its principal place of business at Engelberg's residence, 75 Woodmere Blvd., South Woodmere/Woodsburgh, NY 11598, which is located within Nassau County.

3.      NYCCJ was formed by Engelberg on or about October 15, 2001, purportedly to serve as an advocacy organization for terror victims' rights, but has at all times been solely controlled by Engelberg (who, in turn, has been aided and abetted by his wife, Mindy Engelberg) for his own personal benefit and financial gain such that NYCCJ is really Engelberg's alter ego.

4.      NYCCJ is recognized by the IRS as a tax-exempt organization under Section 50l(c)(3) of the Internal Revenue Code.

5.      This Court has personal jurisdiction over NYCCJ pursuant to CPLR § 301 because NYCCJ is located in New York and conducts its business there.

6.      Venue as to NYCCJ is proper pursuant to CPLR § 503(c) based on the location of NYCCJ's principal place of business.

7.      Defendant contends that Plaintiff has malevolently commenced this action in support of an ulterior motive for illicit financial gain (discussed below) and solely for the purpose of defaming ACCJ (as well as the individual defendants named in this action) by: (a) his

52

D:\TWLFPLLC\

widespread publication of the Complaint, which contains hundreds of defamatory statements such that it is the epitome of libel per se; and (b) having made false oral statements to third parties in connection with such publication.

8.      Relying upon willful and deliberate misrepresentations, Plaintiff attempts to paint a picture of ACCJ that he knows could not be farther from the truth. This action is Plaintiff's last ditch, desperate attempt to control and divert millions of charity dollars to himself as "executive compensation," just as he has done for over a decade while running NYCCJ, all by himself with absolutely no board oversight.

9.      Indeed, for more than a decade, Plaintiff improperly paid himself more than $2 million from the charity funds he controlled, and—along with his spouse—has recently been sued by members of NYCCJ's Board of Directors for years of misconduct in connection with his control and looting of NYCCJ.

10.     That misconduct includes, without limitation: (a) Plaintiff's running NYCCJ by himself out of his house using its substantial assets as his private bank; (b) paying himself salaries and retirement benefits without NYCCJ Board approval or knowledge; (c) appointing his wife to "oversee" a NYCCJ retirement plan as a trustee and causing the funds to be invested with her company so that additional fees could be earned by that family business; (d) filing fraudulent tax returns; (e) naming NYCCJ Board members who had never spoken to him; (f) failing to inform Board members that NYCCJ possessed millions of dollars in assets; and (g) conducting no programmatic activities. (*See* Complaint in *Orlow v. Engelberg*, No. 601689/2016 (Sup. Ct. Nassau County Mar. 14, 2016) ("*Orlow* Complaint") (attached hereto as Exhibit "A")).

11.     After years of improperly paying himself excessive salaries, Plaintiff realized that the well of charity funds at NYCCJ would soon run dry. And so, for more than two years, Plaintiff

53

has tried to get his hands on the charity funds of ACCJ and American Center for Civil Justice Religious Liberty & Tolerance Inc. (the "New Jersey Center"), an organization that ACCJ had contracted with to obtain collections on behalf of judgment claimants that was recently joined as a defendant. Hence, this litigation.

12. To obtain control of ACCJ, Plaintiff brings this action, which relies on two scurrilous assertions: (a) that the last 20 years of corporate activity of ACCJ are fraudulent and should be ignored; and (b) that the last 20 years of the activities of ACCJ's board of directors (the "Board"), which Plaintiff had been a member of at various times, are invalid. Instead, according to Engelberg, corporate control of ACCJ today is maintained by three (not the current seven) Board members—Engelberg, Defendant Eliezer Perr, and Defendant Milton Pollack—on account of Plaintiff's claim that ACCJ is a "membership" organization that requires the approval of its members (Engelberg and Perr) to appoint or remove Board members.

13. However, as Engelberg well knows, ACCJ is not a membership organization and has not acted as a membership organization since at least April 1999. Indeed, ACCJ filed numerous documents with the IRS and New York State authorities (signed by Engelberg), passed bylaws, and issued Board minutes confirming that it was a non-membership organization. Further, Engelberg provided sworn testimony in another action that he was an unpaid "volunteer" of ACCJ for the last 13 years, negating his claim that he is a member of ACCJ.

14. Based on his "membership" tale, Plaintiff then alleges that the Board membership of Perr and Pollack should be revoked allegedly on account of breaches of fiduciary duty, leaving Engelberg in sole control of ACCJ and, more importantly, its charity funds. Once in control of these funds, Engelberg would be free to pay himself excessive salaries and pension benefits as he has done for the last 13 years as the head of his alter ego NYCCJ, as detailed below.

54

D:\TWLFPLLC\

## A BRIEF SUMMARY OF ACCJ'S CORPORATE
## HISTORY AND ONGOING ACTIVITIES

15.     ACCJ was founded as a 501(c)(3) charity in 1996.  Plaintiff was involved in helping found ACCJ, joining with ACCJ's founder, Eliezer Perr, and others after having been unable or unwilling to sustain a medical practice.  It was Eliezer Perr who had extensive experience in international and human rights, with deep contacts internationally in the law enforcement and intelligence communities.  Plaintiff, on the other hand, brought with him no such background or experience.

16.     Although the original Certificate of Incorporation was silent as to the corporate structure, in April 1999, ACCJ filed an amendment to the original Certificate of Incorporation confirming that ACCJ was a non-membership organization.  This amendment, which was signed by Engelberg, was further corroborated and reinforced by another amendment in 2005.  Corporate bylaws from 2007 and 2013 further confirmed ACCJ's non-membership status, and at no point did ACCJ ever operate as a membership organization.

17.     This corporate structure went undisputed for at least the last seventeen (17) years. No one affiliated with the charity, including Plaintiff, challenged that structure.

18.     Moreover, Plaintiff's objections to the constituency of the Board (as reflected by, *inter alia*, the Complaint's Fourth, Fifth, and Ninth Causes of Action) are contradicted by his attendance at Board meetings, his signature on Board minutes, statements he made under oath, and his knowledge of Board action for years without objection.

19.     For decades, ACCJ has been advocating—very successfully—for victims of state-sponsored terrorism.  This has been accomplished under the supervision of a dedicated Board, working with a small number of volunteers and salaried staff.  ACCJ, working in conjunction with

55

D:\TWLFPLLC\

attorneys it retained, has secured judgments totaling hundreds of millions of dollars on behalf of claimants who have signed agreements with ACCJ (the "Claimant and Center Agreements").

20. ACCJ has also been involved in other matters on behalf of terror victims. For example, ACCJ has been funding a federal lawsuit in Washington, DC on behalf of over 150 victims and family members of the November 2009 terror attack at Ft. Hood, Texas. ACCJ's General Counsel, Neal Sher, represents the victims in that suit. Moreover, ACCJ was instrumental in securing Congressional legislation that led to the awarding of Purple Hearts and Defense of Freedom medals to victims. In addition to recognition of their valor and sacrifice, the award recipients obtained much needed financial and medical benefits.

### ACCJ's Charitable Donations Were Fully In Accord With Its Mission And The Law

21. Along with its advocacy and outreach on behalf of victims of terrorism, since its first intake of monies, ACCJ has contributed grants to educational and charitable institutions in furtherance of its non-profit mission. Plaintiff was thoroughly involved in the making of such grants. He signed checks to charities that he now claims improperly received ACCJ grants. He disingenuously objected to such grants in this action to garner news headlines only after he realized that the money he was using to pay himself excessive compensation at NYCCJ was running dry and that it would be necessary to gain financial control over ACCJ or the New Jersey Center to perpetuate his self-enrichment scheme. As noted in the contemporaneously-drafted minutes of an August 23, 2010 Board meeting:

> ***Dr. Engelberg*** countered that insomuch as Jewish schools have been targeted throughout the world, and Jewish children are a constant target of Muslim terrorism as well as other forms violence and persecution, grants be provided to schools that are open to the concept of security, and who are willing to implement some form of security on their grounds, beginning with schools in the Jewish centers of NYC, Monsey NY, Lakewood NJ, and see how it goes.

56

22.     New York law expressly recognizes the appropriateness of such donations by ACCJ.  Furthermore, the Plaintiff-controlled NYCCJ made—from funds earned by ACCJ—the exact same type of donations that Plaintiff now incredulously claims were improperly made by ACCJ.  Indeed, Plaintiff made donations to yeshivas within miles of his home and which his children attended.  The claims in Plaintiff's Complaint regarding charitable donations are thus not only pure hypocrisy but disingenuous and revisionist history.

### The Vital Collection Work Of The New Jersey Center

23.     Similarly, Plaintiff's bogus claim that the New Jersey Center was improperly paid for its collections work on behalf of judgment claimants is a revisionist charade.  Pursuant to a contract between ACCJ and the New Jersey Center entered into on April 12, 2007, further amended and ratified in 2013 (the "New Jersey Contract"), and approved in both instances by ACCJ's Board, the New Jersey Center undertook the responsibility of effectuating collections for judgment claimants on behalf of ACCJ.  Prior to entering into the New Jersey Contract, ACCJ had undertaken virtually no steps to locate and seize Iranian assets.  That work has now progressed on several fronts, including litigation in the U.S., the United Kingdom, and Canada, and successful negotiations with the federal government regarding the satisfaction of the Iranian judgments.  The New Jersey Center continues to this day to fulfill its obligations under the New Jersey Contract by pursuing collections efforts and paying large legal fees in its efforts on behalf of the victims of terror attacks.

24.     Engelberg has repeatedly acknowledged that he knew of the role of the New Jersey Center.  He was in possession of the New Jersey Center's formation documents at least as early as December 2008.  He was aware that Jed Perr headed the New Jersey Center, referred individuals to the New Jersey Center and Jed Perr regarding collections questions, and stated on numerous

57

occasions that Jed Perr was in charge of collection efforts. He was also aware that ACCJ had agreed to pay the New Jersey Center for its work.

25.     Furthermore, Engelberg was involved in transferring the funds that he complains about in the Complaint from ACCJ to the New Jersey Center. Indeed, Engelberg met with Jed Perr and the accountant of the New Jersey Center and NYCCJ in 2010 to discuss a merger of the New Jersey Center with Engelberg's NYCCJ, at which time the assets of the New Jersey Center and their source were known and discussed. Furthermore, Engelberg's NYCCJ donated thousands of dollars to the New Jersey Center.

26.     As such, the allegations in the Complaint concerning Jed Perr, the New Jersey Center, and their relationship and involvement with ACCJ are refuted by facts of record, including Engelberg's past admissions and his history of working with all of these organizations on the very matters of which he now complains.

### Another Blatant Misrepresentation: The American Recovery Center

27.     Engelberg disingenuously makes claims about the incorporation of the American Recovery Center ("ARC"). However, he was fully aware of ARC's intended purpose, which was to be owned by the New Jersey Center and used as a vehicle in collections work for non-ACCJ claimants. Engelberg was involved in the discussions concerning whether the formation of a separate entity was needed for those purposes. Engelberg is also fully aware that ARC never came to fruition, never operated, and its status as an active company was revoked by New Jersey.

### INDISPUTABLE FACTS SHOW THAT IT WAS ENGELBERG WHO ENRICHED HIMSELF WITH MILLIONS OF DOLLARS OF CHARITABLE FUNDS

### Engelberg Enriched Himself Through ACCJ

28.     From 2001-2003, Engelberg paid himself over $1.2 million. During the same period, no other ACCJ officer or director received any compensation. Moreover, Engelberg also

58

D:\TWLFPLLC\

enjoyed the use of a leased luxury car paid for by ACCJ, as well as other perks.

