Exhibit N

*To Be Argued By*:
DAVID D. HOWE
*Time Requested: 15 Minutes*

# New York Supreme Court

## APPELLATE DIVISION—SECOND DEPARTMENT

MICHAEL ENGELBERG, derivatively on behalf of
The American Center for Civil Justice, Inc.,

*Plaintiff-Respondent,*

—against—

ELIEZER PERR, JEDIDIAH PERR and MILTON POLLACK,

*Defendants-Appellants,*

—and—

THE AMERICAN CENTER FOR CIVIL JUSTICE, INC.,

*Nominal Defendant-Appellant.*

DOCKET NO.
**2015-05938**

## BRIEF FOR PLAINTIFF-RESPONDENT

LIVINGSTON HOWE, LLP
747 Third Avenue, 20th Floor
New York, New York 10017
(212) 986-7887

*Attorneys for Plaintiff-Respondent*

Nassau County Clerk's Index No. 606919/14

# **TABLE OF CONTENTS**

Page

Table of Authorities ........................................................................ iii

Preliminary Statement ...................................................................... 1

Counterstatement of Questions Presented ........................................ 1

Nature of the Case ........................................................................... 3

ARGUMENT ................................................................................. 17

I.      The IAS Court Properly Held That Plaintiff Has Standing
        To Maintain This Action ............................................... 17

        A.      Plaintiff Has Sufficiently Pleaded His Status as a Member
                and Director of ACCJ to Support His Standing ................ 18

        B.      Standing Is Also Proper Based on Special Interest Factors. 22

II.     The IAS Court Properly Held That Jed Perr Is Subject To
        Liability As A *De Facto* Officer And Fiduciary ......................... 24

        A.      Allegations of *De Facto* Officer Liability Are a Viable
                Basis for Claims and Are Well-Pleaded ........................... 24

        B.      Jed Perr Is Also Liable As A Fiduciary, and Plaintiff Has
                Pleaded This With Particularity ........................................ 30

III.    The Causes Of Action Alleging Improper Transfers Of Monies To
        The "New Jersey Center," and The Subsequent Misrepresentations
        Made In Filings With The I.R.S., State Claims For Relief .......... 33

                A.  Defendant Jed Perr ...................................... 33

                B.  Defendant Eliezer Perr ................................ 34

                C.  Defendant Milton Pollack ........................... 38

IV.     The Causes Of Action Alleging Improper Donations To Other
        Charities State Claims For Relief................................................... 39

        A.      Plaintiff Has Adequately Alleged That The Challenged
                Donations Were Not Authorized By ACCJ's Corporate
                Charter................................................................................ 40

        B.      The Business Judgment Rule Does Not Foreclose Inquiry
                Into the Donations.............................................................. 44

        C.      The Donations Were in Breach of Defendants' Fiduciary
                Duty of Obedience ............................................................. 47

V.      The Causes Of Action Concerning Jed Perr's For-Profit Entity
        Called "ARC" State Claims For Relief ....................................... 48

VI.     The IAS Court Properly Held That There Is No Time-Bar
        To The Causes Of Action Involving The "2007 Agreement" ..... 51

VII.    Plaintiff Properly Stated A Cause Of Action For An
        Accounting .................................................................................. 57

CONCLUSION ............................................................................. 59

# TABLE OF AUTHORITIES

Page

<u>Cases</u>

*Alco Gravure Inc. v. Knapp Foundation*, 64 N.Y.2d 458 (1985)..................... 43

*American Baptist Churches of Metropolitan N.Y. v. Galloway*,
    271 A.D.2d 92 (2000)............................................................ 50

*Anonymous v. Anonymous*, 137 A.D.2d 739 (2d Dep't 1989)........................ 32

*Auerbach v. Bennett*, 47 N.Y.2d 619 (1979) .................................... 44

*Bertoni v. Catucci*, 117 A.D.2d 892 (3d Dep't 1986) ....................................... 50

*Brach v. Harmony Services, Inc.*, 93 A.D.3d 748 (2d Dep't 2012).................. 22

*Car Park Systems of New York, Inc. v. Ull*, 2014 WL 4652900
    (Sup. Ct. N.Y. Co. 2014)   ....................................................... 27, 55

*Consumers Union of U.S., Inc. v. State of New York*,
    5 N.Y.2d 327 (2005).............................................................. 22

*Daly v. Kochanowicz*, 67 A.D.3d 78 (2d Dep't 2009)  .................................... 30, 49

*Daydov v. Zhuk*, 23 Misc.3d 1129(A) (Sup. Ct. Kings Co. 2009) ................... 50

*Dean v. Harvestime Tabernacle United Pentecostal Church Intl.*,
    79 A.D.2d 793 (2d Dep't 2010)............................................... 22-23

*Deutsche Bank Nat'l Trust Co. v. Haller*, 100 A.D.3d 680
    (2d Dep't 2012)..................................................................... 22

*East Hampton Union Free School Dist. v. Sandpebble Bldrs., Inc.*,
    66 A.D.3d 122 (2d Dep't 2009), *aff'd*, 16 N.Y.3d 775 (2011) .............. 17

*Erbe v. Lincoln Rochester Trust Co.*, 13 A.D.2d 211 (4th Dep't 1961)........... 54

*Evangelista v. Mattone*, 44 A.D.2d 704 (2d Dep't 2007)................................. 55

*Faith Assembly v. Titledge of N.Y. Abstract, LLC*, 106 A.D.3d 47
    (2d Dep't 2013)........................................................................... 30, 31

*Festinger v. Edrich*, 32 A.D.3d 412 (2d Dep't 2006)....................................... 32

*Fleming v. Kamden Properties, LLC*, 41 A.D.3d 781 (2d Dep't 2007) ........... 22

*Foley v. D'Agostino*, 21 A.D.2d 60 (1st Dep't 1964)...................................... 49

*Gould v. Decolator*, 121 A.D.3d 845 (2d Dep't 2014).................................... 19

*Guthartz v. Goldrick*, 19 Misc.3d 861 (Sup. Ct. Nassau Co. 2008) ............... 53

*Howard v. Carr*, 222 A.D.2d 843 (3d Dep't 1995) ......................................... 50

*Han Young v. Chiu*, 49 A.D.3d 535 (2d Dep't 2008)....................................... 50

*Huen New York, Inc. v. Bd. of Educ. Clinton Cent. Sch. Dist.*,
    67 A.D.3d 1337 (4th Dep't 2009)............................................................. 42

*IDT Corp. v. Morgan Stanley*, 12 N.Y.3d 132 (2009)..................................... 53

*In re General Vision Services*, 2006 WL 687162 (Bankr. S.D.N.Y.
    2006), *rearg. den.*, 352 B.R. 25 (Bankr. S.D.N.Y. 2006),
    *aff'd*, 423 B.R. 790 (S.D.N.Y. 2010)...................................................... 27, 55

*In re Kollel Mateh Efraim*, LLC, 2011 WL 1629665 (Bankr.
    S.D.N.Y. 2011) ...................................................................................... 27-28

*Lanzi v. Brooks*, 43 N.Y.2d 778 (1977) ........................................................... 49

*Kopelowitz & Co. v. Mann*, 83 A.D.3d 793 (2d Dept. 2011) ........................... 17

*Lawrence v. Town of East Fishkill*, 167 A.D.2d 447 (2d Dep't 1990).............

*Leon v. Martinez*, 84 N.Y.2d 83 (1994)........................................................... 32, 54

*Levin v. Kitsis*, 82 A.D.3d 1051 (2d Dep't 2011) ............................................ 22

*Loengard v. Santa Fe Industries, Inc.*, 70 N.Y.2d 262 (1987) ........................ 52

*Loeuis v. Grushin*, 126 A.D.3d 761 (2d Dep't 2015) ....................................... 53

*Matter of Alabi v. Community Bd. No. 2*, 17 A.D.3d 459 (2d Dep't 2005) ..... 42

*Matter of Manhattan Eye Ear & Throat Hospital*, 186 Misc.2d 126
    (Sup. Ct. N.Y. Co. 1999) ......................................................................... 47

*M.H. Mandelbaum Orthotic & Prosthetic Services, Inc. v. Werner*,
    126 A.D.3d 857 (2d Dep't 2015) ............................................................ 19

*Morgenthow & Latham v. Bank of N.Y.*, 305 A.D.2d 74 (1st Dept. 2003) ...... 32

*Morris v. Gianelli*, 71 A.D.3d 965 (2d Dept. 2010) ........................................ 52

*Nederlandsche Handel-Maatschappij N.V. v. Schreiber*, 17 A.D.2d 783
    (1st Dep't 1962) ...................................................................................... 46

*Out of the Box Promotions L.L.C. v. Koschitzi*, 2007 NY Slip Op 50973(U)
    (Sup. Ct. Kings Co. 2007) ...................................................................... 21

*Palazzo v. Palazzo*, 121 A.D.2d 261 (1st Dep't 1986) ................................... 57-58

*Parekh v. Cain*, 96 A.D.3d 812 (2d Dep't 2012)............................................. 19, 21

*People v. Ben*, 55 A.D.3d 1306 (4th Dep't 2008) ........................................... 52

*Pludeman v. Northern Leasing Systems, Inc.*, 10 N.Y.2d 486 (2008)............. 38, 46

*Roslyn Union Free School Dist. v. Barkan*, 16 N.Y.3d 643 (2011) ................. 57-58

*Schneiderman v. Lower Esopus River Watch*, 2013 NY Slip Op 50965(U)
    (Sup. Ct. Ulster Co. 2013) ..................................................................... 26,
                                            28, 55

*S.H. and Helen R. Scheuer Family Found. v. 61 Assocs.*, 179 A.D.2d 65
    (1st Dep't 1992) ...................................................................................... 44-45

*Sobel v. Ansanelli*, 98 A.D.3d 1020 (2d Dep't 2012) ..................................... 21

*Sotomayor v. Medifast, Inc.*, 28 A.D.3d 309 (1st Dep't 2006) ........................ 54

*Toscano v. Toscano*, 285 A.D.2d 590 (2d Dep't 2001).................................... 52

*Trinity Co-op Apts. v. J.S. Bldg. Corp.*, 25 A.D.2d 891 (2d Dep't 1966) ........ 27

*Tzolis v. Wolff*, 2006 NY Slip Op 50851(U) (Sup. Ct. N.Y. Co. 2006),
    *aff'd*, 39 A.D.3d 138 (1st Dep't 2007), *aff'd*, 10 N.Y.3d 100 (2008) .... 26

*Verdone v. Suffolk Anesthesiology Assocs., P.C.*, 85 A.D.3d 1152
    (2d Dep't 2011)........................................................................................ 21

*Westchester Religious Inst. v. Kamerman*, 262 A.D.2d 131
    (1st Dep't 1999)  ..................................................................................... 52

*Yeshiva Chasdei Torah v. Dell Equity, LLC*, 90 A.D.3d 746
    (2d Dep't 2011)........................................................................................ 21

*Yue Fung USA Enters., Inc. v. Novelty Crystal Corp.*, 105 A.D.3d 840
    (2d Dep't 2013) ....................................................................................... 19

<u>Statutes and Rules</u>

Civ. Prac. L & Rules ("CPLR") § 213(1) ....................................................... 52, 56

CPLR § 213(7) ................................................................................. 27,
                                                                                                                    28, 52, 55

CPLR § 3014(b) ............................................................................................ 17

CPLR § 3016(b) ............................................................................................. 17,
                                                                                                                    30, 38

CPLR § 3211(a) ............................................................................................ 17

CPLR § 3211(a)(1)........................................................................................ 32

CPLR § 3211(a)(3) ....................................................................................... 17, 22

CPLR § 3211(a)(5)........................................................................................ 17, 51

