**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Timothy P. Neumann, Esq. [TN6429]
Broege, Neumann, Fischer & Shaver, LLC
25 Abe Voorhees Drive
Manasquan, New Jersey 08736
Tel.: (732) 223-8484
Email: timothy.neumann25@gmail.com

*Attorneys for Debtor/Debtor-in-Possession*
*American Center for Civil Justice, Inc.*

| | |
|---|---|
| In Re<br><br>**AMERICAN CENTER FOR CIVIL JUSTICE, INC.,**<br><br>    Debtor. | CHAPTER 11<br><br>CASE NO.: 18-15691/CMG<br><br>Judge: Hon. Christine M. Gravelle |

**DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY
CODE DESCRIBING CHAPTER 11 PLAN PROPOSED BY
THE AMERICAN CENTER FOR CIVIL JUSTICE, INC.**

**PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY. THIS FIRST
MODIFIED DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY
BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THIS PLAN OF
LIQUIDATION. THE PLAN PROPONENT BELIEVES THAT THIS PLAN OF
LIQUIDATION IS IN THE BEST INTEREST OF THE CREDITORS AND THAT THE
PLAN IS FAIR AND EQUITABLE. THE PROPONENT URGES THAT THE VOTER
ACCEPT THE PLAN.**

THE AMERICAN CENTER FOR CIVIL JUSTICE, INC.

___/s/  Neal Sher_____
        NEAL SHER, Secretary/General Counsel

DATED:  September 24, 2018

# TABLE OF CONTENTS

                                                                                    **Page**

I. INTRODUCTION ............................................................................................................4
A. Purpose of this Document ...........................................................................................4
B. Confirmation Procedures ............................................................................................5
1. Persons Potentially Eligible to Vote on the Plan ......................................................5
2. Time and Place of the Confirmation Hearing ...........................................................6
3. Deadline for Voting For or Against the Plan ............................................................6
4. Deadline for Objecting to the Confirmation of the Plan ..........................................7
5. Identity of Person to Contact for More Information Regarding the Plan ..................7
C. Disclaimer ...................................................................................................................7
II. **BACKGROUND** ........................................................................................................7
A. Description and History of the Debtor's Business ......................................................7
B. Principals/Affiliates of Debtor's Business .................................................................8
C. Management of the Debtor Before and After the Bankruptcy ....................................9
D. Events Leading to Chapter 11 Filing .........................................................................9
E. Significant Events During the Bankruptcy ...............................................................16
1. Bankruptcy Proceedings ..........................................................................................16
2. Other Legal Proceedings .........................................................................................21
3. Actual and Projected Recovery of Preferential or Fraudulent Transfers ...............21
4. Current and Historical Financial Conditions ..........................................................21
III. **SUMMARY OF THE PLAN** ...............................................................................22
A. What Creditors and Interest Holders Will Receive Under the Proposed Plan .........22
B. Unclassified Claims ..................................................................................................22
1. Administrative Expenses and Fees ..........................................................................22
2. Priority Tax Claims ..................................................................................................24
C. Classified Claims and Interests ................................................................................24
1. Classes of Secured Claims .......................................................................................25
2. Classes of Priority Non-Tax Claims ........................................................................25
3. Class of General Unsecured Claims .........................................................................26
D. Means of Effectuating the Plan ................................................................................28
1. Funding for the Plan .................................................................................................28
2. Merger…………………………………………………………………………………29
3. Post-Confirmation Management ...............................................................................29
5. Disbursing Agent ......................................................................................................17
E. Other Provisions of the Plan .....................................................................................33
1. Executory Contracts and Unexpired Leases .............................................................33
2. Changes in Rates Subject to Regulatory Commission Approval ..............................34
3. Retention of Jurisdiction ...........................................................................................34
4. Procedures for Resolving Contested Claims .............................................................34
5. Effective Date ............................................................................................................35
6. Modification ..............................................................................................................35
F. Tax Consequences of Plan .........................................................................................35
G. Risk Factors ...............................................................................................................37
IV. **CONFIRMATION REQUIREMENTS AND PROCEDURES** .............................37

A. Who May Vote or Object ............................................................................ 38

1. Who May Object to Confirmation of the Plan ....................................... 38

2. Who May Vote to Accept/Reject the Plan ............................................. 38

a. What Is an Allowed Claim/Interest ...................................................... 38

b. What Is an Impaired Claim/Interest ..................................................... 39

3. Who Is Not Entitled to Vote .................................................................. 39

4. Who Can Vote in More Than One Class ............................................... 39

5. Votes Necessary to Confirm the Plan ................................................... 40

6. Votes Necessary for a Class to Accept the Plan ................................... 40

7. Treatment of Nonaccepting Classes ...................................................... 40

8. Request for Confirmation Despite Nonacceptance by Impaired Class(es) ............................. 40

B. Liquidation Analysis ............................................................................... 41

C. Feasibility .............................................................................................. 42

**V. EFFECT OF CONFIRMATION OF PLAN** ........................................ 44

A. Discharge ............................................................................................... 44

B. Revesting of Property in the Debtor ...................................................... 44

C. Modification of Plan ............................................................................... 44

D. Post-Confirmation Conversion/Dismissal ............................................. 44

# I.
# INTRODUCTION

American Center for Civil Justice, Inc., a New York Corporation, (hereinafter referred to as the "Debtor") is the debtor in a Chapter 11 bankruptcy case. On March 23, 2018 (the "**Petition Date**").  the Debtor commenced a bankruptcy case by filing a voluntary Chapter 11 petition under the United States Bankruptcy Code ("Code"), 11 U.S.C. §101, *et seq*. Chapter 11 of the Code allows the Debtor, and under some circumstances, creditors and other parties in interest, to propose a plan of reorganization ("**Plan**"). The Plan may provide for the Debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both. The Debtor is the party proposing the Plan sent to you in the same envelope as this document. THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE PLAN WHICH IS ANNEXED HERETO AS EXHIBIT A. THE PLAN CONTAINS A LIST OF DEFINITIONS WHICH ARE HEREBY INCORPORATED BY REFERENCE. FAMILIARIZE YOURSELF WITH THOSE DEFINITIONS BEFORE READING THIS DISCLOSURE STATEMENT. This is a plan of reorganization that provides for the payment of creditors from the future revenues of the Debtor. The Effective Date of the proposed Plan is 30 days after entry of an Order of the Bankruptcy Court confirming the Plan.

**A. Purpose of This Document.** This Disclosure Statement summarizes what is in the Plan and tells you certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether or not to confirm the Plan. **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT: (1) WHO CAN VOTE OR OBJECT; (2) THE PROPOSED TREATMENT OF YOUR CLAIM (i.e., what your claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOU WOULD RECEIVE IN LIQUIDATION;  (3) THE HISTORY OF THE DEBTOR AND**

**SIGNIFICANT EVENTS DURING THE BANKRUPTCY; (4) WHAT THE BANKRUPTCY COURT WILL CONSIDER WHEN DECIDING WHETHER TO CONFIRM THE PLAN; (5) THE EFFECT OF CONFIRMATION; AND (6) THE FEASIBILITY OF THE PLAN.**

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how this Plan will affect you and what is the best course of action for you. Be sure to read the Plan as well as the Disclosure Statement. If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern. Code Section 1125 requires a Disclosure Statement to contain "adequate information" concerning the Plan. The term "adequate information" is defined in Code Section 1125(a) as "information of a kind, and in sufficient detail," about a Debtor and its operations "that would enable a hypothetical reasonable investor typical of holders of claims or interests" of the debtor to make an informed judgment about accepting or rejecting the Plan. The Bankruptcy Court ("Court") has determined that the information contained in this Disclosure Statement is adequate, and it has approved this document in accordance with Code Section 1124. This Disclosure Statement is provided to each creditor whose claim has been scheduled by the Debtor or who has filed a proof of claim against the Debtor. Under the Bankruptcy Code, your acceptance of the Plan may not be solicited unless you receive a copy of this Disclosure Statement prior to or concurrently with such solicitation.

**B. Confirmation Procedures**

**1. Persons Potentially Eligible to Vote on the Plan.**

In determining acceptance of the Plan, votes will only be counted if submitted by a creditor whose claim is duly scheduled by the Debtor as undisputed, non-contingent and unliquidated, or

who, prior to the deadline for filing claims ("Bar Date" see § IV, A, 2, a. below), has filed with the Bankruptcy Court a proof of claim which has not been disallowed or suspended prior to computation of the votes on the Plan. All shareholders, partners or members, if any, of record as of the date of approval of this Disclosure Statement may vote on the Plan. The Ballot Form that you received does not constitute a proof of claim. If you are uncertain whether your claim has been correctly scheduled, you should check the Debtor's Schedules, which are on file at the office of the Clerk of the Bankruptcy Court located at: United States Bankruptcy Court, Clarkson S. Fisher US Courthouse, United States Bankruptcy Court, 402 East State Street, Trenton, New Jersey 08608. The Clerk of the Bankruptcy Court will not provide this information by telephone. THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.

