| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY**<br><br>Timothy P. Neumann, Esq. [TN6429]<br>BROEGE, NEUMANN, FISCHER & SHAVER, LLC<br>25 Abe Voorhees Drive<br>Manasquan, New Jersey 08736<br>Tel: (732) 223-8484<br>Email: Timothy.neumann25@gmail.com<br><br>*Attorneys for Debtor/Debtor-in-Possession*<br>*American Center for Civil Justice, Inc.* | |
| In Re<br><br>**AMERICAN CENTER FOR CIVIL JUSTICE, INC.,**<br><br>   Debtor. | CHAPTER 11<br><br>CASE NO.: 18-15691/CMG<br><br>Judge: Hon. Christine M. Gravelle |

**CERTIFICATION OF JED PERR IN SUPPORT OF MOTION TO QUASH JANUARY 15, 2019 SUBPOENA SERVED ON MARCUS OWENS**

Jed Perr, of full age, hereby certifies as follows:

1. I have read the certification of Jeffrey Livingston and his brief in which he argues that he should not be barred by the attorney client privilege from obtaining information from the Debtor's prior counsel because the Debtor – or more precisely my father, me and possibly Neal Sher – concealed from the IRS that $2,000,000 of fees arising from the Collett case had been improperly diverted to American Center for Civil Justice, Religious Toleration & Liberty, Inc. ("RLT") and that Michael Engelberg ("Engelberg"), knew nothing about it.

2. Marcus Owens, a tax attorney and the former head of the IRS tax exempt division, represented the Debtor prepetition in connection with several matters, including an audit by the IRS, dealing with the Office of the New York Attorney General, and also in the Engelberg Derivative Action in the Supreme Court of New York.

3. Marcus Owens succeeded Joann Luehring, an attorney with the law firm of Roberts & Holland. Ms. Luehring was involved in formulating a response to a request for information from the IRS.

4. Annexed hereto as Exhibit A is a copy of an email from Ms. Luehring dated October 2, 2012 addressed "To: 'michael@centerforciviljustice.org'; 'perr@acenter.org'" The first email address is that of Michael Engelberg and, although the email names my father as an addressee, the second email address is mine. In her email, Ms. Luehring states:

> Maria Bianco, the current agent on the audit, has asked for a list of activities engaged in by the Center other than it *(sic)* involvement in the Franqui case. I have prepared such a list and description, but would like you to review and approve it before I send it.

5. At the very bottom of the email is an icon for a Word document identified as "00280036.DOC."

6. Annexed hereto as Exhibit B is a copy of that document. It is a draft of a memo to be sent to the IRS that was prepared by Ms. Luehring. At the bottom of page 2 and continuing on to page 3, it states:

> Following is a partial list of additional cases and their outcomes that the Center helped to bring about, through provision of research and investigation and the location of amenable law firms. **In none of these cases did or will the Center receive reimbursement for its costs and expenditures or otherwise receive any monies**:
>
> 1. Flatow v. Iran:  $26 million has been paid to victims and lawyers; nothing to the Center;
> 2. Eisenfeld v. Iran:  $27+ million has been collected by others;
> 3. Weinstein v. Iran:  No collection on $41 million judgment;
> 5. Stern v. Iran:  $310 million judgment, no collection;
> 6. Bombing of the AMIA Jewish Center in Argentina;
> 7. Bombing of USS Cole;
> 8. Mumbai massacre;
> 9. **Collett v. Libya**; Center helped bring about the recent return of the body of a journalist who was killed in Lebanon in 1985; and
> 10. Empire State Building shooting in 1997.    *(emphasis supplied)*

7. Prominently described is the Collett case and it is clearly stated that it is among the cases in which the Debtor will not receive any funds.

8. Michael Engelberg received a copy of that email from Ms. Luehring. I cannot say whether he bothered to read the email or not, but the notion that I or my father or Neal Sher was concealing information from him is belied by this email.

9. Annexed hereto as Exhibit C is a copy of a fax sent to the IRS by Ms. Luehring dated October 5, 2012. It states precisely the same thing as 00280036.DOC with respect to the Collett case – that the Debtor did not receive any monies. Michael Engelberg was one of the people copied on that fax.

10. Annexed hereto as Exhibit D is an email from JoAnn confirming she received Michael Engelberg's comments on the Memo prior to sending the Memo to the IRS. Engelberg claims to have discovered the missing money in September 2012, this confirmation and the IRS Memo were a month later.

