| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY**<br><br>Timothy P. Neumann, Esq. [TN6429]<br>Broege, Neumann, Fischer & Shaver, LLC<br>25 Abe Voorhees Drive<br>Manasquan, New Jersey 08736<br>Tel: (732) 223-8484<br>Email: timothy.neumann25@gmail.com<br><br>*Attorneys for Debtor/Debtor-in-Possession*<br>*The American Center for Civil Justice, Inc.* | |
| In Re<br><br>**AMERICAN CENTER FOR CIVIL JUSTICE, INC.,**<br><br>    Debtor. | CHAPTER 11<br><br>CASE NO.: 18-15691/CMG<br><br>Judge: Hon. Christine M. Gravelle |

**MEMORANDUM OF LAW REGARDING ATTORNEY/CLIENT AND
WORK PRODUCT PRIVILEGE**

Michael Engelberg, through his counsel, contends that the attorney client privilege and the work product privilege are not available to the Debtor because the privileges have been waived, or because the crime/fraud exception applies. The Debtor disputes Engelberg's contentions because the alleged waiver is predicated on the deposition testimony of Jed Per who was testifying in response to subpoenas served on the American Center for Civil Justice, Religious Liberty & Tolerance, Inc. ("RLT). The actual testimony appears as Exhibit I to the certification of Jeffrey Livingston. There is no attorney client privileged communication in that testimony and hence no waiver.

More importantly, the privilege applies to a specific attorney-client relationship, not a topic, and it applies to specific communications between the attorney and client. Assuming

arguendo that the privilege was waived as to JoAnn Luehring, that does not constitute a waiver as to Marcus Owens, who succeeded her as the tax counsel. Engelberg argues that because Jed Perr testified about the IRS audit, the privilege has been waived. In order for his waiver argument to hold water, he would have to point to specific instances in which Jed Perr, in his testimony, referred to specific and otherwise-privileged communications with an attorney that was in an attorney-client relationship with him or an organization that he was representing.

Engelberg also argues that the crime-fraud privilege applies to deprive the Debtor of the attorney client privilege. The crime-fraud privilege does not apply in the instant case because no crime or deception occurred. Engelberg asserts that the Debtor made false statements to the IRS which was a violation of 18 U.S.C. § 1001(a) which states:

> (a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--
> (1) falsifies, conceals, or covers up by any trick, scheme, or device a **material** fact;
> (2) makes any **materially** false, fictitious, or fraudulent statement or representation; or
> (3) makes or uses any false writing or document knowing the same to contain any **materially** false, fictitious, or fraudulent statement or entry;
> shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331 [18 USCS § 2331]), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591 [18 USCS §§ 2241 et seq., 2250, 2251 et seq., 2421 et seq., or 1591], then the term of imprisonment imposed under this section shall be not more than 8 years. *(emphasis supplied)*

The word "material" is a conspicuous element of a violation of the statute.

On Friday, March 15, 2019, Engelberg deposed Marcus Owens, the attorney who succeeded JoAnn Luehring, as tax counsel representing the Debtor in an audit by the IRS. According to his *curricula vitae* on the website of his law firm, Mr. Owens, prior to entering

private law practice,

> was employed by the Exempt Organizations Division of the Internal Revenue Service and served as the division's director for ten years. In that capacity, he was the chief decision maker regarding design and implementation of federal tax rulings and enforcement programs for exempt organizations, political organizations and tax-exempt bonds. He also served as the IRS's primary liaison with other federal agencies, Congress, and state regulators on exempt organizations issues.

Mr. Owens was questioned about an email that Engelberg's prior counsel, Jonathon Bach, had sent him accusing the Debtor of concealing information. The relevant testimony starts at page 112, line 19 of the transcript as follows:

> Q      Okay. So in his response, Jonathan Bach had a lot to say about that draft --
>
> A      Uh-huh.
>
> Q      -- is that correct?
>
> A      Correct.
>
> Q      He said in this first paragraph: "We presume you have based your draft on information provided by Rabbi Perr, Jed Perr, and Neal Sher. But we wish to warn you that that information and consequently your factual recitation is erroneous and, indeed, fictitious." Did you read this email?
>
> A      Yes.
>
> Q      And did you take it seriously?
>
> A      I did, because, for reasons I'm happy to explain to you, his characterization is not legally accurate on the tax code.
>
> Q      It's not legally accurate?
>
> A      It's not legally accurate.
>
> Q      In which sense?
>
> A      Well, this was a transfer between two charities. It wasn't a payment from a charity to an individual.
>
> Q      Okay.
>
> A      And the Internal Revenue Code permits charities to transfer money between

  each other. There's no need for a particular justification for him. In other words, it doesn't have to be a contractual agreement. And Mr. Bach is characterizing it, and apparently Mr. Engelberg agrees, there was a transfer.