### Engelberg's Conduct In Connection With An ACCJ Pension Fund

29.     In or around 2001, ACCJ authorized the creation of The American Center for Civil Justice Defined Benefit Pension Plan. Without informing the Board, Engelberg then established the pension plan with himself as the sole beneficiary, made himself the manager of the pension plan, and hired his wife's company to manage its investments. He listed the address of the pension plan as his home address to conceal the Plan's existence from the directors and officers of ACCJ.

30.     Between 2001 and 2003, Engelberg wrote ACCJ checks totaling over $340,000 to the pension plan. For more than a decade he filed IRS Forms 5500 without the permission or knowledge of the Board. At this and all other relevant times, he remained the pension plan's sole beneficiary.

31.     In or around 2011, while a Director of ACCJ and without the knowledge of the rest of the Board (although he fraudulently signed documents stating that the entire Board so approved), Engelberg unilaterally directed the dissolution of the pension plan and subsequent rollover of over $900,000 to his individual retirement account.

32.     Plaintiff then unilaterally made filings with the IRS fraudulently representing that ACCJ's Board had unanimously approved the dissolution of the plan.

### Engelberg's Improper Conduct In Connection With The Stethem Funds

33.     In or around July 1998, the Raoul Wallenberg Center For Civil Justice, Inc., the predecessor charity to ACCJ, entered into an agreement with the family of Robert Dean Stethem, who was kidnapped and killed by terrorists. DLA Piper was retained to prosecute the case. ACCJ covered all expenses and paid significant legal fees.

34.     Pursuant to their agreement with ACCJ, the Stethems pledged to give ACCJ 20%

59

of any recovery so that ACCJ could continue its work. The litigation was indeed successful, and the Stethems collected over $21,000,000. From that recovery, ACCJ was entitled to approximately $4,300,000 ("Stethem Funds").

35.     In 2002, the Stethem Funds did not end up going to ACCJ, but to Plaintiff's NYCCJ.

36.     ACCJ agreed to allow NYCCJ to maintain the Stethem Funds in its bank account after Counterclaim-Defendants represented on a variety of occasions—including without limitation in or about November 2002 to Defendants Milton Pollack and Eliezer Perr—that NYCCJ had always been operated as a legitimate not-for-profit corporation which conducted regular activities for charitable and educational purposes and that all activities and spending were overseen by a valid board of directors that met regularly (the "Representations").

37.     At the time Counterclaim-Defendants made the Representations, Engelberg was an officer of ACCJ and controlled the financial accounts of both NYCCJ and ACCJ.

38.     Additionally, ACCJ allowed NYCCJ to maintain the Stethem Funds only if Counterclaim-Defendants agreed, which they did, that: (i) NYCCJ would continue to be operated as a legitimate not-for-profit corporation with regular board meetings and oversight of all NYCCJ activities and spending, both of which would be consistent with its Certificate of Incorporation; (ii) the Stethem Funds would be used solely in furtherance of charitable activities; (iii) all funds needed by ACCJ to conduct its activities would be provided by NYCCJ upon demand by ACCJ; and (iv) breach of the aforementioned conditions would result in a return of the Stethem Funds to ACCJ upon demand (the "Stethem Funds Agreement").

39.     Counterclaim-Defendants did not utilize the Stethem Funds as agreed, otherwise breached the Stethem Funds Agreement, and deceived ACCJ in the process. To divert attention

60

from their multiple breaches of the Stethem Funds Agreement, Plaintiff and NYCCJ paid ACCJ

financial obligations so that their misconduct would not be discovered by ACCJ.

### Engelberg Further Enriched Himself Through His
### Stewardship Of NYCCJ, Which He Privatized For Personal Gain

40.     Instead of utilizing the Stethem Funds as agreed, Counterclaim-Defendants

improperly used most of those funds to enrich Engelberg.

41.     As is discussed in the *Orlow* Complaint, Engelberg controlled every aspect of

NYCCJ, making sure that its board remained unaware that NYCCJ had received the Stethem Funds

so that he could siphon off these assets that were intended for charitable purposes to his private

use.

42.     Engelberg deviously made certain that NYCCJ's board never functioned by:

    a.  leading NYCCJ Board members to believe that NYCCJ had no assets and no

        activities;

    b.  unilaterally certifying and submitting IRS and New York State tax filings

        without first sending drafts of those filings to any NYCCJ Board members for

        review and approval;

    c.  deceptively listing in these tax filings certain individuals as NYCCJ Board

        members when, in reality, these individuals were not really NYCCJ Board

        members; and

    d.  arranging for NYCCJ not to conduct any programming, thereby effectively

        transforming NYCCJ into an instrumentality to pay his unapproved salary,

        benefits, and personal expenses, all of which exceeded more than $2 million.

43.     Specifically, Engelberg's leading of NYCCJ Board members to believe that

D:\TWLFPLLC\

NYCCJ had no assets or activities gave them the false impression that there was no need for them to review any tax filings. Once Engelberg successfully fostered this false impression, he was able to draft and submit what he pleased in the filings (since nobody was anticipating their submission in the first place).

44.     Without any Board oversight, Engelberg illicitly lined his pockets with millions of dollars of "executive compensation" and "retirement" benefits that he had arranged to pay himself. This self-enrichment was all done **without NYCCJ Board knowledge or approval for over a decade**.

45.     Meanwhile, in 2009, while he was playing "game of drones" with NYCCJ's Board, Engelberg deployed his wife, Mindy, to "oversee" a NYCCJ retirement plan as a trustee. Her appointment as trustee—which was done without receiving any NYCCJ Board approval—enabled Engelberg to pay himself additional charity funds—at least $350,000 from 2009 through 2011— without any independent oversight. (*See* Ex. A ¶¶ 47-61).

46.     These wrongful acts—the misleading of NYCCJ's Board as to availability of assets, fraudulent tax filings, failure to conduct NYCCJ programming, establishment of an illicit retirement plan, and seven-figure self-enrichment—were blatant and repeated breaches of the Stethem Funds Agreement by Counterclaim-Defendants.

47.     However, it was not until June 2014 that ACCJ began to uncover Counterclaim-Defendants' breaches of the Stethem Funds Agreement, fraudulent conduct, and unjust enrichment, which led to ACCJ's demand that the Stethem Funds be returned to ACCJ.

48.     In a June 2014 letter from Neal Sher, ACCJ's General Counsel, to Engelberg's counsel, Engelberg was notified that NYCCJ Board members had uncovered his continuous operation of NYCCJ as his alter ego and not as a legitimate not-for-profit corporation, rendering

D:\TWLFPLLC\

the Representations false. (*See* Letter of Neal Sher, Esq. to Allen Bromberger, Esq., dated June 11, 2014 (attached hereto as Exhibit "B")).

49.     Specifically, Plaintiff had, *inter alia*, governed NYCCJ alone, never called any Board meetings, failed to distribute IRS and New York State tax filings for NYCCJ Board review prior to their filing, and listed phantom members of NYCCJ's Board in IRS filings (*see* Ex. B at 3)—intentional misconduct which ultimately became the foundation of the *Orlow* Complaint, and when brought to Plaintiff's attention, was met with deafening silence. (*See* Ex. A ¶¶ 38, 79, 86-89, 102, 116-17).

50.     Sher also detailed how NYCCJ Form 990s revealed that after the infusion of the Stethem Funds into NYCCJ, Plaintiff's compensation from NYCCJ was close to $1.6 million from 2003-2013, notwithstanding that "very little programmatic activities" were listed for NYCCJ in those Form 990s. (*See* Ex. B at 6-7). Indeed, upon information and belief, NYCCJ had no programmatic activity while Plaintiff was paying himself this approximate $1.6 million.

51.     In addition, Plaintiff established a NYCCJ pension fund in 2009 into which he siphoned a total of at least $350,000 from 2009 through 2011. (*See* Ex. A ¶¶ 47-61). Thus, approximately half of the approximate $4,300,000 in Stethem Funds went directly to Plaintiff.

52.     Plaintiff's filings with the IRS make clear that the largest single expenditure of NYCCJ has been Plaintiff's compensation. Conspicuous by its absence is the reporting of any significant efforts to support or advocate on behalf of terror victims.

53.     NYCCJ also made charitable gifts, the combined total of which was significantly smaller than the compensation Plaintiff paid himself. If Plaintiff were so deeply committed to promoting the interests of victims of terror, he would have devoted much of his available resources to fighting for their interests. He did not. Instead, those resources went directly into his pockets.

D:\TWLFPLLC\

Plaintiff has no business being reinstated at ACCJ, or indeed—as the *Orlow* Complaint demonstrates—running any charity at all.

In December 2014, realizing that NYCCJ Board members were on to the fraudulent activities of Plaintiff and NYCCJ and that the assets of NYCCJ were almost exhausted, Plaintiff commenced this action to seize control of ACCJ's charity funds.

### Engelberg's Crusade of Defamation Against ACCJ

54.     As detailed below, Engelberg's Complaint is filled with numerous intentionally false, defamatory, and injurious statements regarding ACCJ.

55.     Furthermore, while they are relevant to none of the Complaint's ten causes of action, Paragraphs 152 through 215 of the Complaint and certain of its accompanying exhibits evidence Engelberg's tortious conduct, namely attempts made in the summer of 2014 to dissuade others from working with ACCJ and to otherwise terminate their relationships with ACCJ.

56.     These attempts were made prior to September 18, 2014—the date upon which Engelberg claims he was replaced as a member of the Board (Compl. ¶ 217)—such that he would have had fiduciary duties of care, loyalty, and obedience owed to ACCJ at that time (and according to Engelberg, he continues to owe fiduciary duties to the present).

57.     Furthermore, he engaged in some of these attempts to dissuade notwithstanding that ACCJ had instructed him that he was not authorized to speak on behalf of ACCJ.  (*See* Compl. Exs. 24, 25 and Ex. B at 4).

58.     The attempts to dissuade were unfortunately successful in part, as can be seen from Complaint Exhibit 47, a vitriolic July 21, 2014, email written by an ACCJ client-claimant, Michael Welch, to, among others, Defendants Eliezer Perr, Jed Perr, and Neal Sher:

64

> After talking with Gerard [Michael's brother], I decided to not sign POA EVEN UNDER PERR's Threat to remove me from case. Neal, please have them removed from center for ALL OUR Best interests. I'm sure this is a mess for you also and causing Stress. If you cannot remove them or they resist[,] than I will look at Legal Recourse for the Perr's Deception of me and other families. I will talk to Dr E [a nickname for Engelberg] about this but, it is I who have decided to take this route. I DO NOT WANT TO HEAR FROM A PERR on this matter unless I retain Legal Counsel, I want them gone from Center.

59.    Engelberg's attempts to dissuade, which were followed by the commencement of this spurious action at the end of 2014, were further augmented by an extensive and malicious defamation campaign against ACCJ that included publication of the Complaint itself—which is replete with false statements—and the making of false oral statements to third parties in connection with such publication.

60.    Specifically, since the filing of this action, Engelberg has circulated the Complaint to newspapers, claimants similar to Michael Welch who have contracts with ACCJ, prospective claimants, members of the Board, Apple Bank (ACCJ's former financial institution of choice), and attorneys who have business relationships or were contemplating business relationships with ACCJ, among others.

61.    In short, Engelberg's attempts to dissuade and resulting campaign of hate have caused irreparable damage to the reputation and business of ACCJ.

**Engelberg Defames ACCJ in the Complaint**

62.    The Complaint, which has been circulated by Engelberg to newspapers and others as described below, contains hundreds of intentionally false statements about ACCJ.