CPLR § 3211(a)(7).............................................................................................. 17

CPLR § 3211(c) ................................................................................................... 19

Not-for-Profit Corporation Law ("N-PCL") ................................................... 18,
28 and *passim*

N-PCL § 102(25) .............................................................................................. 25
n.3, 29

N-PCL § 202(a)(7) ........................................................................................... 42

N-PCL § 601(e) ............................................................................................... 20

N-PCL § 623 ................................................................................................... 18

N-PCL § 714(c)............................................................................................... 24

N-PCL § 717 ................................................................................................... 26

N-PCL § 720(a)(1) .......................................................................................... 24, 25,
26, 29

N-PCL § 720(a)(2) ......................................................................................... 24-25

N-PCL § 801(e) ............................................................................................... 20

N-PCL § 802(a)............................................................................................... 20

N-PCL § 804(a)(ii)........................................................................................... 20

Chapter 466 of the Laws of 2016..................................................................... 28-29

Federal Statutes and Rules

26 U.S.C. § 4958(f)(1)(A), (B) ...................................................................... 25 n.3

26 CFR §53.4958-3(c), (d), (e) ......................................................................... 25 n.3

26 C.F.R. § 53.4958.3(a)(1), (b)(1)(v)............................................................. 25 n.3

## PRELIMINARY STATEMENT

The IAS Court (Hon. Stephen A. Bucaria, J.S.C.) properly denied the Defendants' pre-answer motion to dismiss Plaintiff's Verified Derivative Complaint ("Complaint"), holding that (1) Plaintiff had standing to maintain this suit, (2) the Complaint stated causes of action, and (3) a statute of limitations defense as to certain causes of action lacked merit.  Plaintiff-Respondent, Michael Engelberg, respectfully requests that the Court affirm the order appealed from in all respects.

## COUNTERSTATEMENT OF QUESTIONS PRESENTED

1.      Did the IAS Court properly rule that Plaintiff has standing to maintain this member's derivative action on behalf of nominal Defendant The American Center for Civil Justice, Inc. ("ACCJ"), a charitable not-for-profit corporation?

*Yes.*  The IAS Court properly ruled that Plaintiff may maintain this action in the special circumstances of this case, including his role as a founding member and long-time director of the corporation.  Alternatively, Plaintiff's allegations that he is a member and director of the corporation with capacity to sue are sufficient to withstand pre-answer dismissal, particularly where the documentary proof relied upon by the Defendants to disprove the allegation is contested.  Point I.

2.      Did the IAS Court properly rule that Defendant Jed Perr is subject to suit in this action?

1

*Yes.*  The IAS Court properly ruled that Jed Perr, alleged to be a *de facto* officer of ACCJ, was a "key employee" subject to suit.  Plaintiff's allegations that Jed Perr is a fiduciary of ACCJ are sufficiently particular.  Point II.

3.    Did the IAS Court properly rule that the Complaint states causes of action for breach of fiduciary duty and related theories under the Not-for-Profit Corporation Law?

*Yes.*  The IAS Court properly sustained causes of action One through Nine, which are based on three core factual allegations:

(1)    that Defendants diverted funds from ACCJ to a related entity, called "The American Center for Civil Justice, Religious Liberty and Tolerance, Inc." (a New Jersey corporation, referred to by the parties as the "New Jersey Center"), controlled by Defendant Jed Perr, the son of Defendant Eliezer Perr, and that Defendants misrepresented the facts regarding such transfers in filings with the Internal Revenue Service (Point III);

(2)    that Defendants authorized donations to other charities that exceeded the "purposes" clause of the corporation's charter, which was never properly amended to permit such donations, and that the decisions to make such donations were not shielded by the business judgment rule (Point IV); and

2

(3)    that Defendant Jed Perr misappropriated a corporate opportunity of

ACCJ when he established a separate for-profit entity (Point V).

The IAS Court properly held that Plaintiff's allegations were entitled to favorable

inferences and were sufficiently pleaded against each Defendant to avoid dismissal.

4.    Did the IAS Court properly rule that there is no time-bar to the causes

of action involving the 2007 Agreement between ACCJ and the New Jersey Center?

*Yes*.  The IAS Court properly held that, under the "fiduciary tolling" rule,

Defendants did not "openly repudiate" or otherwise terminate their fiduciary

obligations to ACCJ more than six years prior to the commencement of the action,

by entering into the 2007 Agreement, because the authenticity of that agreement and

the date of its creation is disputed. Point VI.

5.    Does the Complaint state a cause of action for an accounting?

*Yes*. The Complaint sufficiently alleges breaches of fiduciary duty by the

Defendants.  An accounting remedy is well-suited to the circumstances of this case.

Point VII.

## NATURE OF THE CASE

The following statement of facts is taken from the Complaint and its exhibits

(A10 and following), and the Affidavit of Plaintiff Michael Engelberg ("Engelberg

3

Affid.") and its exhibits (A683 and following) submitted to the IAS Court in opposition to the motion to dismiss.[1]

In late 1996, Plaintiff Michael Engelberg and Defendant Eliezer Perr ("Eli Perr" or "Rabbi Perr") founded ACCJ to support victims of terrorism and to assist them in bringing lawsuits against state sponsors of terrorism. A18-19, ¶¶21-27. Over many years, Engelberg had come to trust Rabbi Perr as a mentor and father figure and to rely upon him as a person who had experience with not-for-profit entities. A683-89, ¶¶2, 8).

ACCJ entered into written agreements with victims of terrorism or their estates (the "Claimant and Center Agreements") whereby ACCJ would advance funds for litigation and retain counsel for claimants. The claimants in turn pledged a portion, generally 20%, from any recoveries, to enable ACCJ to carry on its charitable mission. A20-21, ¶¶29, 31-33; A83. Individual claimants also granted powers of attorney to Engelberg authorizing him to act on their behalf. A20, ¶30; A82.

Below, we will focus on the most complex of several areas of misconduct: that Defendants Eli Perr and his son, Jed Perr, illicitly diverted approximately $2.6 million from ACCJ to an entity controlled by Jed Perr (the "New Jersey Center"), and that they and Defendant Milton Pollack sought to cover up the diversion by

---

[1] References to "A_" are to pages of the Joint Appendix.

means of a backdated agreement supplied to the IRS as a cover story.  Concerning other areas of misconduct, we outline the relevant allegations in the argument points, *infra*.

As to all the areas of misconduct, the Complaint and other materials properly considered by the IAS Court are far from conclusory and meet all applicable pleading standards sufficient to survive a motion to dismiss under CPLR 3211.

**Lawsuits Against Iran and Libya**.  By the mid-2000's, ACCJ claimants had achieved a series of judgments against Iran in excess of $300 million (A22-26, ¶¶37-54), but had not made recoveries. In November 2007 ACCJ entered into a contingency retainer with DLA Piper to pursue collection on certain of these judgments.  Plaintiff signed the agreement as attorney-in-fact for the claimants and Defendant Pollack signed on behalf of ACCJ.  A29, ¶¶66-70; A85.

ACCJ also supported two litigations against Libya.  A26, ¶55.  One case was on behalf of the Estate of Alec Collett.  A26-27, ¶¶56-57.  The second case, known as *Franqui*, was brought on behalf of the estates of five individuals killed, and five injured, in a 1972 terrorist attack.  A27-28, ¶¶55-63.

The funds Plaintiff alleges were illicitly diverted arise from recoveries in the two Libya cases.

**Recoveries From Libya.**   In August 2008, Libya entered into a Claims Settlement Agreement to establish a $1.8 billion fund to compensate victims of terrorism.  A28, ¶64; A223, ¶29; A231, ¶47.

In early 2009, through this fund, ACCJ claimants were awarded $10 million per death on six death claims and $3 million per injury on four injury claims, for a total of $72 million – $62 million to *Franqui* claimants, and $10 million to the Estate of Alec Collett.  A31, ¶81.

**Recoveries in the *Ambush* Litigation.**   In February 2009, ACCJ sued an attorney, Joshua Ambush, who had represented several claimants in the *Franqui* litigation.   A32, ¶87.  He was holding up funds due ACCJ over a fee dispute.  In April 2009, ACCJ received $6.4 million from Ambush, which was a portion of ACCJ's 20% share ($8 million) of the $40 million recovered by four of the *Franqui* wrongful death claimants. The balance of $1.6 million was deposited in the Court's registry.  A33, ¶¶88-89.  A further $10 million awarded on a fifth wrongful death claim in *Franqui* was held up in litigation in Puerto Rico.  A33, ¶90.

Ambush also represented four personal injury claimants.  A33-34, ¶91.  One claim was denied; three others were awarded $3,000,000 each.  ACCJ's share would normally be 20%, or $600,000 for each claimant.  In the *Ambush* proceeding, ACCJ received $480,000 for each of three claimants, with the balance of $120,000 for each

deposited in Court.  In January 2010, ACCJ received a check, covering two of the claimants, in the amount of $960,000.  *Id.*

In April 2010, ACCJ received another check, for $480,000, for the third Ambush claimant.  This amount was evidently reported on ACCJ's Form 990 for 2010, on which it reported receipts of $481,847.  A44-45, ¶141; A464.

**Recovery in *Collett* of $2,010,000.**  ACCJ collected its share of the $10,000,000 awarded to the Collett Estate in or about September 29, 2009.  Pursuant to a receipt agreement, a check was made in the amount of $2,010,000, to the order of the ACCJ, and delivered to ACCJ at its Brooklyn address. A32, ¶¶83-86; A110-11, 118; A68, ¶268.

However, this $2,010,000 payment was not reported on ACCJ's 2009 Form 990.  A34, ¶95; A449.  Instead, this sum ended up in the account of a similarly-named New Jersey corporation, the "American Center for Civil Justice, Religious Liberty, and Tolerance, Inc." (a/k/a the "New Jersey Center").  A68-69, ¶¶269-71. Eli Perr's son, Defendant Jed Perr, was the principal officer and a director of the New Jersey Center. A13; A15, ¶7.

**ACCJ Reports Revenue of $7.36 Million.**  On its Form 990 filing for its fiscal year 2009, ended March 31, 2010, ACCJ reported to the IRS precisely the amount it collected in the *Ambush* litigation, to wit, the $6.4 million it received in April 2009, and the $960,000 it received in January 2010, for a total of $7,360,000.

7

A33-34, ¶¶91-92; A449.  The entire $7,360,000 flowed from recoveries by claimants in the *Franqui* litigation from the Libya settlement fund.  A32-34, ¶¶87-92.  ACCJ's Form 990 (A449) made no mention of its collection of $2,010,000 on the *Collett* case, or of the ultimate recipient of the *Collett* monies, the New Jersey Center.  The Form 990 also did not refer to the $600,000 paid by another *Franqui* litigant, Sam Fischel, who was not represented by attorney Ambush (this is discussed further below).

**New Jersey Center Reports Revenue of $2.6 Million.**  On its 2009 Form 990, for fiscal year ending September 30, 2010, the New Jersey Center reported revenue of $2,646,144.  This included the $2,010,000 from *Collett*, and on information and belief an additional amount from Mr. Fischel in the *Franqui* litigation.  A45, ¶¶142-44; A126.  The Form 990 provided no information about the sources of revenues.

(The Defendants and ACCJ do not dispute that the $2,010,000 in Collett monies were deposited to the New Jersey Center's account.  In a draft letter to the IRS, prepared in December 2013, ACCJ stated that it had not "received" any money from the *Collett* matter.  Instead all ACCJ's share in the proceeds of the *Collett* matter were "*received* by the [New Jersey Center] in 2009" (italics supplied).  A37, ¶110; A160-161.)