**2. Time and Place of the Confirmation Hearing**

The hearing at which the Bankruptcy Court will determine whether to confirm the Plan will take place on                                     , at                         {A.M./P.M.}, in the Courtroom of the Honorable Christine M. Gravelle, U.S.B.J., Courtroom 3, Clarkson S. Fisher US Courthouse, United States Bankruptcy Court, 402 East State Street, Trenton, New Jersey 08608.

**3. Deadline for Voting For or Against the Plan**

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot in the enclosed envelope to the Office of the Clerk, United States Bankruptcy

Court, 402 East State Street, Trenton, New Jersey 08608. Your ballot must be received by

2018 **or** it will not be counted.

**4. Deadline for Objecting to the Confirmation of the Plan**

Objections to the confirmation of the Plan must be filed with the Bankruptcy Court and

served by upon the following:

> TIMOTHY P. NEUMANN, ESQ.
> Broege, Neumann, Fischer & Shaver, LLC
> 25 Abe Voorhees Drive
> Manasquan, New Jersey 08736
> (732) 223-8484 (ext. 214)
> Timothy.neumann25@gmail.com

**4. Identity of Person to Contact for More Information Regarding the Plan**

Any interested party desiring further information about the Plan should contact Timothy P.

Neumann, Esq., at the above address, phone number or email address.

**C. Disclaimer**

The financial data relied upon in formulating the Plan is based on the books and records of

the Debtor. The information contained in this Disclosure Statement is provided by the Debtor. The

Plan Proponent represents that everything stated in the Disclosure Statement is true to the

Proponent's best knowledge. **PLEASE NOTE THAT THE APPROVAL OF THIS**

**DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT**

**CONSTITUTE A RULING ON THE MERITS, FEASIBILITY OR DESIRABILITY OF**

**THE PLAN.**

## II.
## BACKGROUND

A.  **Description and History of the Debtor's Business.**

The Debtor locates and assists the victims and their families of state-sponsored terrorism in pursuing claims for civil damages against governments and their agents that have perpetrated or aided and abetted terrorism. It enters into agreements with these individuals in which the Debtor undertakes to retain counsel at the expense of the Debtor to pursue civil recoveries. The individual agrees, in the event of a successful recovery, to reimburse the Debtor its outlay and to donate a percentage of the victim's net recovery to the Debtor.

Michael Engelberg and Eliezer Perr founded the Debtor's predecessor organization, The Raoul Wallenberg Center for Civil Justice, Inc., on November 26, 1996. On January 20, 2005, Raoul Wallenberg Center changed its name to The American Center for Civil Justice, Inc. At the same time, the certificate of incorporation was amended to provide that the corporation was organized for "charitable, religious, and educational purposes," and to permit "distributions to such organizations and those that are committed to perpetuate the causes of civil liberties, civil justice, religious freedom and tolerance as guaranteed by the U.S. Constitution, and those that qualify as exempt organizations under § 501 of the Internal Revenue Code...."

B. **Principals/Affiliates of the Debtor.** The Debtor, although a corporation, has no shareholders. The following individual are members of the board of directors of the Debtor: Eliezer Perr, Milton Pollack.

The New Jersey Center for Civil Justice, Religious Liberty & Tolerance, Inc. is a New Jersey nonprofit corporation. The president of ACCJ-RLT is Jed Per who is the son of Eliezer Perr. In 2007, the Debtor and ACCJ-RLT entered into an agreement (the "2007 Agreement") pursuant to which ACCJ-RLY undertook to endeavor to collect a judgment that had been recovered by

Claimants and agreed to share the donations that would be paid by Claimants upon recovery of compensation. The 2007 Agreement was amended in 2013.  The validity of the 2007 Agreement is disputed by Michael Engelberg, and the Diana Campuzano, Avi Elishis and Gregg Salzman (the "Campuzano Claimants"). The report of Bederson & Company, LLC dated September 19, 2018 provides an analysis of the 2017 Agreement and is annexed hereto as Exhibit B.

**C. Management of the Debtor Before and After the Bankruptcy.** The Debtor's management before and during the bankruptcy proceeding consisted of:  Eliezer Perr, president; Neal Sher, secretary/ general counsel; and Harris Tannenbaum, treasurer/ controller.

**D. Events Leading to Chapter 11 Filing.** The Debtor filed Chapter 11 because it had been sued in New York by the Campuzano Claimants who alleged that the Debtor had failed to protect their right to participate in the distribution of a fund that was created from money (the "Clearstream Account") seized from the Islamic Republic of Iran ("Iran"). The Campuzano Claimants were endeavoring to seize the Debtor's interest in the Clearstream Account, which in the opinion of Debtor's management, should be utilized to benefit all creditors and not just the Campuzano Claimants. The details are as follows:

1.  The Campuzano Claimants sued the Debtor and others in litigation (the "Campuzano New York Action") pending in the Supreme Court of the State of New York, Nassau County, Index No. 605379/2016.

2.  The Debtor disputed the allegations of the complaint and filed an answer to the amended complaint

3.  The Campuzano Claimants were victims of a terror attack at the Ben Yehuda Street pedestrian mall in downtown Jerusalem on September 4, 1997. Three terrorists from the Iran-sponsored Hamas terror organization wearing explosives simultaneously blew themselves up.

4.   The Debtor assisted the Campuzano Claimants in suing Iran in *Campuzano v. Islamic Rep. of Iran*, No. 00-cv-2328 (D.D.C) (the "D.C. Case"), seeking to recover for their damages against Iran, which was alleged to have sponsored the terror attack.

5.   On September 10, 2003, the court in the DC Case entered judgment for compensatory damages in the amount of $10 million for Salzman, $12,010,882.87 for Elishis, and $18,952,725 for Campuzano. *Campuzano*, 281 F. Supp. 2d at 274-75, totaling $40,963,607.80 collectively. The case was tried in the D.C. District Court together with another case brought by another group of victims (the "Rubin Plaintiffs") of the same terror attack, *Rubin v. Islamic Rep. of Iran,* 01-cv-1655 (D.D.C.). <u>*See Campuzano,*</u> 281 F. Supp. 2d at 258. While the Rubin Plaintiffs and Defendants were separately represented, the cases were tried and decided simultaneously, resulting in a single opinion, *Campuzano v. Islamic Rep. of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003). (MTD at p. 2-3).

**The *Heiser* Case**

6.   The Debtor also assisted 67 plaintiffs (the "Heiser Plaintiffs") in a case called *Heiser v. Islamic Rep. of Iran*, Nos. 00-2329 and 01-2104 (D.D.C.) (the "Heiser Case"). The Heiser Case was brought on behalf of the family members and estates of 17 United States service members killed in a June 25, 1996, terrorist attack on the Khobar Towers residence on a U.S. military base in Saudi Arabia. *Estate of Heiser v Islamic Rep. of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006).

7.   The Heiser Case culminated on December 22, 2006 when judgment was entered in favor of the all the Heiser Plaintiffs in the amount of $254,431,903. (*Heiser*, 00-cv-2039, Dkt. 134 (D.D.C.)), which was then supplemented with an additional judgment, granting judgment for categories of damages that had not previously been supported by sufficient evidence,

totaling $36,658,063 (*Heiser*, 00-cv-2039, Dkt. 135 (D.D.C.)). Thus, the total modified

judgment was $291,090,166. The Heiser Plaintiffs recovered $150 million.

**The *Peterson* Case**

8.  Another group of plaintiffs (the "Peterson Plaintiffs"), comprised of the 241 deceased service

members and injured survivors of the October 23, 1983 suicide bombing attack of a Marine

barracks in Beirut, Lebanon, had also filed an action against Iran. That action was *Peterson*

*v. Islamic Rep. of Iran,* 01-2094 and 01-2684 (D.D.C.) (the "Peterson Case"). Due to the

large number of plaintiffs, the judgment in the Peterson Case (the "Peterson Judgment"),

entered September 7, 2007, collectively totaled $2,656,944,877.

9.  The Peterson Judgment was registered in the Southern District of New York and writs of

garnishment were served on banks and financial institutions, including Citibank, which

held an account referred to as the "Clearstream Account," which held over $1.8 billion. The

Peterson Plaintiffs moved to execute their judgment against those assets.

10. Citibank then filed an interpleader action naming as parties all holders of judgments against

Iran who had moved to intervene in the Peterson Case, who had served writs of execution

against Citibank, or who had served a *lis pendens* on Citibank with respect to Iranian assets.