11. Annexed hereto as Exhibit E is an excerpt from the verified complaint in the prepetition derivative action filed by Engelberg. In Para 98 he acknowledges that he was working closely with JoAnn Luring. Yet he claims to have supposedly raised the subject of the missing Collett money when all along the fact that the Debtor had not received the Collett money was conspicuously evident. As shown above this is yet another lie.

12. Annexed hereto as Exhibit F is a copy of correspondence from Michael Engelberg to Ms. Luehring dated March 27, 2012, six months earlier, in which he states that of all the cases in which the Debtor was assisting victims, "In only **two** of the many cases has the Center received any of the pledged monies," and goes on to list other cases in which the Debtor received no money, including Collett v Libya.

13. Michael Engelberg makes that statement and yet he personally signed a receipt for $2,010,000.00 in 2009 for the fees arising from the Collett case. That receipt is annexed hereto

as Exhibit G is a copy of that receipt which was marked at his deposition in this case as Exhibit 14.

14. Exhibit H is a copy of a letter addressed to Michael Engelberg enclosing 4 checks totaling $2,010,000.00 addressed to him.

15. Annexed hereto as Exhibit I (bottom of page 2) is an email from Michael Engelberg acknowledging receipt of the ACCJ IRS tax return form 990 (Exhibit J) for the period ending 3/31/2011 and mentioning that there are a "few typos." The 990's first page clearly shows that the ACCJ previously only received $7,360,000 which represents the money from the Franqui case. Engelberg would have been well aware of this. See page 4, Part IV question #28 ACCJ of the 990 which is answered "no". See page 6 Part IV Section A #2 "no", question #5 "No". See Section B # 11a ACCJ provided a copy of the 990 to all Board members, see also see the accompanying Schedule O (page 33) describing the process of the entire board reviewing the completed Return. Cleary if Engelberg read the return closely enough to detect typographical errors, he certainly would have discerned that there was over $2 million missing, if it really was missing. See #12 of the 990 stating that the ACCJ had a Conflict of Interest Policy signed by all Board members. Furthermore, it's clear that Jed Perr sent Engelberg the return and therefore was hiding nothing from Engelberg.

16. Attached as Exhibit K is a copy of the previous year's 990 showing once again the income of $7,360,000. Engelberg is now denying the veracity of two tax returns although he was on the Board when both were filed and carefully scrutinized at least one of them.

17. Annexed as Exhibit L is a copy of testimony of Engelberg in which he states that I am not a part of the Debtor and that RLT is a different organization.

18. How can he reconcile his receipt of $2,010,000 from the Collett case with his own statements that the Debtor received no money from the Collett case and his acquiescence in statements to the IRS that the Debtor received no money? The answer is obvious – he was aware that the Collett money had been paid to RLT. And that leads to the conclusion that if there was a fraud or crime being perpetrated against the IRS, he was very much at the heart of it. Michael Engelberg was intimately involved in formulating responses to the IRS information requests. Ms. Luehring always sought his input. He reviewed the tax returns which did not include as revenue the Collett money.

19. In fact, there was no fraud and no crime. Engelberg knew that the Collet money had been paid to RLT and he knew that the IRS was being advised that the Debtor did not receive those funds and he raised no objection at the time.

20. Furthermore, payment of the Collett money to RLT was not a fraud on the IRS. Both entities are exempt from tax and whether the Debtor or RLT received the money was of no consequence to the IRS. The fact that RLT received the Collett money was disclosed to the IRS in the Debtor's response to the Information Document request ("IDR") sent by the IRS. As is easily discerned from the April 23, 2012 email from Joann Luehring (Exhibit M), the IRS audit was focused on the nature of the Debtor's activities and whether they were such that the income derived from those activities was exempt. The IRS was contending that the Debtor should have been subject to corporate tax which, if successful, would have cost the Debtor millions of dollars in tax, interest and penalties. The Debtor changed lawyers when, two years into the audit, Joann Luehring was not able to convince the IRS that the Debtor was entitled to exempt status. Marcus Owen, once hired, sent a lengthy memo to the IRS and relatively quickly convinced the IRS that the Debtor was entitled to its exempt status.

21. Mr. Livingston's fanciful theory of a crime is merely an after-the-fact concoction.

22. As is apparent from the demands Engelberg has made in this case, as well the longstanding fraudulent manner in which he has been running the New York Center. he is and has been driven by self-interest and avarice. His repeated claim that his primary goal is enhance the Debtor's governance is demonstrably disingenuous and is the height of chutzpah. For example, at his August 31, 2017 deposition (Exhibit N, pp.907-924) Engelbeg admits as president of his New York Center to taking salary and pension, including writing checks to himself, without board approval. Indeed, for many years he held no board meetings and had no contact with board members. In fact, Judge Bucaria of the New York Supreme Court found that there was substantial evidence that the New York Center abused its tax exempt status.