Q  Pardon me?

A  They are asserting that it was a -- they, I think both of them are speaking -- that it was a transfer from father to son.

Q  And it wasn't a transfer from father to son?

A  It was a transfer from a charity to another charity.

Q  Okay. So it was not a transfer from a father to a son?

A  That's right.

Q  Does that raise any issues, that it was -- that each was associated with one of the two entities between whom the transfer had occurred?

A  It doesn't raise issues under the Internal Revenue Code, because it permits transfers from one charity to another. They can be controlled by the same person. They can be controlled by family members. They can be controlled by third parties. It's a transfer from one charity to another.

Mr. Owens was questioned regarding the absence of the fees generated from the Collet case on the Debtor's tax return. The transcript at p. 140, line 19 states:

Q  All right. Is it also important to the IRS that, in submissions to the IRS such as the submissions in regard to an IDR, that the information submitted be honest and truthful?

A  Yes. Obviously.

Q  All right. And can it be a criminal act to submit false information to the IRS?

A  Could be if it's material.

Q  All right. If it's material – a material intentional lie could be a crime; correct?

A  Correct.

Q  All right. Now, given what you – given what you know and what was reflected in your submission to the IRS, that there was the receipt of $2 million and a recovery for the Collett family members of $10 million, 2 million of which went in the first instance to ACCJ and then to RLT, do you regard this as an honest and truthful statement?

Q   I think it's unclear.

Q   Do you think it's misleading?

A   I don't think it's materially misleading.

Q   You mean an item of $2 million – $10 million to the claimants and $2 million to the ACCJ and then passed on to RLT is not materially misleading?

A   I say it's not materially misleading because it's not material to the IRS concerns here. That's my -- that would be my view. It's a difference, correct. It's a difference. But I don't know that the IRS would have made any decision -- enforcement decision based on knowing that information or not knowing that.

Q   Okay. So, then, how can you give an opinion that it's not material?

A   **Because for purposes of tax-exempt status, it's not material. It's not relevant in determining whether the ACCJ qualifies for tax-exempt status or not**, because –
*(emphasis supplied)*
Q   You mean -- go ahead.

A   -- because there is a long list of tax law precedence that permit organizations to litigate or to fund litigation, to support litigation on behalf of a charitable cause. And protecting, helping people injured in terrorist actions is a charitable cause. So the fact that they receive money or they don't receive money is not as relevant as one might think. Because what is relevant is whether the individuals were victims of terrorism, whether they were injured, and whether the organization is making efforts to seek redress on their behalf. Those are the relevant factors in determining whether the organization is exempt from tax or not.

Q   The IRS wanted to know the facts; right? They wanted to get the truth here, and they asked the question twice. And they didn't – they didn't -- they didn't get the answer in the October 30 memorandum; isn't that right?

A   I disagree with your characterizations that the IRS didn't get the information they needed to make a decision on this examination.

Q   Well, that's hard to know. Now –

A   No, it isn't hard to know.

Q   All right.

A   It actually -- it's actually fairly easy.

Mr. Owens testified that the IRS was concerned with whether the nature of the Debtor's

activities were such that it was entitled to be exempt from taxation. The fact that the Collett money was reported on the tax return of RLT rather than the Debtor was not material to the determination of the Debtor's exempt status, and inter-charity transfers are entirely legitimate under tax law. Whether the 2007 agreement is genuine vel non and the status of Eliezer Perr likewise do not inform the determination of whether the Debtor is entitled to exemption from income tax. Consequently, there was no crime or fraud perpetrated under 11 USC 1001 because the facts that Engelberg alleges were misstated were not material. See, United States v. Deep, 497 F.2d 1316, 1321-22 (9th Cir. 1974):

> [M]ateriality must be demonstrated for a conviction pursuant to section 1001I, 294 F.2d 74, 75 (9th Cir. 1961). The test for determining materiality is
>
>> whether the falsification is calculated to induce action or reliance by an agency of the United States -- is it one that could affect or influence the exercise of governmental functions -- does it have a natural tendency to influence or is it capable of influencing agency decision[.]
>
> United States v. East, 416 F.2d 351, 353 (9th Cir. 1969).

The testimony of Mr. Owens demonstrates beyond doubt that the alleged misinformation given to the IRS was not material and could not therefore be a crime.