63.    An outline of the hundreds of defamatory statements contained therein are excerpted below from the Complaint's "Nature of the Case" section (with some of these statements having absolutely no relation to the Complaint's ten causes of action). Thus, Engelberg

65

intentionally misrepresents that individual defendants Eliezer Perr and Jed Perr:

- "privatiz[ed]" ACCJ and "used their respective positions of authority as officers and directors to siphon off, both directly and indirectly, over $20 million dollars of charitable funds to other shell for-profit and not-for-profit entities, owned and controlled by them";

- "used ACCJ funds for private gain and caused ACCJ to violate the Internal Revenue Code's (the 'IRC') ban on private inurement [and] essentially have treated ACCJ as their own personal piggy bank, donating over $800,000 to various Jewish religious and educational organizations entirely unrelated to, and beyond the scope of the Center's charitable mission";

- "unlawfully" transferred "[o]ver $2.5 million dollars of settlement proceeds" to the New Jersey Center;

- used their positions at ACCJ to establish the American Recovery Center, LLC, to "usurp business opportunities" of ACCJ by making "misrepresentations" that "ACCJ and ARC were somehow related to each other" and thereby "agreements were entered into with third parties, in which ARC, rather than ACCJ, was retained as the consultant to assist with collection efforts for service fees potentially worth a minimum of $18 million";

- "fabricated documents *post hoc,* including Board minutes";

- "provid[ed] false and misleading information to the Internal Revenue Service";

- "ousted the Plaintiff from the organization, falsely claiming that he was no longer a representative, Board Member or the Executive Director of the Center"; and

- "fraudulently induced and sought to coerce claimants into signing new agreements with ACCJ that would provide for additional fees to private persons and/or entities, including Jed Perr's ARC, as 'other professionals/personnel.'"

64.     There are numerous, additional intentionally false categories of defamatory statements made by Engelberg in the Complaint.  A few of the additional defamatory statements are that:

- the "Perrs" never reported receipt of certain funds on ACCJ's Form 990 for 2009 (¶ 95);

66

- the May 28, 2014 Agreement improperly "increased the fees to attorneys and other personnel to 36%" (¶ 162);

- the May 9, 2010 Board minutes "were fabricated and are demonstrably false" (¶ 169);

- the *Heiser* claimants were "fraudulently induced into signing [a] new agreement under the misimpression that Dr. Engelberg sanctioned it as their attorney-in-fact" (¶ 188);

- the *Brewer* plaintiffs were provided with an agreement with the New Jersey Center, which was an "attempt by the Perrs to create confusion and divert funds to an entity with a similar name to ACCJ", and the filing by ACCJ "as a foreign corporation registered to do business in New Jersey [was] a veiled attempt to cover up this obvious deception" (¶ 189);

- the Perrs "were willing to lie and compromise the claims of the remaining Non-*Heiser* claimant[s] unless they signed the May 28, 2014 Agreement" (¶ 210);

- Jed Perr lied to claimants when he wrote to them and "misrepresented that '[a]lthough under the previously signed agreements there is a 20% fee for collections, and 20% fee for litigation, we will be deducting only 36% which will cover all attorney fees and other expenses.'" (¶ 214);

- the Board of ACCJ was not properly constituted and "unlawfully" voted to replace Engelberg on the Board (¶ 217);

- the Perrs have improperly used ACCJ's resources to fund organizations "to most of which they have personal and financial ties" (¶ 222);

- Eliezer Perr and Milton Pollack "fabricate[d] documents and provide[d] misleading information to the IRS in an attempt[ed] cover-up" and "falsified documents and provided false information and documentation to the IRS" (¶¶ 239, 289);

- the Perrs "misappropriated the charitable assets and property of ACCJ for their own personal benefit and/or the benefit of relatives and insiders" (¶ 255);

- the "April 12, 2007 Agreement was not authorized by the Board and, was in fact, a complete fabrication" (¶ 272); and

- "Jed Perr used his position at ACCJ to misrepresent the relationship between ACCJ and ARC to usurp business opportunities for ARC, which he personally owns, constituting self-dealing and private inurement and unjust enriched himself at the Center's expense." (¶ 315).

67

D:\TWLFPLLC\

65.     Engelberg knew that every single one of these allegations (and many more) which are repeated throughout the Complaint were false.

66.     For example, Engelberg was fully aware that ACCJ's charitable donations to private schools and organizations were fully in compliance with ACCJ's agreements with claimants, its mission, and the law.  Since its first intake of monies, ACCJ has contributed grants to educational institutions and other charities in furtherance of its mission.  Engelberg himself was involved in the making of such grants and did not object to them until he realized that the money he was using to pay himself excessive compensation at NYCCJ was running dry such that financial control over ACCJ or the New Jersey Center would be necessary to continue payment of his excessive salary.  As noted in the contemporaneously-drafted minutes of an August 23, 2010 Board meeting:

> ***Dr. Engelberg*** countered that insomuch as Jewish schools have been targeted throughout the world, and Jewish children are a constant target of Muslim terrorism as well as other forms violence and persecution, grants be provided to schools that are open to the concept of security, and who are willing to implement some form of security on their grounds, beginning with schools in the Jewish centers of NYC, Monsey NY, Lakewood NJ, and see how it goes.

67.     Indeed, after receiving the approximate $4.3 million comprising the Stethem Funds, Engelberg made donations to the same private schools and charities about which he accuses the individual defendants of making improper donations, including schools attended by his own children.

68.     Similarly, Engelberg was fully aware of ARC's intended purpose, which was not to benefit Jed Perr personally, but was to be used as a vehicle in collections work for non-ACCJ claimants.  Engelberg participated in the discussions concerning whether the formation of a separate entity to be owned by the New Jersey Center was needed for those purposes.  Engelberg

D:\TWLFPLLC\

is also fully aware that ARC never operated as a business, never entered into any agreements, and was and is an inactive company.

69. In addition, as explained above, Engelberg was fully aware that the New Jersey Center was active in collections work on behalf of ACCJ's claimants after ACCJ had not been particularly successful in locating and seizing Iranian assets. He was in possession of the New Jersey Center's formation documents at least as early as December 2008. He was aware that Jed Perr headed the New Jersey Center, referred individuals to the New Jersey Center and Jed Perr regarding collections questions, and stated on numerous occasions that Jed Perr was in charge of collection efforts. He was also aware that ACCJ had agreed to pay the New Jersey Center for its work.

70. His claim that the 2007 New Jersey Contract was fabricated and not approved by the Board was also intentionally false. Engelberg claims that he was on the Board in 2007, so the agreement and Board approval must have been fabricated.

71. However, in another action, Engelberg testified that during the same timeframe, he was not a Board member or officer, and any work that he performed for ACCJ at that time was on a "voluntary" basis.

72. He also signed Board minutes in 2010 indicating that he was "returning" to the Board such that his repeated claims of fabricated Board minutes and agreements were knowingly false. Engelberg was also fully aware that the collections work of the New Jersey Center had progressed on several fronts, as explained above.

73. In addition, Engelberg met with Jed Perr and the accountant of the New Jersey Center and NYCCJ in 2010 to discuss a merger of the New Jersey Center with Engelberg's

D:\TWLFPLLC\

NYCCJ, at which time the assets of the New Jersey Center and their source were known and discussed. Furthermore, his NYCCJ donated thousands of dollars to the New Jersey Center.

74.     Engelberg was also fully aware that he used ACCJ funds to improperly enrich himself. Without board knowledge or approval, Engelberg used almost half of the $4.3 million comprising the Stethem Funds to pay himself salary and pension contributions. Indeed, Engelberg's filings with the IRS reveal that the largest single expenditure of NYCCJ has been his own compensation.

75.     In contrast, there is an absence of reporting in these filings of any efforts to support or advocate on behalf of terror victims. In other words, NYCCJ had no programmatic activity, yet Engelberg paid himself more than $2 million.

### Engelberg's False Oral Statements to ACCJ Claimants

76.     On or around May 28, 2014, ACCJ sent a letter to a certain group of judgment creditors (the "Non-*Heiser* Judgment Creditors") advising them of claims filed on their behalf in Canada and requesting that they execute an updated Claimant and Center Agreement with ACCJ (the "May 28, 2014 Letter" (which, along with a representative updated Claimant and Center Agreement ("May 28, 2014 Claimant and Center Agreement") is Complaint Exhibit 23)).

77.     This updated Claimant and Center Agreement contained a provision stating that "Claimant agrees and accepts that the Claimant shall be obligated to pay up to 36% of All Recoveries."

78.     Under previous agreements between ACCJ and the Non-*Heiser* Judgment Creditors, the Non-*Heiser* Judgment Creditors agreed to pay up to 20% of their total recovery for legal and collection fees and 20% of the remaining 80% of the recovery—*i.e.*, 16% of the total recovery—would go to ACCJ for its efforts.

70

79.     Thus, at the time of the May 28, 2014 Letter, the Non-*Heiser* Judgment Creditors were obligated under other agreements to pay up to 36% of their recoveries.

80.     As such, the updated Claimant and Center Agreement clarified this obligation, but did not alter it.

81.     On July 23, 2014, ACCJ's counsel sent a letter (Complaint Exhibit 41) explaining in detail to Engelberg that the updated Claimant and Center Agreement did not so alter previous payment obligations of the Non-*Heiser* Judgment Creditors.

82.     However, Engelberg was already aware at the time of the sending of the May 28, 2014 Letter that the Non-*Heiser* Judgment Creditors were obligated to pay up to 36% of their recoveries under previous agreements.  In other words, Engelberg was aware that the updated Claimant and Center Agreement which accompanied the May 28, 2014 Letter did not alter this obligation.

83.     Nonetheless, upon information and belief, between June 2014 and at least September 18, 2014, Engelberg falsely and in bad faith told Non-*Heiser* Judgment Creditors that the individual defendants and ACCJ were using the updated Claimant and Center Agreement to deceive the Non-*Heiser* Judgment Creditors into increasing their payment obligations to ACCJ.

84.     Specifically, on or within one to two days of July 17, 2014, Engelberg sent a letter to claimant Paul Blais discussing the May 28, 2014 Claimant and Center Agreement in which he stated: "It disheartens me that Jed Perr and Neal Sher have convinced you into signing an agreement that is not in your best interest. . . .  Hopefully, you will make a decision **based on accurate information** that will indeed be in your best interest and not in the interest of others." (Letter from Engelberg to Paul Blais, dated July 17, 2014, at 1 (emphasis added) (attached hereto as Exhibit "C")).

71

85.    The implication of the phrase "based on accurate information" is clear: Jed Perr and

ACCJ General Counsel Neal Sher, key representatives of ACCJ, had acted to deceive Mr. Blais in

providing him with <u>inaccurate</u> or false information.

86.    Indeed, in late July 2014, Mr. Sher spoke to Mr. Blais, who informed Sher that he

had recently spoken by telephone with Plaintiff.  In that prior conversation, Plaintiff stated that the

ACCJ and Defendants Eliezer Perr and Jedidiah Perr were trying to get Mr. Blais and other

Claimants to sign the May 28, 2014 Claimant and Center Agreement to:

    a.    "substantially increase the amount of fees that the Center and the Perrs would

        receive from families for their own personal benefit";

    b.    that "the fees set forth in the [May 28, 2014 Claimant and Center] Agreement

        secretly and improperly increased the amount of fees that the ACCJ would earn

        from 32% to 36%";

    c.    and that the "Center, Eliezer Perr and Jed Perr were trying to take advantage of

        you and other Claimants through the signing of the [May 28, 2014 Center and

        Claimant] Agreement."