8

The Complaint's allegations and exhibits readily support the inference that the transfer involved both the father, Eli Perr, who controlled ACCJ, and the son, Jed Perr, who was the principal officer and a director of the New Jersey Center. *See* A160-61. Precisely how the *Collett* monies were "received" by the New Jersey Center is surely within the knowledge of Eli and Jed Perr.

**The Fischel Monies.** The New Jersey Center's report, in its 2009 Form 990, of $2,646,144 in revenues exceeded the $2,010,000 in *Collett* by slightly more than $600,000. The Complaint allegations and exhibits support a reasonable inference that at least $240,000 of the excess, and likely $600,000, came from *Franqui* litigant Sam Fischel. A33, ¶91; A45, ¶¶142-44. Mr. Fischel was not represented by attorney Ambush, so his recovery of $3,000,000, and the 20% (or $600,000) share due ACCJ, was not tied up in the *Ambush* litigation. *Id.*

**Jed Perr, Acting for ACCJ, Collects From Fischel.** Acting as a *de facto* officer of ACCJ, Jed Perr dealt directly with Mr. Fischel to collect his 20% "pledge" to ACCJ. A261-62. He received at least one check from Fischel, in the amount of $240,000. A45, ¶142; A66, ¶¶ 251, 275; A261. An e-mail exchange between them in January 2010 is headed, "Re: American Center receipt." A261-62. Jed used the same e-mail address he used routinely on ACCJ business, and in one e-mail used his ACCJ signature line: "American Center for Civil Justice." A205; A690, A693-94. He asked Fischel whether he wanted one receipt for 2009 and one for 2010. On

9

January 17, 2010, he sent Fischel scanned copies of "receipts as per instructions."

He commented that a check for $240,000 deposited on January 7, 2010, "hasn't yet

cleared in the bank." Fischel replied by e-mail, that he had transferred funds the

following day. A261.

These e-mails confirm that Jed Perr dealt directly with Fischel on payments

due ACCJ, and that he was overseeing the depositing of at least one of Fischel's

checks. He thus had the opportunity to deposit that check, and perhaps others from

Fischel, into the New Jersey Center's accounts. ACCJ's 20% share of Fischel's $3

million recovery would be $600,000.

If ACCJ had deposited any of the Fischel monies to its own account, its

receipts would have exceeded the $7,360,000 it reported, accounted for above by

two receipts from the *Ambush* litigation. It thus would have been required to report

a higher amount. The record is clear: it did not.

The New Jersey Center reported $2,644,144 on its 2009 Form 990 (A126)

consisting of $2,010,000 from *Collett,* plus $634,144. Given Jed Perr's dealings

with Mr. Fischel, the inference is compelling that Fischel monies – at least $240,000,

and likely as much as $600,000 – went to the New Jersey Center.

Therefore, the e-mail exchange between Jed Perr and Fischel lends specificity

to the allegations that monies from the *Franqui* litigation were improperly diverted

to the New Jersey Center.  A45, ¶¶142-44; A66-67, ¶¶251, 253-54; A69, ¶¶275, 277-78; A72, ¶¶302, 304-05.

**Engelberg Learns of the Diversion of Funds.**  Engelberg learned of the diversion of monies to the New Jersey Center in September 2012 while he was being deposed in the *Ambush* case.  A34, ¶94.  He promptly began seeking information from Eli Perr, Jed Perr and Neal Sher, ACCJ's general counsel, but was rebuffed. (See discussion below.)

**ACCJ Is Called to Account By The IRS.**  From early in 2012, Jed Perr and Engelberg were working on IRS inquiries concerning ACCJ's Form 990 filings with JoAnn Luehring, an attorney retained by ACCJ.  A35, ¶97; A688, ¶21; A735-44. The IRS inquiries would ultimately require that ACCJ explain the *Franqui* and *Collett* litigations and its collections from them. A70, ¶285; A156, A175.

In a November 14, 2012, e-mail to Jed, cc'd to Eli Perr and Engelberg, Ms. Luehring stated that Jed had not addressed her concerns and that she was "puzzled that your father [Eli] is not responding to me and my concerns directly."  Ms. Luehring added that "frankness is called for in this situation."  A149.

Shortly thereafter, Ms. Luehring was discharged and replaced by another tax attorney, Marcus Owens, of Caplin & Drysdale.  A35, ¶¶99-100.

In January 2013, Engelberg hired his own counsel, Jonathan Bach of Cooley LLP.  A35-36, ¶101.  Engelberg, through Bach, called for a special meeting of the

11

Board of ACCJ on the IRS inquiry and the $2,646,000 transferred to the New Jersey Center.  A36, ¶102.  This was rebuffed.  A36, ¶102-103.

After further demands for information, ACCJ's counsel, Caplin & Drysdale, began in or about September 2013 to share information with Mr. Bach. A36-37, ¶¶103-09.

**The Backdated 2007 Agreement.**  In September 2013, Caplin & Drysdale provided attorney Bach with the draft of a letter to the IRS and two documents.  A37-38, ¶110-12.  The documents consisted of a single page, styled "Minutes of Board of Directors" of ACCJ, dated April 1, 2007, signed by Pollack, and a two-page agreement between ACCJ and the New Jersey Center dated April 12, 2007, signed by Pollack for ACCJ and by Jed Perr for the New Jersey Center.  A38, ¶112; A192-94.  The parties refer to this crucial document as the "2007 Agreement."

Upon receipt, Bach responded that Engelberg "was not aware of these documents or of their contents and has never seen them before."  A37-38, ¶¶111-12; A195-97.

Bach also pointed out "red flags":  the minutes did not mention a quorum or recusal by Eli Perr, and are "anomalous in that it was *generally not the practice of the ACCJ to make or keep board minutes* (or to hold board meetings at all)."  (Italics supplied.)  A38, ¶112; A195-97.

**The Terms of the 2007 Agreement.**  The 2007 Agreement, A193-94, glibly recites that "ACCJ does not see itself able to effect collection and recovery from Iran and Libya" and provides that the New Jersey Center "shall be the *exclusively authorized entity* representing Recovery Efforts on behalf of ACCJ and ACCJ's Claimants." A193 (emphasis added).

Under the 2007 Agreement, the New Jersey Center would be entitled to 50% of ACCJ's share of recoveries.  The agreement also provided that ACCJ "is hereby assigning to the New Jersey Center, *all ACCJ's interests in Libya claims*, which won't be subject to the 50% sharing …." A194 (emphasis added).

Bach raised obvious questions:   "What unique services did the New Jersey Center have to offer?  What background or experience did Jed Perr provide? He lacks a college education and had no relevant experience at the time." A196.  Bach pointed to a raft of documents that contradicted the supposed existence of the agreement and expressed concern that false information was being provided to the IRS.  A196-97.

**Defendants' Conduct, and the 2007 Agreement, Are Inconsistent.** Defendants' behavior from April 2007 through much of 2014 was inconsistent with the April 2007 Board minutes and the 2007Agreement.  A40-44, ¶¶126-38.

As noted, Pollack, for ACCJ, signed the collections retainer agreement with DLA Piper in November 2007.  A85-89.  The retainer does not refer to the New

13

Jersey Center. It is implausible that Pollack would sign such an agreement just months after signing the purported 2007 Agreement providing that the New Jersey Center will "*represent ACCJ in all matters related to Recovery Efforts.*" A194.

Further, when ACCJ recovered approximately $10 million as a result of the Libya claims in 2009, it did not pay over the entire amount to the New Jersey Center, as the 2007 Agreement would require. Instead, it retained the $7,360,000 it received in its 2009 fiscal year in the *Ambush* litigation. It diverted to the New Jersey Center the *Collett* monies from a separate Libyan matter and, on information and belief, an additional amount from Fischel, a claimant in the *Franqui* case. All these funds represented ACCJ's "interests in Libya claims," supposedly assigned to the New Jersey Center. A44, ¶138. ACCJ's retention of this $7,360,000 was inconsistent with the terms of the 2007 Agreement.

Jed Perr also behaved inconsistently with the 2007 Agreement, by holding himself out as a representative of, and carrying out core responsibilities for, ACCJ. *See*, *e.g.*, A201-12. He signed a revised agreement with DLA Piper in 2011 as "attorney in fact" for ACCJ. A401-06. That agreement made no mention of the New Jersey Center.

In the period 2011 to 2014, Jed sent memos on ACCJ letterhead to claimants and signed them on behalf of ACCJ. See A201-12. (Many of these were designed

14

to mislead the claimants into revising their Claimant and Center Agreements so ACCJ could take more from their recoveries. A47-61, ¶¶152-217.)

**ACCJ's Draft Responses To The IRS.**  The draft responses to the IRS (*see* A37, ¶110) also support the conclusion that the 2007 Agreement was fabricated and backdated to facilitate a cover-up. *See*, *e.g.*, A43, ¶¶131-36.

The explanations of the supposed Board approval of the agreement changed from one draft to the other. The earlier draft (A174-91) disclosed that the "son of the Executive Director of ACCJ" is the Executive Director of the New Jersey Center (A184, penultimate para.).  It also stated that the 2007 Agreement was approved at a Board meeting and that the "Executive Director [Eli Perr] recused himself from the discussion of, and vote to approve, the agreement" (A184, last p*ara*.).

The December 12, 2013 draft (A155-73) states, in a footnote, that one of the New Jersey Center's "Board members is a son of ACCJ's *present* Executive Director," but states that when the Board approved the 2007 Agreement, "ACCJ's current Executive Director was *neither an official nor a Board member* of the ACCJ and therefore did not vote on the approval of the Agreement."  A161 (emphasis added).  The representation that Eli Perr was not a Board member on April 1, 2007, is belied by Eli's own declaration under penalty of perjury, dated April 13, 2009, where he stated:  "I have served on the Board of Directors of The American Center

for Civil Justice . . . since its formation in 1996.  I have at various times served as the President of the Center, and I currently serve on its Board." A302.

Both draft letters to the IRS purport to justify and explain diversion of $2,010,000 (the *Collett* monies) to the New Jersey Center on the ground this was required under the 2007 Agreement, where ACCJ had allegedly assigned all its interests in Libya claims.  A160-61; A184-85.  This explanation was disingenuous, because the $7.3 million ACCJ retained for itself was also from Libya claims.  A70, ¶¶286-87; A159; A183.

Both draft letters incorrectly state that *Franqui* claimants were awarded $59 million.  The correct amount, including $3 million awarded to Fischel, was $62 million.  This was not disclosed because it would have led to the discovery that $600,000 from Fischel had been routed to the New Jersey Center.  A159, A183.

The day after receiving the December 12, 2013 draft letter to the IRS, attorney Bach informed Marcus Owens at Caplin & Drysdale that Engelberg would not endorse the letter.  A199-200.  Bach urged Owens "to be more forthcoming."

## **ARGUMENT**

The IAS Court properly denied Defendant's pre-answer motion to dismiss pursuant to CPLR §3211(a).  Although Defendants' Notice of Motion did not enumerate any subdivisions of that Section, their briefing cited subsections 3211(a)(3) (lack of standing), 3211(a)(5) (statute of limitations), and 3211(a)(7) (failure to state a claim), as supplemented in part by CPLR 3016(b) (particularity). Defendants have not briefed denial of the branch of their motion to strike allegedly scandalous material, CPLR 3014(b), so that issue has been waived.

The relevant legal standards applied on such motions are well-known.  *See East Hampton Union Free School Dist. v. Sandpebble Bldrs., Inc.*, 66 A.D.3d 122, 125 (2d Dep't 2009), *aff'd*, 16 N.Y.3d 775 (2011) (pleadings are to be afforded a liberal construction); *Kopelowitz & Co. v. Mann*, 83 A.D.3d 793, 797 (2d Dept. 2011) (facts set forth in affidavits and exhibits submitted by non-moving party are also assumed to be true).