(*Peterson*, 10-cv-4518, Dkt. 38 (S.D.N.Y.)). Among those named as parties to the

interpleader complaint were the Heiser Plaintiffs and the Rubin Plaintiffs—but not the The

Campuzano Claimants. As to the Heiser Plaintiffs, Citibank's interpleader complaint

alleged:

> Upon information and belief, Third-Party Respondents the Estate of
> Michael Heiser (the "Heiser Judgment Creditors") were plaintiffs in an
> action entitled *Estate of Heiser v. Islamic Republic of Iran, et al.,* Civil
> Action Nos. 00-02329 and 01-02104 (RCL) (D. D.C.), who were awarded
> damages totaling $254,431,903 based on a judgment entered by default

against Iran and other defendants. The Heiser Judgment Creditors served a writ of garnishment (in Maryland) and writs of execution upon Citibank with respect to the Iranian Entities on or about September 1, 2010, January 3, 2011[,] and January 26, 2011, respectively. On or about April 13, 2010 they moved to intervene in the Miscellaneous Action. That motion is *sub judice*. Upon information and belief, on or about March 8, 2011, the Heiser Judgment Creditors commenced a turnover action against Clearstream with respect to the Restrained Assets, which turnover action is duplicative of Plaintiffs' Turnover Proceeding.

11. As to the Rubin Plaintiffs, Citibank's interpleader complaint alleged:

Upon information and belief, Third-Party Respondents Jenny Rubin, Deborah Rubin, Daniel Miller, Abraham Mendelson, Stuart E. Hersh, Renay Frym. Noam Rozenman, Elena Rozenman and Tzvi Rosenman (the "Rubin Judgment Creditors") were plaintiffs in an action entitled *Rubin et al. v. Islamic Republic of Iran, et al.,* Civil Action No. 01-1655 (RCL) (D.D.C.), who were awarded damages totaling approximately $71.5 million based on a judgment entered by default against Iran and other defendants. The Rubin Judgment Creditors delivered a writ of execution to the U.S. Marshall for service upon Citibank with respect to Iranian Entities on or about October 10, 2008.

12. On June 1, 2012, a settlement agreement was executed in the Peterson Case that resulted in the Clearstream Account being divided among the various judgment creditors of Iran who were part of the Peterson Case in amounts prorated corresponding to their judgment amounts. The Heiser Plaintiffs collectively received 7.773% of the Clearstream Account under that agreement. The Peterson settlement agreement was signed on behalf of the Heiser Plaintiffs by Michael Engelberg "as Attorney in Fact on behalf of the Heiser Plaintiffs and for the American Center for Civil Justice, a New York Nonprofit Corporation." Neal Sher also signed as "General Counsel for the American Center for Civil Justice, A New York Nonprofit Corporation and on Behalf of Agent."

13. Summary judgment was granted in favor of the plaintiffs in the Peterson Case (*Peterson v. Islamic Rep. of Iran*, 2013 WL 1155576 (S.D.N.Y. Mar. 13, 2013)), which was affirmed by the Second Circuit Court of Appeals, *Peterson v. Islamic Rep. of Iran*, 758 F.3d 185 (2d Cir. 2014), and by the United States Supreme Court, *sub nom Bank Markazi v. Peterson*, 136 S. Ct. 1310 (2016).

14. In the Campuzano New York Action, the Campuzano Claimants allege that, had the Debtor filed a writ of execution or *lis pendens* on their behalf, the Campuzano Claimants would have been included in the Peterson Case from inception, like the Rubin Plaintiffs and the Heiser Plaintiffs. The Campuzano Claimants allege that they then would have participated in the distribution of the Clearstream Account *pro rata* just like the Rubin and Heiser Plaintiffs did. Campuzano Claimants allege that all Debtor had to do was serve writs of garnishment but was negligent in failing to do so. The Debtor disputes these allegations.

15. The judge presiding over the Peterson Case in the Southern District of New York, the Hon. Katherine Forrest, pursuant to 26 USCS § 468B, appointed a retired federal judge, Hon. Stanley Sporkin, as Trustee to manage the Clearstream Account while the litigation was pending, and to distribute the proceeds after conclusion of the litigation. Correspondence from the Judge Sporkin's counsel dated October 14, 2016 states that the portion of the Clearstream assets that has been made available for distribution and was allocated to the Heiser Plaintiffs under the parties' settlement agreement was $135,078,329.09. Of that amount, 15% or $20,261,749.36 was allocated to the legal fees of DLA Piper, and of the remainder 20% or $22,963,315.95 was allocated to the Debtor as its donation from the Heiser Plaintiffs pursuant to Claimant and Center Agreements they had signed with the Debtor. Trustee Sporkin's counsel states that the Heiser Plaintiffs' money and DLA Piper's money

would be distributed, and the Debtor's money would he held pending the disposition of the

Campuzano New York Action or "a court of competent jurisdiction has entered an

appropriate final order, which is not subject to any appeal or challenge." It also stated:

> The Trustee makes no representations on the validity, merit, or enforceability of
> any of claims asserted in the Campuzano matter or any of the agreements between
> the ACCJ, the Heiser Plaintiffs, or any other party. The Trustee will simply reserve
> and withhold payment of said funds until the appropriate time that they may be
> distributed to the proper party.

16. In a subsequent letter dated July 28, 2017, the Trustee's counsel informed the Debtor that an

additional $3,966,903.76 had become available to the Heiser Plaintiffs, and as a result an

additional $674,373.64 was being held back on account of the Debtor's 20% share. The

additional sum brought the total amount being held by Trustee Sporkin to $23,637,689.59

plus interest (the "Peterson/Clearstream Share")

**Campuzano New York Action**

17. In 2016, Campuzano Claimants initiated the Campuzano New York Action against the

Debtor, Dr. Michael Engelberg, and Neal Sher, Esq. There was already an action pending in

that court brought by Dr. Engelberg against Debtor and its other principals alleging corporate

malfeasance and demanding an accounting, *Engelberg v. Perr,* No. 606919/2014 (Sup.

Ct., Nassau Cty.) ("Engelberg Derivative Action"). Plaintiff filed an answer contesting the

allegations made by Engelberg and counterclaiming against him. Both cases were assigned

to the same judge, Hon. Stephen Bucaria. The Campuzano New York Action was originally

commenced only on behalf of Campuzano. Elishis and Salzman originally sued in federal

court, but that action was dismissed for lack of diversity jurisdiction, whereupon they were

added as plaintiffs in the Campuzano New York Action.

18. Shortly after commencing the Campuzano New York Action, Campuzano requested an order
    of attachment to secure her interests.

19. By order dated September 29, 2016, the New York Supreme Court granted Campuzano's
    motion for an order of attachment but held that the sovereign immunity of the United States
    mandated that, "no garnishment or other process…may be directed to Trustee Sporkin.". It
    also directed that the order of attachment state in bold type that the order "may not be served
    upon Stanley Sporkin, trustee, or upon any other federal officer o[r] employee."

20. By this point Elishis and Salzman had been added to the case.

21. Formal orders of attachment, one for Diana Campuzano and one for Avi Elishis and Gregg
    Salzman, collectively the "Attachment Orders") were entered on November 22, 2016. The
    top of these orders, as required by the New York state court, declare:

    > THIS ORDER OF ATTACHMENT MAY NOT BE SERVED UPON
    > STANLEY SPORKIN, TRUSTEE, OR UPON ANY OTHER FEDERAL
    > OFFICER OR EMPLOYEE.

    The orders expressly direct the sheriff to "attach property of [Debtor] at any time before final
    judgment, by *levy upon any interest* of the [Debtor] in the debt owed to the defendant [from
    the *Peterson* distribution]."

22. The Attachment Order for Diana Campuzano provides: "[T]he amount to be secured by this
    order of attachment, including any interest, costs, and sheriff's fees and expenses [,] shall be
    $9,512,860. Similarly, the Attachment Order for Avi Elishis and Gregg Salzman provides
    that $6,019,115 shall be secured for Elishis and $5,012,765 shall be secured for Salzman.

23. Both Attachment Orders were delivered to the Sheriff of the City of New York on February
    8, 2017. The Sheriff served both Attachment Orders on Debtor by serving Debtor's counsel
    in the Campuzano New York Action on March 6, 2017. The levies the Sheriff served state

that the Sheriff's office levies and attaches "all property in your possession or custody...which you can assign or transfer, whether it consists of a present or future right or interest and whether or not it is vested...."

24. Neither Attachment Order was served on Stanley Sporkin.

25. The Chapter 11 was filed in order to defeat the efforts of the Campuzano Claimants to seize the Debtor's interest in the funds held by Stanley Sporkin and the Debtor has filed an adversary complaint against the Campuzano Claimants requesting that the Court declare that they held no lien against that Paterson/Clearstream Share, or that in the alternative, any lien that they might have held can be avoided pursuant to section 544(a) of the Bankruptcy Code.