23. He accuses my father and I of using the Debtor for our personal benefit when it is he who has received far more than either of us. In the New York litigation, he alleged that my father and I had diverted money to other charitable entities for our personal benefit. The New York Attorney General found this accusation to be entirely false. As has been apparent from the demands Engelberg has made in this case, his real and only agenda is greed.

24. The IRS closed its audit and the Debtor's tax-exempt status remained intact. The New York Attorney General was a party to the New York litigation and was aware of the outrageous allegations made by Engelberg and the court-ordered accountings that were produced by the Debtor and RLT. And yet only Engelberg believes that a crime or fraud was perpetrated.

25. There was no crime, no fraud, no concealment, and no basis for depriving the Debtor or RLT of the attorney client privilege.

26. RLT and the Debtor entered into an agreement in 2007 for RLT to undertake the work of endeavoring to collect on the judgments that the Debtor had obtained for claimants. Annexed hereto as Exhibit O is a copy of the minutes of the board meeting authorizing the Debtor to enter into that agreement.

27. Responding to Livingston regarding my father's 2009 Affidavit, annexed hereto as Exhibit P is the March 2007 meeting Livingston himself mentions. Mr. Leiman was voted for a 2-year term expiring March 2009. Milton Pollack at that time is Chair of Board and President (interesting that Livingston is using these Minutes as his proof, these Minutes say the By Laws - which say no Membership - were renewed. Engelberg denies these Minutes as being true and says these Board members are not valid. Livingston himself writes in this Brief that we can't have it both ways. So does Livingston admit that these minutes are genuine?).

28. Annexed as Exhibit Q are copies of the May 2008 Annual Minutes which Eliezer Perr signed as Secretary making him an officer, not a board member. Note that in the 2007 although my father was nominated to be Secretary it is not clear from any documents that in fact when the 2007 Agreement was approved, that in fact my father already accepted the position and began to act as an "official" as Livingston contends in his Brief. Besides that, in the IRS declaration my father states that he was neither "official" nor Board ...therefore did not vote on approval of Agreement". The term "official" ambiguous and can mean many things. Its not a formal title and by itself does not connote someone with authority to vote. Only the Board held that authority, my father held no official position with voting power.

29. Annexed as Exhibit R are copies of the January 2009 Minutes which reflect that because Joshua Leiman had passed away in December, 2008, pursuant to the By Laws, Mark Hirschman was appointed to fill the remaining portion of the term of Mr. Leiman, until March 2009.

30. In April 2009, Eliezer Perr signs a Declaration, (Exhibit S annexed hereto) stating "I have served on the Board since formation in 1996, I have at various times served as the President and I currently serve on its Board". Note that the last words added "I currently serve on the Board" implies that he was not continuously on the Board, but rather that he was on and off

the board.  My father joined for the board for one month, April 2009, filling a vacant seat as New York law requires at least three Board Members and for that one month there was a vacancy.

31. Annexed hereto as Exhibit T are the May 2009 Annual Minutes, showing that Eliezer Perr served as Secretary, not as a board member. Again, in accordance with By Laws, since Hirchhorn's position filling Mr. Leiman's seat expired, he was elected to serve until 2012. My father was elected to serve as Secretary for 2 years.

32. My father was then elected to serve as Executive Director at a salary of $150,000 a year after many years of no pay.

33. The May 2010 Minutes, (annexed hereto as Exhibit U) which are signed by Engelberg as well, shows my father was now voted to join the Board. Also, Milton Pollack asked my father to take over as President and Chairman. In the May 2009 Pollack was president so my father wasn't in charge anytime until May 2010. Annexed as Exhibit V is the Conflict disclosure signed in May 2010 when Engelberg and Eliezer Perr joined Board.

34. I also annex as Exhibit W the By Laws approved on 3/2007.

35. Engelberg argues that the attorney-client with respect to the relationship between the Debtor and Marcus Owens was waived, but everything he invokes to support that contention involves communications with JoAnn Luehring. How does that apply to the Marc Owens Privilege? Marc Owens was the attorney for the Debtor. I could not waive the Debtor's privilege. My involvement in the Debtors audit was on a voluntary basis to assist but I had no official position that would have vested me with authority to waive anything.

I certify that the above statements are true. I acknowledge that if any of the above statements are willfully false, I am subject to punishment.

Dated: March 8, 2019

By: /s/ Jed Perr
Jed Perr