Engelberg was deeply involved in the response to the IRS Information Document Requests ("IDR"). The earliest iterations of the memorandum that ultimately went to the IRS were provided to Engelberg and he, at the time, made no protest to the very clear statement that the Debtor received money from only two cases and also enumerated all the other cases, including Collett v Libya, in which the Debtor received no money. Engelberg was personally familiar with the Collett case as it was he that signed the receipt for the fees it generated.

Engelberg has requested in camera review by the Court of documents which the Debtor claims are privileged. Whether such review is appropriate is problematic because if

the Court determines that a given document is privileged, it will have already seen the document. That is particularly troublesome where, as here, the Court is the fact finder. In cases tried to juries, the court can censor what the fact finder sees; not so in non-jury cases. If there is to be in camera review, then another judge should conduct the examination,

The most recent submission on behalf of Engelberg is the March 13, 2019 certification of his counsel, Jeffrey Livingston (the "LC"), which improperly is predominantly legal argument or is not based on first-hand knowledge. One of its principle contentions is that even if Engelberg was aware that the Collett fees were not received by the Debtor, a crime or fraud was nevertheless perpetrated against the IRS (LC at ¶ 6). Engelberg misses the point. The Debtor has brought forth the fact of Engelberg's knowledge not for the purpose of demonstrating Engelberg's complicity in any wrongdoing, but to show that there was no wrongdoing. The Debtor did not receive the Collett fees, RLT did. Those fees were reported on the 990 of RLT. Engelberg admits that. "[T]he Collett and Fischel monies were reported by RLT in its 2009 tax year filing, not by ACCJ in its 2009 tax year filing." The IRS was not defrauded. If Engelberg believed that a fraud was being perpetrated, why didn't he alert the IRS at the time, either in 2009 or when the audit was being conducted in 2013? His silence is evidence that his allegation of wrongdoing is a complete fabrication in a desperate attempt to discredit the Perrs and advance his efforts to gain control of the Debtor and the millions of dollars it will soon have.

The Livingston Certification accurately sets forth the facts that the Colletts' agreement was with the Debtor, that the fees were paid in the form of checks to the Debtor, and that those checks were deposited into the account of RLT. None of those facts are revelatory. The Debtor contends that the payment of the Collett fees to RLT was in payment

for services rendered by RLT in undertaking the time, effort and expense to endeavor to collect the judgments that had been entered in favor of the Debtor's claimants. That is the heart of this dispute.

Engelberg also criticizes the fact that Jed Perr has filed a certification which details the facts surrounding the IRS audit. That criticism is completely disingenuous because Engelberg was at all times aware that Jed Perr was assisting the ACCJ in its response to the audit. It was Jed Perr and Engelberg that were working with tax counsel and therefore it was Jed Perr who has first-hand knowledge of the facts. If anyone is to be criticized on the basis of who they choose to present facts to the Court, it is Engelberg who submits not his own certification but that of Mr. Livingston who has firsthand knowledge of nothing.

LC at ¶ 28 states:

> Exhibit B to the March 8 Certification (Docket No. 354-2) is what Jed says is the draft memorandum attached to Ms. Luehring's October 2, 2012 e-mails. In his certification (¶ 6), Jed quotes from the draft memorandum's brief description of the Collett case as the 9th of 10 listed matters that, according to the memorandum, did not result in "reimbursement [to ACCJ] for it costs and expenditures" or otherwise result in ACCJ receiving "any monies." As shown above, the notion that ACCJ did not realize any recovery from the Collett case is demonstrably false, and Luehring's draft memorandum was in error concerning the Collett case.

This is of course argument and does not belong in a certification and presented as a fact. It does illustrate the effort of Engelberg to distort plain fact. The draft memorandum to the IRS states that the Debtor did not receive any money from the Collett case. Engelberg knows that it did not. The monies were paid to RLT. Had the funds been deposited into the Debtor's account and then paid by the Debtor to RLT, the result would have been the same.

The transfer of the Collett money from one charity to another is not a crime. As testified by Marcus Owens, the former head of the tax exempt division of the IRS, the existence vel non of an enforceable contract was not material information. Its existence might be relevant

to whether RLT holds a valid claim, but it is not a predicate for the invocation of the crime/fraud privilege.

## CONCLUSION

For the foregoing reasons, movants respectfully request that the Court rule that Engelberg has failed to sustain his burden of proving that the crime fraud exception is applicable in this case.

Broege, Neumann, Fischer & Shaver, LLC

*Attorneys for Debtor and Debtor-in-Possession*
*American Center for Civil Justice, Inc.*

By: _____/s/ Timothy P. Neumann_____
Timothy P. Neumann

Dated: March 18, 2019