87.    Plaintiff further told Mr. Blais that the "Center, Eliezer Perr and Jed Perr are not

trustworthy and should not be trusted."

88.    Also, on or about June 8, 2014, Plaintiff spoke by telephone to another claimant,

Richard Brewer, concerning the May 28, 2014 Claimant and Center Agreement.   In that

conversation——Plaintiff told him that:

    a.    "you should not sign this new agreement that the American Center, Eliezer Perr

        and Jed Perr are trying to get you and other Claimants to sign";

72

D:\TWLFPLLC\

b. "the [May 28, 2014 Claimant and Center] Agreement is a fraud intended to increase the fees that the Center will earn for the Perrs' personal benefit";

c. the "American Center and the Perrs are secretly trying to increase the fees by four percent and not disclosing all the facts to you and other Claimants"; and

d. "money was being taken from the Center and improperly diverted to the Perrs through an organization that was secretly established in New Jersey for the personal benefit of Eliezer Perr and Jed Perr."

89.     These conversations between Plaintiff and Messrs. Blais and Brewer are those which are known to ACCJ to have taken place, and it is highly probable that additional conversations involving Plaintiff and claimants will come to light as discovery in this action progresses.

90.     Indeed, discovery exchanged between the parties to date has revealed that Plaintiff sent an email to claimants Gerard Welch, Michael Welch, Gregg (a/k/a Dovid) Salzman, Diana Campuzano, Chad Holland, Donna Holland, and James Holland on July 18, 2014 to inform them that Neal Sher was in the midst of speaking with Daniel Kurtz, Esq.—Plaintiff's former counsel—concerning a recent letter.

91.     That letter is most likely Exhibit 39 to the Complaint—a July 17, 2014 letter from Mr. Kurtz to Defendants Eliezer Perr and Jedidiah Perr (on which Neal Sher was also carbon copied) discussing, *inter alia*, the May 28, 2014 Claimant and Center Agreement's fee structure. (*See* Compl. Ex. 39 at 2).

92.     Discovery has also revealed a July 18, 2014 email from Plaintiff to claimant Gerard Welch approving a profanity-laced email of the same date that he wrote to claimant Richard

73

Brewer. That email relayed Welch's criticism of at least one of the Perr defendants' involvement in a "percentage change" and "increase."

93.     Finally, it has come to ACCJ's attention that on September 11, 2014, Plaintiff sent an email to claimant Gregg Salzman referencing Complaint Exhibit 50, a September 9, 2014 letter from Defendant Jedidiah Perr to all judgment creditors, and the "20% collection fees" discussed therein. (*See* Compl. Ex. 50 at 2).

94.     There is thus evidence to indicate that Plaintiff discussed the May 28, 2014 Claimant and Center Agreement with claimants other than Messrs. Blais and Brewer throughout the summer of 2014.

95.     ACCJ would plead the exact contents of any defamatory statements made by Plaintiff in those discussions here but for the fact that none of its directors, officers, or other agents were present or otherwise privy to these conversations.

96.     It is thus only Plaintiff who, having exclusive knowledge, can establish: (a) the content of any statements he made to claimants with precision and particularity; and (b) the total number and specific identities of the claimants with whom he interacted.

97.     All of the statements described above were completely false and made by Engelberg with reckless disregard for the truth and with a malicious, spiteful intent to defame ACCJ, foster false impressions with, and otherwise mislead Mr. Blais and other claimants.

98.     Indeed, Engelberg was confronted via correspondence, dated August 12, 2014, from ACCJ's counsel, Marcus S. Owens, Esq., to his attorney, Daniel L. Kurtz, Esq., concerning the falsity of his statements to Paul Blais and other claimants and instructing him to immediately correct such statements. (Compl. Ex. 48 at 1 ("Further, . . . we understand that he has not corrected the record with Mr. Blais. Moreover, we have learned that he has compounded this situation by

74

D:\TWLFPLLC\

spreading these misrepresentations to other ACCJ claimants, including to at least one person for whom your client does not hold a power of attorney. Accordingly, . . . ACCJ expects and insists that Dr. Engelberg <u>promptly correct the misimpressions triggered by his July 17 letter</u> and transmission of your letter to Mr. Blais. Please ensure that any similar letters sent to other claimants are corrected as well, and <u>please request that your client cease such behavior that is detrimental to . . . ACCJ</u>." (emphasis added))).

99.     In response, Engelberg took the position, via response correspondence from Mr. Kurtz back to Mr. Owens dated following day, that he had been telling the truth and would not obey any instruction to correct the false statements he had made to Mr. Blais and other claimants. (Compl. Ex. 49 at 1 ("[Y]our self-serving mischaracterization of the substance of our letter and our client's communications needs no 'correction.'")).

100.    As such, there is absolutely no question that Engelberg was on notice as of at least August 13, 2014 that the statements to Mr. Blais and other claimants detailed above were false and that as of that date, he exhibited a clear and unambiguous intent to deliberately and willfully refrain from correcting, disavowing, or recanting these statements.

101.    By making such false statements to third parties about ACCJ that would tend to injure the reputation and business of ACCJ and the New Jersey Center, Engelberg defamed ACCJ *per se*.

102.    Furthermore, on June 10, 2014—prior to the time that Engelberg made his oral statements to the Non-*Heiser* creditors—ACCJ, via Neal Sher, clearly and unequivocally instructed Engelberg's counsel, Allen R. Bromberger, Esq., to convey to Engelberg the following message:

75

*Dr. Engelberg must cease and desist from claiming that he is a representative or board member of the ACCJ.*

(Compl. Ex. 24).

103.    Mr. Sher emphasized the importance and sensitivity of this message by reiterating it verbatim in a further letter sent on or about June 11, 2014.  (Ex. B at 4).

104.    Notwithstanding this clear and unequivocal instruction (which was reiterated <u>yet again</u> on August 12, 2014 (*see* Compl. Ex. 48 at 1), even after his false statements had already been made), Engelberg, who purported to be a fiduciary of ACCJ, chose to make his false statements anyway and thereby cause damage to ACCJ's business and reputation.

### Engelberg Circulates the Complaint Widely, Makes Further Defamatory Oral Statements, and Causes Severe Damage to ACCJ

105.    Engelberg then proceeded to commence this action.  Further evidencing his ill will towards the individual defendants and ACCJ—as well as his reckless disregard for the truth—he included false allegations and exhibits pertaining to the May 28, 2014 Claimant and Center Agreement (as well as a similar March 2014 agreement) (*see* Compl. ¶¶ 152-215 and accompanying exhibits) that had no relation or connection to the ten causes of action that he ultimately asserted.

106.    Plaintiff therefore filed the Complaint solely for the purpose of defaming ACCJ (and, by extension, the individual defendants as well).

107.    After the action was commenced, on or about January 1, 2015, Engelberg circulated the Complaint containing the false and defamatory statements detailed above (*see* ¶¶ 62-75) to newspapers including <u>The Forward</u>.

108.    Relying on the false statements in the Complaint and an interview with Engelberg, <u>The Forward</u>—in an article written by staff writer Paul Berger, published on or about January 16,

76

2015, and available at http://forward.com/news/212835/was-terror-compensation-cash-diverted-to-orthodox/—stated that the individual defendants blatantly abused their authority, moved $20 million to other groups controlled by the individual defendants, lied to the IRS, used ACCJ as "their own personal piggy bank" to distribute charity funds to Orthodox yeshivas, improperly formed the New Jersey Center and ARC, lied to claimants and caused losses to ACCJ that amounted to "a minimum of $18 million," and fabricated Board minutes and the agreement with the New Jersey Center concerning collections work, among other things.

109. The Forward also reproduced the likenesses of Engelberg and Eliezer Perr based upon pictures that Engelberg provided to it, and "FailedMessiah.com"—a tabloid-style blog covering Orthodox Jewish matters operated by Shmarya (Scott) Rosenberg, in a post dated January 16, 2015, entitled "Haredi Family Allegedly Loots Org Of Money Meant For American Victims Of Terror Attacks", and available at http://failedmessiah.typepad.com/failed_messiahcom/2015/01/haredi-family-allegedly-loots-org-of-money-meant-for-american-victims-of-terror-attacks-678.html—colorized the likeness of Eliezer Perr that The Forward published with a red and yellow overlay, implying his disgrace, guilt, liability, and/or shame (as well as that of ACCJ by extension).

110. On or about January 9, 2015, Engelberg sent the Complaint—which Engelberg knew contained the numerous defamatory statements detailed above—to Reed Rubinstein, an attorney with whom ACCJ worked and who represents a group of claimants with contracts with ACCJ.

111. Furthermore, on or about January 12, 2015, the Complaint was also sent by Engelberg to Lourdes Morera, an attorney that worked with ACCJ in Puerto Rico.

77

112.     After Engelberg so circulated the Complaint, he then continued his defamatory crusade by slandering ACCJ before Apple Bank and inducing that institution to hinder ACCJ's ability to engage in financial transactions.

113.     Specifically, on or about January 15, 2015, Engelberg spoke in person to Michael Benenfeld, a Vice President at Apple Bank—a financial institution at which ACCJ or Eliezer Perr had maintained nine (9) bank accounts for more than twenty (20) years.

114.     This conversation occurred at Apple Bank's branch located at 4519 13th Avenue, Brooklyn, NY 11219, and at which time, Engelberg gave Mr. Benenfeld a copy of the Complaint.

115.     Engelberg told Benenfeld that "the Center, Eliezer Perr, and Yedidiah [Hebrew for Jedidiah] Perr were engaged in criminal conduct and were stealing charity funds" and that the "Center was a corrupt organization."

116.     Engelberg also stated that "you should read the details of the crimes, which are all in the Complaint."

117.     The effect of this slander was swift and severe.  In an April 14, 2015 letter from Connie Moyer, Esq., Apple Bank's First Vice President, to Eliezer Perr closing all nine accounts, Ms. Moyer stated:

> Apple Bank no longer finds it mutually beneficial to maintain a banking relationship with you.  Please make arrangements to transfer the above referenced accounts to another financial institution of your choosing on or before May 1, 2015.

118.     By his oral statements made to Mr. Benenfeld and circulation of the Complaint, Engelberg directly and proximately torpedoed ACCJ's valuable banking relationship with Apple Bank, which had originally been established more than twenty (20) years earlier.

119.     Engelberg also circulated the Complaint directly to various claimants who had contracts with ACCJ.

78

D:\TWLFPLLC\

120.    Upon information and belief, in so circulating the Complaint, Engelberg also made oral statements defaming ACCJ and the individual defendants similar to the ones that he made to other claimants such as Paul Blais and Richard Brewer, but specific details concerning these statements are not known to ACCJ at this time.

121.    As a direct and proximate result of the statements he made to claimants throughout the summer of 2014, Engelberg's circulation of the Complaint to some of these claimants and the other claimants described above, and oral statements expounding upon the Complaint, some claimants have either already breached their contracts with ACCJ or have indicated their intent to rescind or otherwise not perform upon their contracts with ACCJ in the future (i.e., anticipatory breach) such that ACCJ has suffered actual pecuniary loss, in addition to damage to its business and reputation.

## NYCCJ's Alter Ego Liability

122.    NYCCJ was formed by Engelberg and used by him to defraud ACCJ and the public at large.

123.    As is made clear in the *Orlow* Complaint (Ex. A), which is incorporated by reference as if fully set forth herein, Engelberg operated and managed NYCCJ by himself, without any board involvement, filed false federal and state tax forms, and used NYCCJ for his own personal benefit in violation of federal or state law.