## **POINT I**

### **THE IAS COURT PROPERLY HELD THAT PLAINTIFF HAS STANDING TO MAINTAIN THIS ACTION**

The IAS Court denied Defendants' motion under CPLR 3211(a)(3) to dismiss the Complaint due to Plaintiff Engelberg's alleged lack of capacity to bring derivative claims.  On the pleadings and record presented, this result was correct.

## A.     Plaintiff Has Sufficiently Pleaded His Status as a Member and Director of ACCJ to Support His Standing

Defendants' argument is that ACCJ is not a membership corporation and that Engelberg was neither a member nor director of ACCJ when the action was commenced.   Defendants' motion relied on several corporate documents – amendments to the ACCJ Certificate of Incorporation adopted in 1999 and 2005, and amended by-laws from 2007 and 2013 – advanced as conclusive evidence that, although ACCJ was formed in 1996 as a membership corporation under the Not-for-Profit Corporation Law ("N-PCL"), it was transformed into a corporation with no members by amendments to the certificate of incorporation in 1999 and 2005. Defendants allege that subsequent amendments to the by-laws, in 2007 and 2013, "confirm" that ACCJ has not been a membership corporation since 1999. Furthermore, although Defendants acknowledged that Engelberg at one time had been a member of the Board, they asserted that he no longer was a Director when the derivative action was commenced in December 2014.  Accordingly, Defendants argued, Engelberg was not a proper plaintiff and lacked standing to assert derivative claims on behalf of ACCJ under Section 623 of the N-PCL.  A654-61.

Opposing the motion, Plaintiff challenged the validity, legal sufficiency or authenticity of the corporate actions and documents invoked by Defendants.  A781-86.  Plaintiff asserted that ACCJ remained a membership corporation, that he was both a member and director of ACCJ when the action was commenced, and thus was

18

authorized to assert claims pursuant to the several sections of the N-PCL invoked in the Complaint.

The IAS Court did not conduct an evidentiary hearing to resolve which chronicle of the corporation's organizational structure and legal positions was correct as a matter of fact or law (*see* CPLR §3211(c)), nor did Defendants ask the Court do so.  Instead, Defendants exclusively relied on documentary evidence (documents proffered in their motion papers, and exhibits to the Complaint) to "prove" that Engelberg was incorrect, and/or was estopped to claim that ACCJ was a membership corporation and that he was a member or director when the Complaint was filed.  A654-61.

Defendants' argument has no merit.  The documentary evidence they identified as the basis for dismissal did not "utterly refute the plaintiff's factual assertions," "resolve all factual issues as a matter of law" and was not "unambiguous and of undisputed authenticity."  Therefore, it was an insufficient predicate for dismissal at the pleading stage.  *See*, *e.g.*, *M.H. Mandelbaum Orthotic & Prosthetic Services, Inc. v. Werner*, 126 A.D.3d 857, 858 (2d Dep't 2015); *Gould v. Decolator*, 121 A.D.3d 845, 847 (2d Dep't 2014); *Yue Fung USA Enters., Inc. v. Novelty Crystal Corp.*, 105 A.D.3d 840, 841-43 (2d Dep't 2013); *Parekh v. Cain*, 96 A.D.3d 812, 815 (2d Dep't 2012).

Critical issues of material fact and questions of law were disputed but unresolved. For example, the efficacy of the purported Certificates of Amendment of ACCJ's Certificate of Incorporation, stating "there is no membership" (1999 Amendment) and "[t]he corporation has no members" (2005 Amendment), that Defendants tendered as proof ACCJ had been transformed from a membership corporation, was challenged by Plaintiff (A782-83). Under N-PCL §801(e), membership can be terminated only as provided in the bylaws or Certificate of Incorporation. The ACCJ Certificate of Incorporation (A444-48) contained no such mechanism, and while the bylaws permitted withdrawal of membership in writing (A289), there was no such writing, because Engelberg never resigned. A685, ¶10. Likewise, Defendants presented no direct evidence that Engelberg's membership had ceased on account of death, resignation, expulsion, expiration of term, or dissolution or liquidation of ACCJ, as provided in N-PCL §601(e). Furthermore, as Plaintiff's opposition to the motion explained (A783-85), the purported Certificates of Amendment were legally infirm, and thus of no effect, because neither had been authorized by a vote of the majority of members at a meeting (A684-86) (*see* N-PCL §802(a)), and as to the 2005 Amendment, the amendment was not judicially endorsed and was not noticed to the Attorney General as mandated by N-PCL §804(a)(ii). Under the law, therefore, notwithstanding Defendants' protestations, Plaintiff's membership status never changed following the date of incorporation, and

20

there was no competent record of a legally-valid corporate action, post-incorporation, to establish that Engelberg was not a member when the Complaint was filed.

Moreover, Plaintiff questioned the legitimacy and authenticity of certain of the corporate documents presented by Defendants (A686, ¶¶14-16). *See*, *e.g.*, *Sobel v. Ansanelli*, 98 A.D.3d 1020, 1022 (2d Dep't 2012) (invoices submitted were of disputed authenticity); *Yeshiva Chasdei Torah v. Dell Equity, LLC*, 90 A.D.3d 746, 747 (2d Dep't 2011) (alternate versions of mortgage showing two different principal amounts created ambiguity and issue of authenticity); *Parekh v. Cain*, *supra*, 96 A.D.3d at 815.

As illustrated above, the pivotal questions – whether ACCJ continued to be a membership corporation, and, if so, whether one of its members and directors at the time of suit was Engelberg – were sharply contested before the IAS Court. Where, as here, parties submit "conflicting evidentiary submissions" such that "there exists a significant dispute regarding the essential facts which defendants' documentary evidence does not negate beyond substantial question," dismissal based on purported lack of standing is not appropriate. *Out of the Box Promotions L.L.C. v. Koschitzi*, 2007 NY Slip Op 50973(U) (Sup. Ct. Kings Co. 2007) (none of the documentation submitted by defendant "unequivocally establish[ed]" plaintiff was not a member of LLC), *aff'd*, 55 A.D.3d 575 (2d Dep't 2008); *Verdone v. Suffolk Anesthesiology*

21

*Assocs., P.C.*, 85 A.D.3d 1152, 1153 (2d Dep't 2011) (documentary evidence did not conclusively establish plaintiff was not a shareholder); *Levin v. Kitsis*, 82 A.D.3d 1051, 1052 (2d Dep't 2011) (documentary evidence failed conclusively to establish plaintiff lacked standing); *Dean v. Harvestime Tabernacle United Pentecostal Church Intl.*, 79 A.D.2d 793, 795 (2d Dep't 2010); *Fleming v. Kamden Properties, LLC*, 41 A.D.3d 781 (2d Dep't 2007) ("submissions failed to establish … that plaintiff did not possess ownership interest in the subject real property").

The issue of whether plaintiff lacked capacity to maintain this derivative action presents a complex factual dispute. In those circumstances, dismissal pursuant to CPLR 3211(a)(3) was not warranted. *See Brach v. Harmony Services, Inc.*, 93 A.D.3d 748, 750 (2d Dep't 2012); *see also Deutsche Bank Nat'l Trust Co. v. Haller*, 100 A.D.3d 680 (2d Dep't 2012) (denying cross-motions for summary judgment and to dismiss, where questions of fact regarding plaintiff's standing).

### B.  Standing Is Also Proper Based on Special Interest Factors.

Beyond the foregoing ample grounds for rejecting Defendants' challenge to Engelberg's standing, the IAS Court observed *sua sponte* that "when a derivative action is brought on behalf of a charitable corporation," the decision in *Consumers Union of U.S., Inc. v. State*, 5 N.Y.2d 327, 353 (2005), allowed that there are "special interest" factors warranting a court to "relax the usual rules of standing." A6. The IAS Court ruled that "Engelberg's unique interest as a founder of American Center,

and a director at least until the time that the dispute" emerged between Engelberg and the Defendants "as to the future of American Center" was such a special interest factor (A7-8), and accordingly denied the motion.

Defendants protest that the lower court's "special interest" finding was erroneous as a matter of law because it expands the *Consumers Union* doctrine "well beyond its intended application." Ap. Br. 3.[2] This statement is incorrect. The *ratio decidendi* for recognizing "special interest" standing is that, in certain circumstances, the ability to prosecute a derivative claim on behalf of a charitable corporation should not be precluded by rigid adherence to a strict doctrine of capacity to sue. In this case, apart from Plaintiff, there was no disinterested person affiliated with ACCJ to insure fidelity to its founding mission by asserting a derivative action. The other principals – the three individual Defendants – scarcely could be expected to cause ACCJ to pursue derivative claims against themselves.

In these *sui generis* circumstances, and evaluated against a backdrop of the sharp factual controversy concerning ACCJ's status as a membership organization, and Engelberg's role, the decision to allow the derivative action to proceed beyond the pleading stage was wholly justified and correct.

---

[2] References to "Ap. Br. _" are to pages of the Brief for Defendants-Appellants.

## POINT II

## THE IAS COURT PROPERLY HELD THAT JED PERR IS SUBJECT TO LIABILITY AS A *DE FACTO* OFFICER AND FIDUCIARY

Defendants argue that Jed Perr cannot be liable on any cause of action because he was not an "official" director or officer of ACCJ when the action was commenced, or at any other time relevant to the acts, transactions and occurrences that are the subjects of the claims asserted, and he was not a fiduciary of ACCJ.   Ap. Br. 32, 33-34.  Both of these defenses were properly rejected by the IAS Court.

### A.    Allegations of *De Facto* Officer Liability Are a Viable Basis for Claims and Are Well-Pleaded.

Plaintiff does not allege that Jed Perr was an officer *de jure* of ACCJ.  Rather, the Complaint alleges that he was a "*de facto*" officer of ACCJ since the mid-2000's (A14, ¶4), an allegation that must be accepted as true for purposes of a motion to dismiss at the pleading stage.

Defendants argue that the "*de facto* officer doctrine is only applicable to claims involving the public or third parties, not claims" *inter se* "by or within a corporation."  Ap. Br. 31.  As the claims asserted against Jed arise under N-PCL §§714(c), 720(a)(1) and 720(a)(2), which apply to actions against "officers" and "directors" of not-for-profit corporations, and Jed was a *de facto,* not a *de jure*, officer, their argument continues, Jed is not a proper defendant.

Defendants' argument ignores the plain language of the applicable N-PCL provision.  As in effect when this action was filed, N-PCL §720(a) provided:

> "(a) An action may be brought against one or more directors, officers, **or key employees** of a corporation to procure a judgment for the following relief:
>
> (1) To compel the defendant to account for his official conduct in the following cases:
>
>> (A) The neglect of, or failure to perform, or other violation of his duties in the management and disposition of corporate assets committed to his charge.
>>
>> (B) The acquisition by himself, transfer to others, loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties."

(Emphasis added.)

Appellants conveniently overlook the phrase "key employees" in the statutory enumeration of persons against whom a §720(a) claim lies.[3]  In refusing to grant Defendants' motion, the IAS Court recognized that a "key employee" of a not-for-profit corporation is a proper party defendant.  The Court stated (A8):

> "Finally, based on the allegation that defendant Jedidiah Perr is a de facto officer of American Center, the court must give plaintiff the benefit of the favorable inference that Jedidiah is a key employ[ee] of the not-for-profit corporation."