**E. Significant Events During the Bankruptcy**

**1.    Bankruptcy Proceedings.** The following table is extracted from the docket of the Court and depicts the significant events which have occurred during the Chapter 1 case.

| Filing Date | Docket Entry # | Docket Text |
|---|---|---|
| 03/23/2018 | 1 | Chapter 11 Voluntary Petition Filed by Timothy P. Neumann on behalf of American Center for Civil Justice, Inc. |
| 04/05/2018 | 15 | Motion to Extend Time to File Missing Schedules |
| 04/11/2018 | 18 | Objection to Application to Extend Time to File Missing Documents filed by Robert J. Tolchin, Mark Politan on behalf of Diana Campuzano, Avi Elishis, Gregg Salzman. |
| 04/17/2018 | 26 | Adversary case 18-01195. Complaint by American Center for Civil Justice, Inc. against Diana Campuzano, Gregg Salzman and Avi Elishis challenging extent, priority and validity of lien in Clearstream/Peterson Fund |

| | | |
|---|---|---|
| 04/20/2018 | 28 | Application for Retention of Professional Broege, Neumann, Fischer & Shaver, LLC as counsel for American Center for Civil Justice, Inc. |
| 04/23/2018 | 29 | Motion for Relief from Stay to continue prepetition state court litigation filed by Robert J. Tolchin, Mark Politan on behalf of Diana Campuzano, Avi Elishis, Gregg Salzman. |
| 04/26/2018 | 33 | Objection to Application for Retention of Broege, Neumann, Fischer & Shaver, LLC filed by Robert J. Tolchin, Mark Politan on behalf of Diana Campuzano, Avi Elishis, Gregg Salzman. |
| 05/08/2018 | 43 | Motion to Appoint Trustee Filed by Mark Politan, Robert J. Tolchin on behalf of Diana Campuzano, Avi Elishis, Gregg Salzman. |
| 05/16/2018 | 47 | Order Granting Application to Employ Broege, Neumann, Fischer & Shaver, LLC |
| 05/18/2018 | 52 | Monthly Operating Report for Filing Period April, 2018 filed by Timothy P. Neumann on behalf of American Center for Civil Justice, Inc. |
| 05/22/2018 | 56 | Motion to Appoint Trustee Filed by Joshua Ambush. |
| 05/28/2018 | 66 | Motion to Assume to Assume Executory Stipulation of Settlement of Prepetition Litigation Filed by Timothy P. Neumann on behalf of American Center for Civil Justice, Inc. |
| 06/06/2018 | 79 | Motion to Modify Claims and Reduce Claims and Expunge Claims and Object to Claims of American Center for Civil Justice, Religious Liberty, and Tolerance, Inc., Filed by Mark Politan, Robert J. Tolchin on behalf of Diana Campuzano, Avi Elishis, Gregg Salzman. |
| 06/11/2018 | 85 | Monthly Operating Report for Filing Period March/April 2018 |
| 06/12/2018 | 86 | Adversary case 18-01273. Complaint by American Center for Civil Justice, Inc. against Joshua Ambush to enforce prepetition settlement agreement and expunge claim |
| 06/20/2018 | 93 | Monthly Operating Report for Filing Period May, 2018 |

| 06/29/2018 | 100 | Application for Retention of Professional Bederson & Company, LLP as Forensic Accountant and Expert Witness |
| 06/29/2018 | 101 | Joint Order Scheduling Pretrial Proceedings and Trial of Motion for Appointment of Chapter 11 Trustee. |
| 07/02/2018 | 103 | Motion for Relief from Stay re: Setoff Against Cash Filed by Robert E. Nies on behalf of Law Office of Paul Gaston. |
| 07/03/2018 | 107 | Application for Retention of Professional Lourdes I. Morera Ledn as Special Counsel for Debtor |
| 07/03/2018 | 109 | Objection to Application for Retention of Professional Bederson & Company, LLP as Forensic Accountant and Expert Witness filed by Mark Politan, Robert J. Tolchin on behalf of Diana Campuzano, Avi Elishis, Gregg Salzman. |
| 07/03/2018 | 110 | Objection to Application for Retention of Professional Lourdes I. Morera Ledn as Special Counsel filed by Mark Politan, Robert J. Tolchin on behalf of Diana Campuzano, Avi Elishis, Gregg Salzman. |
| 07/06/2018 | 112 | Motion re: Strike Cert. of No Opposition Filed by William S. Katchen on behalf of American Center for Civil Justice Religious Liberty & Tolerance, Inc. |
| 07/08/2018 | 114 | Objection to Motion for Relief from Stay re: Setoff Against Cash on behalf of Law Office of Paul Gaston filed by Mark Politan, Robert J. Tolchin on behalf of Diana Campuzano, Avi Elishis, Gregg Salzman. |
| 07/09/2018 | 116 | Order Granting Limited Relief from Automatic Stay To Diana Campuzano, Avi Elishis And Gregg Salzman |
| 07/20/2018 | 126 | Monthly Operating Report for Filing Period June, 2018 |
| 07/23/2018 | 127 | Order Regarding Salary of Eliezer Perr. |
| 07/24/2018 | 131 | Supplemental Certification of Lourdes I. Morera Ledn in support of Application for Retention |
| 07/24/2018 | 132 | Verified Response to Objection to Claim of American Center for Civil Justice, Religious Liberty & Tolerance filed by |

| | | William S. Katchen on behalf of American Center for Civil Justice Religious Liberty & Tolerance, Inc. |
|---|---|---|
| 08/01/2018 | 162 | Order Granting Paul Gaston Relief from the Automatic Stay, 11 U.S.C. § 362, For Cause and Authorizing Setoff, Pursuant To U.S.C. § 553(A) of Mutual Debts; |
| 08/08/2018 | 167 | Motion to Expunge Claims and Object To Claims of Gerald Welch Filed by Timothy P. Neumann on behalf of American Center for Civil Justice, Inc. |
| 08/08/2018 | 168 | Motion to Expunge Claims and Object To Claims of Estate of Betty Ann Welch Filed by Timothy P. Neumann on behalf of American Center for Civil Justice, Inc. |
| 08/13/2018 | 171 | Motion to Expunge Claims and Object To Claims of Chad P. Holland Filed by Timothy P. Neumann on behalf of American Center for Civil Justice, Inc. |
| 08/13/2018 | 172 | Motion to Expunge Claims and Object To Claims of Donna M. Holland Filed by Timothy P. Neumann on behalf of American Center for Civil Justice, Inc. |
| 08/13/2018 | 173 | Motion to Expunge Claims and Object To Claims of James R. Holland Filed by Timothy P. Neumann on behalf of American Center for Civil Justice, Inc. |
| 08/13/2018 | 174 | Motion to Expunge Claims and Object To Claims of Michael Welch Filed by Timothy P. Neumann on behalf of American Center for Civil Justice, Inc. |
| 08/13/2018 | 175 | Motion to Expunge Claims and Object To Claims of Joyce Louis Leydet Brewer Filed by Timothy P. Neumann on behalf of American Center for Civil Justice, Inc. |
| 08/13/2018 | 176 | Motion to Expunge Claims and Object To Claims of Richard Paul Brewer Filed by Timothy P. Neumann on behalf of American Center for Civil Justice, Inc. |
| 08/14/2018 | 180 | Motion to Expunge Claims and Object To Claims of Richard Paul Brewer Filed by Timothy P. Neumann on behalf of American Center for Civil Justice, Inc. |

| | | |
|---|---|---|
| 08/15/2018 | 182 | Motion for entry of an Order authorizing the Debtor to reimburse Eliezer Perr for the over-collection of payroll taxes arising from his refunding prepetition salary Filed by Timothy P. Neumann on behalf of American Center for Civil Justice, Inc. |
| 08/20/2018 | 204 | Monthly Operating Report for Filing Period July, 2018 |
| 08/21/2018 | 205 | Motion to Consolidate cases: 18-15691 and 18-26095 filed by William S. Katchen on behalf of American Center for Civil Justice Religious Liberty & Tolerance, Inc.. |
| 08/22/2018 | 207 | Objection to the Debtors Application to Procedurally Consolidate Cases 18-15691 and 18-26095 filed by Jeffrey M. Sponder on behalf of U.S. Trustee. |
| 08/22/2018 | 208 | Withdrawal of Motion to Assume Settlement Agreement of Engelberg Derivative Action filed by Timothy P. Neumann on behalf of Debtor |
| 08/23/2018 | 209 | Consent Order Expanding Scope Of Stay Relief  regarding prepetition litigation brought by Diana Campuzano, Avi Elishis And Gregg Salzman to allow post summary judgment motion and appeals |
| 08/23/2018 | 211 | Order Granting Application to Employ Professional Bederson & Company, LLP as forensic accountant and expert witness |
| 08/23/2018 | 212 | Order Granting Application to Employ Professional Lourdes I. Morera Ledon as Special Litigation Counsel |
| 08/24/2018 | 213 | Order Denying Motion to Consolidate Cases: 18-15691 and 18-26095 |
| 08/30/2018 | 223 | Scheduling Order setting schedule for filing plan |
| 09/17/2018 | 229 | Order expunging claim of Chad P. Holland |
| 09/17/2018 | 230 | Order Expunging Claim of  Donna M. Holland |

| 09/17/2018 | 231 | Order expunging claim of James R. Holland |
| 09/17/2018 | 232 | Order authorizing Debtor to reimburse Eliezer Perr for over-collected payroll taxes |

**2. Other Legal Proceedings.**

(a) The Debtor was a party defendant in the following litigation that was pending on the Petition Date: the Campuzano New York Action; the Engelberg Derivative Litigation.