124.    As such, at all times relevant, Engelberg exercised complete dominion over NYCCJ.

125.    NYCCJ never conducted any business or programmatic activity.

126.    The only assets NYCCJ ever received in the entire history of its corporate existence were the Stethem Funds.

79

127.     Engelberg identified individual board members of NYCCJ who had never agreed to be board members, including but not limited to Saul Seitler, and inserted their names in NYCCJ tax forms submitted to federal and state taxation authorities.

128.     Engelberg concealed the finances of NYCCJ from NYCCJ's board of directors.

129.     NYCCJ and Engelberg have the same address.

130.     NYCCJ's assets were intentionally commingled with the assets of Engelberg, and NYCCJ's assets were used to pay Engelberg's personal expenses.

131.     Engelberg's domination of NYCCJ turned the latter into an instrumentality of fraud and/or otherwise resulted in wrongful or inequitable consequences.

132.     Counterclaim-Defendants perpetrated and perpetuated a fraud upon ACCJ by disregarding corporate formalities and utilizing the Stethem Funds—assets transferred to NYCCJ by ACCJ—as Engelberg's own personal assets, justifying holding NYCCJ liable as Engelberg's alter ego.

133.     Based upon the aforementioned conduct, holding NYCCJ liable as Engelberg's alter ego is justified.

**AS AND FOR A FIRST COUNTERCLAIM AGAINST ENGELBERG**
**NEW YORK CIVIL PRACTICE LAW AND RULES § 3001**
**(DECLARATORY JUDGMENT THAT MICHAEL**
**ENGELBERG IS NEITHER A MEMBER NOR DIRECTOR OF ACCJ)**

134.     Counterclaim-Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth below.

135.     Engelberg asserts that he is a member and director of ACCJ in the Complaint.

136.     Engelberg is not, however, a member of ACCJ.

80

D:\TWLFPLLC\

137.    ACCJ was not incorporated as, and has never operated as, a membership corporation, and therefore, ACCJ has never had any members within the meaning of N.Y. N-PCL § 601.

138.    Engelberg is now time-barred from asserting any alleged member status.

139.    Engelberg has also never paid any membership dues, as would be required for him to be a member.

140.    Furthermore, Engelberg did not sign ACCJ's Certificate of Incorporation and was not issued a membership card or capital certificate evidencing any membership.   In addition, nowhere in the bylaws is Engelberg designated as a member.

141.    In 2007 ACCJ's bylaws were amended.  The amended bylaws state that:

> In accord with the Not-for-Profit Corporation Law of the State of New York, §601(a), ***ACCJ shall have no members***.

(Compl. Ex. 28 (2007 Amended Bylaws (emphasis added))).

142.    In September 2013, the bylaws were once again amended to state that "ACCJ shall have no members."  2013 Amended Bylaws of ACCJ.

143.    In the alternative, if ACCJ were incorporated as a membership corporation, the two purported members—Engelberg and Eliezer Perr—revoked or dissolved any such membership at least by April of 1999.

144.    Engelberg has repeatedly acknowledged that ACCJ has no members.

145.    For example, in April 1999, ACCJ filed an amendment to its Certificate of Incorporation with the New York Department of State, in which Engelberg and Eliezer Perr attested that "there is no membership."  Certificate of Amendment to Certificate of Incorporation, dated April 1999.

81

146.     Engelberg is also not a director of ACCJ and has not been since May 31, 2011, when the term of his membership on the Board expired.

147.     Furthermore, at a meeting of the Board of Directors of ACCJ on September 18, 2014, a quorum of the directors officially voted to replace Engelberg as a director in accordance with ACCJ's Bylaws.

148.     Engelberg has not since been reelected to the Board of Directors of ACCJ.

149.     Therefore, Engelberg is not a member or director of ACCJ as he purports in his Complaint.

150.     By reason of the foregoing, an actual and justiciable controversy exists among the individual defendants, ACCJ, and Engelberg.   Therefore, Counterclaim-Plaintiff seeks a declaratory judgment declaring that: (1) Engelberg is not a member or director of ACCJ; and (2) that he was no longer a Board member at the latest as of September 2014.

### AS AND FOR A SECOND COUNTERCLAIM
### AGAINST COUNTERCLAIM-DEFENDANTS
### (BREACH OF FIDUCIARY DUTY)

151.     Counterclaim-Plaintiff repeats and realleges the facts and allegations contained in the preceding paragraphs as if fully set forth herein.

152.     At all relevant times, Engelberg claims to have been a director and member of ACCJ.

153.     Furthermore, Engelberg has maintained a clear position in this action that he has been a director of ACCJ since 1996 and was never validly removed.  (Compl. ¶ 1 ("Since then [1996], he has been, and currently is, one of the two members of ACCJ as well as a member of the Board." (Emphasis added))).

82

154.    In addition, Engelberg maintains that he was an officer—"Executive Director"—of ACCJ "from 2009 to 2012."  (Compl. ¶ 1).

155.    Engelberg has further held himself out to the world and has otherwise conducted himself in such a manner and fashion to be recognized as a *de facto* officer of ACCJ.

156.    As such, at all relevant times, Engelberg owed ACCJ duties of care, loyalty, and obedience.

157.    Engelberg breached his fiduciary duties to ACCJ and violated N.Y. N-PCL § 717 by:

a.    arranging for excessive, unreasonable, and therefore illegal pension benefits in an amount of no less than $908,907 to be paid to him in 2011 by ACCJ without first obtaining Board approval for the payment of such benefits;

b.    failing to provide much-needed documents that were solely in his possession and to otherwise cooperate with ACCJ's leadership, counsel, and accountants in 2013 in connection with ACCJ's preparation of responses to the IRS' examination of ACCJ, which had to pay its counsel and accountants for additional time spent in preparing ACCJ's responses and otherwise had to expend resources it would not have had to expend but for Engelberg's failure to cooperate;

c.    defaming ACCJ in making false written statements of fact in the Complaint described above in Counterclaims Paragraphs 62-75 ("Written Statements") and false oral statements of fact concerning ACCJ described above in Counterclaims Paragraphs 76-121 ("Oral Statements") to third parties, thereby causing it severe and irreparable reputational damages and concomitant tangible damages resulting from this reputational damage;

d.    making the Written Statements and Oral Statements to third parties, notwithstanding having received explicit instructions from ACCJ for him not to speak on ACCJ's behalf, and deliberately and willfully refraining from correcting, disavowing, or recanting the Oral Statements that he made to claimants over the summer of 2014 after having received explicit instructions from ACCJ for him to take such action; and

e.    misusing "more than $2 million" (Ex. A ¶ 37) of the Stethem Funds— ACCJ monies that had been entrusted to him in 2002—for self-

D:\TWLFPLLC\

enrichment and personal gain from 2003 through 2013. (*See* Ex. A ¶¶ 34-77).

158.    Counterclaim-Defendants perpetrated and perpetuated a fraud upon ACCJ by disregarding corporate formalities and utilizing the Stethem Funds as Engelberg's own personal assets, justifying holding NYCCJ liable as Engelberg's alter ego.

159.    Therefore, Counterclaim-Plaintiff is entitled to a judgment against Counterclaim-Defendants for damages in an amount to be determined at trial.

### AS AND FOR A THIRD COUNTERCLAIM AGAINST COUNTERCLAIM-DEFENDANTS (TORTIOUS INTERFERENCE WITH CONTRACT)

160.    Counterclaim-Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth below.

161.    Engelberg's Written Statements were false.

162.    Engelberg's Oral Statements were false.

163.    The Written Statements were published by Engelberg and the Oral Statements were made by him to various claimants (i.e., the victims of terrorist attacks, their estates, and/or their families) who had valid, pre-existing contracts, namely the Claimant and Center Agreements, with ACCJ (collectively, "ACCJ Claimants").

164.    In addition, the Written Statements were published by Engelberg and the Oral Statements were made by him to Apple Bank—a financial institution with which ACCJ had maintained a valuable relationship for more than twenty (20) years—as described above in Paragraphs 112-118.

165.    Engelberg knew of the existence of the Claimant and Center Agreements, some of which were in existence for over a decade. (*See* Compl. Ex. 2).

84

166.    Engelberg also knew of the existence of ACCJ's contractual relationship with Apple Bank.

167.    Engelberg's publishing of the Written Statements and making of the Oral Statements were not privileged or otherwise justified in any manner.

168.    Engelberg made the Written Statements with the knowledge that they were untrue, or at least with reckless disregard of their truth or falsity, and/or with malice.

169.    Likewise, the Oral Statements were made with the knowledge that they were untrue, or at least with reckless disregard of their truth or falsity, and/or with malice.

170.    Engelberg's Written Statements were libelous and harmful because they contained allegations directly injurious to ACCJ's business, which includes assisting numerous victims of terrorist attacks, their estates, and their families in asserting their rights against sponsors of terrorism.

171.    Likewise, Engelberg's Oral Statements were slanderous per se because they consisted of allegations directly injurious to ACCJ's business.

172.    Engelberg's Written Statements and Oral Statements falsely accused ACCJ of criminal activity, deceptive conduct directed against ACCJ Claimants, self-dealing impacting the interests of ACCJ Claimants, other wrongful acts committed against ACCJ Claimants, and lack of integrity for ACCJ's business such that ACCJ's reputation has been irreparably damaged.

173.    That damage to ACCJ's reputation has led to ACCJ Claimants terminating business relationships with ACCJ, some of those claimants suing ACCJ, and Apple Bank terminating its contractual relationship with ACCJ on or about April 14, 2015.

174.    Specifically, as a direct and proximate result of Engelberg publishing the Written Statements and making the Oral Statements, ACCJ Claimants have either already breached their

contracts with ACCJ, have indicated their intent to rescind or otherwise not perform upon their contracts with ACCJ in the future (i.e., anticipatory breach), and have sued ACCJ.

175.     In addition, as a direct and proximate result of Engelberg publishing the Written Statements and making the Oral Statements, Apple Bank terminated its contractual relationship with ACCJ on or about April 14, 2015.

176.     As such, in addition to damage to its business and reputation, ACCJ has suffered actual pecuniary loss.  This includes, but is not limited to the value of legal services, litigation-related, and/or collections-related fees and expenses that ACCJ Claimants would have paid, reimbursed, or otherwise allocated to ACCJ but did not (in the case of actual breach) or will not (in the case of anticipatory breach) do so because of Engelberg's intentional, tortious, unjustified, and wrongful interference with performance of the Claimant and Center Agreements.

177.     It also includes transaction costs, consequential damages, loss of goodwill, attorneys' fees, and loss of business opportunities that were incurred when ACCJ lost its valuable banking relationship with Apple Bank in April of 2015.

178.     At all times relevant, Engelberg has held himself out to the world as a *de facto* officer and as a director of ACCJ (and continues to do so, notwithstanding that ACCJ does not share this view).

179.     Furthermore, at all times relevant, Engelberg was (and still is) in possession of confidential ACCJ information such as ACCJ's IRS responses, financial records, and Board correspondence such that he maintained a confidential relationship of trust with ACCJ.

180.     As such, at all times relevant, Engelberg has had fiduciary duties of due care, loyalty, and obedience owed to ACCJ.

86

181.     More specifically, these duties include the obligation to refrain from any non-privileged action injurious to one's principal—here, ACCJ—deference to one's principal, and maintenance of a principal's confidential information as confidential.

182.     Engelberg breached all of these duties by making the Written Statements and Oral Statements to ACCJ Claimants and to Apple Bank.