---

[3] When the IAS Court's decision was issued, under N-PCL §102(25), the term "key employee" meant "any person who is in a position to exercise substantial influence over the affairs of the corporation, as referenced in 26 U.S.C. §4958(f)(1(A) and further specified in 26 CFR §53.4958-3(c),(d) and (e)…."  The section of the Internal Revenue Code and the implementing regulation were applicable to Jed Perr as he was a member of the family (*i.e.*, the son) of Rabbi Perr, and Rabbi Perr was a "person ... in a position to exercise substantial influence over the affairs of the corporation."  *See* 26 U.S.C. §4958(f)(1)(A) and (B); 26 C.F.R. §53.4958.3(a)(1) and (b)(1)(v). N-PCL §102(25) was subsequently amended. *See infra*, pp. 28-29.

Defendants disregard this portion of the decision, instead basing their challenge on what they say is a critical distinction in the case law between an action against a *de facto* officer of a corporation when an outsider is the adverse party, and one in which the litigation is purely internal or internecine in character. Ap. Br. 32-33. This supposed distinction, apart from nomenclature or linguistics, is completely without substantive precedential significance in the context of a not-for-profit corporation that is the victim of malfeasance and wrongdoing by an "insider" with fiduciary responsibility to the entity who has violated the duties of loyalty and obedience.

The statutes under which the causes of action asserted against Jed arise, N-PCL sections 720(a)(1) and 717, have been held applicable to a not-for-profit corporation's *de facto* officer. *Schneiderman v. Lower Esopus River Watch*, 2013 NY Slip Op 50965(U) at *24 (Sup. Ct. Ulster Co. 2013) ("[a] *de facto* officer owes the same fiduciary duties to a charity as its named officers"). Other New York courts have held comparable statutes imposing fiduciary duties on corporate officials to apply with equal force both to *de facto* and *de jure* office holders. *See*, *e.g.*, *Tzolis v. Wolff*, 2006 NY Slip Op 50851(U) at *9 (Sup. Ct. N.Y. Co. 2006) (*de facto* manager owed fiduciary duties under Limited Liability Corporation Law section applicable to "managers"), *aff'd*, 39 A.D.3d 138 (1st Dep't 2007), *aff'd*, 10 N.Y.3d 100 (2008).

26

In an effort to bolster the flawed theorem that under New York law whether or not a *de facto* officer can be called to account turns on who – a stranger or an insider – is the adverse party in litigation, Defendants point to four cases: *Trinity Co-op Apts. v. J.S. Bldg. Corp.*, 25 A.D.2d 891 (2d Dep't 1966); *In re General Vision Services*, 2006 WL 687162 (Bankr. S.D.N.Y. 2006), *rearg. den.,* 352 B.R. 25 (Bankr. S.D.N.Y. 2006), *aff'd*, 423 B.R. 790 (S.D.N.Y. 2010); *In re Kollel Mateh Efraim, LLC,* 2011 WL 1629665 (Bankr. S.D.N.Y. 2011); and *Car Park Systems of New York, Inc. v. Ull,* 2014 WL 4652900 (Sup. Ct. N.Y. Co. 2014).  These cases are not instructive, in that they do not concern the internal organization, governance or regularity of operation of a not-for-profit corporation.  Three of the four cases are confined to addressing applicability of the six-year limitations period of CPLR 213(7) to claims alleging that defendants controlled or failed to exercise control over the actual officers and directors of a *for-profit* corporation, an issue of vicarious responsibility.  In stark contrast, the Complaint here alleges that Jed functioned in a manner equivalent to a manager, director or officer.  *See Trinity Co-op Apts.*, *supra* ("the fact that the individual respondents may have controlled the persons who were nominally the officers and directors of plaintiff did not render the 6-year Statute of Limitation . . . applicable to them"); *General Vision Services*, *supra* (CPLR §213(7) did not govern claim that defendants breached their fiduciary duty by negligently failing to monitor and oversee the actions of the Board of Directors); *Car Park*

27

*Systems, supra* ("[i]t has been held that the six (6) year statute of limitations set forth in CPLR 213(7) does not apply to *de facto* officers").[4]

Judicial reluctance exhibited in *Trinity, General Vision* and *Car Park Systems* to allow CPLR 213(7) to be invoked in place of a shorter limitations period for claims against individuals who controlled (or should have controlled) the actual officers or directors, but who were not themselves officers or directors, is inapposite to this case. As the case law supports, the N-PCL applies to a person who, while not holding an official appointment as an officer, nonetheless in practical fact performs a functionally equivalent role. "The use of a charity's assets by a director or officer (titular or *de facto*) for his own personal benefit constitutes a violation of his fiduciary duties." *See Schneiderman*, 2013 NY Slip Op 50965(U) at *24.

Any doubt – and there is none – that within the context of an entity covered by the N-PCL it is of no juridical consequence whether an actor's conduct being scrutinized was performed in a *de jure* or *de facto* role, is completely dispelled in light of amendments to the N-PCL effected by the 2016 Amendment of the Nonprofit Revitalization Act of 2013, Chapter 466 of the Laws of 2016. Among

---

[4] In the fourth case, *In re Kollel Mateh Efraim, LLC,* a bankruptcy Trustee sought to assert a claim against someone who participated in the management and exercised authority on behalf of the Debtor, but who was not a "Manager" as that term was defined in the Limited Liability Corporation Law. The Trustee did not brief the *de facto* manager issue. The Bankruptcy Judge ruled against the Trustee but indicated that the outcome might have been different if the Trustee had presented an argument that the defendant's actions were those of "an agent of the Debtor and owed fiduciary duties in that capacity." 2011 WL 1629665, fn. 10.

other changes is substitution of the phrase "key persons" for "key employees" within

the heading and paragraph (a) of N-PCL §720.  As amended, effective as of May 27,

2017, §720(a) in relevant part now provides:

> "Actions against directors, officers and key persons. (a) An action may be brought against one or more directors, officers or key persons of a corporation to procure the following relief: ..."

N-PCL §102(25), as amended by Chapter 466, defines the term "key person":

> " (25) 'Key person' means any person other than a director or officer, whether or not an employee of the corporation, who (i) has responsibilities, or exercises powers or influence over the corporation as a whole similar to the responsibilities, powers, or influence of directors and officers; (ii) manages the corporation, or a segment of the corporation that represents a substantial portion of the activities, assets, income or expenses of the corporation; or (iii) alone or with others controls or determines a substantial portion of the corporation's capital expenditures or operating budget."

When the factual allegations of the Complaint and other materials submitted

by Plaintiff to the IAS Court are examined and compared with the statutory

definition of "key person" against whom a N-PCL §720(a) claim may be asserted,

the allegations of the derivative claims being prosecuted against Jed Perr and the

"key person" definition are in complete alignment.  It therefore was proper for Jed

Perr to be named as an individual Defendant, and the IAS Court's refusal to dismiss

him from the action was correct.

**B.    Jed Perr Is Also Liable As A Fiduciary, And Plaintiff Has Pleaded This With Particularity.**

Defendants further assert that claims against Jed Perr fail because he was not a fiduciary of ACCJ.  Defendants argue that in order to state a cause of action for breach of fiduciary duty, the proponent must allege, with particularity as required by CPLR §3016(b), (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages caused by the defendant's misconduct, citing *Daly v. Kochanowicz*, 67 A.D.3d 78, 95 (2d Dep't 2009) and *Faith Assembly v. Titledge of N.Y. Abstract, LLC*, 106 A.D.3d 47, 62 (2d Dep't 2013).  Ap. Br. 34-35.

In *Faith Assembly*, fiduciary relationships were defined as follows:

> "A fiduciary relationship 'exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.'"  Such a relationship "may exist where one party reposes confidence in another and reasonably relies on the other's superior expertise or knowledge, but an arms-length business relationship does not give rise to a fiduciary obligation." The core of a fiduciary relationship is "a higher level of trust than normally present in the marketplace between those involved in arm's length business transactions."

106 A.D.3d at 62 (citations omitted).

Judged against these standards and the mandate of CPLR 3016(b), the existence of a fiduciary relationship between Jed Perr and ACCJ is well-pleaded. The allegations of the Complaint and accompanying documentary evidence in the form of emails, letters and memoranda issued by Jed Perr, or received by him, are more than sufficient, for purposes of a motion under CPLR sections 3211 and 3016,

to show that he was entrusted by ACCJ with, and undertook on its behalf, significant operational responsibilities in furtherance of the organizational mission that compelled him to act as a fiduciary.  Such responsibilities included the handling of ACCJ funds (A688, ¶23; A261-62), the supervision of and coordination and correspondence with law firms representing ACCJ claimants (A687-88, ¶21), correspondence and agreements with claimants (A201-212), payment of law firms (A687-88, ¶¶21, 23), distributing funds to claimants and receiving checks from claimants (A688, ¶23; A261-262), and working with retained counsel on providing ACCJ's responses to IRS inquiries (A688, ¶22).  *See supra*, pp. 7-14.  It is beyond cavil that these were core activities and essential responsibilities in carrying out ACCJ's charitable mission and conducting its financial and program activity.  ACCJ reposed a level of confidence and trust in Jed Perr that unquestionably required that he conduct himself in accordance with a higher level of trust than present in ordinary arm's-length transactions.  *See Faith Assembly*, *supra*.

Nor can Jed escape a fiduciary duty by claiming that a snippet of testimony given by Plaintiff in a prior lawsuit against a former attorney creates an "estoppel" such that all of the other well-pleaded facts and circumstances about his actions and status must be ignored.  Defendants cite a mere nine lines of testimony which appear on page 247 of a deposition transcript (A844), without any of the surrounding testimony to provide context.  Ap. Br. 35-36.  This cannot form the basis of an

estoppel.  Judicial estoppel is "applied where a party to an action has secured a judgment in his or her favor by adopting a certain position and then has sought to assume a contrary position in another action simply because his interests have changed." *Anonymous v. Anonymous*, 137 A.D.2d 739, 741 (2d Dep't 1989) (citations omitted).  "The doctrine rests upon the principle that a litigant 'should not be permitted * * * to lead a court to find a fact one way and then contend in another judicial proceeding that the same fact should be found otherwise'".  *Id.* (citations omitted).  Defendants do not even attempt to explain how Plaintiff's testimony was relevant in any way to the prior litigation, much less that it led the other court to make a finding or judgment in his favor.  The cases cited by Defendants are inapposite (Ap. Br. 36).  *Festinger v. Edrich*, 32 A.D.3d 412 (2d Dep't 2006), affirmed a summary judgment where plaintiff's suit against his sister to recover property was inconsistent with his prior claim, at his sentencing in a federal criminal proceeding for fraud, that he had no assets. *Morgenthow & Latham v. Bank of N.Y.*, 305 A.D.2d 74 (1st Dept. 2003), rests on the theory of judicial admission, not estoppel, and was decided under CPLR 3211(a)(1), a provision which Defendants have explicitly disavowed reliance upon in this case, but which requires that the documentary evidence presented conclusively established the defense as a matter of law (*Leon v. Martinez*, 84 N.Y.2d 83, 88 (1994)), which is not the case here. Defendants cannot avoid scrutiny of Jed Perr's conduct by invoking estoppel.

## POINT III

## THE CAUSES OF ACTION ALLEGING IMPROPER TRANSFERS OF MONIES TO THE "NEW JERSEY CENTER," AND THE SUBSEQUENT MISREPRESENTATIONS MADE IN FILINGS WITH THE I.R.S., STATE CLAIMS FOR RELIEF

In the First, Third, Fourth and Fifth causes of action, Plaintiff alleges that Defendants' participation in the transfer of ACCJ funds to the New Jersey Center, and their false statements regarding such transfers, as made to the Internal Revenue Service in an examination, were improper and a breach of fiduciary duty. The First, Third and Fifth Causes of Action are alleged against defendants Eliezer Perr and Jed Perr. The Fourth Cause is alleged against Eliezer Perr and Milton Pollack. The IAS Court properly sustained these claims, and that ruling should be affirmed.