(b) The Debtor filed the following adversary proceedings in the Bankruptcy Court:

   1) the Campuzano Adversary Proceeding – the Debtor has filed a motion for summary judgment which is currently pending;

   2) the Ambush Adversary Proceeding – Ambush has filed a motion to dismiss which is currently pending.

**3. Actual and Projected Recovery of Preferential or Fraudulent Transfers.** The Debtor does not contemplate initiating any actions to recover fraudulent conveyance and preferences.

**4. Current and Historical Financial Conditions.** The post-petition operations of the Debtor are as reflected on the Interim Financial Reports filed by the Debtor on a monthly basis with the Clerk of the United States Bankruptcy Court and the office of the United States Trustee for the District of New Jersey. The Interim Financial Reports are available for inspection and review at either the office of the Clerk of the United States Bankruptcy Court, 402 East State Street, Trenton, New Jersey 08607 or the office of the United States Trustee for the District of New Jersey, 1 Newark Center, Suite 2100, Newark, New Jersey 07102, as well as, the office of the attorneys for the Debtor. A copy of the Debtor's most recent monthly report to the U.S. Trustee is annexed hereto as Exhibit C. The schedules filed by the Debtor, as amended, indicate assets and liabilities as set

forth on Exhibit D. Creditors are entitled to file proofs of claim which supersede the information

in the Debtor's schedules unless the Court determines that the claim that was filed is invalid or

excessive and should be reduced. Eighteen claims were filed. A copy of the Claims Register which

lists the filed claims is annexed hereto as Exhibit E.

### III.
### SUMMARY OF THE PLAN

**A. What Creditors and Interest Holders Will Receive Under the Proposed Plan.** The Plan

classifies claims and interests in various classes. The Plan states whether each class of claims or

interests is impaired or unimpaired. The Plan provides the treatment each class will receive.

**B. Unclassified Claims.** Certain types of claims are not placed into voting classes. They are not

considered impaired and they do not vote on the Plan because they are automatically entitled to

specific treatment provided for them in the Bankruptcy Code. As such, the Proponent has not

placed the following claims in a class:

1. **Administrative Expenses and Fees.**  Administrative expenses are claims for fees, costs

   or expenses of administering the Debtor's Chapter 11 case which are allowed under Code

   Section 507(a)(1), including all professional compensation requests pursuant to Sections

   330 and 331 of the Code. The Code requires that all administrative expenses including fees

   payable to the Bankruptcy Court and the Office of the United States Trustee which were

   incurred during the pendency of the case must be paid on the Effective Date of the Plan

   unless a particular claimant agrees to a different treatment. The following chart lists all of

   the Debtor's unpaid administrative fees and expenses ("Compensation"), an estimate of

   future professional fees and other administrative claims and fees and their treatment under

   the Plan:

| Name | Claim For | Treatment | Estimated Amount |
|------|-----------|-----------|------------------|
| Clerk's Office | Fees | Paid in full on Effective Date | To be supplied |
| Office of U.S. Trustee | Quarterly Fees | Paid in full on Effective Date | To be supplied |
| Broege, Neumann, Fischer & Shaver, LLC | Legal Fees (estimated) | Paid in full on Effective Date | undetermined |

**Bankruptcy Court Approval of Professional Compensation Required:** Pursuant to the Bankruptcy Code, the Bankruptcy Court must rule on all professional compensation and expenses listed in this chart before the compensation and expenses will be owed. The professional in question must file and serve a properly noticed fee application for compensation and reimbursement of expenses and the Bankruptcy Court must rule on the application. Only the amount of compensation and reimbursement of expenses allowed by the Bankruptcy Court will be owed and required to be paid under this Plan as an administrative claim. Each professional person who asserts a further administrative claim that accrues before the confirmation date shall file with the Bankruptcy Court, and serve on all parties required to receive notice, an application for compensation and reimbursement of expenses no later than ninety (90) days after Confirmation. Failure to file such an application timely shall result in the professional person's claim being forever barred and discharged. Each and every other person asserting an administrative claim shall be entitled to file a motion for allowance of the asserted administrative claim within ninety days of the Effective Date of the Plan, or such administrative claim shall be deemed forever barred and discharged. No motion or application is required to fix the fees payable to the Clerk's Office or Office of the United States Trustee. Such fees are determined by statute. As indicated above, the Debtor will need to pay the administrative claims and fees on the

Effective Date of the Plan unless a claimant has agreed to be paid later or the Bankruptcy

Court has not yet ruled on the claim. Applications for compensation and reimbursement of

expenses accrued after Confirmation shall be made pursuant to the Administrative Fee

Order entered on June 26, 2018 [DE 94]

2. **Priority Tax Claims.** Priority tax claims are certain unsecured income, employment and

other taxes described by Code Section 507(a)(8). The Code requires that each holder of

such a Section 507(a)(8) priority tax claim receive on account of such claim regular

installment payments in cash—

> (i) of a total value, as of the effective date of the plan, equal to the allowed
>
> amount of such claim;
>
> (ii) over a period ending not later than 5 years after the date of the order for relief
>
> under section 301, 302, or 303 of the Bankruptcy Code; and
>
> (iii) in a manner not less favorable than the most favored nonpriority unsecured
>
> claim provided for by the plan (other than cash payments made to a class of
>
> creditors under section 1122 (b) of the Bankruptcy Code).

The following chart lists all of the Debtor' Section 507(a)(8) priority tax claims and their

treatment under the Plan:

| DESCRIPTION | AMOUNT OWED | TREATMENT |
|---|---|---|
| Internal Revenue Service | 0.00 | NOT APPLICABLE |
| State of New Jersey Division of Taxation | NO CLAIMS FILED | NOT APPLICABLE |

## C. CLASSIFIED CLAIMS AND INTERESTS.

1. **Classes of Secured Claims.** Secured claims are claims secured by liens on property of the estate. The following represent all classes containing Debtor's secured pre-petition claims and their treatment under this Plan:

| CLASS # | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|----------------|----------------|-----------|
| 1 | Claims of Diana Campuzano, Avi Elishis and Gregg Salzman | NO | YES | The Claims of the creditors in this Class are disputed as to their validity, amount and whether they are secured or unsecured. The Claims in this Class shall be allowed in the amount, if any, as determined by entry of a Final Orders in the New York Campuzano Action and in the Bankruptcy Court, and as secured or unsecured as determined by entry of a Final Order in the Campuzano Adversary Proceeding. The Class 1 Claims, as finally determined by entry of Final Orders, to the extent they are Allowed Claims, shall be paid as follows: (a) to the extent of any Allowed Secured Claim, payment in full upon receipt by the Debtor of the Peterson/Clearstream Share; and (b) to the extent of any Allowed Unsecured Claim, payment pro rata with the Allowed Claims in Class 3. |