183.     His reckless and malicious disregard for the extremely negative perception and impression that would be—and was created—by his publication and making of the Written Statements and Oral Statements, as well as his failure to obey the instructions of his principal, renders his conduct tortious based upon independent breaches of fiduciary duty.

184.     By reason of his tortious conduct predicated upon the separate and independent torts of defamation and breach of fiduciary duty—namely, tortious interference with performance of the Claimant and Center Agreements, his inducement of ACCJ Claimants to breach these ACCJ contracts, and his wrongful inducement of Apple Bank to terminate its longstanding contractual relationship with ACCJ—Engelberg has damaged Counterclaim-Plaintiff in an amount to be determined but in no event less than $10,000,000.

185.     Furthermore, because Engelberg's conduct was not merely tortious but egregious, malicious, wanton, reckless, intentional, and of a bad faith nature, Counterclaim-Plaintiff is also entitled to punitive damages in an amount to be determined at trial.

186.     Counterclaim-Defendants perpetrated and perpetuated a fraud upon ACCJ by disregarding corporate formalities and utilizing the Stethem Funds as Engelberg's own personal assets, justifying holding NYCCJ liable as Engelberg's alter ego.

87

D:\TWLFPLLC\

## AS AND FOR A FOURTH COUNTERCLAIM AGAINST
## COUNTERCLAIM DEFENDANTS
## (TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIP)

187.    Counterclaim-Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth below.

188.    Engelberg's Written Statements were false.

189.    Engelberg's Oral Statements were false.

190.    The Written Statements were published by Engelberg and the Oral Statements were made by him to third parties, including but not limited to The Forward, Reed Rubinstein, Lourdes Morera, Apple Bank, and prospective claimants—those who could enter into contractual relationships with ACCJ and become ACCJ Claimants—and not privileged or otherwise justified in any manner.

191.    Engelberg made the Written Statements with the knowledge that they were untrue, or at least with reckless disregard of their truth or falsity, and/or with malice.

192.    Likewise, the Oral Statements were made with the knowledge that they were untrue, or at least with reckless disregard of their truth or falsity, and/or with malice.

193.    Engelberg's Written Statements were libelous and harmful because they contained allegations directly injurious to ACCJ's business, which includes assisting numerous victims of terrorist attacks, their estates, and their families in asserting their rights against sponsors of terrorism.

194.    Likewise, Engelberg's Oral Statements were slanderous per se because they consisted of allegations directly injurious to ACCJ's business.

195.    Engelberg's Written Statements and Oral Statements falsely accused ACCJ of criminal activity, deceptive conduct directed against ACCJ Claimants, self-dealing impacting the

88

interests of ACCJ Claimants, other wrongful acts committed against ACCJ Claimants, and lack of integrity for ACCJ's business such that ACCJ's reputation has been irreparably damaged.

196.    That damage to ACCJ's reputation has further led to the refusal of prospective claimants to enter into business relationships with ACCJ such that ACCJ has suffered tangible damages.

197.    At all times relevant, Engelberg has held himself out to the world as a *de facto* officer and as a director of ACCJ (and continues to do so, notwithstanding that ACCJ does not share this view).

198.    Furthermore, at all times relevant, Engelberg was (and still is) in possession of confidential ACCJ information such as ACCJ's IRS responses, financial records, and Board correspondence such that he maintained a confidential relationship of trust with ACCJ.

199.    As such, at all times relevant, Engelberg has had fiduciary duties of due care, loyalty, and obedience owed to ACCJ.

200.    More specifically, these duties include the obligation to refrain from any non-privileged action injurious to one's principal—here, ACCJ—deference to one's principal, and maintenance of a principal's confidential information as confidential.

201.    Engelberg breached all of these duties by making the Written Statements and Oral Statements to, *inter alia*, The Forward, Reed Rubinstein, Lourdes Morera, Apple Bank, and various claimants.

202.    His reckless and malicious disregard for the extremely negative perception and impression that would be—and was created—by his publication and making of the Written Statements and Oral Statements to others, as well as his failure to obey the instructions of his principal, renders his conduct tortious based upon independent breaches of fiduciary duty.

89

203.    By reason of his tortious conduct—namely, tortious interference with ACCJ's prospective business relationships predicated upon the separate and independent torts of defamation and breach of fiduciary duty—Engelberg has damaged Counterclaim-Plaintiff in an amount to be determined but in no event less than $10,000,000.

204.    Furthermore, because Engelberg's conduct was not merely tortious but egregious, malicious, wanton, reckless, intentional, and of a bad faith nature, Counterclaim-Plaintiff is also entitled to punitive damages in an amount to be determined at trial.

205.    Counterclaim-Defendants perpetrated and perpetuated a fraud upon ACCJ by disregarding corporate formalities and utilizing the Stethem Funds as Engelberg's own personal assets, justifying holding NYCCJ liable as Engelberg's alter ego.

**AS AND FOR A FIFTH COUNTERCLAIM**
**AGAINST COUNTERCLAIM-DEFENDANTS**
**(DEFAMATION/LIBEL)**

206.    Counterclaim-Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth below.

207.    Engelberg's Written Statements were false.

208.    Engelberg's Written Statements were published to third parties, including The Forward, Reed Rubinstein, Lourdes Morera, Apple Bank, and various claimants, and not privileged in any manner.

209.    Engelberg's Written Statements were made with the knowledge that they were untrue, or at least with reckless disregard of their truth or falsity, and/or with malice.

210.    Engelberg's Written Statements were libelous and harmful because they contain allegations directly injurious to Counterclaim-Plaintiff's business.

90

D:\TWLFPLLC\

211.    Engelberg's Written Statements improperly accuse Counterclaim-Plaintiff of criminal activity and lack of integrity for Counterclaim-Plaintiff's business.

212.    By reason of the conduct of Engelberg, Counterclaim-Plaintiff has been damaged in an amount to be determined, but in no event less than $10,000,000.

213.    By reason of Engelberg's malicious actions against Counterclaim-Plaintiff, it is also entitled to punitive damages in an amount to be determined at trial.

214.    Counterclaim-Defendants perpetrated and perpetuated a fraud upon ACCJ by disregarding corporate formalities and utilizing the assets transferred to NYCCJ by ACCJ as Engelberg's own personal assets, justifying holding NYCCJ liable as Engelberg's alter ego.

### AS AND FOR A SIXTH COUNTERCLAIM
### AGAINST COUNTERCLAIM-DEFENDANTS
### (DEFAMATION/SLANDER)

215.    Counterclaim-Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth below.

216.    Engelberg's Oral Statements were false.

217.    Engelberg's Oral Statements were made to third parties, including The Forward, Apple Bank, and various claimants, and not privileged in any manner.

218.    Engelberg's Oral Statements were made with the knowledge that they were untrue, or at least with reckless disregard of their truth or falsity, and/or with malice.

219.    Engelberg's Oral Statements were slanderous per se because they contain allegations directly injurious to Counterclaim-Plaintiff's business.

220.    Engelberg's Oral Statements improperly accuse Counterclaim-Plaintiff of criminal activity and lack of integrity for Counterclaim-Plaintiff's business.

91

D:\TWLFPLLC\

221.     By reason of the conduct of Engelberg, Counterclaim-Plaintiff has been damaged in an amount to be determined, but in no event less than $10,000,000.

222.     By reason of Engelberg's malicious actions against Counterclaim-Plaintiff, it is also entitled to punitive damages in an amount to be determined at trial.

223.     Counterclaim-Defendants perpetrated and perpetuated a fraud upon ACCJ by disregarding corporate formalities and utilizing the Stethem Funds as Engelberg's own personal assets, justifying holding NYCCJ liable as Engelberg's alter ego.

### AS AND FOR A SEVENTH COUNTERCLAIM AGAINST COUNTERCLAIM-DEFENDANTS NEW YORK NOT-FOR-PROFIT LAW § 720(a)(1) (BREACH OF FIDUCIARY DUTY)

224.     Counterclaim-Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth below.

225.     On May 1, 2001, the Board adopted a resolution authorizing the establishment of a pension plan: The American Center for Civil Justice Defined Benefit Pension Plan.

226.     Without informing the Board, Plaintiff, who was then an officer of ACCJ and who had control over ACCJ's financial accounts and checkbooks, subsequently established this pension plan with himself as the sole beneficiary.

227.     Plaintiff also made himself the manager of the pension plan and, on information and belief, unilaterally hired his wife's employer, Gilder Gagnon Howe & Co., to manage the plan's investments.

228.     Between 2001 and 2003, Plaintiff wrote ACCJ checks for $342,377 to the pension plan in the following amounts: $149,456 in 2001, $175,400 in 2002, and $17,521 in 2003.  At this and all other relevant times, he remained the pension plan's sole beneficiary.

92

D:\TWLFPLLC\

229.    In or about 2011, while a director of ACCJ and without the knowledge of the rest of the Board, Plaintiff unilaterally directed the dissolution of the pension plan and subsequent rollover of $908,907 to his individual retirement account.

230.    Moreover, he falsely swore to the IRS that ACCJ's Board had unanimously approved the dissolution of the pension plan.  There was no such Board approval.

231.    When he was an officer and director of ACCJ, Plaintiff was at all times subject to the provisions of N.Y. N-PCL §§ 202(a)(12) and 515(b).

232.    Under N.Y. N-PCL § 202(a)(12):

Each corporation, subject to any limitations provided in this chapter or any other statute of this state or its certificate of incorporation, shall have power in furtherance of its corporate purposes . . . .  To elect or appoint officers, employees and other agents of the corporation, define their duties, fix their *reasonable* compensation and the reasonable compensation of directors, and to indemnify corporate personnel. *Such compensation shall be commensurate with services performed.*

(Emphasis added).

233.    Under N.Y. N-PCL § 515(b), "A corporation may pay compensation in a *reasonable* amount to members, directors, or officers for services rendered . . . ." (emphasis added).

234.    The pension benefits Plaintiff received from ACCJ were neither "reasonable" nor "commensurate with services performed" and were thus in violation of N.Y. N-PCL §§ 202(a)(12) and 515(b).

235.    Such pension benefits to Plaintiff were therefore unlawful transfers of corporate assets.

236.    While an officer or director of ACCJ, Plaintiff owed ACCJ fiduciary duties of care, loyalty, and obedience.

93

237.    While an officer and director of ACCJ, Plaintiff knowingly and unlawfully

transferred or caused the transfer of unlawful pension payments to himself and for his own personal

benefit in breach of his fiduciary duties to ACCJ and in violation of N.Y. N-PCL § 717.

238.    While an officer and director of ACCJ, Plaintiff also knowingly accepted, and thus

acquiesced in, the unlawful transfers of pension payments in breach of his fiduciary duties to ACCJ

and in violation of N.Y. N-PCL § 717.

239.    As such, Plaintiff neglected, failed to perform, or otherwise violated his duties of

management and disposition of corporate assets committed to his charge within the meaning of

N.Y. N-PCL § 720(a)(1)(A) and caused the acquisition by himself or waste of corporate assets due

to his neglect of, failure to perform, or other violation of his duties within the meaning of N.Y. N-

PCL § 720(a)(1)(B).

240.    Consequently, ACCJ is entitled to a judgment directing Plaintiff to account for his

official conduct in violation of N.Y. N-PCL § 720(a)(1) and for Counterclaim-Defendants to make

restitution to ACCJ of all unlawful pension payments from ACCJ to Plaintiff in an amount to be

determined at trial.

241.    Counterclaim-Defendants perpetrated and perpetuated a fraud upon ACCJ by

disregarding corporate formalities and utilizing the Stethem Funds as Engelberg's own personal

assets, justifying holding NYCCJ liable as Engelberg's alter ego.