### A. Defendant Jed Perr.

Defendant Jed Perr argues, in one sentence, that the allegations of the Complaint regarding his role in the improper transfers of funds to the New Jersey Center are "conclusory." Ap. Br. 37. This skeletal argument ignores the detailed allegations set forth in the Complaint and its exhibits which describe this scheme and his involvement in it. As detailed *supra*, the Complaint particularizes and documents that Jed Perr knowingly and unlawfully signed the backdated 2007 Agreement; that he diverted or accepted funds owed ACCJ to his own entity, the New Jersey Center; that he jeopardized ACCJ's charitable mission by attempting to mislead claimants into signing agreements designed to increase ACCJ's share of

33

claimant recoveries without proper disclosure; and that he personally participated in

a scheme to conceal from the IRS and Plaintiff the true facts and circumstances of

the unlawful diversion of funds to the New Jersey Center, by stonewalling inquiries

from Plaintiff and ACCJ's tax attorney, and by signing the falsified and backdated

2007 Agreement, for presentation to the IRS as justification for the diversion. These

allegations are not conclusory.

### B. Defendant Eliezer Perr.

In a declaration dated April 13, 2009, under penalty of perjury, Eli Perr stated:

"I have served on the Board of Directors of The American Center for Civil Justice

... since its formation in 1996.   I have at various times served as the President of the

Center, and I currently serve on its Board." A-302.  Now, however, he contends (Ap.

Br.44-45) that, just when the illicit diversions of funds occurred, in the fall of 2009

and January of 2010, he was not a director of ACCJ and therefore owed it no

fiduciary duty.  He points to ACCJ's 2009 Form 990 (A-126), which does not list

him as a director, and to May 9, 2010 Board minutes (A-285-86), which, he argues,

prove by implication that he was not a member of the Board during the previous

period, because he was elected at the meeting to fill a vacancy on the Board.  Ap.

Br. 45.   (He does not attempt to claim that he was not a fiduciary when he

participated in a cover-up of the diversions by submitting false explanations to the

IRS.  A70, ¶¶285-87.)

This 2009 Form 990 is the same filing that omits $2.6 million of revenue from the *Collett* and *Fischel* settlements, diverted to the New Jersey Center.  It identifies Eliezer Perr as an "independent contractor" receiving compensation of $150,000 for "professional services." A456. This is further described as "Fee for services (non-employees)," under item 11a, "Management." (A58).  In other words, Eli Perr was paid $150,000 in the fiscal year ending March 31, 2010, to manage ACCJ.  No doubt his duties and responsibilities included ensuring ACCJ's revenues were collected and accurately reported.  Even taking the Form 990 at face value – that he was not a director, and this fact is contested – Eli Perr undertook in 2009, or more likely never gave up, the responsibilities of a fiduciary.

He also relies on minutes of an ACCJ Board meeting held on May 9, 2010 (A-285-86) (shortly after the diversion of funds).  The minutes attribute to Pollack the statement that Eli Perr, "who has been working tirelessly for the Corporation, deserved the honor and recognition as Chairman of the Board and President/Executive Director."  According to the minutes, Perr was then elected to the Board and as President/Executive Director, and he "would *continue* to receive … $200,000 per annum." A285-86 (emphasis added).  The minutes state that Eli Perr attended as "Secretary," which suggests that he himself prepared the minutes and perhaps was already an officer.

The minutes also indicate that a draft of the 2009 Form 990 was circulated and discussed, follow-up with the accountant was requested, and the Board approved "its filing upon completion."  A286. The Form 990 was filed in August 2010, signed with the name of Milton Pollack.

Authentic or not, the minutes reflect that Eli Perr held dominant power within ACCJ.  He evidently drafted the minutes and was firmly in control of the Form 990. Looking back to the period of the diversions, he was in position to attempt to falsely diminish his responsibility for ACCJ's affairs.

If the May 9, 2010 meeting actually occurred, in discussing the Form 990, Eli Perr was unquestionably subject to a duty to inform the Board that $2.6 million of ACCJ's revenues had gone to his son's New Jersey entity.  If the 2007 Agreement had existed, he had a duty to so inform the Board, and to explain that monies went to the New Jersey Center pursuant to that agreement, even though the agreement's terms were not fully honored.  The minutes are silent on all these points, just as Eli Perr was silent about the 2007 Agreement until 2013, when it became necessary to devise an alibi to explain to the IRS the diversion of millions to his son's entity. Thus the May 2010 minutes impeach the authenticity of the 2007 Board minutes and 2007 Agreement by the absence of any reference to them.  They also further evidence Eli Perr's status as a fiduciary, as well as his breaches of duty.

More simply, it is an absurd notion that Eli Perr, a founder, President at various times, and director of ACCJ from inception to the date of his declaration in April 2009, would go off the Board immediately after signing that declaration, and have no official position, and therefore owe no fiduciary duty to ACCJ, despite being paid $150,000 as an "independent contractor" to manage the affairs of ACCJ; and then, at the close of the fiscal year of the diversions, be lauded and restored to official power and authority as Chairman of the Board, President and Executive Director, now at a salary of $200,000 per year.

Eli Perr also argues that the Fourth Cause of Action should be dismissed on the ground there is no basis for alleging the 2007 Agreement is a fabrication. Ap. Br. 46. The motion record is replete, however, with allegations and exhibits showing the agreement was a fabrication, and Eli Perr's role in using it in a cover-up. *See* A70, ¶285, and discussion *supra*, pp. 12-14.

Perr's argument that the Complaint only shows he "may have miscalculated" the receipts from the *Franqui* litigation (Ap. Br. 46) can be rejected out of hand. As explained in the statement of facts (p. 16, *supra*), Fischel's recovery of $3,000,000 from the *Franqui* case was omitted from the letters to the IRS. A159, A183. This was an obvious exercise in deception to avoid explanation to the IRS that the $600,000 due ACCJ from Fischel was diverted to the New Jersey Center.

The notion that Rabbi Perr, a founding member and director, officer and employee of ACCJ and his son Jed Perr, who by reason of his father was entrusted and functioned as an officer, had nothing to do with the illicit transfers is neither logical nor credible.  No one else had the motive or opportunity to do it.  The particularities as to when and how the transfers were made are for the most part exclusively within the Perrs' knowledge and control.  And while CPLR 3016(b) requires specificity, New York courts have repeatedly held that "where [as here] concrete facts 'are peculiarly within the knowledge of the party charged … it would work a potentially unnecessary injustice to dismiss a case at an early stage where any pleading deficiency might be cured later in the proceeding."  *See Pludeman v. Northern Leasing Sys., Inc.*, 80 N.Y.S.2d 422, 425 (2008) (citations omitted).

### C.  Defendant Milton Pollack.

Defendant Pollack does not deny his role as a Board member.  He asserts that the IAS Court's denial of his motion to dismiss the Fourth Cause of Action should be reversed because removal from the Board should be granted only where a director is guilty of "grave derelictions." Ap. Br. 42.  He asserts that Plaintiff's supporting allegation – that the 2007 Agreement is a post-hoc fabrication and was not properly approved by the Board – is "conclusory."  *Id.*

If proved, Plaintiff's allegations surely would constitute a "grave dereliction" of duty.

Far from "bare allegations", the Complaint devotes over 60 paragraphs to the factual circumstances and documentary evidence supporting the conclusion that Pollack participated knowingly in a scheme to create, backdate, and sign the 2007 Board minutes and 2007 Agreement, and present them to the IRS as a justification for the improper transfers to the New Jersey Center.  A31-45, ¶¶81-144; A70-71, ¶¶284-89.  In light of the Complaint's abundant and specific allegations, which Pollack neglects to analyze, his argument that the Complaint is conclusory should be rejected.

## POINT IV

## THE CAUSES OF ACTION ALLEGING IMPROPER DONATIONS TO OTHER CHARITIES STATE CLAIMS FOR RELIEF

The IAS Court properly sustained the Seventh, Eighth and Ninth causes of action, asserted against all Defendants, for improperly authorizing donations to other charities unrelated to the problem of terrorism.

The Complaint alleges that Defendants breached their fiduciary duties to ACCJ by making donations totaling $837,500 to various Jewish and educational organizations, wholly unrelated to benefitting or assisting victims of terrorism. Plaintiff alleges such donations were *ultra vires* of ACCJ's corporate purposes and that the purported amendments of the corporate charter, which Defendants claimed had broadened the corporate purposes to permit these donations, were not properly authorized.  Plaintiff also alleges that these donations violated the Claimant and

39

Center Agreements.  A61-64, ¶¶218-30.  *See* Seventh Cause of Action (A74-75) (breach of fiduciary duty); Eighth Cause of Action (A76-77) (unlawful transfer); Ninth Cause of Action (A77-78) (removal of officer or director).

The IAS Court held that Plaintiff had adequately alleged that the revisions to the corporate charter, upon which Defendants relied, were not properly authorized; that, due to allegations of bad faith, the business judgment rule could not be invoked to validate the donations; and that these allegations sufficed to support a cause of action for removal from office.  A8.

### A.   Plaintiff Has Adequately Alleged That The Challenged Donations Were Not Authorized By ACCJ's Corporate Charter.

Plaintiff alleges that ACCJ was established to support victims of terrorism, advocate on their behalf and assist them in bringing lawsuits against those responsible.  A18-19, ¶¶19-27.  That is the Center's goal and purpose, and what the ACCJ has been doing for many years.  A19-31, ¶¶28-80.

The original Certificate of Incorporation defines the purpose of the corporation as benefitting and/or assisting victims of terrorism in a myriad of ways. As set forth in that charter (A445):

> THIRD:  The purpose or purposes for which the corporation is formed are as follows:
>
> To create, form and establish a civil rights organization for the benefit of victims of terrorism in the United States and abroad; to promote, foster, increase and advance the civil rights of victims of terrorism; to

40

maintain a network of lawyers, researchers, journalists, investigators and government officials to further the purposes of this corporation; to identify and document terrorist acts committed and/or sponsored by individuals, groups or states; to identify sources, resources and assets of the perpetrators and sponsors of terrorism to advise victims of their rights and methods of addressing compensation for acts of terror; to advocate the passage of legislation that will make it a crime to sponsor, aid and abet terrorists and to promote legislation that will simplify and speed the collection of punitive damages; to encourage interest, awareness and activism in the American and world political arena with reference to the plight of victims of terrorism throughout the world; to initiate and promote civic and political programs beneficial to the victimized people of the world; to hold, conduct and organize meetings, discussions and forums to consider community opinions on issues affecting the health and the economic, educational and social welfare of victims of terrorism throughout the world; to aid, assist, cooperate, co-sponsor, and otherwise engage in concerted action with private and governmental agencies and organizations on all programs designed, calculated and dedicated to the improvement of life for the aforesaid people; *to solicit, collect and otherwise raise money for charitable, eleemosynary and benevolent purposes and to expend such monies for such purposes* and generally to advance the accountability to the victims of terrorists and those who sponsor, aid and abet acts of terror throughout the world. . . . (Emphasis added.)

Defendants take out of context and isolate the italicized text near the end of this detailed statement of purpose ("to solicit, collect and otherwise raise money for charitable, eleemosynary and benevolent purposes and to expend such monies for such purposes ...."). They argue that this clause authoritatively proves that ACCJ was formed to raise and donate money for general charitable purposes. Ap. Br. 38.

41

This argument is flawed.   Immediately preceding that phrase, ACCJ's specific purpose is set forth in detail; and immediately following that phrase, and modifying it, ACCJ's specific purpose is rearticulated: "and generally to advance the accountability to the victims of terrorists and those who sponsor, aid and abet acts of terror throughout the world."