2. **Classes of Priority Non-Tax Claims.** Certain priority non-tax claims that are referred to in Code Sections 507(a)(3), (4), (5), (6), and (7) are entitled to priority treatment. These claims are to be treated as follows:

| CLASS# | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| None | | | |

3. **Classes of General Unsecured Claims.** General unsecured claims are unsecured claims not

entitled to priority under Code Section 507(a). These claims are to be treated as follows:

| CLASS# | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 2 | Unsecured Claims of professionals who are not insiders and who provided Prepetition services to the Debtor.  This Class includes: Weinreb Law Firm, PLLC; Cullen Dykman, LLP; Diamond Reporting; Dinsmore & Shohl LLP; Koffsky Schwalb, LLC; Loeb & Loeb, LLP; Lourdes L. Morena Ledon; Professor Dan Sarooshi; Professor Roy D. Simon;  Tory's LLP; Weinreb Law Firm, PLLC | NO | YES | A.  The holders of Allowed Claims in this Class shall be paid on the Effective Date the lesser of:<br><br>  (a) the full amount of their Allowed Claim; or<br><br>(b) their pro rata share of the Peterson/Clearstream Share which remains after payment to Class 1 Creditors of the amount, if any, finally determined to be Allowed Secured Claims held by the Class 1 Creditors.<br><br>B.   In addition, the Claims in this Class shall be paid 25% of the Debtor's Postpetition Net Revenues, payable within 30 days after the due date of the Debtor's Form 990 federal returns. Payments shall be made annually only if the Debtor has Net Revenues in any given year.<br><br>C.   In addition, if in its sole discretion, the Debtor |

| | | | | |
|---|---|---|---|---|
| | | | | decides to pursue a claim against DLA Piper, the Allowed Claims in this Class shall be paid pro rata from the net proceeds after litigation costs of the DLA Litigation, which will be split 50% to the Holders of Claims in Class 2 and Class 3, and 50% to the Debtor.<br><br>D.  No Claim shall be paid more that the full amount of the Allowed Claim. |
| 3 | Claims of all other unsecured creditors not separately classified in a different Class. | NO | YES | A.  The holders of Allowed Claims in this Class shall be paid on the Effective Date the lesser of:<br><br>(a) the full amount of their Allowed Claim; or<br><br>(b) their pro rata share of the Peterson/Clearstream Share which remains after payment to Class 1 Creditors of the amount, if any, finally determined to be Allowed Secured Claims held by the Class 1 Creditors.<br><br>In addition, the Claims in this Class shall be paid 25% of the Debtor's Postpetition Net Revenues, payable within 30 days after the due date of the Debtor's Form 990 federal returns. Payments shall be made annually only if the Debtor has Net Revenues in any given year. |

| | | | | C. In addition, if in its sole discretion, the Debtor decides to pursue a claim against DLA Piper, the Allowed Claims in this Class shall be paid pro rata from the net proceeds after litigation costs of the DLA Litigation, which will be split 50% to the Holders of Claims in Class 2 and Class 3, and 50% to the Debtor.<br><br>D. No Claim shall be paid more that the full amount of the Claim and amounts received by creditors from third parties shall be credited against each Claim. |
|---|---|---|---|---|
| 4 | Claims of Insiders (Eliezer Perr, Neal Sher) | YES | YES | Allowed Claims in this Class shall be paid in full but only after all other Allowed Claims in other classes have been paid in full, at such times and amounts as is determined by the board of directors of the Reorganized Debtor. |

### D. **MEANS OF EFFECTUATING THE PLAN.**

1.      **Funding for the Plan**. Creditors will be paid from the proceeds of the Peterson/Clearstream Share, the proceeds of the DLA Litigation if the Debtor decides to pursue it, and the Debtor's Postpetition Net Revenues. The Debtor will retain counsel to pursue the claims against DLA Piper for malpractice and indemnification if it determines that the pursuit of the DLA Litigation would be beneficial.

2.    **Merger**. The Debtor shall merge with the New Jersey Center for Civil Justice, Religious Liberty & Tolerance, a New Jersey corporation ("ACCJ-RLT") (the "Merger") and a new corporation ("NEWCO" until the entity is formed) formed pursuant to the New Jersey Nonprofit Corporation Act. (N.J.S.A. 15A:1-1 *et seq*.). NEWCO shall be the surviving entity and the Debtor and ACCJ-RLT shall be dissolved promptly after the merger.  The merger shall be subject to the following conditions:

(a)  Compliance with applicable state laws of New York and New Jersey governing the merger of nonprofit corporations. Unless and until the requisite approvals under applicable non-bankruptcy law are obtained, the Debtor shall continue to operate as a corporation separate and apart from ACCJ-RLT, the treatment to creditors shall remain the same, except that the claim of ACCJ-RLT shall be subordinated to the claims of other creditors and be included in Class 4 of the Plan. Within 30 days of Confirmation, the Debtor shall make application to retain special counsel to assist in in obtaining state law approval of the Merger. Within 30 days of entry of a retention order approving the retention of such counsel, the appropriate motion or pleading shall be filed in the Supreme Court of the State of New York requesting approval of the Merger. The deadlines set forth in this paragraph may be extend for good cause shown upon request made prior to the expiration of the applicable time period.

3. **Post-Confirmation Management**. The management of the Reorganized Debtor shall be under the direction of a board of directors ("Board"). The Board shall be comprised of individuals, the majority of whom are individuals who are independent and have had no prepetition affiliation with the Debtor. Any vacancy on the Board shall be filled only by such independent directors.

3.1 **Board of Directors:** The following tables sets forth the post-confirmation composition of the slate of directors and officers of the Debtor between the date of Confirmation and the Merger, and their annual compensation.

| Name | Prepetition Compensation | Post-Confirmation Compensation |
|---|---|---|
| Hon., James Clyne, J.S.C., retired | 0.00 | 18,000.00* |
| Donald Steckroth, U.S.B.C., retired | 0.00 | 18,000.00* |
| Hon. Janet Eisenberg, N.Y. Ad. L. J., retired | 0.00 | 18,000.00* |
| * Assuming attendance at 1 meeting per month and to be adjusted commensurate with time spent which will be significantly more in the first few months after confirmation | | |

3.2 **Officers:**

| Name/Title | Prepetition Compensation | Post-Confirmation Compensation |
|---|---|---|
| Eliezer Perr, President | $200,000.00 | 0.00 |
| Neal Sher, secretary/general counsel | $150,000.00 | $150,000.00 |
| Harris Tanenbaum, treasurer/controller | 0.00 | $60,000.00 |

3.3 **Post-Merger**. After the merger, the following table sets forth the post-confirmation composition of the slate of directors and officers of the Reorganized Debtor and their annual compensation.

| Name | Prepetition Compensation | Post-Confirmation Compensation |
|---|---|---|
| Hon. James Clyne, J.S.C., retired | 0.00 | 18,000.00* |

| | | |
|---|---|---|
| Hon. Donald Steckroth, U.S.B.C., retired | 0.00 | 18,000.00* |
| Hon. Janet Eisenberg, N.Y. Ad. L. J., retired | 0.00 | 18,000.00* |
| * Assuming attendance at 1 meeting per month and to be adjusted commensurate with time spent which will be significantly more in the first few months after confirmation | | |

.

3.4 **Officers:**

| Name/Title | Prepetition Compensation | Post-Confirmation Compensation |
|---|---|---|
| Jedd Perr, President | 198,000.00* | 198,000.00 |
| Neal Sher, secretary/general counsel | 150,000.00 | 150,000.00 |
| Harris Tanenbaum, treasurer/controller | 60,000.00 | 80,000.00 |

* Paid by ACCJ-RLT

4. **Disbursing Agent**. The Debtor's attorney shall act as the disbursing agent for the purpose of making the initial distributions to be paid on the Effective Date. The Disbursing Agent shall post no bond and shall receive compensation for distribution services rendered and expenses incurred pursuant to the Plan at its normal hourly rates. Subsequent payments under the Plan will be made by the Reorganized Debtor.

5. **Transfer Taxes.** The issuance, transfer, or exchange of any of the securities. issued under, or the transfer of any other assets or property pursuant to or in connection with the Plan or the making or delivery of an instrument of transfer under or in connection with the Plan shall not, pursuant to section 1146 of the Bankruptcy Code, be taxed under any law imposing a stamp tax, transfer tax or other similar tax.

6. **Effectuating Documents and Further Transactions**.   The President, Treasurer or Secretary of the Debtor shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures, and other agreements or documents and take or direct such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Secretary or any Assistant Secretary of any Debtor shall be authorized to certify or attest to any of the foregoing actions.

7. **Corporate Action.**   All matters provided for under the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, or any corporate action to be taken by, or required of the Debtors or the Reorganized Debtors shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the stockholders or directors of any of such entities.

8. **Delivery of Distributions.**   Distributions to holders of Allowed Claims shall be made by the Disbursing Agent (a) at the holder's last known address, or (b) at the address in any written notice of address change delivered to the Disbursing Agent or the Debtor.  If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made, unless and until the Disbursing Agent is notified of such holder's then current address, at which time all missed distributions shall be made to such holder without interest.  Amounts in respect of undeliverable distributions made through the Disbursing Agent shall be returned to the Reorganized Debtor until such distributions are claimed or become unclaimed property.