## AS AND FOR AN EIGHTH COUNTERCLAIM
## AGAINST COUNTERCLAIM-DEFENDANTS
## NEW YORK NOT-FOR-PROFIT LAW § 720(a)(2)
## (UNLAWFUL CONVEYANCE, ASSIGNMENT, OR TRANSFER)

242.    Counterclaim-Plaintiff repeats and realleges the allegations in the preceding

paragraphs as if fully set forth below.

94

D:\TWLFPLLC\

243.    The pension benefits Plaintiff received from ACCJ were neither "reasonable" nor "commensurate with services performed," and thus were in violation of N.Y. N-PCL §§ 202(a)(12) and 515(b).

244.    Such pension benefits to Plaintiff were therefore unlawful transfers of corporate assets.

245.    Plaintiff knew that the pension payments that he received from ACCJ were unlawful under N.Y. N-PCL §§ 202(a)(12) and 515(b).

246.    Therefore, ACCJ is entitled to a judgment setting aside all pension payments from ACCJ to Plaintiff and directing that Counterclaim-Defendants return such payments to ACCJ in an amount to be determined at trial.

247.    Counterclaim-Defendants perpetrated and perpetuated a fraud upon ACCJ by disregarding corporate formalities and utilizing the Stethem Funds as Engelberg's own personal assets, justifying holding NYCCJ liable as Engelberg's alter ego.

### AS AND FOR A NINTH COUNTERCLAIM
### AGAINST COUNTERCLAIM-DEFENDANTS
### NEW YORK NOT-FOR-PROFIT LAW § 720(a)(1)
### (BREACH OF FIDUCIARY DUTY)

248.    Counterclaim-Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth below.

249.    At all times relevant, Engelberg was a director of ACCJ and owed ACCJ fiduciary duties of care, loyalty, and obedience.

250.    In 2013, the Board requested Engelberg to produce certain documents that were in his possession and to otherwise cooperate with ACCJ's leadership, counsel, and accountants in the preparation of ACCJ's responses to an ongoing IRS examination.

95

D:\TWLFPLLC\

251.    Engelberg refused to produce these documents, which were necessary for the preparation of ACCJ's responses to the IRS examination, and to otherwise so cooperate in the preparation of ACCJ's responses.

252.    As a direct result of Engelberg's failure to produce these documents that were solely in his possession and to otherwise cooperate with ACCJ's leadership, counsel, and accountants in preparation of responses to the IRS examination, ACCJ had to pay its counsel and accountants for additional time spent in preparing the responses and otherwise had to expend resources it would not have had to expend but for Engelberg's failure to cooperate.

253.    Engelberg's knowing and willful failure to produce the requested documents and otherwise cooperate constituted breaches of his fiduciary duties to ACCJ and violated N.Y. N-PCL § 717.

254.    Engelberg's breaches of fiduciary duty further caused waste of ACCJ's corporate assets—a form of damages explicitly recognized by N.Y. N-PCL § 720(a)(1)(B).

255.    Counterclaim-Defendants perpetrated and perpetuated a fraud upon ACCJ by disregarding corporate formalities and utilizing the Stethem Funds as Engelberg's own personal assets, justifying holding NYCCJ liable as Engelberg's alter ego.

256.    Consequently, Counterclaim-Plaintiff is entitled to a judgment against Counterclaim-Defendants for damages in an amount to be determined at trial.

### AS AND FOR A TENTH COUNTERCLAIM AGAINST ENGELBERG
### NEW YORK CIVIL PRACTICE LAW AND RULES § 7101
### (REPLEVIN)

257.    Counterclaim-Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth below.

96

D:\TWLFPLLC\

258.    At the time of the commencement of this case, and at all relevant times, ACCJ was and still is the owner and is entitled to the immediate possession of ACCJ's corporate records.

259.    On information and belief, Engelberg is in possession of ACCJ corporate records, including but not limited to pension documents, bank statements, and Claimant and Center Agreements, and wrongfully detained and still detains such records from ACCJ.

260.    Engelberg's detention of any of ACCJ's corporate records is wrongful.

261.    Engelberg has failed to return such corporate records or to respond otherwise to ACCJ's demand to him to return such corporate records.

262.    Therefore, ACCJ is entitled to a judgment that it is the owner and entitled to the immediate possession of such corporate records and further directing Engelberg to return all documents and other materials in any form in his possession, custody, or control that constitute ACCJ corporate records and awarding compensatory damages to ACCJ in an amount to be determined at trial.

### AS AND FOR AN ELEVENTH COUNTERCLAIM AGAINST COUNTERCLAIM-DEFENDANTS (DECLARATORY JUDGMENT THAT NYCCJ IS THE ALTER EGO OF MICHAEL ENGELBERG)

263.    Counterclaim-Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth below.

264.    As explained above and as discussed at length in the *Orlow* Complaint (Ex. A), at all relevant times, NYCCJ was the alter ego of Engelberg.

265.    Specifically, NYCCJ was formed by Engelberg and used by him to defraud ACCJ and the public at large.

97

D:\TWLFPLLC\

266.     Engelberg operated and managed NYCCJ by himself, without any board involvement, filed false federal and state tax forms, and used NYCCJ for his own personal benefit in violation of federal or state law.

267.     As such, at all times relevant, Engelberg exercised complete dominion over NYCCJ.

268.     NYCCJ conducted no business or programmatic activity.

269.     The only assets NYCCJ ever received in the entire history of its corporate existence were the Stethem Funds, which NYCCJ obtained when Engelberg diverted these funds to that organization and agreed to the Stethem Funds Agreement.

270.     Engelberg identified individual board members of NYCCJ who had never agreed to be board members, including but not limited to Saul Seitler, and inserted their names in NYCCJ tax forms submitted to federal and state taxation authorities.

271.     Engelberg concealed the finances of NYCCJ from NYCCJ's board of directors.

272.     NYCCJ and Engelberg have the same address.

273.     NYCCJ's assets were intentionally commingled with the assets of Engelberg and NYCCJ's assets were used to pay Engelberg's personal expenses.

274.     Engelberg's domination of NYCCJ turned the latter into an instrumentality of fraud and/or otherwise resulted in wrongful or inequitable consequences.

275.     Furthermore, Engelberg's Representations caused ACCJ to allow NYCCJ to maintain control over the Stethem Funds.

276.     Counterclaim-Defendants perpetrated and perpetuated a fraud upon ACCJ by disregarding corporate formalities and utilizing the Stethem Funds—assets transferred to NYCCJ

98

by ACCJ—as Engelberg's own personal assets, justifying holding NYCCJ liable as Engelberg's alter ego.

277.    As alter egos, Engelberg and NYCCJ are liable for the agreements, contracts, conduct, debts, judgments, and liabilities of each other.

278.    By reason of the foregoing, ACCJ is entitled to judgment against Engelberg and NYCCJ declaring them to be alter egos of each other and liable for the agreements, contracts, conduct, debts, judgments, and liabilities of each other.

**AS AND FOR A TWELFTH COUNTERCLAIM**
**AGAINST COUNTERCLAIM-DEFENDANTS**
**(BREACH OF CONTRACT)**

279.    Counterclaim-Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth below.

280.    In or about November 2002, ACCJ, Engelberg, and NYCCJ entered into the Stethem Funds Agreement, which was an oral agreement.

281.    Pursuant to this agreement, Counterclaim-Defendants agreed that:

    i.    NYCCJ would continue to be operated as a legitimate not-for-profit corporation with regular board meetings and oversight of all NYCCJ activities and spending which would be consistent with its Certificate of Incorporation;

    ii.    the Stethem Funds would be used solely in furtherance of charitable activities;

    iii.    all funds needed by ACCJ to conduct its activities would be provided by NYCCJ upon demand by ACCJ; and

99

D:\TWLFPLLC\

    iv.  breach of the aforementioned conditions would result in a return of the

Stethem Funds to ACCJ upon demand.

282.    Counterclaim-Defendants, as explained more fully above, willfully and materially breached the Stethem Funds Agreement multiple times between 2003 and the present by: (a) using the Stethem Funds for Engelberg's personal benefit, which was not in accordance with the terms of the Stethem Funds Agreement; and (b) failing to operate NYCCJ properly with board oversight and corporate formalities, as described above.  (*See* Ex. A ¶¶ 34-77).

283.    On or about June 11, 2014, because Counterclaim-Defendants had breached the Stethem Funds Agreement, ACCJ, among other things, demanded a refund of the Stethem Funds.

284.    Counterclaim-Defendants have refused to return the Stethem Funds to ACCJ.

285.    As a direct and proximate result of Counterclaim-Defendants' breaches of the Stethem Funds Agreement, ACCJ is entitled to judgment against Counterclaim-Defendants in the amount of the Stethem Funds.

### AS AND FOR A THIRTEENTH COUNTERCLAIM AGAINST COUNTERCLAIM-DEFENDANTS (<u>FRAUDULENT INDUCEMENT</u>)

286.    Counterclaim-Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth below.

287.    In the alternative, the Stethem Funds Agreement was a product of fraud and is subject to rescission.  In particular, Counterclaim-Defendants represented on a variety of occasions—including without limitation in or about November 2002 to Defendants Milton Pollack and Eliezer Perr—that NYCCJ had always been operated as a legitimate not-for-profit corporation which conducted regular activities for charitable and educational purposes and that all activities

100

and spending were overseen by a valid board of directors that met regularly (the "Representations").

288.     ACCJ was induced to enter the Stethem Funds Agreement and to maintain the Stethem Funds with NYCCJ based upon the Representations.

289.     As set forth above, the Representations were false when made.

290.     Engelberg knew at the time that the Representations were made that same were false.  Specifically, Engelberg knew that NYCCJ had always been under his complete dominion and control and that there was no board oversight, no board meetings, no corporate formalities, and no legitimate programmatic activities.

291.     Counterclaim-Defendants made the Representations with the intent to deceive ACCJ.

292.     ACCJ only discovered the falsity of the Representations on or about June 11, 2014.

293.     Had ACCJ known of the falsity of the Representations, it never would have entered into the Stethem Funds Agreement in the first place.

294.     ACCJ justifiably relied to its detriment upon the Representations in entering into the Stethem Funds Agreement and allowing the Stethem Funds to remain with NYCCJ based upon Engelberg having been one of ACCJ's founders and the founder of NYCCJ, his position then as an officer of ACCJ, and his control then over the financial accounts of both NYCCJ and ACCJ.

295.     As a direct and proximate result of its reliance upon the Representations, ACCJ was deprived of the Stethem Funds.

296.     By reason of the foregoing, ACCJ is entitled to judgment against Counterclaim-Defendants awarding rescission of the Stethem Funds Agreement and in the amount of the Stethem Funds (i.e., directing their return to ACCJ).

101

D:\TWLFPLLC\

## AS AND FOR A FOURTEENTH COUNTERCLAIM
## AGAINST COUNTERCLAIM-DEFENDANTS
## (UNJUST ENRICHMENT)

297.    Counterclaim-Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth below.

298.    In the alternative, even if the Stethem Funds Agreement did not exist or was not valid or enforceable, Counterclaim-Plaintiff allowed for the transfer of the Stethem Funds for Counterclaim-Defendants' benefit.

299.    Indeed, the only assets NYCCJ ever received in the entire history of its corporate existence were the Stethem Funds such that ACCJ's transfer of them was the primary efficient cause of NYCCJ's existence and continued functioning as a financially viable entity.