The isolated italicized phrase cannot be said to be the "purpose" of ACCJ, in view of the extensive surrounding language describing a specific purpose.  "[T]he *ejusdem generis* rule of statutory construction requires that, where a general term is preceded by specific phrases which are all of the same nature, the general term must also be limited to matters within that class."  *Lawrence v. Town of East Fishkill*, 167 A.D.2d 447, 448 (2d Dep't 1990).  *See Matter of Alabi v. Community Bd. No. 2*, 17 A.D.3d 459 (2d Dep't 2005) (specific provision in by-laws controls over general provision); *Huen New York, Inc. v. Bd. of Educ. Clinton Cent. Sch. Dist.*, 67 A.D.3d 1337, 1338-39 (4th Dep't 2009) ("specific provisions concerning an issue are controlling over general provisions").

Defendants' citation to N-PCL §202(a)(7) adds nothing.  Ap. Br. 39.  It merely enumerates powers that a not-for-profit corporation may exercise, "subject to any limitations provided in … its certificate of incorporation … in furtherance of its corporate purposes."   This merely returns the argument to the certificate of incorporation.

42

Defendants argue that ACCJ's purpose was made more general in a 2005 Amendment to the corporate charter.  However, as discussed in Point I, *supra*, the IAS Court found that Plaintiff had adequately pleaded that the 2005 Certificate of Amendment was not properly authorized. A8.  Plaintiff alleges that this amendment was not authorized by a majority vote of the members at a meeting as required under the N-PCL, and it added to the stated purposes of the organization without proper approval as required under the N-PCL.  A685-86, ¶14.  The challenged donations, having only a general charitable purpose, were not made in furtherance of ACCJ's corporate purpose of benefitting and/or assisting victims of terrorism.

The donations also were inconsistent with the Claimant and Center Agreements pursuant to which Claimants engaged the ACCJ to assist them in bringing litigation against the culpable state sponsors of terrorism.  A20, ¶32; A83. In exchange for this assistance, claimants pledged a share of any recovery to ACCJ "[i]n further consideration of the ongoing efforts and services of the Center to assist other victims of oppression and deter terrorism, and to promote the Center's ability to carry out its goals and purposes." *Id.*  The challenged donations do not promote the Center's "ability to carry out its goals and purposes" as defined by the certificate of incorporation. *See Alco Gravure Inc. v. Knapp Foundation*, 64 N.Y.2d 458, 462 (1985) (N-PCL section 804, "which permits amendment of the certificate of incorporation …, cannot be construed to authorize an amendment inconsistent with

the purposes for which funds were given to the corporation without compliance with

… quasi-cy pres principles").

### B. The Business Judgment Rule Does Not Foreclose Inquiry Into the Donations.

Defendants assert (Ap. Br. 39-40) that the business judgment rule bars any

judicial inquiry into these donations absent bad faith or interestedness (*i.e.,* a direct

financial benefit in the transaction).

The business judgment doctrine "bars judicial inquiry into actions of

corporate directors taken in good faith and in the exercise of honest judgment in the

lawful and legitimate furtherance of corporate purpose." *Auerbach v. Bennett*, 47

N.Y.2d 619, 629 (1979).  The "business judgment rule does not foreclose inquiry

by the courts into the disinterested independence" of those making decisions and

shields them "only if they possess a disinterested independence and do not stand in

the dual relation which prevents an unprejudicial exercise of judgment." *Id.* at 631.

A "complaint may not be dismissed for failure to state a cause of action solely upon

the application of the business judgment rule" where there has been "a prima facie

showing of a lack of such disinterested independence or such dual relation."  *S.H.

and Helen R. Scheuer Family Found. v. 61 Assocs.*, 179 A.D.2d 65, 70 (1st Dep't

1992).

Here, not only did the Perrs have a conflict of interest, as most of the

donations were to Yeshivas to which they had personal ties, Plaintiff alleges that

they financially benefitted from some of the transactions as the donations paid tuition for Rabbi Perr's grandchildren.  A62, ¶¶223-226.  This is "precisely the type of dual interest and potential for self-interest which would create an exception to the shield provided by the business judgment rule …." *Scheuer Family Found.*, *supra*, 179 A.D.2d at 70.

Defendant Pollack argues that the only allegation against him concerning donations is that he approved a $100,000 donation to Mesila International at a May 20, 2013 board meeting.  He argues that, according to the minutes (A560), Plaintiff exited before the Mesila donation came up for consideration.  From this, Pollack argues that Plaintiff waived his claims concerning this donation.  Pollack cites no authority for this proposition.  Further, Plaintiff is suing derivatively on behalf of ACCJ; no argument is made that ACCJ waived such claim.  Pollack also fails to mention that Plaintiff exited the meeting only when Defendant Eli Perr objected to the participation of Plaintiff's attorney and secured a vote of the Board disallowing his participation.  A560.

Pollack's argument is incorrect in the further respect that the Mesila donation is not the only one charged specifically against him.  The Complaint also charges Pollack with approving the donation of $250,000 to the National Society of Hebrew Day Schools (A74, ¶322; A76, ¶336; A77, ¶347), according to the minutes of a September 1, 2013 meeting (A591).

Defendant Jed Perr argues that these causes of action should have been dismissed as against him as well, because nothing in the Complaint connects him to the donations.   This argument ignores that at least some of the unauthorized donations were directed to recipients controlled by or for the benefit of Rabbi and Jed Perr's close relatives.   Moreover, beyond putting Jed on clear notice of the transactions as to which the exercise of his fiduciary obligations is being questioned, within the broad framework of the allegations of the Complaint, particularly that Defendants actively concealed considerable information from Engelberg despite his inquires, "concrete facts" as to the improper donations "are peculiarly within the knowledge" of the Defendants.   At the early pleading stage, it would have been an "unnecessary injustice to have dismissed th[ese] cause[s] of action" as to Jed "where any pleading deficiency might be cured later." *See Pludeman v. Northern Leasing Systems, supra,* 10 N.Y.2d at 491-92.   This is especially true in this case considering the fulsome description of Jed Perr's active personal participation in the scheme of misconduct set forth in the Complaint.   Indeed, even if Jed Perr did not himself directly cause or personally ratify making the contributions, the wrongful acts of his co-defendants in furtherance of the scheme are sufficient to plead his liability.   *See Nederlandsche Handel-Maatschappij N.V. v. Schreiber*, 17 A.D.2d 783 (1st Dep't 1962).

### C.      The Donations Were in Breach of Defendants' Fiduciary Duty of Obedience.

Beyond "bad faith" or "interestedness" in a transaction, directors of a not-for-profit corporation owe an additional and distinct fiduciary duty.  Unlike for-profit corporations, directors of non-profits "are charged with the duty to ensure that the mission of the charitable corporation is carried out" and owe a "duty of obedience."  *Matter of Manhattan Eye Ear & Throat Hospital*, 186 Misc.2d 126, 152 (Sup. Ct. N.Y. Co. 1999).  This duty "requires the director of a not-for profit to 'be faithful to the purposes of the organization', since '[u]nlike business corporations, whose ultimate objective is to make money, nonprofit corporations are defined by their specific objectives: perpetuation of particular activities are central to the *raison d'etre* of the organization.'" *Id.* (citation omitted). Thus, while a Board's decision might be prudent from a business perspective, in certain cases, the "duty of obedience … mandates that a Board, *in the first instance*, seek to preserve its original mission." *Id.* (emphasis added).  Donations to religious and educational causes of personal choice, rather than to carry out the mission of ACCJ to benefit and assist victims of terrorism, is a fundamental breach of this duty of obedience.

## POINT V

## THE CAUSES OF ACTION CONCERNING JED PERR'S FOR-PROFIT ENTITY CALLED "ARC" STATE CLAIMS FOR RELIEF

The IAS Court properly sustained two causes of action against Defendant Jed Perr for diversion of corporate opportunity.

The Complaint alleges that ACCJ proposed to a group of lawyers and law firms representing claimants unrelated to ACCJ that they join forces in pursuing an Iranian asset in the U.K.  A45-46, ¶146.  Plaintiff alleges that Jed Perr usurped this corporate opportunity by forming ARC (a for-profit LLC of which he was the sole member) to handle this effort, and that in doing so, Jed misrepresented that ARC had a relationship with ACCJ and was already assisting with collections for ACCJ claimants.  A46, ¶¶147-150.  Plaintiff alleges that this breach of duty to ACCJ, which constituted self-dealing, gives rise to a claim for restitution against Jed (Second Cause of Action, A67-68) and his removal as an officer of ACCJ (Sixth Cause of Action, A73-74).

The IAS Court denied Defendants' motion to dismiss these two causes of action for failure to state a claim, holding that the diversion of a financial opportunity can cause harm to a not-for-profit corporation just as it can for a business corporation.  A7.

As in the IAS Court, on appeal Defendants attack these causes of action on several grounds, none of which is persuasive.  Ap. Br. 40-41.  First, Defendants

argue that Plaintiff is "estopped" from claiming that Jed was a fiduciary of ACCJ, citing Plaintiff's deposition testimony in 2012. This "estoppel" argument has been refuted above (*see supra* at 31-31). The Complaint more than sufficiently pleads facts supporting the IAS Court's conclusion that Jed was a fiduciary of ACCJ.

Next, Defendants argue that Plaintiff has not sufficiently alleged that Jed's misconduct caused any damages to ACCJ, citing *Daly v. Kochanowicz*, *supra*, 67 A.D.3d at 95. Ap. Br. 40. In that case, the purchaser of a house alleged that the defendants engaged in a scheme to conceal evidence of water damage. It was held that since "plaintiff acknowledges that she was aware of evidence of water intrusion in the basement of the subject property, the complaint fails to allege 'damages that were directly caused by the defendant's misconduct.'" *Id.* at. 96-97 (citation omitted). This case does not stand for the proposition that detailed allegations of damages are required where, as here, the circumstances constituting the misconduct are within a defendant's exclusive knowledge and control. *See Lanzi v. Brooks*, 43 N.Y.2d 778, 780 (1977) (CPLR 3016(b) "is not to be interpreted so strictly as to prevent an otherwise valid cause of action in situations where it may be 'impossible to state in detail the circumstances constituting a fraud'"); *Foley v. D'Agostino*, 21 A.D.2d 60, 68 (1st Dep't 1964) ("the statements in the pleading, viewed with reason and liberality, are 'sufficiently particular' to give the defendants notice of the plaintiffs' claims . . . and of the elements of plaintiffs' alleged cause of action").

Defendants further argue that an officer is not precluded from participating in a similar business unless he "cripples or injures the corporation", citing *Howard v. Carr*, 222 A.D.2d 843, 845 (3d Dep't 1995).  *Howard* holds only that where conduct does cripple or injure the corporation, it is impermissible, not that such conduct is a prerequisite for such a claim.  This is not a case where an officer is "acting in good faith" by participating in a "similar business" *(see Bertoni v. Catucci*, 117 A.D.2d 892 (3d Dep't 1986)).  Jed Perr set up a private company and sought to divert ACCJ business to it.  This is a fundamental breach of the duty of good faith and loyalty. *See Han Young v. Chiu*, 49 A.D.3d 535 (2d Dep't 2008) (defendant "diverted a corporate opportunity in breach of fiduciary duty as an officer . . . by secretly establishing a competing entity and acquiring the property at issue ... in which the [corporation] had a 'tangible expectancy'"); *Daydov v. Zhuk*, 23 Misc.3d 1129(A) (Sup. Ct. Kings Co. 2009) (operation of a competing business by shareholder); *American Baptist Churches of Metropolitan N.Y. v. Galloway*, 271 A.D.2d 92 (2000) ("the goal of a not-for-profit is to make money that can be spent on furthering its social welfare objectives ... [and it] suffer[s] an injury when a fiduciary's misconduct frustrates these goals").