9. **Unclaimed Property**.  Any Cash, assets and other property to be distributed on account of any Claim under the Plan that remain unclaimed (including by an Entity's failure to

negotiate a check issued to such Entity) or otherwise not deliverable to the Entity entitled thereto before the later of (a) one year after the date of distribution or (b) 120 calendar days after an order allowing such Entity's Claim becomes a Final Order, shall become vested in, and shall be transferred and delivered to, the Reorganized Debtors.  In such event, such Entity's Claim shall no longer be deemed to be Allowed and such Entity shall be deemed to have waived its rights to such payments or distributions under the Plan pursuant to section 1143 of the Bankruptcy Code and shall have no further Claim in respect of such distribution and shall not participate in any further distributions under the Plan with respect to such Claim.

**E. Other Provisions of the Plan.**

**1. Executory Contracts and Unexpired Leases.** The Plan provides that all Executory Contracts and Unexpired Leases, except for those specifically assumed by the Debtor in writing, in the Plan, or previously assumed by Court Order, shall be deemed rejected. All proofs of claim with respect to claims arising from said rejection must be filed with the Bankruptcy Court within the earlier of (i) the date set forth for filing claims in any order of the Bankruptcy Court approving such rejection or (ii) thirty (30) days after the Confirmation Date. Any such claims, proofs of which are not filed timely, will be barred forever from assertion.

1. Assumptions. The following are the unexpired leases and executory contracts to be assumed as obligations of the reorganized Debtor under this Plan: all Claimant and Center Agreements.

2. Rejections. On the Effective Date, all executory contracts not assumed shall be deemed to be rejected. The order confirming the Plan shall constitute an order approving the rejection of the lease or contract. If you are a party to a contract or lease to be rejected and you object to the

rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan. See Disclosure Statement for the specific date. **THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM ARISING FROM THE REJECTION OF A LEASE OR CONTRACT IS UP TO AND INCLUDING SIXTY (60) DAYS FOLLOWING THE ENTRY OF THE CONFIRMATION ORDER.** Any claim based on the rejection of an executory contract or unexpired lease will be barred if the proof of claim is not timely filed unless the Court later orders otherwise.

**2. Changes in Rates Subject to Regulatory Commission Approval.** This Debtor is not subject to governmental regulatory commission approval of its rates.

**3. Retention of Jurisdiction.** The Court shall retain jurisdiction of this case pursuant to the provisions of Chapter 11 of the Bankruptcy Code, pending the final allowance or disallowance of all Claims affected by the Plan, and to make such orders as are necessary or appropriate to carry out the provisions of this Plan. In addition, the Court shall retain jurisdiction to implement the provisions of the Plan in the manner as provided under Section 1142, sub-paragraphs (a) and (b) of the Bankruptcy Code. If the Court abstains from exercising, or declines to exercise jurisdiction, or is otherwise without jurisdiction over any matter set forth in this Section, or if the Debtor or the reorganized debtor elect to bring an action or proceeding in any other forum, then this Section shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court, public authority or commission having competent jurisdiction over such matters.

**4. Procedures for Resolving Contested Claims.** The Debtor and/or the Disbursing Agent shall have 60 days subsequent to confirmation to object to the allowance of claims. The Proponent has reviewed the claims that have been filed and has filed objections to several claims, some of which have been resolved by the entry of orders expunging certain claims. Other objections are still

pending and will be litigated or settled as the case may be after Confirmation. The Proponent reserves the right to object to the amount of the claims of Michael Engelberg and the Campuzano Claimants.

**5. Effective Date.** The Plan will become effective on the Effective Date which is the date 30 days after entry by the Bankruptcy Court of the order of confirmation.

**6. Modification.** The Plan Proponent may alter, amend or modify the Plan at any time prior to the Confirmation Date and thereafter as provided in Section 1127(b) of the Bankruptcy Code.

**F. Tax Consequences of Plan.** CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS. The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers to possible tax issues this Plan may present to the Debtor. The Proponent CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action.

1. Federal Income Tax Consequences to the Debtor. Since the Debtor may not repay all creditors in full immediately, the difference between payment in full and the present value of the amount to be paid under the Plan will be treated as cancellation of indebtedness income under § 108 of the IRC. The Debtor will not have to pay income taxes on account of such cancellation of indebtedness income.

2. Federal Income Tax Consequences to Holders of Allowed Claims. Holders of Allowed Claims are likely to recognize a gain or loss equal to the amount realized under the Plan in respect of their Claims less their respective tax bases in their Claims. The amount realized for this purpose

will generally equal the sum of the cash, discounted to present value, received by holders under

the Plan in respect of their Claims.  Any gain recognized by the holder of an Allowed Claim will

generally be treated as capital gain, provided that the Claim represented a capital asset in such

holders' hands.  The character of any gain or loss recognized will also depend on a number of other

factors, including the tax status of the holder, whether the Claim was purchased at a discount, and

whether and to what extent the Holder has previously claimed a bad debt deduction with respect

to the Claim.  The capital gain will be considered long term with respect to Claims held for more

than one year, and short term with respect to claims held for one year or less.  The holders'

aggregate tax basis for any consideration received under the Plan will generally equal the amount

realized.  The holding period for any consideration received under the Plan will generally begin

with the date following the receipt of such consideration.

Holders of Allowed Claims not previously required to have included in their gross income

any accrued but unpaid interest on a Claim may be treated as receiving taxable interest income to

the extent any consideration received under the Plan is allocable to such interest.  Holders

previously required to include in their gross income any accrued but unpaid interest on a Claim

may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the

Plan.  Holders of Allowed Claims constituting installment obligations for tax purposes may be

required to recognize currently any gain remaining with respect to the obligations if pursuant to

the Plan the obligation is considered to be satisfied at other than its face value, distributed,

transmitted, sold or otherwise disposed of within the meaning of section 453( b) of the IRC.

A holder who under the Plan receives in respect of its Allowed Claim an amount less than

the holders' tax basis in such Claim may be entitled in the year of receipt or in an earlier year to a

bad debt deduction in some amount under Section 166 of the IRC or a worthless securities

36

deduction under Section 165 (g) of the IRC.  A holder of an Allowed Claim may be entitled to a bad debt deduction with respect to such Claim only if (a) such holder is a corporation, or (b) such Claim constituted a debt either (i) created or acquired (as the case may be) in connection with a trade or business of such holders or (ii) debt the loss from the worthlessness of which is incurred in such Holder's trade or business.  A holder that has previously recognized a bad debt deduction with respect to its Claim, however, may be required to include in its gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the holders' adjusted basis in such Claim.

**G. Risk Factors.** The following discussion is intended to be a non-exclusive summary of certain risks attendant upon the consummation of the Plan. You are encouraged to supplement this summary with your own analysis and evaluation of the Plan and Disclosure Statement, in their entirety, and in consultation with your own advisors. Based on the analysis of the risks summarized below, the Plan Proponent believes that the Plan is viable and will meet all requirements of confirmation:

**1.** There is a risk that the future revenues of the Reorganized Debtor will be insufficient to pay the amount, if any, that will be owed to creditors after the initial distributions from the Peterson Fund. This risk will be much greater if the Court determines that the Campuzano Claimants have an enforceable lien in the Debtor's interest in the Peterson Fund.

**2.** Another factor which will affect the amounts creditors receive is the outcome of the claims allowance process. Claims totaling over $100,000,000.00 have been filed. The Debtor is challenging the bulk of these claims. The final universe of Allowed Claims will affect whether Allowed Claims will be paid in full from the Peterson/Clearstream Share or will have to hope that the Debtor's future Net Revenue will be sufficient to provide for substantial payments.

**IV.**
**CONFIRMATION REQUIREMENTS AND PROCEDURES**

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THIS PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims. The proponent CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic. Many requirements must be met before the Bankruptcy Court can confirm a Plan. Some of the requirements include that the Plan must be proposed in good faith, that creditors or interest holders have accepted the Plan, that the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and that the Plan is feasible. These requirements are not the only requirements for confirmation.

**A. Who May Vote or Object**

**1. Who May Object to Confirmation of the Plan.** Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

**2. Who May Vote to Accept/Reject the Plan.** A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim that is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.

**a. What Is an Allowed Claim/Interest.** As noted above, a creditor or interest holder must first have an allowed claim or interest to have the right to vote. Generally, any proof of claim or interest will be allowed, unless a party in interest brings a motion objecting to the claim. When an objection to a claim or interest is filed, the creditor or interest holder holding the claim or interest

38

cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection or allows the claim or interest for voting purposes. **THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE WAS JULY 18, 2018.** A creditor or interest holder may have an allowed claim or interest even if a proof of claim or interest was not timely filed. A claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim. An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest.

      **b. What Is an Impaired Claim/Interest**. As noted above, an allowed claim or interest only has the right to vote if it is in a class that is impaired under the Plan. A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class. For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the members of that class 100% of their claim plus interest. In this case, the Proponent believes that classes ONE, TWO, THREE and FOUR are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan. Parties who dispute the Proponent's characterization of their claim or interest as being impaired or unimpaired may file an objection to the Plan contending that the Proponent has incorrectly characterized the class.