300.    As discussed above, aside from serving as NYCCJ's financial life support, the Stethem Funds had two specific purposes:

   a.   they were to be used solely in furtherance of charitable activities; and

   b.   they were to be used as an on-demand source of funding for the conduct of ACCJ's activities.

301.    At no point in time were the Stethem Funds ever supposed to be used for private gain or inurement by Engelberg, NYCCJ, or anyone else.

302.    Yet, as discussed above, in violation and contravention of the intended purposes of the approximate $4,300,000 comprising the Stethem Funds, Counterclaim-Defendants directly or indirectly arranged for or permitted approximately half of them to go directly to Engelberg.

303.    This wrongful conduct has resulted in Counterclaim-Defendants being unjustly enriched at Counterclaim-Plaintiff's expense.

102

D:\TWLFPLLC\

304.     Based upon the foregoing, as well as principles of equity and good conscience, Counterclaim-Plaintiff is entitled to judgment against Counterclaim-Defendants awarding disgorgement of their ill-gotten gains and restitution thereof in the amount of the Stethem Funds.

### AS AND FOR A FIFTEENTH COUNTERCLAIM
### AGAINST COUNTERCLAIM-DEFENDANTS
### (FRAUD)

305.     Counterclaim-Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth below.

306.     Irrespective of the Stethem Funds Agreement's existence or validity, as discussed above, Engelberg's making of the false Representations on his behalf and on behalf of NYCCJ while having an intent to deceive ACCJ and knowing that these representations were false lead ACCJ to rely upon these representations to its detriment when it ultimately permitted the Stethem Funds to remain with NYCCJ.

307.     As discussed above, ACCJ only discovered the falsity of the Representations on or about June 11, 2014, such that it was only at or about this time that ACCJ first realized that it had been defrauded by Engelberg and NYCCJ.

308.     As a direct and proximate result of its reliance upon the Representations, ACCJ was deprived of the Stethem Funds.

309.     By reason of the foregoing, ACCJ is entitled to judgment against Counterclaim-Defendants awarding it compensatory damages in the amount of the Stethem Funds.

310.     In addition, by reason of Counterclaim-Defendants' willful acts of fraud and their refusal to return the Stethem Funds to ACCJ after ACCJ made demand for same, ACCJ is entitled to punitive damages in an amount to be determined at trial.

D:\TWLFPLLC\

## AS AND FOR A SIXTEENTH COUNTERCLAIM
## AGAINST COUNTERCLAIM-DEFENDANTS
## (CONSTRUCTIVE TRUST)

311.    Counterclaim-Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth below.

312.    In 2002, prior to when the Stethem Funds were transferred to NYCCJ, Engelberg was an officer of ACCJ who also had control over ACCJ's financial accounts and checkbooks.

313.    Thus, in 2002, Engelberg had a fiduciary relationship and confidential relationship of trust with ACCJ.

314.    Engelberg took advantage of his position as an ACCJ fiduciary and this confidential relationship of trust when he made the Representations to ACCJ, which were false and which he knew to be false.

315.    ACCJ relied upon the truthfulness and accuracy of the Representations, as well as Engelberg having been a founder of both ACCJ and NYCCJ, in allowing NYCCJ to maintain the Stethem Funds.

316.    Engelberg took advantage of his position as an ACCJ fiduciary and his confidential relationship of trust with ACCJ when he—on behalf of himself and NYCCJ—promised to utilize the Stethem Funds only on behalf of ACCJ or for charitable purposes consistent with NYCCJ's Certificate of Incorporation, while having no intention of doing so.

317.    Engelberg further took advantage of his position as an ACCJ fiduciary and his confidential relationship of trust with ACCJ when he proceeded, as has been discussed at length in the preceding paragraphs, to unjustly enrich himself by wrongfully misusing the Stethem Funds for his personal benefit.

104

D:\TWLFPLLC\

318.    On or about June 11, 2014, ACCJ made demand for the return of the Stethem Funds upon discovering that Engelberg had been unjustly enriched and that the Stethem Funds had been used for his personal benefit.  (*See* Ex. B at 7).

319.    Consequently, ACCJ is entitled to judgment impressing a constructive trust upon the Stethem Funds and ordering their restitution to ACCJ.

### AS AND FOR A SEVENTEENTH COUNTERCLAIM AGAINST COUNTERCLAIM-DEFENDANTS (ACCOUNTING)

320.    Counterclaim-Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth below.

321.    As discussed above, at all relevant times, Engelberg (and NYCCJ, being Engelberg's alter ego) had either a fiduciary relationship or confidential relationship of trust with ACCJ.

322.    The Stethem Funds Agreement charged Counterclaim-Defendants with a legal duty to account for and utilize the Stethem Funds for ACCJ or for charitable purposes in accordance with NYCCJ's Certificate of Incorporation, as well as to refrain from using the Stethem Funds for private enrichment.

323.    Relevant law also charged Counterclaim-Defendants with the same duties.

324.    Specifically, Engelberg, a fiduciary of ACCJ, was required to act with due care and good faith in properly accounting for and utilizing the Stethem Funds and not using same for private enrichment.

325.    And while NYCCJ—an alter ego of Engelberg—had the same duties in that it was Engelberg's alter ego, its Certificate of Incorporation imposed them independently as well.

D:\TWLFPLLC\

326.     Based upon Counterclaim-Defendants' misuse of the Stethem Funds as discussed above, Counterclaim-Plaintiff is entitled to judgment ordering a full accounting from Counterclaim-Defendants from 2002 until the present of the Stethem Funds and awarding restitution to ACCJ of any funds wrongfully used or still held by these defendants.

**WHEREFORE**, Counterclaim-Plaintiff prays that the Court enter judgment as follows:

A.     On its First Counterclaim, judgment declaring that: (1) Engelberg is not a member or director of ACCJ; and (2) that he was no longer a Board member at the latest as of September 2014;

B.     On its Second Counterclaim for breach of fiduciary duty, judgment against Counterclaim-Defendants for damages in an amount to be determined at trial;

C.     On its Third Counterclaim for tortious interference with contract, judgment against Counterclaim-Defendants for damages in an amount to be determined at trial but in no event less than $10,000,000, and an additional award of punitive damages;

D.     On its Fourth Counterclaim for tortious interference with advantageous business relationship, judgment against Counterclaim-Defendants for damages in an amount to be determined at trial but in no event less than $10,000,000, and an additional award of punitive damages;

E.     On its Fifth Counterclaim for defamation/libel, judgment against Counterclaim-Defendants for damages in an amount to be determined at trial but in no event less than $10,000,000, and an additional award of punitive damages;

F.     On its Sixth Counterclaim for defamation/slander, judgment against Counterclaim-Defendants for damages in an amount to be determined at trial but in no event less than $10,000,000, and an additional award of punitive damages;

106

D:\TWLFPLLC\

G.    On its Seventh Counterclaim for statutory breach of fiduciary duty, judgment directing Plaintiff to account for his official conduct in violation of N.Y. N-PCL § 720(a)(1) and for Counterclaim-Defendants to make restitution to ACCJ of all unlawful pension payments from ACCJ to Plaintiff in an amount to be determined at trial;

H.    On its Eighth Counterclaim for statutory breach of fiduciary duty, judgment setting aside all pension payments from ACCJ to Plaintiff and directing that Counterclaim-Defendants return such payments to ACCJ in an amount to be determined at trial;

I.    On its Ninth Counterclaim for statutory breach of fiduciary duty, judgment against Counterclaim-Defendants for damages in an amount to be determined at trial;

J.    On its Tenth Counterclaim, judgment declaring ACCJ to be the owner of and awarding it immediate possession of certain corporate records wrongfully taken by Engelberg, further directing Engelberg to return all documents and other materials in any form in his possession, custody, or control that constitute ACCJ corporate records, and awarding compensatory damages in an amount to be determined at trial;

K.    On its Eleventh Counterclaim, judgment against Engelberg and NYCCJ declaring them to be alter egos of each other and liable for the agreements, contracts, conduct, debts, judgments, and liabilities of each other;

L.    On its Twelfth Counterclaim for breach of contract, judgment against Counterclaim-Defendants in the amount of the Stethem Funds;

107

D:\TWLFPLLC\

M.     On its Thirteenth Counterclaim for fraudulent inducement, judgment against Counterclaim-Defendants awarding rescission of the Stethem Funds Agreement and directing return of the Stethem Funds to ACCJ;

N.     On its Fourteenth Counterclaim for unjust enrichment, judgment against Counterclaim-Defendants awarding disgorgement of their ill-gotten gains and restitution thereof in the amount of the Stethem Funds;

O.     On its Fifteenth Counterclaim for fraud, judgment against Counterclaim-Defendants awarding ACCJ compensatory damages in the amount of the Stethem Funds and punitive damages in an amount to be determined at trial;

P.     On its Sixteenth Counterclaim for a constructive trust, judgment impressing a constructive trust upon the Stethem Funds and ordering their restitution to ACCJ;

Q.     On its Seventeenth Counterclaim for an accounting, judgment ordering a full accounting from Counterclaim-Defendants from 2002 until the present of the Stethem Funds and awarding restitution to ACCJ of any such funds wrongfully used or still held by these defendants;

R.     On all Counterclaims, awarding it all costs and attorneys' fees incurred in commencing and prosecuting this action;

S.     On all Counterclaims, awarding it pre-judgment, post-judgment, and any other form of applicable interest at the legal rate;

T.     Dismissing the Complaint in its entirety with prejudice; and

108

D:\TWLFPLLC\

U.     Awarding any such other and further relief that this Court deems just and proper.

Dated: July 9, 2017
      Garden City, NY

Respectfully submitted,

THE WEINREB LAW FIRM, PLLC

By: _____
          Elan E. Weinreb, Esq.
1225 Franklin Avenue, Suite 325
Garden City, NY 11530-1693
Tel.: (516) 620-9716
eweinreb@weinreblaw.com
*Attorneys for Defendant and Counterclaim-Plaintiff*
*The American Center for Civil Justice, Inc.*

109

D:\TWLFPLLC\

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MICHAEL ENGELBERG, derivatively on behalf of The
American Center for Civil Justice, Inc.,

        Plaintiff,

        - v -

ELIEZER PERR, JEDIDIAH PERR, MILTON POLLACK,
and AMERICAN CENTER FOR CIVIL JUSTICE,
RELIGIOUS LIBERTY AND TOLERANCE, INC.

        Defendants,

THE AMERICAN CENTER FOR CIVIL JUSTICE, INC.,

        Nominal Defendant,

THE NEW YORK CENTER FOR CIVIL JUSTICE,
TOLERANCE & VALUES, INC.,

        Additional Defendant on Counterclaims.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Index No. 606919/2014

IAS Part 1

Justice Assigned:
Hon. Stephen A. Bucaria, J.S.C.

**VERIFICATION**

Pursuant to CPLR § 3020(d), ELAN E. WEINREB, an attorney licensed to practice law in the State of New York, affirms the following under the penalty of perjury:

I am Counsel for Defendant and Counterclaim-Plaintiff THE AMERICAN CENTER FOR CIVIL JUSTICE, INC. ("ACCJ"). This Verification is made by the undersigned and not by an officer of ACCJ because ACCJ is not located within the county in which the undersigned is located. I have read the foregoing Second Amended Verified Answer and Counterclaims, know the contents thereof, and same is true to my knowledge, except as to those statements made upon information and belief. As to those matters, I believe them to be true.

The foregoing Second Amended Verified Answer and Counterclaims is based on facts and information related to me by my client, personal knowledge, and upon a review of the file.

Dated: Garden City, NY
      July 9, 2017

                        Elan E. Weinreb, Esq.

110

D:\TWLFPLLC\