Finally, Defendants brazenly argue (Ap. Br. 41) that Plaintiff actually consented to the arrangement with ARC, citing an October 2012 e-mail with attachments (A845-864), put into the motion record as an exhibit to a reply affidavit

of ACCJ's General Counsel, Neal Sher (A814-15).  The e-mail is equivocal at best;

it does not establish Plaintiff's approval of any arrangement.

## POINT VI

### THE IAS COURT PROPERLY HELD THAT
### THERE IS NO TIME-BAR TO THE CAUSES OF
### ACTION INVOLVING THE "2007 AGREEMENT"

Defendants also moved to dismiss the First, Third and Fifth causes of action

pursuant to CPLR 3211(a)(5), relying on the six-year statute of limitations.

Defendants' fifth "question presented" is whether the IAS Court erred "when it held

that Plaintiff's causes of action involving the 2007 Agreement between ACCJ and

the New Jersey Center (the '2007 Agreement') are not time-barred" (Ap. Br. 6).

As discussed above, based on the improper transfer of funds to the New Jersey

Center, Plaintiff alleges, against Defendants Eliezer and Jed Perr, claims for breach

of fiduciary duty, seeking restitution, damages and an accounting (first cause of

action); to set aside the unlawful conveyance, assignment or transfer (third cause);

and for their removal as an officer or director of the corporation (fifth cause).  The

relief sought is essentially equitable in nature.

In the IAS Court, Defendants argued that these claims were time-barred under

a six-year statute because they accrued in April 2007, when the alleged agreement

was made between ACCJ and the New Jersey Center.  (The action was commenced

on December 29, 2014.)  The IAS Court rejected this argument and applied the

"fiduciary tolling" rule, under which a limitations period for breach of fiduciary duty

"does not begin to run until the fiduciary has openly repudiated his or her obligation

or the relationship has otherwise been terminated." *People v. Ben*, 55 A.D.3d 1306,

1308 (4th Dep't 2008); *Westchester Religious Inst. v. Kamerman*, 262 A.D.2d 131

(1st Dep't 1999).  The IAS Court found that there was no showing that ACCJ had

repudiated its right to these monies within the six years preceding commencement.

This holding was correct and it should be affirmed.  As stated in *Morris v.

Gianelli*, 71 A.D.3d 965, 967 (2d Dept. 2010) (citations omitted):

> "To dismiss a cause of action pursuant to CPLR 3211(a)(5), on
> the ground that it is barred by the Statute of Limitations, a
> defendant bears the initial burden of establishing prima facie that
> the time in which to sue has expired".  In addition, upon a motion
> to dismiss a complaint pursuant to CPLR 3211, a court must take
> the allegations in the complaint as true and resolve all inferences
> in favor of the plaintiff.

A six-year period of limitations applies to actions "by or on behalf of a

corporation against a present or former director, officer or stockholder for an

accounting . . . or to recover damages for waste or for an injury to property or for an

accounting in conjunction therewith."  CPLR 213(7).  *See*, *e.g.*, *Toscano v. Toscano*,

285 A.D.2d 590 (2d Dep't 2001).

In addition, New York courts apply the "catch-all" six-year limitation period

of CPLR §213(1) to claims of breach of fiduciary duty in which the relief sought is

equitable in nature.  *Loengard v. Santa Fe Industries, Inc.*, 70 N.Y.2d 262 (1987)

(applying six-year statute where "the relief demanded in the complaint ... is equitable in nature …"); *Loeuis v. Grushin*, 126 A.D.3d 761, 764 (2d Dep't 2015).  This is not a case in which the equitable remedies are "incidental" to the action, as in *IDT Corp. v. Morgan Stanley*, 12 N.Y.3d 132, 139-40 (2009) (three-year statute applied where remedy sought for breach of fiduciary duty was "purely monetary").  Equitable remedies are the essence of this action.

Furthermore, the commencement of the action on December 29, 2014, was timely even without reliance on the fiduciary tolling doctrine.  ACCJ and its charitable beneficiaries were injured when the improper transfers took place, starting in September 2009, not when the disputed April 2007 Agreement was made.  *Loeuis v. Grushin*, *supra* (six-year statute for fiduciary duty claims began to run not when deed was executed in 2003, but when property was actually conveyed in 2006); *Guthartz v. Goldrick*, 19 Misc.3d 861 (Sup. Ct. Nassau Co. 2008) (cause of action for breach of fiduciary duty accrued when corporation experienced damage).

The alleged entry into the 2007 Agreement also cannot be accepted, on a motion to dismiss, as the time of accrual, given Plaintiff's allegations that the agreement was fabricated after the fact to justify improper transfers.  Plaintiff only learned of the transfers in 2012 during a deposition in the *Ambush* case.  A34, ¶94.  He then spent a year making inquiries as to the reason for the transfers, was stonewalled, and finally received a copy of the sham agreement in 2013 as the

purported justification.    A34-38, ¶¶94-112.    These well-pleaded allegations foreclose the conclusion, on a pre-answer motion, that the alleged date of entry into the controverted agreement marks the accrual date.  A pre-answer motion based on documentary evidence fails unless it "conclusively establishes a defense to the asserted claims as a matter of law." *Leon v. Martinez*, *supra* at 88.  *See Sotomayor v. Medifast, Inc.*, 28 A.D.3d 309 (1st Dep't 2006) (document of questionable authenticity "should not have been relied upon in dismissing" causes of action); *Erbe v. Lincoln Rochester Trust Co.*, 13 A.D.2d 211 (4th Dep't 1961) (fiduciary cannot take advantage of the limitations statute through statements of false facts or concealment of true facts).

Although the fiduciary tolling doctrine is not essential to uphold denial of the motion, that doctrine, relied upon by the IAS Court, also justifies rejection of the time-bar defense.  In opposing the application of that doctrine, Defendants first argue that neither Eli nor Jed Perr has been shown to be a fiduciary of ACCJ at any relevant time, such that the tolling doctrine is not applicable.  As shown above, Plaintiff has sufficiently pleaded such fiduciary relationships.

Defendants next argue that if the fiduciary tolling doctrine applies, their "open repudiation" of duty occurred on April 12, 2007, the alleged date of the disputed agreement.  Defendants state that this "transfer, far from being concealed, was set forth in ACCJ's books and records in April 2007."  Ap. Br. 50.  But this entry into

the disputed agreement was not a *present* "transfer" – it was an assignment of *future* contingent recoveries.   Moreover, there is no support in the record, and none is cited, for the claim that this transaction was "set forth" in the Company's books and records in 2007.  And critically, as discussed above, Plaintiff alleges that he only learned of the transfers in 2012 and did not receive a copy of the sham agreement until 2013.  A34-38, ¶¶94-112.  Thus, the alleged entry into the disputed 2007 Agreement, which was not disclosed to Plaintiff for years, does not establish Defendants' "open repudiation" of their fiduciary duties in 2007. "The dispositive issue is whether the repudiation was clear and made known to plaintiff." *Evangelista v. Mattone*, 44 A.D.2d 704, 705 (2d Dep't 2007).

April 12, 2007 is the only date offered by Defendants that would fix accrual beyond the six-year statutory period.  Defendants further argue, however, for the first time on appeal, that a three-year period should be applied to the claims against Defendant Jed Perr, citing *Car Park Sys. of N.Y. v. Ull*, *supra*.  That case discusses the issue in a footnote, citing *In re General Vision Services, Inc.*, 352 Bky. Rptr. 25 (Bankr. S.D.N.Y. 2006), for the proposition that CPLR 213(7) should not be applied to fiduciary duty claims seeking money damages against a *de facto* officer. As discussed above (*see* pp. 27-28, *supra*), these cases are not instructive regarding claims of malfeasance by the management of a not-for-profit charity.  *See Schneiderman*, 2013 NY Slip Op 50965(U) at *24 ("[t]he use of a charity's assets

by a director or officer (titular or *de facto*) for his own personal benefit constitutes a violation of his fiduciary duties").  As noted above, the six-year catch-all provision of CPLR 213(1) applies in any event to fiduciary duty claims seeking equitable relief.

Even if the three-year statute is applied, the action was timely filed. Defendants argue that Jed Perr's "open repudiation" of his duties occurred either (1) in August 2010, when ACCJ filed its 2009 Form 990, in which it failed to reflect the income diverted to the New Jersey Center, or (2) in April 2011, when the New Jersey Center filed its 2009 Form 990, in which it recorded receipt of the payments. Defendants cite no authority for the proposition, and it makes no sense, that the mere filing of such a document creates a presumption that anyone has read it or should be estopped to deny knowledge of its contents.  Plaintiff has specifically alleged that he was unaware of these transfers until 2012.  A34, ¶94.  Moreover, these tax filings fail to disclose the critical facts at issue and therefore do not constitute a "clear repudiation" of fiduciary duties.  There is no mention in ACCJ's 2009 Form 990 that any amounts were assigned or transferred to the New Jersey Center.  The New Jersey Center's 2009 Form 990 merely reflects a lump sum of income, categorized as "Contributions and grants", without detail or explanation as to their source.  There is nothing indicating that these monies were received by virtue of an assignment from ACCJ.  These documents do not constitute full disclosure and cannot be used

as an accrual date under the fiduciary tolling doctrine, even under a three-year statute.

## POINT VII

## PLAINTIFF PROPERLY STATED A
## CAUSE OF ACTION FOR AN ACCOUNTING

Although the IAS Court did not separately discuss this branch of Defendants' motion in its Order, the court properly denied Defendants' motion to dismiss the tenth cause of action, for an accounting.

"The right to an accounting is premised upon the existence of a confidential or fiduciary relationship and a breach of the duty imposed by that relationship respecting property in which the party seeking the accounting has an interest." *Palazzo v. Palazzo*, 121 A.D.2d 261, 265 (1st Dep't 1986). As shown above, the Complaint sufficiently alleges breaches of fiduciary duty by the Defendants, including improper diversion and use of charitable assets and opportunities over a period of years. An accounting remedy is essential and is well suited to the circumstances of this case.

Defendants' reliance on *Roslyn Union Free School Dist. v. Barkan*, 16 N.Y.3d 643 (2011), is misplaced. In that case, the court dismissed a cause of action for an accounting where there were no allegations that the defendant, a school board member, had received any stolen monies or possessed any relevant documentary proof that the plaintiff had not acquired, and where "the State Comptroller was able

57

to trace countless financial transactions in order to determine how the vast bulk of the stolen monies was used and the identity of the individuals who received the funds ….” *Id.* at 653.   By contrast, Plaintiff, who has been frozen out of ACCJ, seeks derivative relief on its behalf from the wrongdoers who have diverted and misapplied funds, in a manner which has largely been concealed from view, and who remain in control of the entity and its records.   As in *Palazzo v. Palazzo*, *supra*, Plaintiff “has ... repeatedly requested information concerning [the funds] obtained by [the] defendant *[sic]* ... [and] such information has not been supplied” and “the sums derived from [the transfers] have been deposited into accounts which [defendant] alone controls…”   Absent an accounting, it will likely be impossible to “determine how the vast bulk of the stolen monies was used and the identity of the individuals who received the funds” (*Roslyn*, *supra*). At the pleading stage, Plaintiff’s allegations are more than sufficient.

58

## CONCLUSION

The IAS Court properly denied the motion to dismiss and its Order should be

affirmed, with costs to the Plaintiff-Respondent.

Dated:  New York, New York
       June 8, 2017

                       LIVINGSTON HOWE LLP

                       By: _____

                         David D. Howe
                         Jeffrey E. Livingston
                         Ira H. Block
                  747 Third Avenue, 20th Floor
                  New York, New York 10017
                  (212) 986-7887

                  *Attorneys for Plaintiff-Respondent*