**3. Who Is Not Entitled to Vote.** The following four types of claims are not entitled to vote: (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to Code Section 507(a)(1), (a)(2), and (a)(8)**;** and (4) claims in classes that do not receive or retain any value under the Plan. Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Code Section 507(a)(1), (a)(2), and (a)(7) are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Code. Claims in classes

that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan. EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

**4. Who Can Vote in More Than One Class.** A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim.

**5. Votes Necessary to Confirm the Plan.** If impaired classes exist, the Bankruptcy Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting classes, as discussed later in Section (IV.A.8.).

**6. Votes Necessary for a Class to Accept the Plan.** A class of claims is considered to have accepted the Plan when more than one-half (½) in number and at least two-thirds (b) in dollar amount of the allowed claims that actually voted, voted in favor of the Plan. A class of interests is considered to have accepted the Plan when at least two-thirds (b) in amount of the allowed interest-holders of such class which actually voted, voted to accept the Plan.

**7. Treatment of Nonaccepting Classes.** As noted above, even if all impaired classes do not accept the proposed Plan, the Bankruptcy Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner required by the Code. The process by which nonaccepting classes are forced to be bound by the terms of the Plan is commonly referred to as "cramdown". The Code allows the Plan to be "crammed down" on nonaccepting classes of claims or interests if it meets all consensual requirements except the voting requirements of Section 1129(a)(8) and if the Plan

does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has

not voted to accept the Plan as referred to in 11 U.S.C. §1129(b) and applicable case law.

**8. Request for Confirmation Despite Nonacceptance by Impaired Class(es).** The party

proposing this Plan asks the Bankruptcy Court to confirm this Plan by cramdown on impaired

classes if any of these classes do not vote to accept the Plan.

**B. Liquidation Analysis.** Another confirmation requirement is the "Best Interest Test", which

requires a liquidation analysis. Under the Best Interest Test, if a claimant or interest holder is in an

impaired class and that claimant or interest holder does not vote to accept the Plan, then that

claimant or interest holder must receive or retain under the Plan property of a value not less than

the amount that such holder would receive or retain if the Debtor were liquidated under Chapter 7

of the Bankruptcy Code.

In a Chapter 7 case, the Debtor's assets are usually sold by a Chapter 7 trustee. Secured

creditors are paid first from the sales proceeds of properties on which the secured creditor has a

lien. Administrative claims are paid next. Next, unsecured creditors are paid from any remaining

sales proceeds, according to their rights to priority. Unsecured creditors with the same priority

share in proportion to the amount of their allowed claims. Finally, interest holders receive the

balance that remains after all creditors are paid, if any.

In order for the Court to be able to confirm this Plan, the Court must find that all creditors

and interest holders who do not accept the Plan will receive at least as much under the Plan as such

holders would receive under a Chapter 7 liquidation. This requirement is not even applicable

because nonprofit corporations such as the Debtor do not have interest holders (stockholders) and

because cannot be Chapter 7 debtors absent their consent, and the Debtor would never consent to

Chapter 7 liquidation.

Assuming that  the Debtor would liquidate under Chapter 7, the Plan Proponent maintains

that this requirement is met here for the following reasons: if a Chapter 7 trustee were to liquidate

the assets of the Debtor, he or she would proceed precisely as the Debtor is proceeding under the

Plan, that is, litigate the extent and validity of the secured claim filed by the Campuzano Claimants,

collect the Debtor's interest in the Clearstream Account, and distribute it in accordance with the

hierarchy mandated by the Code. In Chapter 7 however, the claims of insiders would not be

voluntarily subordinated, the merger with ACCJ-RLT would not be achieved, if at all,  without

protracted and expensive litigation, the trustee would hire her/his own counsel and accountants,

all at considerable expense, and then would litigate the validity of claims and finally distribute

funds which would add many months, if not years, to the time when creditors would finally receive

payments. In addition, the Trustee would not continue to operate the Debtor's business and pursue

recoveries for victims and there would be no future revenues. If the sum total of Allowed unsecured

claims is less than the Peterson/Clearstream Share, all unsecured claims will be paid in full, and

creditors will receive at least as much as they would receive in Chapter 7. If, however, the universe

of Allowed Claims exceeds the Peterson/Clearstream Share, creditors will have to hope that future

revenues or perhaps the DLA Litigation generates additional funds. In Chapter 7 however, the

business of the Debtor will not be operated and there will be no future revenues. A Chapter 7

trustee is unlikely to pursue the DLA Litigation as the Debtor has not even determined whether it

is worthwhile to do so. Consequently, the Peterson/Clearstream Share would as a practical matter

be the sole source for payment to creditors, and that fund would be further reduced by the

administrative expenses of the Chapter 7 trustee and her/his professionals. The Plan does all of

what a trustee would do and more, and does it sooner, and at less cost. Thus, regardless of the

financial condition of the Debtor, creditors will receive more than they ever would if the Debtor
waived its rights and acceded to liquidation under Chapter 7.

**C. Feasibility.** A requirement for confirmation involves the feasibility of the Plan, which means
that confirmation of the Plan is not likely to be followed by the liquidation or the need for further
financial reorganization of the Debtor or any successor to the Debtor under the Plan, unless such
liquidation or reorganization is proposed in the Plan. There are at least two important aspects of a
feasibility analysis.

(1) The first aspect considers whether the Debtor will have enough cash on hand on the
Effective Date of the Plan to pay all the claims and expenses that are entitled to be paid on such
date. The Plan Proponent maintains that this aspect of feasibility is satisfied as illustrated here:

| DEBTOR PRE-MERGER | |
|---|---:|
| Cash Debtor will have on hand by Effective Date (assuming 12/31/2018) | |
| **From** Net Revenues | $ 1,221,926.00 |
| **From** Peterson/Clearstream Share (approximate) | 24,000,000.00 |
| TOTAL | 25,221,926.00 |
| **LESS** | 1,0000 |
| **To Pay:** Statutory costs & charges | |
| **To Pay:** Expenses of Administration | |
| to Broege, Neumann, Fischer & Shaver, LLC (estimated) | 150,000.00 |
| to Bederson & Company, LLP (estimated) | 75,000.00 |
| **To Pay:** Plan Payments due on Effective Date - | 24,000,0000.00 |
| Balance after paying these amounts | $995,926.00 |

| REORGANIZED DEBTOR POST-MERGER | $3,000,000.00 |
|---|---|

(2) The second aspect considers whether the Proponent will have enough cash over the life of the Plan to make the required Plan payments. The Proponent believes that this second aspect of the feasibility requirement is met for the following reasons: the cash requirements of the Plan are met by obtaining the Peterson/Clearstream Share. If it is determined that the Campuzano Claimants do not hold an unavoidable lien, the entire amount – approximately $24,000,000 with interest) will fund the Plan. If it is determined that the Campuzano Claimants hold an unavoidable lien on the Peterson/Clearstream Share, there will still be more approximately $8,000,000 remaining to fund payments to other creditors. Future payments

## V.
## EFFECT OF CONFIRMATION OF PLAN

**A. Discharge.** The Plan provides that upon confirmation of the Plan, the Debtor shall not be discharged of liability for payment of debts incurred before confirmation of the Plan, to the extent specified in 11 U.S.C. §1141. The provisions of the Plan shall be binding upon Debtor, all Creditors and all Equity Interest Holders, regardless of whether such Claims or Equity Interest holders are impaired or whether such parties accept the Plan, upon Confirmation thereof.

**B. Revesting of Property in the Debtor. T**he confirmation of the Plan revests all of the property of the estate in the Debtor.

**C. Modification of Plan.** The Proponent may modify the Plan at any time before confirmation. However, the Bankruptcy Court may require a new disclosure statement and/or revoting on the Plan if Proponent modifies the plan before confirmation. The Proponent may also seek to modify the Plan at any time after confirmation so long as (1) the Plan has not been substantially consummated and (2) the Bankruptcy Court authorizes the proposed modification after notice and

a hearing. Proponent further reserves the right to modify the treatment of any Allowed Claims at any time after the Effective Date of the Plan upon the consent of the Creditor whose Allowed Claim treatment is being modified, so long as no other Creditors are materially adversely affected.

**D. Post-Confirmation Conversion/Dismissal.** A creditor or party in interest may bring a motion to convert or dismiss the case under Section 1112 (b), after the Plan is confirmed, if there is a default in performance of the Plan or if cause exists under Section 1112(b). Quarterly fees pursuant to 28 U.S.C. § 1930(a)(6) continue to be payable to the Office of the United States Trustee post-confirmation until such time as the case is converted, dismissed, or closed pursuant to a final decree.